1   Jeffrey F. Keller, Esq. (SBN 148005)
    jfkeller@kellergrover.com
2   Kathleen R. Scanlan, Esq. (SBN 197529)
    kscanlan@kellergrover.com
3   **KELLER GROVER LLP**
    1965 Market Street
4   San Francisco, CA 94103
    Telephone: (415) 543-1305
5   Facsimile: (415) 543-7861

6   Gordon Schnell (NY Bar No. 2502136)
    gschnell@constantinecannon.com
7   Marlene Koury (NY Bar No. 4423471)
    mkoury@constantinecannon.com
8   **CONSTANTINE CANNON LLP**
    335 Madison Avenue
9   New York, NY 10017
    Telephone: (212) 350-2700
10   Facsimile: (212) 350-2701

11   Attorneys for Relator

**FILED**

2015 MAR -6 P 3 34

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

**SEALED
BY COURT ORDER**

**JD**

12        IN THE UNITED STATES DISTRICT COURT

13        NORTHERN DISTRICT OF CALIFORNIA

**CV 15 1062**

14

15   [UNDER SEAL]

16

17           Plaintiff,

     v.

18

19   [UNDER SEAL]

20

21          Defendants.

22

CASE NO.

***FILED IN CAMERA AND UNDER SEAL
DO NOT ENTER ON PACER***

**COMPLAINT FOR VIOLATIONS OF
FALSE CLAIMS ACT**

**JURY TRIAL DEMANDED**

**DO NOT ENTER ON PACER
DO NOT PLACE IN PRESS BOX**

23       **FILED UNDER SEAL AS REQUIRED BY 31 U.S.C. § 3730(b)(2)**

24

25

26

27

28

COMPLAINT FOR VIOLATIONS OF THE
FALSE CLAIMS ACT

*Sidebar (left margin):* KELLER GROVER LLP · 1965 Market Street, San Francisco, CA 94103 · Tel. 415.543.1305 | Fax 415.543.7861

Jeffrey F. Keller, Esq. (SBN 148005)
jfkeller@kellergrover.com
Kathleen R. Scanlan, Esq. (SBN 197529)
kscanlan@kellergrover.com
**KELLER GROVER LLP**
1965 Market Street
San Francisco, CA  94103
Telephone: (415) 543-1305
Facsimile: (415) 543-7861

Gordon Schnell (NY Bar No. 2502136)
gschnell@constantinecannon.com
Marlene Koury (NY Bar No. 4423471)
mkoury@constantinecannon.com
**CONSTANTINE CANNON LLP**
335 Madison Avenue
New York, NY 10017
Telephone: (212) 350-2700
Facsimile: (212) 350-2701

Attorneys for Relator
KATHY ORMSBY

**KELLER GROVER LLP**
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

## IN THE UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* KATHY ORMSBY, | CASE NO. |
| Plaintiff, | ***FILED IN CAMERA AND UNDER SEAL DO NOT ENTER ON PACER*** |
| v. | |
| SUTTER HEALTH, a California not-for-profit corporation and PALO ALTO MEDICAL FOUNDATION, a not-for-profit health care organization. | **COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT** <br><br> **JURY TRIAL DEMANDED** |
| Defendants. | **DO NOT ENTER ON PACER DO NOT PLACE IN PRESS BOX** |

**FILED UNDER SEAL AS REQUIRED BY 31 U.S.C. § 3730(b)(2)**

COMPLAINT FOR VIOLATIONS OF THE
FALSE CLAIMS ACT

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

Kathy Ormsby brings this *qui tam* action as Relator on behalf of the United States of America against Sutter Health and Palo Alto Medical Foundation (together, "Sutter" or "Defendants"), under the False Claims Act, 31 U.S.C. § 3729-3733, and alleges – upon knowledge with respect to her own acts and those she personally witnessed, and upon information and belief with respect to all other matters – as follows:

## PRELIMINARY STATEMENT

1.  This case is about Sutter's fraud on Medicare Part C, commonly known as the Medicare Advantage program, through its submission of inaccurate and unsupported medical information which artificially inflates the reimbursement Medicare provides for Sutter's Medicare Advantage patients.

2.  Under the Medicare Advantage program, private health insurance companies are authorized to administer Medicare benefits on behalf of the United States. They offer Medicare Advantage plans to Medicare eligible beneficiaries who pay monthly premiums and copayments that are often less than the coinsurance and deductibles under traditional fee-for-service models for Medicare Part A and B. The Medicare Advantage program has proven to be popular with seniors and now covers nearly *16 million Americans* at a cost expected to top $150 billion in 2014.

3.  A critical difference between traditional Medicare and the Medicare Advantage program is how the private insurance companies, and the providers with whom they contract to deliver healthcare to the beneficiaries, are paid those billions of dollars by the government. Unlike the fee-for-service model in traditional Medicare, the Medicare Advantage program provides a set capitation payment each year for the complete care of a beneficiary, a model often called Managed Care. Since not all beneficiaries require the same level of care, however, the Medicare Advantage program requires payments to the private health insurance companies (and the healthcare providers) be risk-adjusted annually based on the health status of each beneficiary.

4.  In 2004, the government implemented the Hierarchical Condition Category (HCC) model to calculate risk-adjusted payments for each beneficiary. The HCC model was intended to compensate the healthcare providers based on the state of health of the particular enrollee, with

COMPLAINT FOR VIOLATIONS OF THE
FALSE CLAIMS ACT                                        1

1   greater compensation going to those who care for those with greater health issues. The private

2   insurance companies collect risk adjustment data, including beneficiary diagnoses data, from

3   hospital inpatient facilities, hospital outpatient facilities, and physicians and submit it to the

4   Centers for Medicare and Medicaid Services ("CMS"). CMS uses the HCCs, as well as

5   demographic characteristics, to calculate a risk score for each beneficiary. CMS then uses the

6   risk scores to adjust capitated payments for the next payment period.

7       5.      Defendant Sutter Health ("Sutter") through four affiliates, including Defendant

8   Palo Alto Medical Foundation ("PAMF"), offers ten (10) Medicare Advantage plans for health

9   care services at Sutter through three private insurance companies. Through these ten plans, Sutter

10  is responsible for providing healthcare to approximately 48,000 eligible beneficiaries for which

11  CMS pays them hundreds of millions of dollars in capitation payments each year.

12      6.      While Sutter has reaped the benefits of the Medicare Advantage program, it has

13  utterly failed to assume any of its responsibilities clearly set out in the regulations for the

14  Advantage program for assuring the capitation payments it has taken, and continues to take, are

15  accurate and truthful. Relator Kathy Ormsby learned this first-hand when she went to work for

16  Sutter's PAMF affiliate in 2013.

17      7.      As a result, Sutter has taken and continues to take hundreds of millions of dollars

18  in inflated capitation payments for the care of eligible beneficiaries based on risk adjustment data

19  Sutter knows to be inaccurate, incomplete or false. Sutter has been doing this for many years by

20  shirking duties to monitor, investigate and certify the accuracy, completeness and truthfulness of

21  the risk adjustment data it submits, and causes to be submitted, to CMS. Further, after receiving

22  inflated capitation payments, Defendants have failed in their duties to monitor whether the

23  payments from CMS were accurate. Even now, they continue to retain the inflated capitation

24  payments from prior years they know to be overpayments.

25      8.      When Relator exposed a massive number of inflated capitation payments to PAMF

26  caused by its systematic failure to code for HCCs accurately, she implemented procedures to

27  refund the overpayments it received from Medicare. The compliance failures Relator uncovered

28  should have been an eye-opener to Sutter-wide inflated capitation payments because what Relator

COMPLAINT FOR VIOLATIONS OF THE
FALSE CLAIMS ACT                                    2

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

1    identified was not a problem with just a sub-section of payments at PAMF for 2013. Relator

2    exposed a system-wide failure at Sutter to train physicians on proper HCC coding which was

3    causing the inaccurate HCCs to be in the patients' medical records, a complete lack of any

4    auditing for the accuracy of the HCCs they were submitting for payment, and a complete lack of

5    auditing to validate that payments they did receive were correct. This perfect storm is causing

6    massive overpayments to Sutter under the Medicare Advantage program.

7         9.    Moreover, as described below, while Relator directed Sutter's return of millions in

8    refunds to CMS, Sutter has taken steps to throttle Relator's efforts to refund all the inaccurate

9    payments made to PAMF and taken no effort at all to correct the inaccurate payments it knows

10   exist at Sutter's other affiliates because of what Relator discovered at PAMF. Worse still, since

11   Medicare Advantage payments are made prospectively, Defendants' failure to make these

12   corrections and refund these overpayments is causing new, additional false claims to be submitted

13   for the capitation payments still based on what Sutter knows to be inaccurate risk-adjustment

14   data.

15        10.   The solution to this increasingly expensive spiral is for Sutter to stop all billing to

16   CMS until it can correct its systems. However, to date Sutter has made no move to cut off what it

17   knows are massive overpayments from CMS, causing hundreds of millions of dollars in damages

18   to the federal government.

19                                          **PARTIES**

20        11.   Relator Kathy Ormsby (the "Relator") is a citizen of the United States and a

21   resident of the State of California. She has been employed by Sutter since May 2013 and she is

22   currently the Risk Assessment Factor ("RAF") Manager in Sutter's PAMF affiliate. She is suing

23   on behalf of the United States, inclusive of the United States Department of Health and Human

24   Services, Center for Medicare Services, pursuant to 31 U.S.C. § 3730(b).

25        12.   Defendant Sutter Health is a California not-for-profit corporation headquartered in

26   Sacramento County, California. Sutter owns, controls and/or operates affiliated hospitals and

27   physician foundations throughout California, including the Palo Alto Medical Foundation. Sutter

28   generates annual operating revenue of roughly $9.6 billion with approximately 48,000 employees.

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

13.     Defendant Palo Alto Medical Foundation is part of the Peninsula Coastal Region of Sutter and is headquartered in Palo Alto, California.  PAMF is a not-for-profit health care organization with approximately 4,300 employees and locations across Alameda, San Mateo, Santa Clara and Santa Cruz counties.

<strong>JURISDICTION AND VENUE</strong>

14.     Pursuant to 28 U.S.C. § 1331, this District Court has original jurisdiction over the subject matter of this civil action since it arises under the laws of the United States, in particular the False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq.*  In addition, the FCA specifically confers jurisdiction upon the United States District Court, 31 U.S.C. § 3730(b).

15.     This District Court has personal jurisdiction over Sutter pursuant to 31 U.S.C. § 3732(a) because the FCA authorizes nationwide service of process and Sutter has significant operations within this district.

16.     Venue is likewise proper in this district pursuant to 31 U.S.C. § 3732(a) because Sutter transacts substantial business and resides in this judicial district.

<strong>FACTUAL BACKGROUND</strong>

**I.     THE MEDICARE PROGRAM**

17.     Medicare is a health care benefit program funded by the federal government.  The Medicare program compensates participating doctors, hospitals and other health care providers who furnish health care services to citizens of the United States (and certain other legal residents) who have reached the age of 65 or who suffer from certain qualifying disabilities.  Medicare was established by Title XVIII of the Social Security Act of 1965 (codified as amended at 42 U.S.C. §1395 *et. seq.*).

18.     The agency of the United States responsible for the Medicare program is the Department of Health and Human Services ("HHS").  *See e.g.* 42 U.S.C. §§1395b-1, 1395b-2, 1395b-3, 1395b-4, 1395b-7, 1395r and 1395u.  The agency within HHS administering the program is the Centers for Medicare and Medicaid Services ("CMS").

19.     The Medicare Program is comprised of Parts A, B, C and D.  This case is about Sutter's fraud on Part C.

COMPLAINT FOR VIOLATIONS OF THE
FALSE CLAIMS ACT

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

## II.   MEDICARE PART C – THE ADVANTAGE PROGRAM

20.     Medicare Part C, also known as Medicare Advantage, authorizes qualified individuals to opt out of traditional fee-for-service coverage under Medicare Parts A and B and enroll in privately-run managed care plans that provide coverage for both inpatient and outpatient services. 42 U.S.C. §§ 1395w–21, 1395w–28. Part C allows private health insurance companies to administer Medicare benefits on behalf of the United States. The private health insurance companies that run these plans are known as Medicare Advantage Organizations ("MAO") and act as agents of CMS.

21.     In the Medicare Advantage program, Medicare eligible beneficiaries join a Medicare Advantage plan offered by an MAO. Beneficiaries usually pay monthly premiums and copayments that are often less than the coinsurance and deductibles under the traditional Medicare Part A and B programs.

22.     The MAOs may enter into contracts with providers to provide health care services for enrollees on behalf of the MAO. However, "[a]ll contracts or written agreements must specify that the related entity, contractor, or subcontractor must comply with all applicable Medicare laws, regulations, and CMS instructions." 42 C.F.R. § 422.504 (i) (4) (iv)(C). The MAOs with which Sutter contracts to provide healthcare services for Medicare Advantage beneficiaries include Health Net, Inc.; Humana, Inc.; and UnitedHealth Group Inc. Sutter offers eligible beneficiaries ten (10) Medicare Advantage products. *See,* http://www.pamf.org/physicians/healthplans.html#maplan.

### A.  The Program's Key Attributes

23.     As described by the HHS's Office of the Inspector General ("OIG"), here are the key attributes of the Medicare Part C program:

*Medicare Advantage Program*

The Balanced Budget Act of 1997, P.L. No. 105-33, established Medicare Part C to offer beneficiaries managed care options through the Medicare+Choice program. Section 201 of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, P.L. No. 108-173, revised Medicare Part C and renamed the program the Medicare Advantage (MA) program.

COMPLAINT FOR VIOLATIONS OF THE
FALSE CLAIMS ACT

5

Organizations that participate in the MA program include health maintenance organizations, preferred provider organizations, provider-sponsored organizations, and private fee-for-service (FFS) plans. The Centers for Medicare & Medicaid Services (CMS), which administers the Medicare program, makes monthly capitated payments to MA organizations for beneficiaries enrolled in the organizations' health care plans (beneficiaries).

*Risk-Adjusted Payments*

Subsections 1853(a)(1)(C) and (a)(3) of the Social Security Act require that payments to MA organizations be adjusted based on the health status of each beneficiary.  In calendar year (CY) 2004, CMS implemented the Hierarchical Condition Category (HCC) model (the CMS model) to calculate these risk-adjusted payments.

Under the CMS model, MA organizations collect risk adjustment data, including beneficiary diagnoses, from hospital inpatient facilities, hospital outpatient facilities, and physicians during a data collection period.[1]  MA organizations identify the diagnoses relevant to the CMS model and submit them to CMS.  CMS categorizes the diagnoses into groups of clinically related diseases called HCCs and uses the HCCs, as well as demographic characteristics, to calculate a risk score for each beneficiary.  CMS then uses the risk scores to adjust the monthly capitated payments to MA organizations for the next payment period.[2]

*Federal Requirements*

Regulations (42 CFR § 422.310(b)) require MA organizations to submit risk adjustment data to CMS in accordance with CMS instruction. …

Diagnoses included in risk adjustment data must be based on clinical medical record documentation from a face-to-face encounter; coded according to the International Classification of Diseases, Ninth Revision, Clinical Modification (ICD-9-CM) (the Coding Guidelines); assigned based on dates of service within the data collection period; and submitted to the MA organization from an appropriate risk adjustment provider type and an appropriate risk adjustment physician data source.

https://oig.hhs.gov/oas/reports/region2/20901014.pdf.

## B. The Critical Role of Risk Adjustment

24.     Risk adjustment is a unique feature of the Medicare Advantage program that does not exist in traditional Medicare fee-for-service plans.  The purpose of risk adjustment is to "allow[] CMS to pay plans for the risk of the beneficiaries they enroll" and to "make appropriate and accurate payments for enrollees with differences in expected costs."*Medicare Managed Care*

---

[1]Risk adjustment data also include health insurance claim numbers, provider types, and the from and through dates for the services.

[2]For example, CMS used data that MA organizations submitted for the CY 2006 data collection period to adjust payments for the CY 2007 payment period.

COMPLAINT FOR VIOLATIONS OF THE
FALSE CLAIMS ACT

6

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

*Manual*, Ch. 7, § 20. An MAO with a population of patients with less severe illnesses than normal would see a downward adjustment of its capitation rates because it was servicing a healthier than normal population of patients. *See* 42 C.F.R. §§ 422.308(c) and 422.310; *see also* 70 Fed. Reg. 4588, 4657 (intending to pay MAOs "appropriately for their plan enrollees (that is, less for healthier enrollees and more for less healthy enrollees)."). The risk adjustment system was phased in beginning in or about 2005 and was completed by or about the end of the 2008.

25.     Each time a Medicare Advantage patient is treated, the healthcare provider enters patient diagnosis and treatment codes into the patient's medical records. The patient's health conditions are coded using the International Classification of Disease- 9 ("ICD-9-CM"). The approximately 3,300 ICD-9-CM codes map to 70 Hierarchical Condition Categories ("HCC") in CMS' risk adjustment model. CMS requires documentation in the patient's medical record to support every HCC submitted. The documentation must support the active presence of the condition and indicate the healthcare provider's assessment and plan for treatment.

26.     The provider, in turn, forwards the HCCs from the patient's medical records to the MAO. Each visit for each Medicare Advantage patient results in a new submission of this risk adjustment data from the patient's medical records to the MAO. Each submission includes all of the HCCs – new and existing – for each patient.

27.     MAOs are required to submit the risk adjustment data to CMS in accordance with CMS instructions. 42 CFR § 422.310(b). The MAO aggregates the patient data for all beneficiaries and electronically submits it to CMS in the form of Risk Adjustment Processing System ("RAPS") reports. CMS requires reports to be submitted at least quarterly.

28.     CMS is required to risk adjust payments to Medicare Advantage organizations on an ongoing basis. 42 U.S.C. § 1395w-23(a)(3); 42 C.F.R. §§ 422.308(c); 422.310(g). The capitation rate is set on a yearly basis, and is subject to two retroactive adjustments per plan year. CMS determines the per-patient capitation amount using actuarial tables based primarily on the patient's medical diagnoses and adjusted for the patient's county of residence and over 70 factors such as age, sex, severity of illness, etc. "Medicare risk adjustment is prospective, meaning diagnoses from the previous year and demographic information are used to predict future costs,

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

1   and adjust payment." *CMS* 2013 National Technical Assistance Risk Adjustment 101 Participant

2   Guide at p. 3.

3       29.    HHS' Office of the Inspector General acknowledges that because payments to

4   MAOs are adjusted based on the patient's health status "inaccurate diagnoses may cause CMS to

5   pay MA organizations improper amounts." *HHS OIG Work Plan*, FY 2015, found at

6   http://oig.hhs.gov/reports-and-publications/archives/workplan/2015/FY15-Work-Plan.pdf.

7       30.    CMS has specifically notified MAOs and Part C providers that it relies on the data

8   they submit to make appropriate and accurate payments under the Medicare Advantage program:

9   "Accurate risk-adjusted payments rely on the diagnosis coding derived from the member's

10   medical record." (*See, e.g., CMS* 2013 National Technical Assistance Risk Adjustment 101

11   Participant Guide at p.13). Put simply, Medicare relies on the patient diagnosis codes and data

12   healthcare providers like Sutter provide the MAOs to determine the appropriate and accurate

13   capitation payment per patient.

14       **C. Defendants' Duties Under the Medicare Advantage Program**

15       31.    Because CMS relies on the data supplied by healthcare providers like Sutter, there

16   are clear duties they must abide by to ensure the data they provide is accurate, complete and

17   truthful. *See* 42 C.F.R. § 422.504 (i) (4) (iv)(C) (discussing provider's obligations to comply with

18   all applicable Medicare laws, regulations, and CMS instructions.).

19       1.    The Duty to Monitor

20       32.    Foremost among these duties is the duty to monitor the implementation of the

21   Medicare Advantage program for compliance with CMS' requirements. Accordingly, every

22   healthcare provider is required to implement an effective compliance program that meets the

23   regulatory requirements set forth at 42 C.F.R. §§422.503(b)(4)(vi) and 423.504(b)(4)(vi).

24   *Medicare Managed Care Manual*, Ch. 21.

25       33.    In implementing an effective compliance program, each healthcare provider must,

26   among other things: develop procedures to promote and ensure compliance with all Part C rules

27   and regulations; provide effective training and education for employees; implement policies and

28   procedures to conduct baseline assessments of major compliance and risk areas, including

COMPLAINT FOR VIOLATIONS OF THE
FALSE CLAIMS ACT             8

1   accuracy of claims processing, detection of potentially fraudulent claims and provider oversight

2   and monitoring; and conduct regular audits. *See*, 42 C.F.R. §§ 422.504(i), (l)(3);

3   422.503(b)(4)(vi)(A), (C)(1)-(3), (D), (E), (F). *See also, Medicare Managed Care Manual*, Ch.

4   21 §§ 30-50.

### 2.   The Duty to Investigate

6       34.   CMS also anticipated possible program noncompliance or fraud, waste and abuse

7   (FWR).  It might "be discovered through a hotline, a website, an enrollee complaint, during

8   routine monitoring or self-evaluation, an audit, or by regulatory authorities."  In those instances,

9   however it is discovered, the healthcare provider "must initiate a reasonable inquiry as quickly as

10  possible, but not later than 2 weeks after the date the potential noncompliance or potential FWR

11  incident was identified." *Medicare Managed Care Manual*, Ch. 21 § 50.7.1. *See also*, 42 C.F.R.

12  § 422.503(b)(4)(vi)(G); 42 C.F.R. § 423.504(b)(4)(vi)(G).  Thus, there is a clear duty not just to

13  investigate possible noncompliance or fraud.  There is a duty to investigate it promptly.

### 3.   Duty to Certify Accuracy of Risk Adjustment Data

15      35.   Healthcare providers also have a duty to certify the accuracy, completeness and

16  truthfulness of the risk adjustment data they submit, or cause to be submitted, to CMS.  42 C.F.R.

17  § 422.504(l) (the duty to certify accuracy is "a condition for receiving a monthly payment").

18      36.   The duty extends to any provider that may generate the data the MAO ultimately

19  submits. *See*, 42 C.F.R. §§ 422.504(l)(3) ("If such data are generated by a related entity,

20  contractor, or subcontractor ...such entity ... must certify that the data it submits under § 422.310

21  are accurate, complete and truthful.); *see also* 42 C.F.R. § 422.310 (discussing risk adjustment

22  data).

23      37.   This duty to certify accuracy, completeness and truthfulness applies to any data

24  submitted to CMS and is a continuing obligation.  42 C.F.R. § 422.310(g)(1); 42 C.F.R. §§

25  422.504(l); (i)(4)(iii).

### 4.   Duty to Return Overpayments

27      38.   On May 24, 2010, the Patient Protection and Affordable Care Act became law.

28  Pub. L. No. 111-148, 124 Stat. 755, 42 U.S.C. § 18001 (2010).  The Affordable Care Act

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

1  established a new section of the Social Security Act and created a duty for any person to return

2  any overpayments. Social Security Act of 1935 (Title XI), ch. 531, § 1128J(d), (codified as

3  amended at 42 U.S.C § 1320a-7k(d) (2011)). Overpayment means "any funds that a person

4  receives or retains under sub-chapter XVIII or XIX to which the person, after applicable

5  reconciliation, is not entitled to under such subchapter."42 U.S.C § 1320a-7k (d)(4)(B).

6      39.    To find a violation of this provision, there need not be "proof of specific intent to

7  defraud." 31 U.S.C. § 3729(b). Rather, Section 1320a-7k (d)(4)(A) defines "knowing" and

8  "knowingly" as those terms are defined in 31 U.S.C. § 3729(b). Thus, "knowing and knowingly

9  mean that with respect to information of the existence of an overpayment, a person: (1) has actual

10  knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the

11  information; or (3) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C.

12  § 3729(b).

13      40.    In January, 2014, in proposed rulemaking implementing the Affordable Care Act

14  for the Medicare Advantage program, CMS reiterated that the duties created by the Affordable

15  Care Act went into effect on May 24, 2010 - when it was signed into law -- and were not

16  dependent on final rulemaking by CMS:

> We remind all stakeholders that even in the absence of a final regulation on these
> statutory provisions, MA organizations and Part D sponsors are subject to the
> statutory requirements found in section 1128J (d) of the Act and could face
> potential False Claims Act liability, Civil Monetary Penalties (CMP) Law liability,
> and exclusion from Federal health care programs for failure to report and return an
> overpayment. Additionally, MA organizations and Part D sponsors continue to be
> obliged to comply with our current procedures for handling inaccurate payments.

21  79 Fed Reg 1917, 1996 (Jan. 10, 2014).[3]

22      41.    On May 23, 2014, CMS published final regulations regarding these duties. 42

23  C.F.R. § 422.326. *See also*, 79 Fed. Reg. 29844, 29923 (May 23, 2014). In relevant part, Section

24  422.326 provides:

26  [3] Healthcare providers like Sutter are stakeholders to whom this guidance is directed. When
27  MAOs contract with healthcare providers like Sutter to care for beneficiaries, the MAO's duties
    are extended to the provider who must agree to comply with all rules and regulations of the
28  Medicare Advantage program. 42 C.F.R. § 422.504 (i) (4) (iv)(C).

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

COMPLAINT FOR VIOLATIONS OF THE
FALSE CLAIMS ACT                                        10

(b) *General Rule*. If an MA organization has identified that it has received an overpayment, the MA organization must report and return that overpayment in the form and manner set forth in this section.

(c) *Identified Overpayment*. The MA organization has identified an overpayment when the MA organization has determined, or should have determined through the exercise of reasonable diligence, that the MA organization has received an overpayment.

(d) *Reporting and returning of an overpayment*. An MA organization must report and return any overpayment it received no later than 60 days after the date on which it identified it received an overpayment, unless otherwise directed by CMS for purposes of § 422.311.

\*\*\*

(e) *Enforcement*. Any overpayment retained by an MA organization is an obligation under 31 U.S.C. § 3729 (b)(3) if not reported and returned in accordance with paragraph (d) of this section.

(f) *Look-back period*. An MA organization must report and return any overpayment identified for the 6 most recent completed payment years.

42 C.F.R. § 422.326.

> 5.   Complying With These Duties is a Condition of All Medicare Advantage Payments

42.   As a condition of receiving capitation payments from the Government under the Medicare Advantage program, all healthcare providers are required to monitor and investigate the integrity of the risk adjustment data and certify the same. *See,* 42 C.F.R. § 422.504(i)(4)(v), (l).

43.   In 2014, CMS emphasized that the duties to monitor, investigate and certify the accuracy of payment related data have existed for years, and are the basis upon which CMS makes its payments under the Medicare Advantage program. CMS wrote, "For many years organizations have been obliged to submit accurate, complete, and truthful - payment related data, as described at §422.504(l).... Further, CMS has required for many years that diagnoses that MA organizations submit for payment be supported by medical record documentation. Thus, **we have always expected that MA organizations [] ... implement, during the routine course of business, appropriate payment evaluation procedures in order to meet the requirement of certifying the data they submit to CMS for purposes of payment.**" 79 Fed. Reg. 29844, 29923 (May 23, 2014) (discussing requirements to certify the accuracy of risk adjustment data and a new requirement imposing FCA liability for the retention of overpayments set forth at 42

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

C.F.R. §§ 422.504(l) and 422.326). CMS further emphasized, "MA organizations ...are expected to have effective and appropriate payment evaluation procedures and effective compliance programs as a way to avoid receiving or retaining overpayments. Thus, **at a minimum, reasonable diligence would include proactive compliance activities conducted in good faith by qualified individuals to monitor for the receipt of overpayments.** However, conducting proactive compliance activities does not mean that the person has satisfied the reasonable diligence standard in all circumstances. In certain circumstances, for example, reasonable diligence might require an investigation conducted in good faith and in a timely manner by qualified individuals in response to credible information of a potential overpayment." *Id.* at 29923-24 (emphasis added).

## SUTTER'S MEDICARE ADVANTAGE FRAUD

44.     As described below, Sutter has defrauded the United States through a systematic pattern and practice of shirking these duties to monitor, investigate and certify the accuracy, completeness and truthfulness of the risk adjustment data it submitted, and caused to be submitted to CMS, while taking millions in inflated capitation payments based on inaccurate, incomplete or false risk adjustment data. As further described below, this conduct is ongoing. Sutter continues to submit, and cause to be submitted, risk adjustment data it knows is not accurate, complete and truthful.

## I.     RELATOR'S EXPERIENCE IN RISK ADJUSTMENT

45.     Relator has been a professional medical coder for more than twenty years. In 2004, she became a Certified Professional Coder (CPC) with the American Association of Professional Coders (AAPC). The AAPC's CPC credential is the gold standard for medical coding in physician office settings. A "CPC has proven by rigorous examination and experience that they know how to read a medical chart and assign the correct diagnosis (ICD-9), procedure and supply code for a wide variety of clinical cases and services." https://www.aapc.com/certification/cpc.aspx

46.     Prior to joining Sutter, Relator worked as a Data Quality Trainer for risk adjustment for Kaiser Permanente ("Kaiser") which like Sutter provides healthcare services under

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

the Medicare Advantage Program. In that position, Relator gained a deep understanding of how the risk adjustment component of the Medicare Advantage program is supposed to work and the various duties healthcare providers like Sutter have under the program. Indeed, since Relator started in that position in 2007, the same year CMS fully implemented its risk adjustment model, Relator has been working in this specialized coding area from the beginning.

47.     Relator's experience in this area is particularly strong because she worked at Kaiser at a time when it was operating under a Corporate Integrity Agreement ("CIA") after failing a Medicare audit in its Hawaii division.

48.     In that position, which she held for nearly six years before coming to Sutter, Relator was responsible for training physicians in how to document for HCCs that would be used to calculate risk adjustment scores. She was also responsible for supervising the risk adjustment auditors who audited physician documentation in the patients' medical records to ensure compliance the rules and regulations of the Medicare Advantage program. Her supervisors included directors at the corporate offices who created the policies and procedures as well as the auditing plans which she and her team implemented.

49.     While Relator carried out these audit responsibilities for one division of Kaiser, this same auditing procedure was implemented in other divisions too. Relator and her counterparts in other divisions met regularly to discuss their auditing work. Since all of Kaiser's Medicare policies and procedures were under close scrutiny by CMS (because of the CIA), Relator understood them to be the standard of compliance when implementing the risk adjustment component of the Medicare Advantage program.

50.     In 2013, Relator accepted a position as a Risk Adjustment Project Manager with PAMF. Her job responsibilities were to help develop a Risk Adjustment Factor ("RAF") program and to train physicians who had been identified to help support the RAF initiative at PAMF.

## II.    SUTTER'S LACK OF A RISK ADJUSTMENT PROGRAM

51.     On May 6, 2013, Relator reported for work at PAMF's Sunnyvale, California office. Suzy Cliff, PAMF's Vice President of Revenue Cycle, handled Relator's orientation. Initially, it was not even clear to whom Relator should be reporting. Cliff told Relator that PAMF

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

had "nothing" in place for risk adjustment.  Cliff gave her a binder including reports comparing PAMF's RAF scores to the California average.  The binder also included materials on methodologies for problem-solving generally.  Other than that binder, Cliff directed Relator to an empty cubicle.

52.     In stark contrast to what Relator had come to know at her previous employer, there was no risk adjustment compliance program at PAMF.  There was also nothing to indicate a program ever existed in any form prior to her arrival even though PAMF had been operating as a healthcare provider under the Advantage program for at least six years.  There were no PAMF or Sutter policies or procedures regarding the Advantage program to review.  There were no audits or results of any PAMF or Sutter accuracy testing from prior years or months.  There was no correspondence from any of PAMF's or Sutter's MAOs or expected Standards of Conduct in operating the Advantage program.  There were no sign-in sheets evidencing training of any healthcare professionals at any time.  Even though PAMF had approximately 10,000 patients enrolled in the Advantage program, Relator was the only (and apparently first) PAMF employee working on issues of risk adjustment in PAMF's Advantage program.   The approximately 57 other PAMF employees with coding and auditing duties were all working on revenue cycle/fee for service coding.

53.     Within the first month of Relator's employment, Julie Cheung, Sutter's RAF Program Manager, called Relator to welcome her.  Cheung indicated that she was very excited to hear any of Relator's ideas regarding risk adjustment because of Relator's nearly six years of experience at her prior employer doing RAF coding and auditing.  The conversation focused on Relator providing Cheung information about what she had done previously.  They did not discuss what PAMF or Sutter had been doing or were doing now.  This conversation confirmed for Relator that Sutter had been doing little, if anything, to monitor, investigate or certify the accuracy, completeness or truthfulness of the risk adjustment data it submitted to generate payments under the Medicare Advantage program – something she was seeing directly at PAMF.

///

///

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

**III.     RELATOR BEGINS TO INTRODUCE RISK ADJUSTMENT CONTROLS**

54.     Since Relator's job responsibilities were supposed to include training a designated group of physicians, she started to develop a presentation to use with them which would give a high-level description of HCC coding and how risk adjustment worked in the Advantage program. Relator also began randomly auditing primary care physician ("PCP") encounters[4] to understand the strengths and weaknesses of PAMF's existing systems, and what issues to focus on with her training of physicians.

55.     Relator's initial PCP encounter audits were for dates of service in 2013. She looked at 42 PCP encounters identifying 62 HCCs. Of the 62 HCCs identified, 53 of them were incorrect because the documentation in the patient's medical records were not supported by the ICD-9-CM coding guidelines.

56.     In July 2013, Relator met with Kris Crow, PAMF's Director of Coding and Education, to discuss her findings and her concerns that PAMF did not have sufficient risk adjustment controls to ensure compliance with the Medicare Advantage rules and regulations.

57.     During this meeting Crow instructed Relator to write up her findings. Crow also agreed to create 5 Full Time Employee ("FTE") positions to audit risk adjustment data in the Medicare Advantage program (the "RAF auditors"). Relator and Crow also discussed Relator's recommendation that the RAF auditors create a billing note when the HCC is not supported in the encounter but was submitted.

58.     Per Crow's instruction, Relator created a Corrective Action Plan ("CAP") based on the random audits she had conducted. The CAP documented the purpose of the audit was to identify the accuracy rates of the PCPs, something which neither PAMF nor Sutter had captured to date. As Relator had relayed to Crow, the CAP identified the deficiencies she had found in the PCPs' HCC documentation; namely, the 53 coding errors out of the 62 reported HCCs.

59.     Relator described as the "Root Cause" for these deficiencies that: "proper instruction for document requirements had not been communicated clearly to providers. Palo

---

[4] An encounter is a face to face physician visit. 42 C.F.R. § 410.2(6).

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

1  Alto Medical Foundation currently lacks clearly defined procedure for auditing and provider

2  feedback."

3      60.    The CAP set forth a detailed action plan which included hiring additional RAF

4  auditors to perform encounter audits, establishing an expectant provider accuracy rate, and

5  retracting payments where the HCCs captured and submitted were not documented according to

6  ICD-9-CM coding guidelines.

7      61.    The CAP further provided for a specific focus audit on cancer, fractures, and

8  stroke HCCs.  According to Relator's proposed plan, the auditors would review documentation to

9  confirm the referenced conditions were active and if not, remove the condition from billing and

10  refund the improper payment to Medicare.

11      62.    Since neither PAMF nor Sutter had any meaningful policies or procedures for the

12  auditing or training of HCC coding, Relator outlined her plan for the RAF Coding Manager to

13  develop policies and procedures that meet all applicable requirements and establish a consistent,

14  compliant process for auditing, queries, and provider coaching; develop short training modules

15  and single page tip sheets explaining Medicare requirements for documentation; and monitor the

16  audit results for consistency and training opportunities.

17      63.    Relator also for the first time set RAF HCC coding compliance goals and

18  benchmarks for PAMF to reach, including establishing provider accuracy rates by end of Q1

19  2014; monitoring accuracy improvements; achieving an 85% accuracy rate for all Family

20  Medicine/Internal Medicine providers by end of 2014; and monitoring RAF auditors to maintain

21  accuracy rate of 95%.

22      64.    Relator warned that "[f]ailure to achieve these benchmarks will result in an

23  additional corrective action plan."

24      65.    Crow never responded to Relator about the corrective actions described in the

25  CAP.  She did, however, approve the five RAF auditors Relator recommended and which Relator

26  hired soon thereafter.

27  ///

28  ///

COMPLAINT FOR VIOLATIONS OF THE
FALSE CLAIMS ACT

16

**IV.    RELATOR UNCOVERS WIDESPREAD COMPLIANCE ISSUES AND MASSIVE OVERPAYMENTS**

66.    With what appeared to be management's blessing, and after hiring the five RAF auditors to assist her, Relator began to implement the audits contemplated in the CAP. The first part of the RAF audit process included ten encounter audits per PCP per quarter.[5] From these encounter audits, Relator expected to establish an accuracy rate in coding HCCs for the PCPs. This would identify which PCPs needed coaching or other training on proper HCC coding.

67.    The second part of the RAF audit process was a focus audit for three HCCs Relator knew from her previous experience at Kaiser were commonly miscoded.[6] These were HCCs for Cancer, Fracture and Stroke. The focus audit was more inclusive than the encounter audits because the RAF auditors were looking at every instance where these HCCs would have been used. It was not limited to just the PCPs.

68.    Each of these audits revealed a widespread failure of PAMF to comply with the requirements of the Medicare Advantage program and PAMF's systematic overbilling of the program through improper and/or non-compliant HCC coding.

**A.    Lack of PCP Training on Proper HCC Coding**

69.    The PCP encounter audits quickly revealed the PCPs had little to no training in proper HCC coding. This was readily revealed in survey/questionnaires the PCPs completed as part of the audit which made clear there was no previous or ongoing training on HCC coding for the physicians. It was further confirmed from the one-on-one sessions the RAF Auditors had with the PCPs where they acknowledged having had no meaningful training on HCC coding.

70.    Here is a sampling of the numerous physician comments complaining about their lack of training for proper HCC coding:

---

[5] An encounter audit is a tool to measure whether a PCP is complying with the coding guidelines, or not. It looks solely at what data a PCP enters in a specific patient encounter. Encounter audits are commonly used to obtain an accuracy rate for a specific provider.

[6] A focus audit looks at a patient's history for the entire year to try to validate the HCC for that year.

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

- During Dr. Dror's one-on-one training held March 28, 2014, the RAF Auditor noted that "She was upset that the education is coming after the audits and not before. She feels there is a lack of education on this as a whole."

- Dr. Williams in the one-on-one meeting held April 3, 2014, asked "What HCC coding was. She had no knowledge of HCC coding."

- During Dr. Agah's one-on-one meeting on March 11, 2014, the doctor stated that "they have not received sufficient training on HCC coding from the Champions. Said, never heard of diagnostic champions, never contacted by the champtions [sic] for HCC education/training."

- Dr. Yao in the one-on-one meeting held October 8, 2014, stated "she has very little if any HCC education. I asked if Dr. Dresden or Dr. Vahamaki had helped her with HCC information, and she gave a negative response of NO."

- Dr. Butterfield in the one-on-one meeting held April 9, 2014, stated that "she was unclear of HCC."

- Dr. Agrawal in the one-on-one meeting held March 27, 2014, stated that she "had heard about HCC and understands the importance, but had no training on it."

- Dr. Browns in the one-on-one meeting held March 12, 2014, "suggested more training on HCC…. Not enough exposure has been provided the HCC from the Champions."

- During Dr. Maclay's one-on-one meeting held April 2, 1014, the RAF Auditor noted that "Dr. Maclay is one in the growing number of Physician's that have not spoken or rarely spoken to their champions or anyone else regarding HCC coding/documentation."

- During Dr. Meehen one-on-one meeting held April 10, 1014, the RAF Auditor noted that "Dr. Meehan knew very little about the HCC process…"

71.    Relator confirmed with her peers in other Sutter affiliates that they had no such training either. In fact, as her peers in other affiliates learned what Relator was doing at PAMF, they asked her to provide them with whatever training materials she was developing and using so they could use them too.

72.    As the encounter audits progressed, Relator kept her supervisor, Crow, informed of what she and the RAF auditors were learning, including the overwhelming lack of PCP training. The results of these encounter audits were also published to the RAF reporting site and were available for all PAMF employees to review, including executive management.

///

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

18

**B. Inflated Billing and Overpayments for Cancer, Fracture, Stroke**

73.     While the RAF auditors proceeded with the encounter audits, they also began the focus audit for cancer, fracture and stroke. Initially, the goal was to audit the risk adjustment data for an entire year for these three HCCs. However, this quickly proved unrealistic with only five auditors who were dividing their time between the focus audit, the encounter audits and the PCP training. From her experience at Kaiser, Relator knew that a five-person audit team was not nearly sufficient to perform this volume of work for an organization the size of PAMF. This chronic understaffing was a known issue to PAMF's VP of Revenue Cycle. In regular meetings, Cliff would ask Relator if there was anything *other than more staff* that Cliff could do to support her.

74.     Even though the RAF Auditors had not reviewed an entire year's worth of data and the audit was not complete, the trends evident from the results they had compiled showed PAMF's pervasive failure to submit proper HCC coding for these three conditions, leading to PAMF's significantly inflated billing for Medicare reimbursement, and massive overpayments.

**V.     MANAGEMENT DIRECTS RELATOR TO STOP AUDITING RECORDS WHERE PAMF ALREADY HAD BEEN PAID AND TO STOP REFUNDING FOR OVERPAYMENTS**

75.     Throughout the auditing process in which Relator had embarked, she regularly updated Crow (PAMF Director of Education and Coding) and Cliff (PAMF VP of Revenue Cycle) on the status of the RAF audit team, including the results of both the encounter audits and the focus audit of HCCs for cancer, fracture, stroke. She provided them a written report of the auditing activity, including the number of audits completed and the number of HCC adds and deletes the team made in the patients' medical records. Relator followed up her written reports in meetings with either Crow or Cliff.

76.     In one meeting with Crow in early 2014, Relator reported that the RAF auditors were also finding inaccurate HCC coding outside the scope of the 2013 cancer, fracture, stroke focus. This included (a) inaccurate codes for other HCCs in the 2013 year of service, (b) inaccurate codes for cancer, fracture, stroke in other service years, and (3) inaccurate codes for

COMPLAINT FOR VIOLATIONS OF THE
FALSE CLAIMS ACT

19

other HCCs in other service years. The RAF auditors had identified trends in inaccurate coding for diabetes and morbid obesity, among others. She reported to Crow that the RAF auditors were capturing these inaccuracies on a spreadsheet. Relator asked Crow if she wanted to see the information on these other inaccuracies. Crow did not want to see the spreadsheet. Instead, she instructed Relator to "just hold onto it."

77.     In a meeting with Cliff, during the summer of 2014, they discussed the status of the auditing process. Cliff relayed an inquiry from Roger Larsen (Sutter Regional VP of Finance and CFO, Peninsula Coastal Region) questioning why Relator was auditing risk adjustment data for which they'd already been paid.

78.     In another meeting with Cliff during the same timeframe, Cliff instructed Relator to stop submitting corrections to incorrect HCCs in the patient medical records. Cliff again pointed to Larsen's concern that Relator was auditing the old data for which Medicare reimbursement had already been obtained. Larsen apparently was particularly concerned with revisiting the already-submitted data when PAMF's RAF scores were going down during this time period in 2014 (in part because of the increased scrutiny Relator and her team were providing to ensure the risk-adjustment data was accurate and proper).

79.     Relator refused to participate in any attempt to avoid repaying known overpayments. Despite Cliff's instruction, Relator continued with the audit and took whatever corrective action the audit results supported, including removing the inaccurate data that had caused, and was continuing to cause, Medicare overpayments to PAMF.

80.     Relator also wanted to be clear to her superiors that what she was doing was proper and necessary to correct PAMF's pervasive failure in complying with the Medicare Advantage program requirements and to ensure its compliance going forward. In this regard, on or about August 12, 2014, Relator prepared a Revised-PAMF Corrective Action Policy ("RCAP") which updated her original CAP action plan. As she stressed in her revised plan, "the purpose of this policy is to ensure that Palo Alto Medical Foundation (PAMF) implements timely and effective actions when indicators reveal a need for a corrective action" because "PAMF has a responsibility to ensure all documentation supports reimbursement received."

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

81.     Relator further spelled out in the RCAP the critical requirement that HCC coding comply with Medicare rules and regulations before submitting HCC codes to CMS for payment, something that PAMF was clearly not doing as Relator's audit so plainly revealed.  As Relator explained, this "documentation is a vital component for ensuring that all PAMF providers are adhering to Medicare Guidelines and the OIG (Office of Inspector General) recommendations for compliance.  It is required that any condition submitted for Medicare Advantage reimbursement be documented and addressed according to official guidelines."

82.     Finally, Relator reported in the RCAP how successful her auditing and training program was becoming in reducing PAMF's non-compliant submissions of HCC codes to CMC:

> [t]he current process of auditing and feedback has proven to be successful. For quarter one, 2013 dates of service, the auditors identified 185 HCC conditions incorrectly captured and submitted for reimbursement.  The diagnoses identified were submitted to OPTUM[7] to be retracted.  Provider education and feedback is continuing.  With continued auditor feedback and provider coaching the number of errors has decreased and physician accuracy continues to improve.  This current process has proved to bring an increase in compliant documentation.

83.     On September 29, 2014, Relator attended a meeting of PAMF executive management, including Roger Larsen (Sutter Regional VP of Finance and CFO, Peninsula Coastal Region), Dr. Conroy (Chief Medical Officer), Suzy Cliff, Dr. Veko Vahamaki (Director of Diagnostic Coding/HCC), Dr. Edward Yu (Medical Director for Quality), Dr. Criss Morikawa (Medical Director of Information Technology), and Dr. Nilufer Vesuna (Member, PAMF Compliance Committee).  Relator gave a brief presentation on what her RAF audit team was doing, including the Audit Plan.  She specifically identified the three HCCs of cancer, fracture, stroke as compliance issues.  She explained that they are routinely over-reported by providers like PAMF and Sutter which increases the risk adjustment score for the Medicare Advantage program and leads to substantial overpayments by Medicare.  Dr. Conroy reviewed the 2014 RAF Auditing Plan specifically identifying a "high priority-potential compliance issue" for cancer, fracture, stroke.  The Plan also indicated that the RAF Audit team would report on PAMF

---

[7] Optum is a subsidiary of UnitedHealth.

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

1    accuracy rates for coding HCCs for cancer, fracture and stroke for compliance with the Medicare

2    Advantage program. Dr. Conroy told Relator the Auditing Plan "looks good" and "keep doing

3    what you're doing."

4        84.    At the conclusion of the September 29, 2014 meeting, Relator approached Dr.

5    Vesuna (Member, PAMF Compliance Committee) with a folder containing a copy of the

6    Corrective Action Plan, the Revised Corrective Action Policy, together with a list of one-on-one

7    trainings with the physicians' comments. Relator knew Dr. Vesuna was a member of PAMF's

8    Compliance Committee. Relator explained that she had been through a Medicare audit before.

9    She told Dr. Vesuna she had prepared a corrective action plan based on that prior experience and

10   her findings at PAMF to date, but that it was not going to mean anything unless someone signed

11   off on it. She urged Dr. Vesuna to review the materials.

12       85.    Several weeks later Dr. Vesuna returned the folder to Relator telling her it was

13   well-written and very thorough. Dr. Vesuna told Relator the CAP/RCAP was something the

14   Director of Education and Coding needed to review. However, that position was now vacant after

15   Crow transferred out of PAMF on or about August 14, 2014.

16       86.    On the afternoon of November 26, 2014 – the day before Thanksgiving, Relator

17   was called to a meeting with Marcella Alaniz, Jessica Lin (a PAMF compliance analyst), and

18   Mary Campbell (a PAMF project manager) in Campbell's office. Alaniz told Relator she had

19   never approved Relator's deleting and adding HCCs from patients' medical records. She

20   instructed Relator to stop her team from doing so immediately. Alaniz also instructed Relator

21   that, going forward, the physician would be the only ones permitted to correct the patient

22   encounter in EPIC, Sutter's Electronic Medical Records and billing system. Alaniz told Relator

23   to instruct the RAF auditors to make any changes on the billing side of EPIC only.

24       87.    Relator highlighted for Alaniz, Lin and Campbell that this new procedure would

25   not stop the incorrect HCCs from being submitted to the MAO and then to CMS for the

26   Advantage patients because payments for the Advantage program are generated based on risk

27   adjustment data in a patient's medical record – not HCCs in the billing records. She stressed that

28

COMPLAINT FOR VIOLATIONS OF THE
FALSE CLAIMS ACT                                 22

1   deleting information from the billing file while leaving the same inaccurate HCCs in the patient's

2   medical record would continue to overbill for the Advantage patients.

3         88.    Of course, Alaniz, Lin Campbell and the rest of PAMF's management knew this.

4   It was commonly known at Sutter that changing only the billing file would not fix inaccurate

5   codes in the data CMS actually relies on to generate the Advantage payments.

6         89.    Despite her protestations, Relator had no choice but to follow the plan her

7   superiors directed her to implement. Thus, she directed her audit team to stop making the

8   changes to the patients' medical records and to instruct the physicians to make the corrections the

9   auditors identified. In other words, Relator was now barred from refunding any overpayments to

10   CMS unless and until the physicians made the corrections themselves. Despite numerous

11   attempts by Relator and her team to get the physicians to correct the inaccuracies in the HCCs,

12   most physicians ignored or refused to make the changes. The list of inaccurate codes identified

13   by the RAF auditors continues to grow and PAMF is preventing Relator from doing anything

14   about it.

15         90.    Notably, the approach Alaniz was instructing Relator to use at PAMF was well-

16   known at Sutter to be flawed. On or about February 23, 2015, Julie Cheung (Sutter's RAF

17   Program Manager) confirmed that the other three Sutter affiliates were only making changes to

18   the billing records, not the patient's medical records. [8] More importantly, Cheung admitted

19   changing the HCCs on the billing side only does not support accurate submissions of risk

20   adjustment data for the Medicare Advantage program. Cheung understood that HCCs that were

21   determined to be unsupported by the billing department and removed from the billing file would

22   not be removed from the patients' medical record that was used as the basis for the

23   risk adjustment data submitted to CMS as part of the Medicare Advantage program. Cheung

24   admitted that Sutter knows errors caught by the billing auditors at the time of billing are being

25   
26   [8] Cheung also told Relator the other affiliates were only auditing PCP data for the Medicare
    Advantage program at the time of service, not post-payment like the RAF team. Cheung was
27   admitting that for 80% of Sutter's Medicare Advantage beneficiaries, it was not auditing to
    evaluate whether the *payments* Sutter received were accurate, or not. *Compare* 79 Fed. Reg.
28   29844, 29923-24 (discussing duty to monitor for overpayments).

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

1   resubmitted to CMS nonetheless when the patient records are swept for the Advantage Program.

2   She shared Relator's concern that this approach prevents Sutter from complying with the

3   Medicare Advantage program requirements. Cheung admitted this was a Sutter-wide problem

4   telling Relator they needed to "brainstorm" how to fix it because she did not know how. Sutter

5   has collected and continues to collect overpayments based on these known errors.

6   **VI.   RELATOR WARNS OF SIGNIFICANT CONTINUED ISSUES OF NON-**

7   **COMPLIANCE, BUT TO NO AVAIL**

8       91.    In her continued effort to do her job and implement the risk adjustment controls

9   for which she thought she was hired, Relator prepared a summary of the troubling results from

10  her Focus Audit for cancer, stroke and fractures.

11      92.    For HCC-10 (Cancer), the RAF auditors reviewed 227 encounters out of a total of

12  2937 encounters reported in 2013 for patients for whom HCC-10 was submitted to CMS from

13  Sutter's PAMF affiliate. These 227 HCC-10 encounters were found in the medical records of 182

14  patients. Out of the 182 patients where HCC-10 was submitted to CMS, only 18 patients had

15  supporting documentation. For the other 164 patients, the documentation did not support HCC-

16  10 according to ICD-9-CM guidelines and was therefore submitted to CMS in error. The RAF

17  auditors submitted refunds for those overpayments. Relator also calculated an HCC-10 accuracy

18  rate of only 9.88% for PAMF in 2013 based on the focus audit.

19      93.    For two HCCs for Stroke (HCC-99/100), the RAF auditors reviewed 393

20  encounters out of a total of 778 encounters reported in 2013 for patients for whom HCC-99/100

21  was submitted to CMS from Sutter's PAMF affiliate. These 393 HCC-99/100 encounters were

22  found in the medical records of 169 patients. Out of the 169 patients where HCC-99/100 was

23  submitted to CMS, only 7 patients had supporting documentation. For the other 162 patients, the

24  documentation did not support HCC-99/100 according to ICD-9-CM guidelines and was therefore

25  submitted to CMS in error. The RAF auditors submitted refunds for those overpayments. Relator

26  also calculated an HCC-99/100 accuracy rate of only 4.1% for PAMF in 2013 based on the focus

27  audit.

28

COMPLAINT FOR VIOLATIONS OF THE
FALSE CLAIMS ACT

24

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

94.     For two HCCs for Fracture (HCC 169/170), the RAF auditors reviewed 243 encounters out of a total of 828 encounters reported in 2013 for patients for whom HCC-169/170 was submitted to CMS from Sutter's PAMF affiliate.  These 243 HCC-169/170 encounters were found in the medical records of 86 patients.  Out of the 86 patients where HCC-169/170 was submitted to CMS, only 29 patients had supporting documentation.  For the other 57 patients, the documentation did not support HCC-169/170 according to ICD-9-CM guidelines and was therefore submitted to CMS in error.  The RAF auditors submitted refunds for those overpayments.  Relator also calculated an HCC-169/170 accuracy rate of only 33.7% for PAMF in 2013 based on the focus audit.

95.     On December 19, 2014, she emailed the summary to her superiors to impress on them the scale of PAMF's compliance failures and the need for PAMF to continue with the audit regimen she had recommended but which she had been directed to discontinue.  Included among the group to whom she send the summary was Marcella Alaniz (PAMF Compliance Analyst), Jessica Lin (PAMF Compliance Analyst), Norma Galvan (PAMF Revenue Cycle Project Manager), Suzy Cliff (PAMF VP, Revenue Cycle), Lydia McGriff (Lead RAF Auditor), Robert Zulim (PAMF Manager of Decision Support ), Dr. Criss Morikawa (Medical Director of Information Technology), and Dr. Veko Vahamaki (PAMF Director of Diagnostic Coding/HCC).

96.     Relator reported the roughly 90% failure rate for the HCC-10 audit she conducted and the significant likelihood this failure rate applied across the board for PAMF's billing for this HCC and is still continuing today.  Other than the RAF audit and the refunds it triggered before Relator was directed to discontinue the process, PAMF has taken no steps to audit or refund Medicare for any overpayments relating to any other HCC-10s for 2013 – or for any other year.

97.     Relator also reported the roughly 95% failure rate for the HCC-99/100 audit she conducted and the significant likelihood this failure rate applied across the board for PAMF's billing for this condition and is still continuing today.  Other than the RAF audit and the refunds it triggered before Relator was directed to discontinue the process, PAMF has taken no steps to audit or refund Medicare for any overpayments relating to any other HCC-99/100s for 2013 – or for any other year.

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

98.     Relator also reported the roughly 66% failure rate for the HCC-169/170 audit she conducted and the significant likelihood this failure rate applied across the board for PAMF's billing for this condition and is still continuing today.  Other than the RAF audit and the refunds it triggered before Relator was directed to discontinue the process, PAMF has taken no steps to audit or refund Medicare for any overpayments relating to any other HCC-169/170s for 2013 – or for any other year.

99.     Relator pointedly warned in her email that since her audit team was no longer permitted to correct for coding errors, "[w]e have identified 94 encounters that have been submitted to CMS without supporting documentation for HCC conditions billed" and Relator "expect[ed] this number to increase daily until a resolution can be implemented."

100.     Relator further questioned what could be done in those situations where the treating physician was no longer at PAMF.  Since policy required the physicians to change the HCCs in the patients' medical records, there would be no way to accomplish this in those instances where the physician was no longer there.  She asked Alaniz for guidance on how to resolve the known coding inaccuracies in these kinds of examples.  Alaniz never responded.  To the best of Relator's knowledge, those errors remain uncorrected, and the overpayments have not been returned to CMS.

101.     Without changing the patient records where they found errors, Relator and the RAF auditors otherwise continued their work for nearly a month.  Relator and the RAF auditors continued to identify errors in the patients' medical records through their auditing and began asking the physicians to delete the HCCs that were not supported by the coding guidelines.

102.     Relator and the RAF auditors continued to train the physicians on the importance of accurate HCC coding in the patients' medical records but the auditors were identifying errors faster than the physicians were correcting them  As a result, known errors continued to mount without the return of known overpayments caused by these errors.

103.     On January 21, 2015, Relator had a meeting with Alaniz, Lin, McGriff, Poms and Dr. Vahamaki to discuss the continued issues regarding the 2013 HCC coding accuracy rates for cancer, stroke and fractures.  In  an email she wrote the next day to Cliff, with copies to everyone

COMPLAINT FOR VIOLATIONS OF THE
FALSE CLAIMS ACT                                           26

1    at the meeting as well as Galvan, Robert Zulim, Dr. Morikawa and Troklus, Relator summarized

2    the meeting and her continued concerns regarding "accuracy rates of cancer, fracture and stroke

3    (2013 dates of service and beyond);" "payments received without supporting documentation;"

4    "encounters created by providers who are no longer at PAMF and have unsupported HCC

5    submissions;" "providers who are not responding to staff messages regarding specificity and

6    clarification of HCC's submissions to CMS;" and PAMF's "discontinued use of auditing billing

7    notes/corrections to rectify unsupported ICD-9-CM."

8        104.    Relator also voiced her concern with the lack of support she was receiving from

9    the Compliance Department to deal with these issues: "The only follow up we can expect from

10   compliance going forward, is they are working on this.  I am concerned with the lack of feedback

11   as we have a great responsibility to provide actions taken to those who are aware of the

12   noncompliance. Per Marcella, some compliance issue can take up to 1 ½ years to be resolved."

13       105.    Instead of convincing her superiors to allow her to resume her recommended

14   auditing approach, she was directed to stop her auditing activities altogether.  On January 22,

15   2015, Cliff called Relator to relay to her the Compliance Department's order to stop all auditing

16   until further notice.  Relator conveyed the stop work order to all of her auditors that same day.

17   Relator later documented this instruction in an email dated on or about February 10, 2015, to Julie

18   Cheung where Relator confirmed she had "reported [the] findings to our local compliance

19   department and they have requested that we stop auditing."

20       106.    Not willing to give up on her auditing responsibilities, on or about January 23,

21   2015, Relator offered in an email to Suzy Cliff to use her RAF Auditors to continue training

22   PAMF's physicians in proper HCC coding: "[a]gain I would like to utilize my team to get out and

23   train our physicians, all specialties on correct HCC coding as a priority.  After going through a

24   Medicare Audit at Kaiser, I know this is the main thing they were interested in....How are you

25   educating your providers."

26       107.    She followed that up with another email on or about January 26, 2015,

27   recommending that Sutter share the accuracy results of the RAF focus audit of cancer, fracture,

28   stroke with all Sutter providers.  "Could be a real eye opener and an opportunity."

COMPLAINT FOR VIOLATIONS OF THE
FALSE CLAIMS ACT                              27

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

108.   On January 29, 2015, Relator met with Alaniz, Lin and Christian Gabriel, the new Director of Education and Coding who replaced Crow in the position.  Alaniz confirmed that Relator and her team were not to be doing any auditing until further notice.

109.   On February 10, 2015, Relator had her first one on one meeting with Gabriel. Relator yet again conveyed her concern with the failing accuracy rates for cancer, fracture, stroke and the lack of support anywhere at Sutter for correcting the problems identified by the focus audit.  She informed Gabriel that there were no policies and procedures in place at PAMF or Sutter to support RAF.  She reviewed the Medicare Advantage Compliance Self-Assessment with him to highlight PAMF's and Sutter's lack of compliance with the rules and regulations for the Advantage program and to give him a resource to try to get the support Relator believed necessary to correct the known deficiencies.  Gabriel asked Relator to email him the assessment tool so he could forward it to Nancy McGinnis (Sutter's RAF Director).  Gabriel stated that he would ask McGinnis if she had ever filled out the Medicare Self-Assessment and if there are any policies and procedures in place for RAF at Sutter.

110.   On February 23, 2015, Gabriel sent an email to Relator, copying Alaniz and Troklus, requesting a breakdown of (1) how many inaccuracies from the RAF audit team's 2013 results have not yet been corrected, (2) how many encounters total where the RAF auditors removed HCCs; and (3) how many encounters since November 28, 2014 that still need to be corrected.

111.   On February 25, 2015, McGriff told Relator that Compliance audited five of the RAF team's encounters and found three auditing errors.  As a result, Compliance determined Relator's compliance concerns to be unfounded.

112.   Compliance's after-the-fact "investigation" relying on just five of the encounters audited was not done in good faith and is nothing more than pretense to justify Sutter's continued unlawful conduct.  It also flies in the face of Sutter's duties to monitor, investigate and certify the accuracy, completeness and truthfulness of the risk-adjustment data submitted to CMS under the Advantage program.  *See, e.g.,* 42 C.F.R. §310 (discussing risk adjustment data); 42 C.F.R. §326 (reporting and returning of overpayments); 42 C.F.R. §§ 422.503(b)(4)(vi) (adopt and implement

COMPLAINT FOR VIOLATIONS OF THE
FALSE CLAIMS ACT                                    28

1    an effective compliance program), (D) (establishment and implementation of effective lines of

2    communication); (I) (the duty to certify accuracy); 42 C.F.R. § 423.504(b)(4)(vi) (adopt and

3    implement an effective compliance program). *See also* ¶¶ 31-43, above (discussing duties).

4         113.    Ironically, the three "errors" supposedly found in the RAF auditors work was

5    enough to assure Sutter that any compliance concerns were unwarranted when Relator's

6    documenting 383 total errors in the focus audit for just three HCCs for just a portion of one year

7    resulting in millions in overpayments went ignored.  PAMF's conclusion that it has no

8    compliance issues utterly dismisses the virtual certainty that the 383 errors were only a small

9    portion of the actual coding errors for those HCCs, and most importantly that PAMF has millions

10   more in overpayments caused by those errors.

11        114.    Over more than a year and a half, Relator and her RAF Auditors confirmed and

12   documented:

13       •   No training program for HCC coding existed for physicians at PAMF or
             any other Sutter affiliate;
14

15       •   The partial RAF audit for cancer, fracture, stroke for 2013 dates of service
             was the only auditing being done Sutter-wide to validate proper payments
16           under the Medicare Advantage program and it was detecting massive
             overpayments because of systematic coding problems in known problem
17           conditions (90% coding failure rate for cancer; 95% coding failure rate for
             stroke; and 66% coding failure rate for fractures);

18       •   Inaccurate coding for other HCCs in 2013 and for all HCC coding in other
             years;
19

20       •   No accuracy rates for any HCCs for other affiliates at Sutter;

21       •   Other than the partial RAF focus audit, no auditing for the accuracy of
             payments received to identify potential overpayments Sutter-wide.

22   The failure of PAMF and Sutter to address these failings, not to mention the affirmative efforts to

23   shut down Relator in her various auditing activities, directly violates the company's clear

24   obligations to use "reasonable diligence" to ensure it does not overbill the Medicare Advantage

25   program. *See*, 79 Fed. Reg. 29844, 29923-24 (May 23, 2014) ("[A]t a minimum, reasonable

26   diligence would include proactive compliance activities conducted in good faith by qualified

27   individuals to monitor for the receipt of overpayments. … In certain circumstances, for example,

28

COMPLAINT FOR VIOLATIONS OF THE
FALSE CLAIMS ACT                              29

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

1  reasonable diligence might require an investigation conducted in good faith and in a timely

2  manner by qualified individuals in response to credible information of a potential overpayment.")

3      115.    The RAF audit should have been an "eye-opener" for Sutter, as Relator suggested

4  and has repeatedly tried to demonstrate.  Instead, Sutter is knowingly ignoring the systematic and

5  thorough audit contemplated by the rules and regulations governing the Medicare Advantage

6  program.  Even worse, it is ignoring the clear evidence Relator has uncovered of widespread

7  unsupported documentation for HCCs and resulting overpayment that have continued and will

8  continue until Sutter takes the corrective action that Relator has recommended.  As a result, Sutter

9  has continued to collect millions of dollars from CMS in improper payments based on HCCs it

10  knows to be unsupported and improper.

11                          **HARM TO THE GOVERNMENT**

12      116.    As a result of Sutter's submission of inflated HCC coding, it has over-billed and

13  received payments from CMS of thousands of dollars per patient based on HCCs that are

14  improper and unsupportable.

15      117.    By way of example only, the following is a list of fraudulent patient claims that

16  CMS paid Sutter based on risk adjustment data Sutter provided which it knew to be false.  Each

17  one of these examples demonstrates Sutter's knowing inclusion of HCCs not supported by the

18  actual medical condition of the patient that caused, and continue to cause, CMS to make higher

19  payments for the care of these patients through the Medicare Advantage program.

20      a.  **Patient 1** elected to participate in the Medicare Advantage program.

21          Patient 1 was examined by Dr. Jeff Tao on February 5, 2011, August 3,

22          2013 and August 14, 2013 and a nurse practitioner on August 29, 2013

23          both of whom are providers within Sutter's PAMF affiliate.  According to

24          the RAF Audit, PAMF submitted to CMS from Patient 1's medical records

25          unsupported HCC-10 (ICD-9-CM 185 - "Malignant Neoplasm of Prostate)

26          encounters for 2011, 2012 and 2013.  These HCC-10 encounters in Patient

27          1's medical records lacked supporting documents pursuant to the IDC-9-

28          CM guidelines.  According to the patient's medical records, Patient 1 had

COMPLAINT FOR VIOLATIONS OF THE                      30
FALSE CLAIMS ACT

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

"Localized carcinoma of the prostate status post a radical prostatectomy 2002." However, according to the RADV Medical Record Checklist and Guidance Document and ICD-9-CM guidelines, a notation indicating "history of cancer" without an indication of current cancer treatment, is not sufficient documentation for validation of this HCC. Pursuant to the RADV and ICD-9-CM, to accurately code a cancer diagnosis, like HCC-10, the medical record documentation must clearly state that the cancer is active. When a primary malignancy has been previously excised or eradicated from its site and there is no further treatment directed to that site and there is no evidence of any existing primary malignancy, a code from category V10, Personal history of malignant neoplasm, should be used to indicate the former site of the malignancy. Since Patient 1 had his prostate removed in 2002, and there was no treatment directed to cancer, the correct ICD-9-CM code would have been V10, personal history-not HCC-10. As a result of submitting these unsupported HCC encounters, Patient 1's risk adjustment factor increased by an estimated .187 (based on 2013 risk adjustment for the area of service) and PAMF received an estimated additional $2,033 per year for each of the three years the HCC encounters were submitted. The unsupported HCC encounters in Patient 1's medical records caused CMS to reimburse the MAO and Sutter at a significantly higher rate than they were entitled.

b. **Patient 2** elected to participate in the Medicare Advantage program. Patient 2 was examined by Dr. Barry Eisenberg, a provider within Sutter's PAMF affiliate, on January 2, 2009, October 2009, December 23, 2010, and April 15, 2014. According to the RAF Audit, PAMF submitted to CMS from Patient 2's medical records unsupported HCC-10 (ICD-9-CM 185 - "Malignant Neoplasm of Prostate") encounters for 2009, 2010 and 2014. These HCC-10 encounters in Patient 2's medical records lacked

COMPLAINT FOR VIOLATIONS OF THE
FALSE CLAIMS ACT                              31

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

1    supporting documents pursuant to the IDC-9-CM guidelines.  According to

2    the patient's medical records, Patient 2 had "past medical history is

3    significant for prostate cancer, 3+3 adenocarcinoma, Stage T1a. He is

4    status post radical prostatectomy 2002 NED."  However, according to the

5    RADV Medical Record Checklist and Guidance Document and ICD-9-CM

6    guidelines, a notation indicating "history of cancer" without an indication

7    of current cancer treatment, is not sufficient documentation for validation

8    of this HCC.  Pursuant to the RADV and ICD-9-CM, to accurately code a

9    cancer diagnosis, like HCC-10, the medical record documentation must

10   clearly state that the cancer is active.  When a primary malignancy has

11   been previously excised or eradicated from its site and there is no further

12   treatment directed to that site and there is no evidence of any existing

13   primary malignancy, a code from category V10, Personal history of

14   malignant neoplasm, should be used to indicate the former site of the

15   malignancy.  Since Patient 2 had his prostate removed in 2002, and there

16   was no treatment directed to cancer, the correct ICD-9-CM code would

17   have been V10, personal history-not HCC-10.  As a result of submitting

18   these unsupported HCC encounters, Patient 2's risk adjustment factor

19   increased by an estimated .187 (based on 2013 risk adjustment for the area

20   of service) and PAMF received an estimated additional $2,033 per year for

21   each of the three years the HCC encounters were submitted.  The

22   unsupported HCC encounters in Patient 2's medical records caused CMS

23   to reimburse the MAO and Sutter at a significantly higher rate than they

24   were entitled.

25   c.   **Patient 3** elected to participate in the Medicare Advantage program.

26        Patient 3 was examined by Dr. Barry Eisenberg on September 27, 2012 and

27        March 4, 2014 and by Dr. Rejesh Shinghal on December 14, 2013 and

28        March14, 2014, both of whom are providers within Sutter's PAMF

COMPLAINT FOR VIOLATIONS OF THE
FALSE CLAIMS ACT                                    32

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

affiliate. According to the RAF Audit, PAMF submitted to CMS from Patient 3's medical records unsupported HCC-10 (ICD-9-CM 185-"Malignant Neoplasm of Prostate) encounters for 2012, 2013 and 2014. These HCC-10 encounters in Patient 3's medical records lacked supporting documents pursuant to the IDC-9-CM guidelines. According to the patient's medical records, "Fifteen years ago the patient had a retropubic prostatectomy for prostate cancer. (1995) no recurrence." However, according to the RADV Medical Record Checklist and Guidance Document and ICD-9-CM guidelines, a notation indicating "history of cancer" without an indication of current cancer treatment, is not sufficient documentation for validation of this HCC. Pursuant to the RADV and ICD-9-CM, to accurately code a cancer diagnosis, like HCC-10, the medical record documentation must clearly state that the cancer is active. When a primary malignancy has been previously excised or eradicated from its site and there is no further treatment directed to that site and there is no evidence of any existing primary malignancy, a code from category V10, Personal history of malignant neoplasm, should be used to indicate the former site of the malignancy. Since Patient 3 had his prostate removed in 1995, and there was no treatment directed to cancer, the correct ICD-9-CM code would have been V10, personal history-not HCC-10. As a result of submitting these unsupported HCC encounters, Patient 3's risk adjustment factor increased by an estimated .187 (based on 2013 risk adjustment for the area of service) and PAMF received an estimated additional $2,033 per year for each of the three years the HCC encounters were submitted. The unsupported HCC encounters in Patient 2's medical records caused CMS to reimburse the MAO and Sutter at a significantly higher rate than they were entitled.

COMPLAINT FOR VIOLATIONS OF THE
FALSE CLAIMS ACT

33

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

d.  **Patient** 4 elected to participate in the Medicare Advantage program. Patient 4 was examined by Dr. Natalia Colocci on March 20, 2012, July 18, 2012, January 23, 2013, April 24, 2013, June, 6, 2013, August 21, 2013, December 2, 2013, April 2, 2014 and again August 13, 2014 and by Dr. Richard B. Chalker on April 13, 2012, April 24 and 26, 2013, May 28, 2013, June 25, 2013, July 2, 2014.  Both are providers within Sutter's PAMF affiliate.  According to the RAF audit, no documentation at any of the face to face visits supported the HCC-8s which was submitted on each encounter.  These HCC-8 encounters in Patient 4's medical records lacked supporting documents pursuant to the IDC-9-CM guidelines.  According to the patient's medical records, Patient 4 had a documented history of lung cancer.  However, according to the RADV Medical Record Checklist and Guidance Document and ICD-9-CM guidelines, a notation indicating "history of cancer" without an indication of current cancer treatment, is not sufficient documentation for validation of this HCC.  To accurately code a cancer diagnosis, like HCC-8, the medical record documentation must clearly state that the cancer is active. When a primary malignancy has been previously excised or eradicated from its site and there is no further treatment directed to that site and there is no evidence of any existing primary malignancy, a code from category V10, Personal history of malignant neoplasm, should be used to indicate the former site of a malignancy.  Since Patient 4 has a history of lung cancer, and there is no treatment directed to cancer, the correct ICD-9-CM code would be V10, personal history-not HCC-8.  As a result of submitting these unsupported HCC encounters, Patient 4's risk adjustment factor increased by an estimated .919 (based on 2013 risk adjustment for the area of service) and PAMF received an estimated additional $9,994 per year for each of three years the HCC encounters were submitted.  The unsupported HCC

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

1       encounters in Patient 4's medical records caused CMS to reimburse the

2       MAO and Defendants at a significantly higher rate than they were entitled.

3     e.   **Patient 5** elected to participate in the Medicare Advantage program.

4       Patient 2 was examined by Dr. Edward Yu on September 15, 2009,

5       November 12, 2009, March 23, 2010, April 15, 2010, October 4, 2011,

6       February 29, 2012, May 17, 2012 and November 12, 2013, at a provider

7       within Sutter's PAMF affiliate. According to the RAF Audit, PAMF

8       submitted to CMS from Patient 5's medical records unsupported HCC-96

9       (ICD-9-CM 434.91) on all encounters referenced. According to the

10      patient's medical records, Patient 5 had a history of a stroke (CVA). These

11      HCC-96 encounters in Patient 5's medical records lacked supporting

12      documents pursuant to the ICD-9-CM guidelines. However, according to

13      the RADV Medical Record Checklist and Guidance Document and ICD-9-

14      CM guidelines, ICD-9-CM codes 434.01, 434.11 or 434.91 are only to be

15      used for an acute stroke, such as at the time of the initial hospital admission

16      or upon initial diagnosis in the skilled nursing facility. Since Patient 5 only

17      had a history of a stroke (CVA), the correct code would be "history of

18      CVA" - not HCC-96. As a result of submitting these unsupported HCC

19      encounters, Patient 5's risk adjustment factor increased an estimated .265

20      (based on 2013 risk adjustment for the area of service) and PAMF received

21      an estimated additional $2882.00 per year for each of the five years the

22      HCC encounters were submitted for Patient 5. The unsupported HCC

23      encounters in Patient 5's medical records caused CMS to reimburse the

24      MAO and Sutter at a significantly higher rate than they were entitled.

25    118.    In each of the examples set forth in the preceding paragraph, after Sutter

26 knowingly entered the false HCCs in the patient medical records, Sutter knowingly submitted the

27 false information to the MAO which in turn presented it to CMS. Relying on the accuracy of the

28 risk adjustment data the MAO submitted to it, the United States, through CMS, paid these false

COMPLAINT FOR VIOLATIONS OF THE
FALSE CLAIMS ACT

claims by issuing the capitation payments for each Sutter Medicare Advantage patient to the MAO covering that patient. The payments were electronically transferred from CMS to specific Advantage accounts designated by each of the MAOs. Each of the MAOs kept a portion of each Medicare Advantage payment for itself and then remitted the balance of the capitated payment to Sutter for each of its Medicare Advantage patients. Payments were made by CMS to the MAO and by the MAO to Sutter regularly, in precisely this manner. In each instance, the false HCCs ultimately submitted to CMS resulted in Medicare Advantage payments to the MAO and Sutter that were higher than they otherwise would have been allocated based on the patient's actual medical condition.

119. These examples are illustrative of the false claims Sutter has submitted, and caused to be submitted, to CMS. Because the conduct is ongoing it is also continuing to submit and causing to be submitted, additional false claims. As discussed above, the coding inaccuracies in the records of patients at PAMF for 2013 also exist in the patients' records for other years. In addition, Sutter knows that the same uncorrected inaccuracies in HCC coding Relator identified at PAMF exist in each of Sutter's three other affiliates. In total, Sutter's Medicare Advantage program services approximately 48,000 beneficiaries. Accordingly, Relator expects that there are tens of thousands of false claims that have been submitted to CMS during the relevant period. Further, because Sutter has known of these overpayments by CMS, the retention of each overpayment creates a new and separate false claim for each overpayment after sixty (60) days.

120. While the exact amount will be proven at trial, the United States has paid hundreds of millions of dollars in improper, inflated capitation payments under the Medicare Advantage program as a result of Sutter's scheme.

## PUBLIC DISCLOSURE/ORIGINAL SOURCE

121. The facts alleged in this Complaint have not been previously disclosed to the public or the government in any fashion. 31 U.S.C. § 3730(e)(4).

122. Even if substantially the same allegations or transactions as alleged in this complaint were publicly disclosed, the Relator is an "original source" as defined in 31 U.S.C. § 3730(e)(4)(B). Relator has knowledge that is independent of and materially adds to any publicly

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

1   disclosed allegations or transactions, and voluntarily provided the information to the Government

2   before filing this action.

3                                    **COUNT I**

4                   **Presentation of False or Fraudulent Claims In**

5         **Violation of the False Claims Act – 31 U.S.C. § 3729(a)(1)(A)**

6         123.   Relator realleges and incorporates by reference the allegations made in Paragraphs

7   1 through 122 of this Complaint.

8         124.   Sutter and PAMF are liable under the False Claims Act because they knowingly

9   submitted false or fraudulent claims to CMS that are prohibited by 42 U.S.C. §1395 *et. seq.*

10        125.   Each of them submitted false or fraudulent claims to the government for payment

11  or caused the claims to be submitted, when they repeatedly submitted claims for payment under

12  the Medicare Advantage program certifying the accuracy, truthfulness and correctness of the data

13  CMS uses to determine the payment that was, in fact, not accurate, truthful or complete.

14        126.   As alleged above and incorporated herein, at all times relevant to this complaint

15  Sutter and PAMF violated their duties to the government as part of the Medicare Advantage

16  programs, including:

17        i.     The duty to submit the risk adjustment data to CMS in accordance with

18               CMS instructions.  42 CFR § 422.310(b); 422.504(i)(4) (v) and

19               422.503(b)(4)(vi), 423.504(b)(4)(vi);

20        ii.    The duty to implement an effective compliance program that meets the

21               regulatory requirements set forth at 42 C.F.R. §§422.503(b)(4)(vi) and

22               423.504(b)(4)(vi);

23        iii.   The duty to initiate a reasonable inquiry as quickly as possible after the

24               date the potential noncompliance or potential fraud is identified. 42 C.F.R.

25               § 422.503(b)(4)(vi)(G); 42 C.F.R. § 423.504(b)(4)(vi)(G);

26        iv.    The duty to certify the accuracy, completeness and truthfulness of the risk

27               adjustment data they submit, or cause to be submitted, to CMS.  42 C.F.R.

28               § 422.504(l); 42 C.F.R. §§ 422.504(l)(3)

COMPLAINT FOR VIOLATIONS OF THE
FALSE CLAIMS ACT                          37

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

127.   For all these claims, therefore, Sutter and PAMF are liable under the FCA.

128. ·   As a direct and proximate result of each presentation of false or fraudulent claims for payment, the United States has suffered actual monetary damages and is entitled to recover actual and treble damages plus a civil monetary penalty for each false or fraudulent claim paid from each of the Defendants in an amount to be determined at trial.

## COUNT II

### False or Fraudulent Records and Statements

### Material to False or Fraudulent Claims

### Violation of the False Claims Act – 31 U.S.C. § 3729(a)(1)(B)

129.   Relator realleges and incorporates by reference the allegations made in Paragraphs 1 through 128 of this Complaint.

130.   Any person who knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim is liable for violation of the False Claims Act. 31 U.S.C. § 3729(a)(1)(B).

131.   Sutter and PAMF knowingly made, used, caused to be made, or caused to be used, false or fraudulent records and statements material to false or fraudulent claims for care and services under the Medicare Advantage program.   Relator cannot identify at this time all of the false or fraudulent records and statements because they were submitted at numerous times under various requests for payment.  The false or fraudulent records and statements include, but are not limited to:

i.   risk adjustment data CMS relies on to generate capitation payments;

ii.   the certifications of the accuracy, completeness and truthfulness of the data submitted to CMS for the payment of capitation payments under the Medicare Advantage program.

132.   These false or fraudulent records and statements were material to the government's payments of funds under the Medicare Advantage program.  This materiality is reflected in Sutter's and PAMF's multiple duties as participants in the Medicare Advantage program, including:

COMPLAINT FOR VIOLATIONS OF THE
FALSE CLAIMS ACT

i.    The duty to submit the risk adjustment data to CMS in accordance with CMS instructions.  42 CFR § 422.310(b); 422.504(i)(4) (v) and 422.503(b)(4)(vi), 423.504(b)(4)(vi);

ii.    The duty to implement an effective compliance program that meets the regulatory requirements set forth at 42 C.F.R. §§422.503(b)(4)(vi) and 423.504(b)(4)(vi);

iii.    The duty to initiate a reasonable inquiry as quickly as possible after the date the potential noncompliance or potential fraud is identified. 42 C.F.R. § 422.503(b)(4)(vi)(G); 42 C.F.R. § 423.504(b)(4)(vi)(G);

iv.    The duty to certify the accuracy, completeness and truthfulness of the risk adjustment data they submit, or cause to be submitted, to CMS.  42 C.F.R. § 422.504(l); 42 C.F.R. §§ 422.504(l)(3).

133.    Compliance with the multiple duties, described above, is a condition of payment by the Medicare program.

134.    As a direct and proximate result of the Defendants knowingly making, using, causing to be made, or causing to be used, false or fraudulent records and statements material to false or fraudulent claims, the United States has suffered actual monetary damages and is entitled to recover actual and treble damages plus a civil monetary penalty for each false or fraudulent claim paid from each of the Defendants in an amount to be determined at trial.

## COUNT III

### Retention of Overpayments

### Violation of the False Claims Act – 31 U.S.C. § 3729(a)(1)(G)

135.    Relator realleges and incorporates by reference the allegations made in Paragraphs 1 through 134 of this Complaint.

136.    As described above, the Defendants submitted false claims which the government paid.

137.    An overpayment is a payment by a federal entity to a provider or supplier in excess of what was due and payable.  An overpayment may include overpayments caused by the

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

submission of unsupported HCCs in the Medicare Advantage program.  An overpayment may be received through an innocent billing error or through a mistake of the contractor.  42 USC § 1320a-7k (d)(1) warns that "returning the overpayment … is an obligation (as defined in 3729(b)(3) of title 31 for purposes of section 3729 of such title.").

138.    As of May 24, 2010, the effective day of the legislation that established subsection 7k (d)(1), each day that the Defendants retain an overpayment, they are violating the FCA.

139.    As a direct and proximate result of the Defendants' retention of overpayments, the United States has suffered actual monetary damages and is entitled to recover from all of the Defendants actual and treble damages plus a civil monetary penalty for each retained overpayment as a false or fraudulent claim paid in an amount to be proven at trial.

## RELIEF REQUESTED

WHEREFORE, Relator requests judgment be entered against Defendants, ordering that:

1.    As to all counts for the violations of the Federal False Claims Act, Defendants:

    a.    cease and desist from violating the False Claims Act, 31 U.S.C. § 3729 *et. seq.;*

    b.    pay an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty against Defendants of not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729;

    c.    Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d);

    d.    Relator be awarded all costs of this action, including attorneys' fees, expenses, and costs pursuant to 31 U.S.C. §§3730(d);

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

COMPLAINT FOR VIOLATIONS OF THE
FALSE CLAIMS ACT

2.    Relator, on behalf of the United States, also requests that Plaintiff be granted all such other relief as the Court deems just and proper.

**DEMAND FOR JURY**

Pursuant to Fed. R. Civ. P. 38, the Relator hereby demands a trial by jury.

Dated:  March 6, 2015

Respectfully submitted,

**KELLER GROVER, LLP**

By:

KATHLEEN R. SCANLAN
JEFFREY F. KELLER
Attorneys for Relator

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861