JOSEPH H. HUNT
Assistant Attorney General

DAVID L. ANDERSON (CABN 149604)
United States Attorney
SARA WINSLOW (DCBN 457643)
Chief, Civil Division
KIMBERLY FRIDAY (MABN 660544)
Assistant United States Attorney

> 450 Golden Gate Avenue, Box 36055
> San Francisco, California 94102-3495
> Telephone: (415) 436-7102
> Facsimile: (415) 436-6927
> kimberly.friday@usdoj.gov

MICHAEL D. GRANSTON
PATRICIA L. HANOWER
A.THOMAS MORRIS
J. JENNIFER KOH
OLGA YEVTUKHOVA
Attorneys, Civil Division
United States Department of Justice

> P.O. Box 261, Ben Franklin Station
> Washington, D.C. 20044
> Telephone: (202) 307-1026

Attorneys for the United States of America

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* KATHY ORMSBY, | CASE NO. C 15-01062 JD |
| Plaintiff, | |
| v. | **UNITED STATES' COMPLAINT-IN - INTERVENTION** |
| SUTTER HEALTH and PALO ALTO MEDICAL FOUNDATION, | |
| Defendants. | |

The United States of America ("United States" or "Government") brings this action against Defendants Sutter Health ("Sutter") and its affiliate, Palo Alto Medical Foundation ("PAMF"), to recover treble damages and civil penalties for their (collectively, "Defendants") violations of the False Claims Act ("FCA"), 31 U.S.C. §§ 3729–3733, and damages and other relief for their common law violations of payment by mistake and unjust enrichment.

Sutter and PAMF's violations of the FCA stem from their participation in the Medicare Advantage Program. Millions of elderly and disabled individuals throughout the United States receive healthcare benefits through Medicare, which is administered by the Centers for Medicare and Medicaid Services ("CMS"). Sutter, through its provider affiliates, including PAMF, serves more than 100 communities in Northern California and furnishes healthcare to tens of thousands of Medicare beneficiaries enrolled in the Medicare Part C Program, known as Medicare Advantage ("MA"). Sutter and PAMF violated the FCA by knowingly submitting and causing the submission of thousands of false claims, and the corresponding false statements and records, relating to the MA Program. *See* 31 U.S.C. § 3729 (a)(1)(A), (B). This misconduct resulted in tens of millions of dollars of overpayments from Medicare. Sutter and PAMF then compounded this misconduct by knowingly and improperly avoiding their obligations to repay these overpayments to Medicare. *See id.* § 3729(a)(1)(G).

Having filed a notice of intervention pursuant to 31 U.S.C. § 3730(b)(4), the United States alleges for its complaint-in-intervention ("Complaint") as follows:

## **INTRODUCTION**

1.    There are four parts to the Medicare Program: Part A covers inpatient care, Part B covers outpatient care, Part C is the Medicare Advantage Program discussed below, and Part D is prescription drug coverage. A beneficiary eligible for Medicare may choose to be covered under what is commonly referred to as "traditional" Medicare, which is Medicare Parts A and B, in which CMS reimburses healthcare providers for services rendered via submission of claims. This is known as a fee-for-service payment system. Another option for a Medicare beneficiary is Medicare Advantage, in which a beneficiary may opt instead to enroll in a Medicare Advantage

Plan ("MA Plan") managed by a private insurance company ("MA Organization").  *See* Subchapter XVIII of the Social Security Act, 42 U.S.C. §§ 1395w-21 to 1395w-28.

2.     Much like any other private health insurance plan, MA Plans come in a variety of forms.  For reasons that will be discussed below, many MA Plans are structured similarly to an HMO (Health Maintenance Organization), in which an MA Organization organizes a network of healthcare providers that a beneficiary may go to for healthcare services with the central point of contact being the beneficiary's primary care physician.  Others are structured like a PPO (Preferred Provider Organization) that offers a network of healthcare providers that a beneficiary can use for medical care and may see a specialist without a referral.

3.     CMS reimburses MA Plans differently than traditional Medicare.  CMS pays MA Organizations a capitated (fixed) amount for each beneficiary that covers all Medicare Part A and Part B benefits (except hospice).  This capitated rate is set by a bid submitted by the MA Organization that is compared to an administratively set benchmark established under the Part C statute.  *See* 42 U.S.C. §§ 1395w-23(a)(1)(B) and 42 C.F.R. § 422.304.

4.     Recognizing that the cost of care for a beneficiary will vary, CMS adjusts this fixed amount based on a methodology that takes into account various factors, including the health status of each beneficiary.  This health status adjustment, referred to as risk adjustment, results in higher capitated rates for sicker patients and lower capitated rates for healthier patients.  As discussed more fully below, the risk adjustment is generally based on the submission to CMS of beneficiaries' health status or illnesses in the form of diagnosis codes.  The diagnosis codes submitted for a beneficiary are reflected in what is referred to as a risk score.  The risk-adjustment payment is the bid amount multiplied by the risk score for each enrollee.  *See* 42 C.F.R. § 422.308(e).  As detailed further below, the International Statistical Classification of Diseases and Related Health Problems ("ICD") sets forth the standards accepted by CMS and the healthcare industry for the identification of diagnosis codes by their physicians.

5.     In many instances, MA Organizations contract with healthcare providers to participate in the MA Plan's network.  Sutter, through its provider affiliates, including PAMF, furnishes healthcare services to thousands of Part C beneficiaries under at least 10 MA Plans

managed by three MA Organizations: United Healthcare Group, Health Net, Inc., and Humana Inc.  Pursuant to these agreements, Sutter and PAMF submit patient encounter data, which reflects information gathered during a visit with a healthcare provider, including diagnosis codes, to MA Organizations for their MA Plan enrollees.  The MA Organizations, in turn, submit these diagnosis codes to CMS through what is known as the Risk-Adjustment Processing System ("RAPS") and through the Encounter Data System ("EDS").  CMS uses these diagnosis codes to calculate a risk score for each beneficiary, which is then used to adjust the capitated payments to the MA Organizations for each MA Plan enrollee.  To do so, CMS employs a risk-adjustment model, called the Hierarchical Conditions Category ("HCC") model, which takes into account both demographic factors (such as age and gender) and medical conditions of a patient to determine the risk scores for beneficiaries in MA Plans.  The medical conditions, as represented by diagnosis codes, are grouped into HCCs, which are categories of clinically-related medical diagnoses.  *See* 42 C.F.R. § 422.2.  The diagnosis codes grouped or "mapped" into HCCs that affect payment include major, severe, and/or chronic illnesses.  These diagnosis codes are referred to as "risk-adjusting diagnosis codes."  Not all diagnosis codes result in an adjustment in risk score and thus not all diagnosis codes affect payment.  Related groups of diagnoses are ranked on the basis of disease severity and the cost associated with their treatment.

6.     Every month, CMS pays the MA Organizations the capitation amount as established by the bid and adjusted using its risk-adjustment methodology for each beneficiary. MA Organizations pay providers who care for beneficiaries through a variety of arrangements; however, many large provider groups, such as Sutter and PAMF, enter into a capitated or "gainsharing" arrangement that aligns their financial interests.  Under a capitated arrangement, the MA Organization enters into a contract to pay a portion of the capitation payment from the Government to its providers like Sutter and PAMF, less a percentage fee for administration as determined by its contracts.  MA Organizations also pay some providers on a fee-for-service basis for each service, such as an office visit, provided to a beneficiary.  Frequently, the provider also enters into "gainsharing" agreements with the MA Organizations where they receive incentive payments based in whole or in part on total revenues that MA Organizations receive

from the Government for the beneficiaries cared for by these gainsharing providers. These agreements incentivize providers such as Sutter and PAMF to increase the number of risk-adjusting diagnoses they report to MA Organizations, and to report diagnosis codes for more severe risk-adjusting medical conditions. The more risk-adjustment payments obtained by the MA Organizations for the beneficiaries cared for by Sutter and PAMF, the more money MA Organizations pay to Sutter and PAMF pursuant to the capitation and gainsharing agreements. Hence, the patient risk-adjusting diagnosis codes that map to HCCs directly impact the payments received by the MA Organizations and providers like Sutter and PAMF.

7. The scheme in this case centers on Sutter and PAMF (1) knowingly submitting thousands of false diagnosis codes to MA Organizations and knowingly causing the submission of thousands of false diagnosis codes to CMS, and (2) knowingly retaining overpayments resulting from the submission of these false diagnosis codes. Specifically, each false diagnosis code that Sutter and PAMF knowingly submitted and that was used in CMS's risk-adjustment of payments is a false claim under the FCA. These false claims caused the MA Organization's diagnosis submissions to CMS to be false and inflated Sutter and PAMF's share of the capitated payment, resulting in overpayments from CMS. *See U.S. v. Bornstein*, 423 U.S. 303, 312-13 (1976) (a subcontractor's FCA penalties are calculated based on the number of false claims submitted to a contractor, and not the number of false claims the subcontractor caused the contractor to submit to the Government).

8. Sutter and PAMF embarked on a campaign to maximize the number of risk-adjusting diagnosis codes that were reported to the MA Organizations, thus increasing the CMS payment to those MA Organizations, and in turn, to Sutter and PAMF, regardless of whether those codes accurately reflected the patients' documented medical conditions. This campaign originated at the executive levels of Sutter and PAMF, with the goal of maximizing reimbursements from CMS for patients enrolled in MA Plans.

9. Sutter and PAMF recklessly pursued this aggressive course without any meaningful training programs for their affiliated physicians relating to preventing Part C fraud, waste, or abuse. Sutter and PAMF also had ineffective compliance programs that did not guard

against the submission of erroneous, invalid, unsupported or otherwise false diagnosis codes.  To the contrary, Sutter and PAMF encouraged physicians to code diagnoses aggressively and, in many instances, improperly in order to maximize Medicare reimbursements.

10.   From no later than January 1, 2010 through at least January 31, 2016, Sutter and PAMF engaged in aggressive coding practices that resulted in the systematic submission of false risk-adjusting diagnosis codes to the MA Organizations.  In so doing, Sutter and PAMF knowingly ignored numerous red flags regarding false claims, statements, records and overpayments, raised by audits conducted by their own employees, feedback provided by physicians treating MA patients, and audits and warnings by MA Organizations.  Instead of reimbursing CMS for the overpayments, conducting further audits, and funding compliance and training programs, Sutter and PAMF turned a blind eye to these red flags and doubled down on their scheme to increase risk-adjusting diagnosis codes.  Sutter and PAMF knew that the diagnosis codes being submitted to CMS were rife with errors and knew that the submission of these false risk-adjusting codes would inflate Sutter and PAMF's share of the Medicare Part C payments.

11.   This scheme gives rise to FCA claims against Sutter and PAMF for submitting and causing the submission of false claims in violation of 31 U.S.C. § 3729(a)(1)(A), using and causing the use of false records and statements material to false claims in violation of § 3729(a)(1)(B), using and causing the use of false records and statements material to the obligation to repay overpayments in violation of § 3729 (a)(1)(G), and avoiding the obligation to repay overpayments in violation of § 3729(a)(1)(G).

## THE PARTIES

12.   Plaintiff is the United States of America, suing on behalf of the United States Department of Health and Human Services ("HHS"), which includes its operating division, CMS.  At all times relevant to this Complaint, CMS administered and supervised the Medicare Part C Program and made risk-adjustment payments under Part C of the Program.  The United States filed its notice of intervention in this action on December 4, 2018.

13.     The *qui tam* relator, Kathy Ormsby, filed an action alleging violations of the FCA on behalf of herself and the United States Government pursuant to the *qui tam* provisions of the FCA on March 6, 2015.  *See* 31 U.S.C. § 3730(b).  Ormsby is a citizen of the United States and a resident of the State of Nevada.  As detailed herein, Ormsby was hired on May 6, 2013, by Sutter's affiliate, PAMF, as the Risk-Adjustment Project Manager to help support a RAF (Risk-Adjustment Factor) initiative at PAMF.  Her job responsibilities changed almost immediately after she started working at PAMF, when she saw that Sutter had no program to comply with its obligations to provide accurate risk-adjustment data under the Medicare Advantage program.  With the new title of RAF Manager, Ormsby began attempting to develop a compliant RAF program at PAMF, including conducting audits of PAMF's diagnosis code submissions to MA Plans.  She also recruited, trained and supervised a team of certified coders whose function, among others, was to audit the accuracy of PAMF's diagnosis coding and medical record documentation.  Coders situated in-house at a healthcare provider generally review clinical evidence, specifically the medical record, to ensure that it meets all of the appropriate documentation requirements, and that accurate diagnosis codes are assigned for input into the billing system.  Ormsby has personal knowledge of the fraud at Sutter and PAMF.  On May 7, 2015, Ormsby left PAMF for another position.

14.     Defendant Sutter Health is a California non-profit corporation with headquarters in Sacramento County, California.  Sutter owns, controls and/or operates affiliated hospitals and physician foundations throughout California, including PAMF.

15.     Defendant Palo Alto Medical Foundation is an affiliate of Sutter with headquarters in Palo Alto, California.  PAMF is a non-profit corporation with over 4,000 employees at locations in Alameda, San Mateo, Santa Clara, and Santa Cruz.  Sutter controls PAMF, including through overlapping corporate governance boards and executive officers.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction over this action per 28 U.S.C. § 1345 because the United States is the Plaintiff.  In addition, the Court has subject matter jurisdiction over FCA claims for relief under 31 U.S.C. § 3732(a) and (b).

17.     This Court has personal jurisdiction over Defendants under 31 U.S.C. § 3732(a) because at least one of the Defendants can be found in, resides in, and transacts business in this District, or has committed the alleged acts in this District.

18.     Venue lies in this District under 28 U.S.C. § 1391(b), (c) and 31 U.S.C. § 3732(a) because the Defendants can be found in and transact business in this District, a substantial part of the events or omissions giving rise to the claims occurred in this District, and all of the Defendants are subject to the Court's jurisdiction under the FCA.

## THE FALSE CLAIMS ACT

19.     The FCA is the primary civil remedial statute designed to deter fraud upon the United States and reflects Congress's objective to "enhance the Government's ability to recover losses as a result of fraud against the Government."  S. Rep. 99-345, at 1, as reprinted in 1986 U.S.C.C.A.N. 5266.  "The Medicare Advantage capitation payment system is subject to the False Claims Act."  *United States ex rel. Silingo v. WellPoint, Inc.*, 904 F.3d 667, 673 (9th Cir. 2018).

20.     First, a defendant violates the FCA when it "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval."  31 U.S.C. § 3729(a) (1)(A).  As pertinent to this case, the term "claim" under Section 3729(b)(2) of the FCA includes "(A) . . . any request or demand, whether under a contract or otherwise, for money . . . that . . . (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government—(I) provides or has provided any portion of the money . . . requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money which is requested or demanded."  *Id*. § 3729(b)(2).

21.     Second, a defendant violates the FCA when it "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."  *Id.* § 3729(a)(1)(B).

22.     Third, a defendant violates the FCA when it "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or

decreases an obligation to pay or transmit money or property to the Government." *Id*. § 3729(a)(1)(G).  The FCA defines the term "obligation" to include "the retention of any overpayment." *Id*. § 3729(b)(3).

23.     Upon learning of a false diagnosis code resulting in an MA overpayment from CMS, the duty exists to delete or otherwise withdraw that code.  *See United States ex rel. Swoben v. United Healthcare Ins. Co.*, 848 F.3d 1161, 1176–77 & n.8 (9th Cir. 2016).  So doing would result in CMS's electronic processing system recalculating the payment amount, which is the first step in CMS's process to recoup the overpayment.  The failure to delete or withdraw these false codes after notice thereof constitutes the knowing retention of an overpayment in violation of 31 U.S.C. § 3729(a)(1)(G).

24.     Under the FCA, the terms "knowing" and "knowingly" include "actual knowledge of the information," "deliberate ignorance of the truth or falsity of the information," or "reckless disregard of the truth or falsity of the information," and "require no proof of specific intent to defraud."  *Id*. § 3729(b)(1)(A),(B).  Congress intended that the terms "knowing" and "knowingly" "reach what has become known as the 'ostrich' type situation where an individual has 'buried his head in the sand' and failed to make simple inquiries which would alert him that false claims are being submitted." S. Rep. No. 99-345, at 21, as reprinted in 1986 U.S.C.A.N. 5266, 5286 (quotations in original.)  "It is intended that persons who ignore 'red flags' that the information may not be accurate or those persons who deliberately choose to remain ignorant of the process through which their company handles a claim should be held liable under the Act." H. Rep. No. 99-660, at 21 (1986) (to accompany False Claims Act of 1986, H.R. 4827).  As used in this Complaint, the terms "knowing" and "knowingly" have the meaning ascribed to them by the FCA, as do their derivatives "knowledge," "known," and "knew."

25.     The term "material," as used in the FCA, "means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property."  31 U.S.C. § 3729(b)(4).

26.     The FCA imposes liability of treble damages plus a civil penalty for each false claim in an amount (as pertinent here) not less than $5,500 and not more than $11,000 for claims

submitted prior to August 1, 2016; not less than $10,781 and not more than $21,563 for claims

submitted between August 1, 2016 and February 3, 2017, and as appropriately statutorily

adjusted for inflation each successive year under the Bipartisan Budget Act of 2015, Pub. L. 114-

74, § 701, 129 Stat. 584, 599-601 (2015).  See 31 U.S.C. § 3729(a)(1).

## THE MEDICARE ADVANTAGE SYSTEM AND THE ROLE OF PROVIDERS

27.    Medicare is a federally-operated health insurance program administered by CMS

benefiting individuals 65 and older and the disabled.  *See* 42 U.S.C. § 1395c *et seq*.  Parts A and

B of the Medicare Program are known as "traditional" Medicare.  Part A covers inpatient and

institutional care.  Part B covers physician, hospital, outpatient, and ancillary services and

durable medical equipment.  Under Medicare Parts A and B, CMS reimburses healthcare

providers using the fee-for-service system, in which providers submit claims to CMS for

healthcare services actually rendered, such as a physician office visit or hospital stay.  CMS then

pays the providers directly for each service based on payment rates pre-determined by the

Government.

28.    Under Medicare Part C, Medicare beneficiaries may opt out of "traditional"

Medicare and instead may enroll in MA Plans and receive healthcare services managed by those

Plans.  The MA Plans are run by MA Organizations, which are often private insurers.  *See* 42

C.F.R. §§ 422.2, 422.503(b)(2).  Many MA Organizations contract with hospital networks,

physician groups, and other providers, such as Sutter and PAMF, to furnish healthcare services

under the MA Plans.

29.    Pursuant to Medicare regulations, Sutter and PAMF are classified as "first tier"

entities" and "related entities."  *See id*. §§ 422.2 & 422.500.  A first tier entity "means any party

that enters into a written agreement, acceptable to CMS, with an MA organization . . . to provide

. . . healthcare services for a Medicare eligible individual under the MA program."  *Id*., §§ 422.2.

A related entity "means any entity that is related to the MA organization by common ownership

or control and (1) [p]erforms some of the MA organization's management functions under

contract or delegation; [or] (2) [f]urnishes services to Medicare enrollees under an oral or written

agreement . . . ."  *Id*.  First tier and related entities such as Sutter and PAMF must, among other

things, perform their services in a manner that complies with the MA Organization's contractual obligations to the Government, *id*. at 422.504(i)(3)(iii); agree to "comply with all applicable Medicare laws, regulations, and CMS instructions," *id*. at 422.504(i)(4)(v); and receive effective compliance training and education relating to preventing fraud, waste, and abuse, *id*. at § 422. 503(b)(4)(vi)(C)(1).  Furthermore, if a related entity or first tier entity generates data relating to an MA Organization's claims for payments from the MA Program, it (as well as the MA Organization) must certify the accuracy and truthfulness of that data.  *Id*. at § 422.504(l)(3).

## **MEDICARE PART C RISK-ADJUSTMENT PAYMENTS**

30.     In Medicare Part C, the Government pays to each MA Organization a fixed, capitated (per beneficiary enrollee in each MA Plan) amount, adjusted by the expected risk of each beneficiary, on a monthly basis for the provision of items and services that are covered for Medicare beneficiaries under Parts A and B of the Social Security Act.  This per-member, per-month payment does not depend on the amount of healthcare services provided to an enrollee.  Each year this payment is based on a bidding process with CMS, in which each MA Plan, through an MA Organization, submits a bid amount, which is then compared to an administratively set benchmark set by CMS based on a statutory formula.  *See* 42 U.S.C. § 1395w-23; *see also* 42 C.F.R. § 422.2, subparts F and G.  Since 2000, Congress has required that the capitated payments be adjusted for each MA Plan enrollee based on (1) each enrollee's demographic factors such as age, and gender, among others, and (2) each enrollee's health status.  *See* 42 U.S.C. § 1395w-23 (a)(1)(C).  This is known as risk adjustment, and the risk score, sometimes referred to as the risk-adjustment factor or "RAF," acts as a multiplier that is applied to the MA Organization's bid for covering Part A and B services.  42 U.S.C. § 1395w-23(a)(1)(G) and 42 C.F.R. § 422.308(e).

31.     The Secretary of HHS has the authority to determine the risk-adjustment methodology.  *See id*.  Since 2004, CMS has employed an HCC model to calculate a risk score for each beneficiary in an MA Plan.  As directed by Congress, the HCC model takes into account demographic factors and health status.  With respect to health status, the HCC model relies on diagnosis codes documented by authorized health care providers, *e.g.,* physicians in patient

encounters during office visits and hospital outpatient and inpatient stays.  In fact, diagnoses are the sole determinant in the calculation of any risk-adjustment payment based on a beneficiary's health status.

32.     The ICD classifications set forth the standards accepted by CMS and the healthcare industry for the identification of diagnosis codes for health conditions.  *See* 45 C.F.R. § 162.1002(a)(1)(i), (b)(1), (c)(2)(i) ; 42 C.F.R. § 422.310 (d)(1); CMS, *Medicare Managed Care Manual* Chapter 7, Exhibit 30 (Rev. 57, Aug. 13, 2004).  ICD codes are alphanumeric codes used by the healthcare providers, insurance companies and public health agencies to represent diagnoses; every disease, injury, infection and symptom has its own code.  The applicable standards for these ICD diagnosis codes are set forth in the International Classification of Diseases, Ninth Revision, Clinical Modification ("ICD-9") through October 1, 2015, and thereafter the International Classification of Diseases, Tenth Revision, Clinical Modification ("ICD-10").  To ensure accuracy, the patient's diagnoses must result from a face-to-face encounter between physician and patient during the relevant year and must be appropriately documented in the patient's medical record at the time of the encounter.  In addition, codes should be based on documented conditions that require or affect patient care treatment or management.  *See* CMS, *Medicare Managed Care Manual* Chapter 7, § 111.8 (Rev. 57, Aug. 13, 2004), *see also* CMS, *2008 Risk Adjustment Data Technical Assistance for Medicare Advantage Organizations Participant Guide* (2008).

33.     The HCCs are categories of clinically-related medical diagnoses including major, severe, and/or chronic illnesses.  *See* 42 C.F.R. § 422.2.  Each HCC correlates with the marginal predicted cost of medical expenditures for that set of medical conditions based on CMS's data from administering the traditional Medicare Fee-For-Service program.  Higher relative values (sometimes referred to as a relative factor, multiplier, or coefficient) are assigned to HCCs that include diagnoses with greater disease severity and treatment costs.  Between 2004 and 2013, there were 70 HCCs in the Part C risk-adjustment model, and starting in 2014 that number increased to 79, as CMS revised its risk-adjustment model.  A single beneficiary may have none, one, or multiple HCCs.  Some examples of HCC codes are HIV/AIDS (HCC 1), metastatic

cancer and leukemia (HCC 8), congestive heart failure (HCC 80), and ischemic stroke (HCC 100).  HCC numerical codes changed between the 2004-13 model (known as Version 12) and the 2014 model (known as Version 22).  The numerical examples of HCC codes cited herein are from the Version 22 model.

34.    The HCC model is prospective, meaning that it relies on risk-adjusting diagnosis codes from dates of service by a provider in one year (the "date of service year") to determine payments in the following year (the "payment year").  Each MA Plan beneficiary's risk score is calculated anew for the following year.  The higher a MA Plan beneficiary's risk score, the higher the payments by CMS to the MA Organizations.  The MA Organization then distributes a contractually-determined percentage of these payments to providers such as Sutter and PAMF.  Thus, the risk-adjusting diagnosis codes that map to HCC codes submitted by Sutter and PAMF materially impact the amount of the payments CMS makes to an MA Organization, and therefore, to Sutter and PAMF.

35.    Illustrating this process as pertinent to Sutter and PAMF, generally after a face-to-face encounter between a physician and an MA Plan patient, the provider (generally the physician and/or coder) (1) documents the encounter in the patient's electronic medical record, (2) assigns the diagnosis reflecting the patient's medical conditions and uses the capabilities of the electronic medical record to assign the appropriate ICD diagnosis codes, and (3) adds those diagnosis codes into Sutter's electronic records system.  The diagnosis codes are transmitted electronically to the MA Organizations through either an electronic data submission after a patient encounter or through a monthly process in the electronic records system known at Sutter and PAMF as "sweeping" or "sweeps."  In turn, the MA Organizations electronically submit these codes to CMS.  CMS maps each beneficiary's diagnosis codes to HCCs (*i.e.*, the risk-adjusting diagnosis codes), and then calculates each beneficiary's risk score to apply to the payment calculation and determine the reimbursement.

36.    Regulations and guidance made clear to MA Organizations and providers such as Sutter and PAMF that CMS relies on the risk-adjusting diagnosis codes submitted by providers to determine and make accurate capitation payments for each patient enrolled in the Part C

Program.  "Accurate risk-adjusted payments rely on the diagnosis coding derived from the member's medical record." *See, e.g.,* 42 C.F.R. § 422.504(l)(3); CMS, *2013 National Technical Assistance Risk Adjustment 101 Participant Guide* 13 (2013).

37.     MA Organizations can delete diagnoses from both the Risk-Adjusting Processing System ("RAPS") and Encounter Data System ("EDS") to comply with their obligation to delete known erroneous, invalid, unsupported or otherwise false diagnosis codes previously submitted to CMS.  Similarly, Sutter and PAMF also have an obligation to delete these false codes in their systems.  Doing so should cause the MA Organizations to delete those codes in the RAPS system, and thereby cause CMS to adjust the RAF score for the patient downward and the capitated payment downward as well.

### SUTTER AND PAMF'S KNOWLEDGE AND POLICIES RELATING TO RAF

38.     At all times relevant to this Complaint, Sutter and PAMF knew the importance of risk adjustment and the workings of CMS's RAPS and EDS data systems, including but not limited to:  (1) how the HCC model calculated a beneficiary's risk score; (2) regular changes to the HCC model; (3) the ICD classification system for diagnoses codes; (4) the mapping of risk-adjusting diagnosis codes to HCCs; (5) the importance of these risk-adjusting diagnosis codes  in determining each beneficiary's risk score; (6) the direct relationship between a beneficiary's risk score and the ultimate payments to Sutter and PAMF; (7) the requirements that each diagnosis code in a patient's records must result from a face-to-face encounter between health care provider and patient and be documented in the patient's medical records; (8) the importance of these requirements to payment under the Medicare Advantage program; and (9) the duty to delete known invalid, false or unsupported diagnosis codes and return overpayments to CMS.

39.     A December 2013 outline authored and provided by Kathy Ormsby to Sutter and PAMF executives described the importance of PAMF physicians capturing all of the risk-adjusting patient diagnosis codes, stating:

> Medicare Advantage plans rely entirely on the Hierarchical Condition Category for reimbursement.  Because of this, it is essential for Medicare Advantage plans to ensure providers capture

the complete diagnostic profile of every Medicare Advantage patient . . . Medicare Advantage plans must capture HCCs conditions annually.  When documentation does not support the chronic condition(s), and no identification of HCCs has taken place, no reimbursement will be collected from

Medicare.

40.     Sutter and PAMF also regularly tracked RAF data relating to (1) their MA patient population and how their average risk scores compared to state and national benchmarks, (2) a "prevalence" rate identifying the percentage of MA Plan patients assigned certain especially lucrative codes, and (3) the "HCC Recapture Rate" and "HCC Score Comparison" designed to track the performance of "acuity capture and reporting" by PAMF physicians.  These data metrics were summarized on a "RAF Dashboard" which was widely distributed throughout Sutter and PAMF, including to Julie Cheung (Sutter's RAF Program Manager) and Roger Larsen (PAMF's Chief Financial Officer and also a Sutter Regional Vice President of Finance).  Larsen followed and at times commented on these tracking numbers.

41.     Sutter and PAMF used this "acuity capture and reporting" metric not just to track the extent to which their physicians were "capturing" all possible risk-adjusting diagnosis codes for each MA Plan patient, but also to determine how well the coders and others were ensuring that the physicians aggressively captured these codes.  At times, PAMF management permitted "[t]he coder . . . to make correction[s] per Management discretion" to ensure capturing diagnosis codes not recorded by a doctor in the patient's medical records during a patient encounter.  Sutter also distributed a "Critical Pathway Chart" to physicians summarizing "seven critical activities" at the "pre-visit," "point of care," and "post visit" stages of each patient's "face-to-face encounter" with a PAMF doctor that "must be performed to maximize outcomes for HCC capture and reporting."  Sutter and PAMF engaged in numerous strategy meetings to achieve these goals.

42.     Sutter was acutely aware that it had an obligation to report and return overpayments to CMS.  Sutter's written policies and procedures required Sutter and its affiliates

including PAMF to return overpayments to CMS.  "**Overpayment Refund, 13-540** . . .

**POLICY**[:] Sutter Health and its Affiliates will report and refund overpayments from state and

federal health care programs within 60 days of identification, or the due date for any applicable

reconciliation" (emphasis in original.)  This policy also required that "[a]s appropriate, Sutter

Health and its affiliates will take remedial steps to prevent identified overpayments from

recurring."  The policy defined "**Overpayment**" to include "incorrect code or modifier

assignment resulting in a higher level of reimbursement, insufficient or lack of documentation to

support billed services . . . lack of medical necessity, . . . or any other finding that reflects an

overpayment was received as a result of inaccurate or improper coding or reporting of healthcare

items or services" (emphasis in original.)

43.     Sutter and PAMF knew that Medicare and ICD guidelines required them to

properly document the diagnosis codes in a patient's medical records.  Ormsby, as part of her

responsibilities as PAMF's RAF Manager, developed an approved coding guide which was

distributed to all of the certified coders who worked on RAF issues at PAMF, encapsulating

CMS's guidance for coding and documentation.  In that guide, and also during training, Ormsby

explained that to be documented properly as a diagnosis code the medical condition must be

monitored, evaluated, and assessed or treated at a face-to-face encounter between the health care

provider and patient.  To avoid over-coding, the guide identified some of the common coding

pitfalls that may result in false coding.  These include warnings that (1) physicians should not

code conditions without documentation in the medical records, (2) physicians should not code a

condition as active or chronic if there is just a "history of" the condition without any

management, evaluation, assessment and treatment in the current calendar year, and (3)

diagnoses should be documented and coded to the highest level of specificity.

## SUTTER AND PAMF'S AGGRESSIVE CAMPAIGN
## TO MAXIMIZE REIMBURSEMENTS

44.     Beginning no later than 2010, Sutter and PAMF began a campaign to increase the

number of risk-adjusting diagnosis codes for its MA patients, in order to generate revenue and

maximize reimbursements from CMS.  This effort became known as the RAF Campaign.

Discussing the early stages of the RAF Campaign, Dr. Steven Lane (a physician in PAMF's network and PAMF's Electronic Health Record Ambulatory Physician Director), in a January 3, 2012 email with the subject line "HCC codes: more to consider as chronic?," explained, "Over the past year or two . . . increasing attention has been focused on the importance of appropriately identifying and coding HCC diagnoses to improve RAF scores and Medicare managed care reimbursement . . .".  Sutter and PAMF believed that doing so would be "worth tens of millions of dollars to the enterprise" that had been so far "left on the table" and tasked Nancy McGinnis (Sutter's RAF Director) "to lead the efforts to improve Sutter Health's RAF scores."  By 2012, PAMF physicians and management were discussing the "urgency that the upper echelon of Sutter feels for the need to enhance our HCC RAF scores."

45.     As part of the RAF Campaign, Sutter and PAMF identified so-called "Physician Champions" to "act as a liaison between the coding team and the physicians" on the theory that physicians would be more likely to accept diagnosis coding guidance from other physicians. With respect to PAMF, Dr. Veko Vahamaki, PAMF's Lead RAF Physician Champion, supervised the champions at PAMF's four divisions in Alameda (Dr. Amy Lin), Camino (Dr. Graham Dresden), Palo Alto (Dr. Anita Gupta), and Santa Cruz (Dr. Susan Schaefer).  The Physician Champions received additional pay from Sutter for this work, and encouraged aggressive coding with management approval.

46.     Sutter and PAMF understood and openly acknowledged that the Physician Champions were key to increasing Part C reimbursements.  In late 2011, Dr. Jeffrey Burnich (Sutter Senior Vice President and Executive Officer) widely distributed a "RAF Program Summary" at Sutter and PAMF describing, among other things, the importance of the Physician Champions' role in increasing RAF scores.  A few months later, in February 2012, Burnich expressed concern to Suzy Cliff (PAMF's Vice President of Revenue Cycle) and other management that PAMF, in particular, was "leaving millions of dollars on the table" from what he termed "sub-par coding."  A couple of days thereafter, a member of Sutter leadership required PAMF to "identify a PAMF operational director to work with them in improving our RAF scoring/coding on our Medicare Advantage patients."

47.     In September 2012, Dr. Jeffrey Brown (PAMF's Associate Medical Director for Managed Care) designed a "coding party" to improve MA patients' risk scores.  This had been a "pilot" project at PAMF, and, in a follow-up email to PAMF executives Kris Anne Crow (Director of Coding and Education for PAMF) and Cliff, Brown highlighted that "PAMF does not have the luxury of taking a few years to get HCC initiatives off the ground and running," noted "we are not making progress fast enough," and asked to review the data from the pilot so that "[i]f the data looks good we need to spread this quickly to the rest of the organization."

48.     By November 2012, Sutter and PAMF had formalized the RAF Campaign, calling it the "Risk Adjusted Factor Project." The Project's goal was "to reach a 28% improvement in the HCC performance" for its MA Plan patients.  By late 2012, Sutter and PAMF outlined new steps in furtherance of this goal, including approving the hiring of a "Project Manager" to coordinate the RAF Campaign and a "Database Analyst" to track the diagnostic coding performance of network physicians.  Sutter also asked coders in all of its affiliates, including PAMF, to schedule annual "Medicare Wellness Exams" for MA Plan patients lacking any risk-adjusting diagnosis codes to ensure the capture of every possible code that could increase CMS's payments.  Sutter also tracked the success of each affiliate, including PAMF, in scheduling the Medicare Wellness Exams and rewarded meeting a goal of 75% annual wellness visits with a 1% upside bonus at the group level.  Sutter and PAMF understood that "capturing more wellness exams" increased the capture of risk-adjusting diagnosis codes and thus increased revenue.

49.     Also, in November 2012, Brown approved coders adding risk-adjusting diagnosis codes to patient medical records that had been missed by physicians during their patient encounters.  Dr. Vahamaki called this a "pit crew plan" and believed it "would significantly help with the RAF efforts."  Vahamaki, who possessed significant influence in the RAF Campaign due to his position as a Physician Champion supervisor, defended this approach in response to Dr. Christopher Jaegar's (a Sutter Vice President and also its Chief Medical Informatics Officer) concern that "having a coder change an entry that I purposefully enter that has clinical meaning to me/others . . . seems like a dangerous step," and forwarded this exchange to Julie Cheung (Sutter's RAF Program Manager).

50.     In addition, at this time some PAMF physicians began to receive "HCC/RAF cheat sheets" to make it even easier to capture the lucrative diagnosis codes.  The cheat sheets identified the risk-adjusting diagnosis codes that were common to many MA Plan patients (such as diabetes).  The cheat sheets were used to pressure physicians to add these codes into the patient's electronic medical records even during encounters focusing on other patient healthcare problems.

51.     Sutter-affiliated physicians, including those at PAMF, also received a customized "Problem List" for their MA Plan patients through Sutter's electronic medical record system.  A Problem List is a list of health problems with the corresponding diagnosis codes and can be used as a high-level summary of a patient's past health problems.  Sutter and PAMF management used the Problem Lists to pressure physicians to add risk-adjusting diagnosis codes that had not been "captured" during past patient encounters and to refresh risk-adjusting diagnosis codes that were not captured in the current year.  To make this as easy as possible for the physicians, at management's direction coders or Physician Champions pre-populated the Problem Lists with lucrative diagnosis codes and the Problem Lists auto-flagged these codes with "a red pushpin icon" that served as a "visual reminder" for the physician to examine the patient with that diagnosis code in mind.  To document a diagnosis code in a patient's medical records, all the physician then needed to do was electronically move the diagnosis code from the Problem List to the patient encounter part of the electronic medical record.  At times, disputes arose over the pre-population of the Problem Lists.  One typical dispute involved instances in which physicians or PAMF employees did not believe that patient diagnoses qualified as chronic and thus should not be captured to increase RAF scores, while management disagreed and often "err[ed] on the side of including the [diagnoses] as chronic."

52.     Over time, Sutter and PAMF took this practice even further and began to pre-populate the encounter itself with risk-adjusting diagnosis codes.  Physicians expressed the concern that risk-adjusting diagnoses appeared in patient medical records before the physician ever saw the patient.  Yet, these risk-adjusting diagnosis codes appeared in the patient records notwithstanding what health conditions were managed, evaluated, assessed or treated by the

physician during the actual patient encounter.  Physicians were also concerned that they did not know how to delete incorrect diagnoses from their patient's documentation (*see, e.g.*, ¶ 96 i*nfra*). Despite these concerns, Sutter and PAMF did not ensure that false diagnoses were appropriately deleted from the electronic medical record and not submitted for reimbursement to MA Organizations and CMS.

53.     In early 2013, Brown sent letters to physicians with more than "20 MA patients . . . asking those with higher than PAMF average HCC scores what they thought helped them in HCC coding and ask[ing] those with lower than PAMF average scores what the barriers to HCC coding were."  He compiled these results in a survey distributed to Sutter and PAMF executives in March 2013, including Cheung and McGinnis of Sutter and Larsen, Cliff and Crow of PAMF. The survey found that for the above-average physicians, auto-flagging of diagnosis codes in the Problem Lists and the HCC/RAF cheat sheets (called in the survey, the "HCC code tip sheet") especially helped increase coding.  On the other hand, the below-average coding physicians focused on patient care and treatment rather than on coding as exemplified by this statement, "I do not address longstanding stable or prior conditions when that is not important to the care being delivered at the moment."  In the survey, Brown classified that statement as among the "Barriers to Better Coding."

54.     Sutter and PAMF's data-mining practices also played an important role in the RAF Campaign.  Using data mining, Sutter and PAMF "pushed" their physicians through messages in the electronic medical record to find and refresh especially high-paying risk-adjusting diagnosis codes to increase patients' RAF scores.  Similarly, PAMF physicians received "queries" in the electronic medical record from coders reminding the physicians to ensure that all such diagnostic codes were captured.  Numerous physicians disliked this practice and felt "pressured" to add diagnosis codes that they did not believe to be clinically accurate or relevant.  Further, PAMF coders met one-on-one with physicians to discuss their diagnosis coding.  During these meetings, the auditors at times encouraged the physicians to addend their patient records and add risk-adjusting diagnosis codes.  An addendum to the medical record is a note drafted by a physician or other medical professional that clarifies or amends a previous note

made by that same professional, typically within 30 days of the encounter.  Some physicians, such as Drs. Williams and Wong, when prompted to addend records from a prior year, thought it was unethical to be asked to addend old face-to-face encounters.  The coders also laid out a plan to address other risk-adjusting diagnosis codes with PAMF physicians, including for major depression, cachexia, protein calorie malnutrition, morbid obesity and COPD.  Those diagnosis codes were viewed as "high potential missed opportunity [to] increase RAF score."

55.    In August 2013, physicians in PAMF's network began receiving "daily alert" forms for the MA Plan patients on each physician's schedule that day.  The daily alerts identified "what HCC codes have not yet been captured this year for the patient[s]."  Those codes included not just previously diagnosed conditions, but also conditions that data mining software, using an algorithm, "suspects" a patient may have.  The focus of the daily alerts was on pressuring physicians to increase RAF scores rather than on improving coding accuracy or meeting the clinical needs of patients.

56.    In addition to the daily alerts, each physician received a weekly list of MA patients scheduled to see them that week and a monthly report of MA Patients needing to schedule Medicare Wellness Exams by year end.  The purpose of these forms was to "aid in your capturing of chronic conditions."  In response, physicians raised concerns about this pressure and requested that the messages from RAF coders be "nicer."

57.    Also, by August 2013, PAMF executives including Cliff and Vahamaki also received these daily alerts, the weekly lists, and the monthly reports in order to interact with and, if necessary, pressure PAMF physicians to increase diagnosis coding during their MA Plan patient encounters.  One way PAMF management would do this was to have a coder review a physician's documentation after a patient encounter and identify any overlooked risk-adjusting diagnosis codes.  The coder would then tell the physician to confirm the addendum in the patient's medical records.  For example, in August 2013, Vahamaki developed "Dr. V's PCP [primary care physician] Audit Letter Template," explaining, "The diagnostic coding team has added this code to your visit as an addendum . . . Please email back to confirm that this patient has this diagnosis."

58.     Sutter and PAMF's RAF Campaign achieved results.  The RAF Campaign set a goal of capturing 80% of risk-adjusting diagnosis codes within its HCC focus areas: chronic obstructive pulmonary disease, diabetes, and vascular disease.  For example, the "Diagnostic Coding Champions Meeting Minutes" for the August 13, 2013 meeting attended by most of PAMF's senior executives identified "gains" over the past two months in these "3 Key Areas" of coding and compared the performance among PAMF's four divisions.  Also, Sutter data from early 2014 showed $4.4 million in revenue gains from the RAF Campaign in comparing year-end results for 2013 with 2012.  Further, in March 2015, Sutter reported "a 20% overall system wide increase" in the RAF risk scores of MA Plan patients, including increases at all four of PAMF's divisions between 15% and 23% that were expected to achieve $4.173 million in additional Medicare reimbursements.

## **RED FLAG – POOR RESULTS IN MA ORGANIZATION AUDITS**

59.     Each MA Organization, contractually through its provider agreement, requires Sutter and its affiliates, including PAMF, to participate and cooperate in medical chart reviews and audits conducted by the MA Organization or other related entities.  The results of an audit and medical chart review by United Health Group ("UHG"), an MA Organization, and Optum (a UHG affiliate) raised red flags for Sutter and PAMF concerning false risk-adjusting diagnosis codes for dates of service in 2010, 2011 and 2012.

60.     In particular, UHG conducted a "Risk-Adjustment Coding Compliance Review" ("RACCR") audit, which is a retrospective medical chart review focusing on so-called "outlier" risk-adjusting diagnosis codes that the provider being examined submitted much more frequently than the industry average among other large providers.  UHG and Optum auditors identified HCC 82 (acute myocardial infarction, or heart attack) as an outlier and determined that 27 out of 30 of the patient records containing diagnosis codes mapping to this HCC were erroneous, invalid, unsupported or otherwise false in one audit (a 90% failure rate) in October 2012.  A later audit found that six out of seven patient records contained underlying diagnosis codes that were similarly false (an 86% failure rate).

61.     With respect to the October 2012 audit with the 90% failure rate, Sutter and PAMF leadership, including Larsen and Brown (PAMF's Associate Medical Director for Managed Care), knew of these findings.  At a December 2012 "PAMF Coding and Compliance Committee" meeting, Larsen lamented about "the negative impact to our reimbursement" resulting from deleting these codes in the medical records due to the audit results.  But, rather than taking steps to determine whether other records contained similarly false diagnosis codes, the supposed "compliance committee" deliberately decided not to perform any follow-up audits. Crow admitted at the same meeting that the coding department "presently does not have the bandwidth to support such an effort [to perform follow-up audits]" despite the need to do so.  No coders or auditors were assigned by PAMF or Sutter to perform follow-up audits.

62.     Later audits by Optum and UHG auditors focused on the heart attack risk-adjusting diagnosis code at PAMF's Camino location 28 out of 30 erroneous, invalid, unsupported or otherwise false codes for dates of service in years 2013, 2014, and 2015 (a 93% failure rate) and three out of four similarly false codes at its Mills-Peninsula location (a 75% failure rate).  Sutter and PAMF knew that they were required to delete these codes.  While they deleted the specific diagnosis codes identified by the Optum and UHG auditors, Sutter and PAMF deliberately ignored the much larger coding problems identified by these high audit failure rates and refused to expand auditing of diagnoses that mapped to heart attack specifically and to any of the other risk-adjusting diagnosis codes more generally.

## RED FLAG - THE INEFFECTIVE COMPLIANCE AND TRAINING PROGRAMS FOR RISK-ADJUSTMENT CODING

63.     As highlighted by these audit results, Sutter and PAMF lacked any effective compliance or training program related to diagnostic coding for its Medicare Part C program. While there was a PAMF coding and compliance committee, as noted above its members focused primarily on Sutter's RAF Campaign and little on audits examining the validity of the coding or other compliance efforts.

64.     For example, in March 2013, Crow informed Katie Borgstrom, PAMF's Interim Chief Operating Officer, that one of PAMF's divisions, Mills-Peninsula, "has never been audited

and we have no idea what is going on there."  Crow also admitted that PAMF's coding and training group "had no credibility" with physicians and summarized these ineffective coding and compliance efforts, stating: "Historically, the coding department has had no structure, no policies and really no accountability in terms of education provided and timely feedback" to the physicians in PAMF's network.  At that time, Crow discussed these problems with Richard Slavin, PAMF's Chief Executive Officer, who agreed that PAMF must improve in these areas.

65.     On May 6, 2013, Sutter hired the relator, Kathy Ormsby, as PAMF's Risk-Adjustment Project Manager.  She reported to Kris Crow and at times to Suzy Cliff.  In this position, Ormsby served as "the primary liaison between [the] coding, revenue cycle, quality & clinical departments with regards to the Medicare Advantage RAF/HCC coding initiative."

66.     Ormsby had earned a coding certification from the American Academy of Professional Coders.  She also possessed substantial experience with HCC codes, risk-adjusting diagnosis codes mapping to HCC codes, the ICD standards, and Medicare Part C compliance and training  through her previous, six-year employment at an MA Organization.  There, her responsibilities included training physicians in the MA Organization's network on accurate coding, supervising risk-adjustment auditors, and helping to ensure compliance with Medicare rules and regulations relating to the MA Program.

67.     Within the first few days on the job, Ormsby became aware that PAMF lacked a compliance or coding training program relating to Medicare Part C.  As Ormsby explained in notes written at a PAMF performance review several years later, on the first day "I was sent to a cube with nothing in it but an empty desk," "with absolutely no support, tools or guidance."  In another performance review, Kris Crow, her supervisor, admitted that when Ormsby arrived no coding compliance or training program existed at PAMF.

68.     Ormsby also realized that the same problems existed system-wide at Sutter.  She knew there were no Sutter coding compliance manuals or training guides for physicians on diagnosis coding.  Also, a discussion with Cheung (Sutter's RAF Program Manager), within the first month of Ormsby's employment, confirmed the lack of any compliance program at Sutter concerning risk-adjustment diagnosis coding or compliance.  Indeed, Cheung admitted to

1   Ormsby that prior to joining Sutter she possessed no coding or compliance experience, and

2   Ormsby knew from her work with Cheung that she primarily focused on the RAF Campaign

3   rather than on Medicare Part C compliance.

4       69.    Despite Ormsby's efforts detailed below, the compliance and training problems at

5   Sutter and PAMF did not improve.  An August 2014 coding survey of dozens of physicians in

6   PAMF's network (reflecting physician discussions between March and August 2014 with the

7   coding and auditing team Ormsby hired at PAMF) revealed no meaningful improvement in

8   coding compliance or training.  PAMF executives Larsen, Vahamaki, Cliff, and Crow all

9   received the survey results showing widespread confusion among physicians (as well as the

10  compliance department) about the coding requirements.  Not surprisingly, this survey also

11  showed these physicians' patient medical records were replete with false diagnosis codes,

12  including codes mapping to HCC codes for different types of cancer, diabetes, renal failure,

13  emphysema, pulmonary disease, and vascular disease, among others.  In fact, the little physician

14  education that PAMF physicians had received on diagnosis coding (prior to Ormsby's efforts)

15  focused on increasing RAF scores.  For example, in February 2014, Dr. Karen Suskiewicz told a

16  PAMF auditor who questioned the adequacy of the patient's medical record documentation for a

17  diabetes diagnosis, "I was told [at] the coding meeting last year that we should 'upcode'

18  whenever possible . . ." (quotation in original.)

19      70.    Over time, the attitude of Sutter and PAMF management towards coding

20  compliance became more dismissive, as management continued to ignore red flags as well as

21  warnings by Ormsby.  Under the tenure of Christian Gabriel (Ormsby's new supervisor) that

22  began in early February 2015, compliance became even less of a priority than it had been under

23  her former supervisor, Kris Crow.  As described below, this did not happen by chance, but

24  represented a calculated effort by Sutter and PAMF to further the RAF Campaign and improve

25  their efforts at maximizing Medicare reimbursement.

26  //

27  //

28  //

**RED FLAG - ORMSBY'S AUDIT RESULTS PROVIDED SUTTER AND PAMF**

**WITH ACTUAL NOTICE ABOUT THOUSANDS OF FALSE CLAIMS**

71.     Concerned about the lack of coding compliance and training, Ormsby personally conducted, within a few weeks of her hiring, a random diagnosis coding audit of 42 physician-patient encounters at PAMF occurring in the first two quarters of 2013.  In so doing, she followed the ICD-9 coding guidelines used by Medicare.  This type of audit is called an "Encounter Audit."  It evaluates one physician-patient encounter in a given year and is useful to establish a baseline for coding accuracy.  However, an Encounter Audit alone does not determine the extent of overpayments from CMS.  A patient may have more than one encounter with the physician annually or an encounter with a different physician or in a different setting later that year that may establish the validity of a diagnosis.

72.     Ormsby completed this audit in early June 2013.  She discovered an 85% coding failure rate, with 53 of the 62 risk-adjusting diagnosis codes being false.  All of these codes had been submitted by PAMF for reimbursement, which raised a red flag of overpayments from CMS.

73.     A month later, on July 8, 2013, one of the MA Organizations, UHG, sent McGinnis, Sutter's RAF Director, a letter "identif[ying] your practice as having submitted one or more HCCs at significantly higher rates than your peers," requesting supporting documentation, and noting UHG's engagement of a consulting firm to conduct a medical chart review.  Cheung, Sutter's RAF Program Manager, received and forwarded the UHG letter to Ormsby, among others, who responded to Sutter and PAMF executives that the letter "identifies [PAMF] as having some red flags and I want us to be compliant."  Ormsby also began lobbying for auditing support, stressing "[w]e really need to get on the ball with our potential HCC auditor[s]."

74.     In light of her audit results, Ormsby created a "Corrective Action Plan" in early August 2013.  Her plan called for hiring certified coders to perform audits and developing a compliance and training program to improve coding accuracy.  Ormsby also cited the 85% diagnosis coding failure rate in her June 2013 audit, and identified the "root cause" as PAMF's ineffective compliance and training.  The Corrective Action Plan explained that the audit

"confirmed that proper instruction for documentation requirements had not been communicated clearly to providers" and that PAMF "currently lacks a clearly defined procedure for auditing and provider feedback."

75.     The Corrective Action Plan called for two types of audits: "Encounter Audits" similar to Ormsby's June 2013 audit, and "FOCUS Audits" examining the error rates of several key HCCs (cancer, stroke, and fractures) that Ormsby understood from her prior experience were often miscoded and resulted in lucrative CMS reimbursements.  The FOCUS Audits examined diagnosis codes in PAMF patient medical records covering an entire calendar year and thus could be used in determining overpayments from CMS.  Ormsby gave her supervisor, Crow, a copy of the Corrective Action Plan.  Soon thereafter, Ormsby received authorization to hire five certified coders, but no substantive feedback about the Corrective Action Plan.  PAMF management above Crow approved the hiring of the five certified coders to work as auditors. However, at the time, management viewed audits as a tool to increase diagnostic coding rather than for compliance.

76.     While the Encounter and FOCUS audits proceeded at PAMF, Ormsby learned of additional risk-adjusting diagnosis coding problems in PAMF's MA beneficiary medical records. In January 2014, one of the Physician Champions, Dr. Gupta, identified "thousands" of "old, outdated and incorrect" diagnoses on the Problem Lists that place "[us] at risk of incorrectly coding them in a given year."  In addition to Ormsby and her supervisor, Crow, other PAMF executives learned of this problem, including Vahamaki and the four Physician Champions.

77.     In an April 3, 2014 proposal to Crow and Cliff seeking five more full-time coders to augment her team, Ormsby identified 185 risk-adjusting diagnosis codes that had been "incorrectly captured by providers and submitted for reimbursement" in just the first quarter of 2013 alone.  Ormsby explained that with these additional coders "[d]ocumentation across all of PAMF would be better supported to reach the requirements identified by CMS (Center for Medicare and Medicaid Services) and show a marked increase in compliance" (parenthetical in original.)

78.     Shortly after this proposal, Sutter and PAMF received the results of a chart review by a consultant, Peak Health Services, engaged by UHG and Health Net, another MA Organization, for dates of service in calendar years 2012 and 2013.  The Peak chart review identified over 8,000 false diagnosis codes for MA Plan patients that Sutter and its affiliates needed to delete based on "overcod[ing]" and diagnoses "not supported in documentation."  Sutter and PAMF executives, as well as Ormsby, learned of these results.  Despite this additional red flag, Sutter and PAMF executives did not direct Ormsby or any other auditor to take remedial action to identify other false diagnosis codes.

79.     On June 3, 2014, Ormsby informed management that preliminary results of the 2013 Encounter Audits were showing high failure rates.  The Encounter Audits found 1,082 false risk-adjusting diagnosis codes out of a total of 2,226 patient encounters audited, a nearly 50% failure rate (48.9%).

80.     A few weeks later, on June 27, 2014, Ormsby informed Crow that the Physician Champions were erroneously educating PAMF physicians about the diagnosis coding requirements for morbid obesity and aortic atherosclerosis.  Based on her dealings with them, Ormsby explained to Crow that "[i]t is apparent that the champions have been training our providers on aortic arthrosclerosis and morbid obesity incorrectly" and suggested an audit to uncover the extent of the problem.  PAMF did not authorize any audit in response to this request.

81.     Approximately one month later, in late July 2014, Ormsby raised another red flag, identifying false diagnosis codes with PAMF management relating to a single MA Plan patient identified herein as Patient A dating back to a patient encounter in 2010.  An MA Organization (UHG) had requested the medical records for Patient A supporting the submission of a risk-adjusting diagnosis code (prostate cancer) during dates of service in 2010.  In response, Ormsby pulled Patient A's medical records and found nothing in the record to support the prostate cancer code for that year.  She provided Patient A's medical records to UHG as requested and brought this problem to the attention of her supervisor, Crow, as well as to Cheung at Sutter.  In response, Cheung reprimanded Ormsby for turning over Patient A's medical records to UHG and ordered her never to do that again, but instead to send any patient medical records to Cheung.

82.     Concerned about potential liability, Crow asked Ormsby to calculate the potential reimbursements to CMS from the false coding related to Patient A in light of UHG's understanding of CMS's position that "if one HCC failed in audit, [CMS] could assume that for every patient in the plan that submitted the same HCC, [CMS] can ask for the payment back." Given the false coding of prostate cancer for Patient A, Ormsby identified a total of 484 codes for prostate cancer submitted for payment in 2010 and estimated the potential reimbursement at $1.936 million, which she stated "is probably low."

83.     Also, in July 2014, Ormsby performed another Encounter Audit similar to the one she had conducted in June 2013.  This time she reviewed 20 physician-patient encounters covering the one-month period of March 2013.  Ormsby found a 90% failure rate, with false risk-adjusting diagnosis codes in 18 of the 20 encounters.

84.     In December 2014, Ormsby and her audit team memorialized the final tally of the 2013 FOCUS Audit of risk-adjusting diagnosis codes for cancer, stroke, and fracture.  For cancer (HCC 10, categorizing breast, prostate, colorectal and other cancers and tumors), 164 of the 182 patient records audited for the 2013 calendar year were erroneous, invalid, unsupported or otherwise false for HCC 10.  Ormsby calculated the "HCC 10 Accuracy" rate at 9.88% for this cancer code.  For stroke (HCC 99/100, including cerebral hemorrhage and ischemic or unspecified stroke), 162 of the 169 patient records audited for the 2013 calendar year were similarly false for HCC 99/100.  Ormsby calculated the "HCC 99/100 Accuracy" rate at 4.1% for these stroke codes.  For fracture (HCC 169/170, including vertebral fractures without spinal cord injury and hip fracture/dislocation), 57 of the 86 patient records audited for the 2013 calendar year were also false for HCC 169/170.  Ormsby calculated the "HCC 169/170 Accuracy" rate at 33.7% for these fracture codes.

85.     As noted in ¶ 75 *supra*, FOCUS Audits are especially important for compliance purposes because they identify false risk-adjusting diagnosis codes that result in inflated Medicare reimbursements and, upon identification, trigger the duty to delete these codes to ensure the appropriate reimbursement.  On December 16, 2014, Ormsby met with Marcella Alaniz, a PAMF Compliance Analyst, to discuss these poor results.  Ormsby also discussed the

2013 FOCUS Audit results with Jessica Driver-Zuniga, Sutter's lead RAF/HCC coder, including the continuing problem of false diagnosis codes still being submitted to MA Organizations and subsequently to the CMS reimbursement system.

86.     Three days later, on December 19, 2014, Ormsby widely distributed the 2013 FOCUS Audit results to PAMF senior management, flagging the high failure rates (cancer 90%, stroke 96%, and fracture 64%). Ormsby identified the audit as a high-priority compliance issue encompassing over 7,500 encounters in one year of service. That same day Ormsby notified PAMF senior management that there were additional false risk-adjusting diagnosis codes that had been submitted to CMS and that required reimbursements of the overpayments from CMS. She wrote, "We have identified 94 encounters that have been submitted to CMS without supporting documentation for HCC conditions billed" from PAMF physicians. Ormsby also wrote that she "expect[ed] this number to increase daily until a resolution can be implemented."

87.     These audit results further showed that over 3,500 patient encounters from 2013 dates of service remained un-reviewed. In fact, Ormsby's auditing team had the capacity to review only a small percentage of the cancer, stroke and fracture encounters for 2013 dates of service at PAMF, which itself was only a small portion of the encounters that should have been reviewed. No other dates of service had been reviewed, and Ormsby raised that concern to her immediate supervisor, Suzy Cliff, in writing, on January 21, 2015.

88.     The false coding problems highlighted by the 2013 FOCUS and Encounter Audits came as no surprise to PAMF management. Indeed, throughout 2014, Ormsby distributed the monthly RAF Dashboard results to management, including to Larsen and Cliff of PAMF. These results detailed hundreds of erroneous, invalid, unsupported or otherwise false diagnosis codes compiled as the Encounter and FOCUS Audits progressed.

89.     In early January 2015, Ormsby raised a new problem concerning "misleading labels" for stroke in Sutter's electronic medical record system to management at Sutter and PAMF, including Cheung at Sutter and Cliff at PAMF. Ormsby attached a screen shot showing these misleading labels, which stated that various types of stroke, as long as they took place within eight weeks of the visit, were considered acute and carried an "HCC" label. Ormsby

explained that this diagnosis code should not be captured after a patient is discharged from the hospital in an in-patient setting (much less within eight weeks), but "[t]he labels are causing providers to capture the incorrect ICD-9 codes and we are being reimbursed inappropriately."  In response to Ormsby's request to remove the words "8 weeks" from the label, Cheung resisted, noting that "[t]he Compliance Reimbursement Team hasn't yet weighed in."  Cheung also admitted that these misleading electronic medical record labels were a system-wide problem at all of Sutter's affiliates, not just PAMF, and cautioned that a change in labelling "won't be made for just one organization."

90.    Finally, in March 2015, Ormsby updated her FOCUS and Encounter Audit results at the request of her new supervisor, Christian Gabriel, who started working in that position at PAMF on or about February 1, 2015.  The updated 2013 FOCUS Audit results showed Ormsby and her auditing team's deletion of 1001 false diagnosis codes that had been submitted for reimbursement.  These deletions resulted in downward adjustments of the CMS reimbursements that had been inflated by these false codes.  Also, the 2013 and 2014 Encounter Audit results showed the deletion in the electronic medical record system of 777 false diagnosis codes in 2013 and 517 false diagnosis codes in 2014.  Upon reviewing this data, Gabriel asked Ormsby to calculate an overpayment amount for these false codes.  She estimated it at approximately $4.2 million and explained to him that this likely represented just the tip of the iceberg.  For example, 3,844 encounters remained unaudited in date of service year 2013 alone and thousands of later encounters also were never audited.  Based on the aggressiveness of the RAF Campaign, the substantial encounter coding error rates identified by Ormsby and the auditing team, and, as detailed further below, management's refusal, starting in early 2015, to use audits as a tool to identify erroneous coding, Sutter and PAMF knowingly submitted and caused the submission to Medicare of thousands of false risk-adjusted diagnosis codes (*i.e.* false claims) for date of service years 2014, 2015, and 2016 and did not delete those false codes or refund overpayments to CMS.

//

//

//

**SUTTER AND PAMF KNOWINGLY IGNORED RED FLAGS AND ACTUAL NOTICE OF FALSE CLAIMS AND THWARTED EFFORTS TO IMPROVE CODING**

91.     As detailed above, Sutter and PAMF management knew about the ineffective compliance and training that would inevitably result in substantial false coding.  They also knew about the internal and external audits highlighting years of substantial false coding at PAMF.  Instead of addressing these problems, Sutter and PAMF management continued to engage in the RAF Campaign and encouraged aggressive diagnosis coding, resulting in the submission of false codes and inflated Medicare reimbursements.

92.     Before Ormsby's arrival at PAMF in May 2013, Sutter and PAMF management recklessly disregarded and were deliberately indifferent to problems of false diagnosis coding, with few attempts made to audit or otherwise identify such problems even in the face of the high failure results of audits and chart reviews by UHG, Peak and Optum.  Indeed, the RAF Campaign itself, with the goal of increasing lucrative diagnosis coding, highlighted Sutter and PAMF's focus on Part C profits over compliance.

93.     One illustration of this corporate attitude came in early February 2012.  Greta Fees, the Sutter Director of Coding, Documentation and Data Quality, expressed concern about "the added descriptive of chronic to the diagnosis code descriptions," for among others, leukemia, bronchitis, and asthma.  Labelling these diagnoses as chronic instead of acute would permit the addition of risk-adjusting diagnosis codes from patient encounters and, thus, increase reimbursements from CMS.  However, Fees believed that these diagnoses clinically related to "acute" rather than chronic conditions and explained that research she had undertaken did "not support adding the descriptive term of chronic . . . as that would change the definition, intent and possibly use of the code."  She relayed these concerns to Dr. Lane of PAMF and Dr. Meg Durbin, a PAMF Regional Medical Director, Managed Care, both of whom wanted to add the "chronic" label to these diagnoses.  In response to Fees' concern, Lane and Durbin pushed back in support of the "chronic" designation, tried to pressure Fees into accepting their analysis, and then claimed they were "approaching a consensus" with Fees despite her continued disagreement with them.

94.     Another illustration of this attitude came in September 2012, when Dr. Brown of PAMF designed the "coding party" to improve MA patients' risk scores.  See *supra* at ¶ 47.  In so doing, Brown characterized emphasizing patient care to the physicians as a strategy to increase coding "as opposed to simply hammering on them to code better."

95.     Similarly, in response to UHG's October 2012 audit of 30 patient charts that identified a 90% error rate for one code, the "PAMF Coding and Compliance Committee" focused on the loss of revenue from the audit and rejected any expansion of audits due to a lack of resources in PAMF's coding department.  *See* ¶¶ 59-61 *supra*.

96.     In addition to these internal discussions prioritizing the RAF Campaign above coding compliance and training, Sutter and PAMF received a steady stream of complaints from physicians in PAMF's network highlighting their concerns about the push for aggressive risk-adjusting diagnosis coding.  Among the examples:

- Dr. Joann Falkenburg expressed discomfort several times to Physician Champions Dr. Amy Lin and Dr. Vahamaki about the RAF Campaign's encouragement of upcoding, including:  (i) "I got two new HCC [daily] alerts today and have concerns about both of them"; (ii) "they [coders] suggested [a patient] get diagnosed with COPD [asthma] based on a diagnosis in UC a year and a half ago . . . I don't feel it is legitimate to code this"; (iii) "with my patient on hospice, there is something that seems unseemly about pursuing a new diagnosis of PVD [pulmonary vascular disease] when she has weeks to live"; (iv) "it makes me feel a little fraudulent to be considering it"; and (v) "I try to be pretty legitimate about how I diagnose, document and chart and want to avoid any possibility that it looks like I am working someone up just for the financial upside."

- Dr. Douglas Tucker complained to Vahamaki and others in PAMF's management about a coder changing a patient diagnosis, stressing that:  (i) "changing a diagnosis from acute bronchitis to pneumonia is not a simple or unimportant change"; and (ii) "it is so obviously unethical."

- Dr. Heather Linebarger complained to Vahamaki, among others, about the Medicare Wellness Exams: "I have serious questions about the new policy of booking in Medicare Advantage patients to review all HCC codes . . . This represents a waste of time for the patient and a loss of appointment and worsening of access for me."

- Dr. Thomas Deetz told a PAMF auditor, Lydia McGriff, "pre-populating diagnoses into his visit encounter is possibly fraud . . . Does CMS know about what you all are doing?" McGriff then relayed Deetz's concerns to Gabriel.

- Dr. Lisa Gervin told a PAMF auditor, Lawrence Poms, she did not know how to delete an incorrect HCC code entered by a coder after her patient visit, and Poms then told Gabriel about this incident.

- "[M]ultiple doctors" complained to one of the Physician Champions, Dr. Graham Dresden, about the "harshness of the messages" on the daily alerts: "they were offended by the messages and . . . felt like the message was either confusing, fraudulent, excessive, etc." Dresden relayed this complaint to PAMF management.

97.     In addition to the frequent complaints from physicians, after Ormsby's arrival Sutter and PAMF management received actual notice from Ormsby and her audit team about rampant false diagnosis coding and ineffective compliance and training. Initially, Sutter and PAMF management ignored her and continued the RAF Campaign unabated. However, as Ormsby and her auditing team deleted false diagnosis codes that mapped to HCCs and negatively impacted the reimbursement from CMS, Sutter and PAMF management took steps to impede her efforts and stop her ability to delete false codes.

98.     As noted above, by August 2013 Ormsby had collected Encounter Audit data showing significant error rates (53 of 62 false diagnostic codes from the 42 physician-patient encounters) and developed the first Corrective Action Plan. Yet, other than hiring additional auditors, which at the time management expected would be employed to help increase RAF scores and revenue, Ormsby's other compliance and training recommendations were ignored.

99.     Despite discussions with management about physician complaints regarding the RAF Campaign, no changes took place.  Rather, Sutter and PAMF management continued to pressure the physicians to increase risk-adjusting diagnosis coding.

100.    On January 8, 2014, one of the Regional Physician Champions, Dr. Schaefer, stated her misgivings to Dr. Sean Gaskie concerning the RAF Campaign's "[M]edicare compliance" after reviewing a graph showing substantial increases in the "Quarterly Capture Rate" of HCC coding in 2013 compared with 2012.  Schaefer understood and told Gaskie that "[M]edicare frowns on practices that just increase revenue."  In response, Gaskie tried to redirect her focus to quality patient care, while admitting that "we're used to thinking of RAF as just '100M left on the table.'"

101.    Later that month, another Regional Physician Champion, Dr. Gupta, identified to PAMF management "old, outdated, and incorrect" Problem Lists sent to the physicians via the electronic medical record system.  Gupta warned that "the Problem Lists are not fully compliant" and if errors "remain on the list, then we are at risk of incorrectly coding them." *See, e.g.,* ¶¶ 51-52, 76 *supra* for additional detail.

102.    As Ormsby and her auditing team continued to identify and delete false risk-adjusting diagnosis codes that impacted Medicare reimbursements throughout 2013 and the first two quarters of 2014, Sutter and PAMF management began to impede her efforts at ensuring that Sutter and PAMF receive only the appropriate reimbursement for MA Plan patients.  Notwithstanding Ormsby's multiple requests for additional auditors beginning in early April 2014 and several audits identifying substantial false diagnosis coding, Sutter and PAMF prevented her from hiring the additional auditors she needed for Medicare Part C compliance and auditing.

103.    On September 29, 2014, Ormsby attended a PAMF executive meeting with Larsen, Cliff, Vahamaki, and many others.  At the meeting, Ormsby delivered a PowerPoint presentation summarizing the results, to date, of the Encounter and FOCUS Audits.  The results continued to demonstrate significant concerns, with 6,082 false risk-adjusting diagnosis codes identified out of 12,220 physician-patient encounters reviewed.  Ormsby also made compliance

1   and training recommendations at the meeting, including "Diagnosis Champions" to work

2   alongside the Physician Champions and to train the physicians in PAMF's network about proper

3   coding and other compliance issues.

4       104.   A few days after the meeting, Larsen responded.  Rather than lauding Ormsby's

5   compliance efforts or recommending the implementation of any of her compliance and training

6   ideas, he complained to Dr. Vahamaki, Cliff, and Dr. Michael Conroy, PAMF's Chief Medical

7   Officer, about his unhappiness with the pace of the RAF Campaign in increasing reimbursements

8   from CMS.  The first paragraph of Larsen's email, dated October 1, 2014, highlights the focus of

9   PAMF's Chief Financial Officer on profits over compliance:

10          We are now over a year into the HCC improvement effort [*i.e.*, the

11          formal RAF Campaign] and I see that we are making some limited

12          progress but are behind where we could be and will likely not

13          achieve more than a modest improvement if we continue as is.

14          Given our existing efforts and the general mindset of the physicians

15          I predict we will achieve at most a 10% improvement.  As discussed

16          in the original plan, critical to the success of a successful program is

17          the shift in PCP [primary care provider] perspective to catch the

18          vision of thinking about actively managing and thinking of patients

19          in terms of their chronic conditions.  In general, I am concerned that

20          we do not have this shift in thinking which is critical to building a

21          foundation for longer term and more significant improvement.  We

22          are still thinking of this as a coder supported initiative versus

23          physician owned.  I think we may need to ask the Board to

24          reconsider implementing a physician compensation incentive along

25          with a refocus on the other key parts of the plan to effectively change

26          the PCP culture necessary for HCC success.

27      105.   That day, Vahamaki forwarded Larsen's email to Cheung and McGinnis of Sutter

28  and they discussed Larsen's focus on the RAF Campaign and Ormsby's compliance efforts.  In

particular, Vahamaki agreed with Larsen's "strategic" focus on profits and identified one barrier as the coding department's (*i.e.*, Ormsby's) focus on compliance.  Cheung agreed that Larsen "sees the significance of the physician champions" to the RAF Campaign's success.  Also criticizing Ormsby, Vahamaki expressed "shock[]" that Ormsby had presented the PowerPoint without informing him ahead of time, claimed she had "hijacked the meeting for the first 25 minutes in order to give this presentation," and complained about her "most definitely pushing her own agenda."  He also indicated that the Physician Champions "universally questioned and disliked" Ormsby's idea of Diagnosis Champions and did not recommend presenting this proposal at upcoming management meetings, "as it clearly does not represent PAFMG/PAMF at this time."  A few minutes later, Cheung agreed, "considering this a closed issue," and effectively ending any possibility of Sutter or PAMF implementing Ormsby's recommendations.

106.   Following the plain directives from Larsen, Vahamaki and Cheung, Sutter and PAMF management took additional steps to limit Ormsby's attempts to ensure that the RAF Campaign complied with the law.  One such step was to prevent PAMF coders from deleting false diagnosis codes requiring reimbursement and instead forcing the busy network physicians to do so.  On October 15, 2014, Cliff told Ormsby, in an email entitled "HCC Coding Corrections," "[p]er our conversation this morning, please remind your team to stop performing any charge corrections on accounts until we can map out the downstream [e]ffects."

107.   In a related step to stop the deletion of false but lucrative diagnosis codes, on November 12, 2014, Dr. Criss Morikawa, a PAMF executive, distributed to PAMF management and Ormsby's auditing team an email describing PAMF's new policy prohibiting "submitting charge corrections to payors (esp. Medicare) more than 30 days after date of service" (parenthetical in original.)  In response, Dr. Edward Yu, PAMF's Medical Director, inquired, "What happens if the incorrect diagnosis code puts us at risk of [M]edicare fines for inaccurate coding?"  Morikawa replied that due to the "close to a million charge transactions" that PAMF submits every month "it is not scalable to hold and review every encounter-even on say all [M]edicare."

108.     Thereafter, on November 26, 2014, Ormsby attended a meeting with Marcella Alaniz and Jessica Lin (both PAMF Compliance Analysts), among others.  Alaniz complained that Ormsby lacked any authority to delete false diagnosis codes from patient encounters in the electronic medical record and instructed her to stop doing so immediately.  Instead, only the physicians could make these deletions, while Ormsby and her auditors could make changes just to the billing records.  In response, Ormsby explained that the monthly "sweeps" of diagnosis codes for reimbursement purposes related to the encounter side of the electronic medical record, not the billing side of the electronic medical record (which was intended to serve as a billing mechanism and record for patients who were enrolled in "traditional" fee-for-service Medicare). She also explained that, as a result, deleting false risk-adjusting diagnosis codes from the billing side and not the encounter side of the electronic medical record would do nothing to prevent false codes from being submitted for reimbursement to MA Organizations, and in turn to Medicare.

109.     A few days later, Ormsby tried to reverse management's directive to stop her auditing team from deleting false diagnosis codes.  On December 1, 2014, Ormsby warned PAMF management, including Alaniz, Cliff, Morikawa, and Debbie Troklus (PAMF's Compliance Director), that "I don't think this recommendation is a compliant solution."  The next day, December 2, 2014, Ormsby warned PAMF management about the importance to Medicare of proper diagnosis coding and Medicare's upcoming focus on coding compliance.

110.     On December 10, 2014, Ormsby became even more explicit about Sutter and PAMF's widespread false coding and the prospect of being caught by Medicare.  She stated, "I am very concerned about the large number of non-compliant chronic HCC conditions that have been submitted to the health plans for reimbursement," and once again highlighted the 2015 "OIG Work Plan[s]" emphasis on MA audits of diagnostic coding.  Ormsby also explained that, based on her experience, most physicians will not delete unsupported codes due to time pressure and inattention, and some cannot do so because they are no longer affiliated with PAMF.  She sent the email to Conroy (PAMF's Chief Medical Officer), Vahamaki and Cliff.  Cliff subsequently chastised Ormsby for escalating the issue to Conroy.

111.    Despite Ormsby's efforts, Sutter and PAMF continued the RAF Campaign without implementing any of her recommendations.  Quite the contrary, that same month (December 2014), Dr. Schaefer, the Regional Physician Champion of Diagnostic Coding for Sutter, increased the coding pressure on physicians because "as we approach end of year [we] are trying to maximize capture of HCC's."

112.    Ormsby's concerns about the new policy prohibiting the deletion of false diagnosis codes on the patient encounter side of the electronic medical record system was widely known throughout PAMF and by certain Sutter managers, leading to her at times being purposefully bypassed on internal discussions about coding problems.  As Dr. Schaefer put it in a widely distributed December 2014 email discussing a coding issue, "I am not sending this to Kathy as we know what happens."

113.    In addition, Ormsby distributed the results of her FOCUS Audit in mid-December 2014 and continued raising issues about PAMF's false coding.  She also raised these issues at a January 21, 2015 meeting with Cliff and sent a follow-up email the next day to PAMF management, including Vahamaki, Cliff, Troklus, Alaniz and Morikawa.  In the email, she "reiterated [her] concerns regarding" five key HCC coding compliance problems, as follows:

1.    Accuracy rates of cancer, fracture and stroke (2013 dates of service and beyond);

2.    Concerns regarding the payments received without supporting documentation (60 day window);

3.    Encounters by providers who are no longer at PAMF and have unsupported HCC submissions;

4.    Providers who are not responding to staff messages regarding specificity and clarification for HCC's submitted to CMS;

5.    Discontinued use of the auditing billing notes/corrections to rectify unsupported ICD-9" (parenthetical in original.)

114.    Additionally, Ormsby notified management that the monthly electronic medical record "sweeps" of risk-adjusting diagnosis codes from the patient encounter records would lead

to the submission of many false codes to the MA Organizations and then to CMS.  Highlighting this particular problem, a February 24, 2015 memo from Driver-Zuniga (Sutter's lead RAF/HCC coder) admitted that unsupported diagnosis codes that were known by PAMF and Sutter to be invalid were being "swept" into the reimbursement system.

115.    PAMF elevated Ormsby's concerns to Sutter.  Nevertheless, Sutter and PAMF's focus on profits over compliance did not change.  Ormsby and her auditing team continued to be barred from deleting false diagnosis codes, and management continued to review "the financial impact of revising PAMF's RAF scores."

116.    As a result, Ormsby's audit team did not conduct any additional Encounter, FOCUS or other compliance audits through at least May 2015 (after Ormsby left Sutter).  When Ormsby's former team re-started doing audits, management directed that they focus on audits that would increase HCC coding and raise RAF scores, as explained below.

117.    Despite the red flags raised by the FOCUS Audits and to ensure the continued aggressive approach to diagnosis coding, as noted above in early February 2015 Sutter and PAMF hired Gabriel to supervise Ormsby.  *See supra* ¶¶ 70, 90.  Initially, Ormsby tried to impress upon Gabriel the importance of coding compliance issues.  She presented him with a recent CMS presentation highlighting, among other things, the importance of appropriate HCC coding and documentation, as well as identifying the Medicare rules related thereto.  Ormsby also gave Gabriel a self-assessment relating to PAMF's MA Plan program describing the need for more auditors and compliance.

118.    Nevertheless, the RAF Campaign continued to be Gabriel's priority over compliance.  When Ormsby attempted to raise compliance issues, Gabriel directed her to discuss any "differences in private" with him alone rather than via emails that included the auditing team.  Then, on March 9, 2015, Gabriel issued a "verbal warning" to Ormsby based on misgivings about the RAF Campaign that she had expressed at a meeting with Gabriel and her auditing team.  He also made clear that at this time the audit "team, structure and process is my #1 focus" "[g]iven the lack of progress in improving our RAF/HCC scores."

119.    Similarly, at a "Strategy Meeting" in mid-March 2015, Gabriel stressed the new focus of Ormsby's auditing toward "rais[ing] the RAF score."  A few days later, on March 18, 2015, Gabriel detailed this new focus to the auditing team at a three-hour meeting that Ormsby could not attend.  In a follow-up email to the auditing team, Gabriel admitted that he had "dropped a 'bomb' on you in terms of a new initiative . . ." (quotation in original.)  Relaying the contents of this meeting to Ormsby, Ellie Kamkar, Manager of Coding, Training and Auditing at PAMF, reported that Gabriel had directed the auditing team "to take off the compliance hat and put on the revenue hat" based on directives from senior management.  Kamkar also believed that Gabriel "was asking her to teach physicians how to up code."

120.    A week later, at a meeting on March 25, 2015, Gabriel expressly told Ormsby that "[w]e need to audit to raise [RAF] score[s]."  He also directed her and the auditing team to conduct more data-mining audits that would "support leadership's directives for this year" regarding the RAF Campaign.  These types of data-mining audits focused on alerting physicians about risk-adjusting diagnosis codes that remained on the Problem Lists and potentially could be added to patient records.  Increasing Medicare reimbursement was the goal of these audits, as Gabriel explained, in a March 26, 2015 email to PAMF management and Ormsby's auditing team.  He identified "our overall goals," as:

- Identification of new HCC's

- Decreasing the # of patients without HCC's

- Maintain/improve HCC capture rate for 2015

- Improve RAF/HCC scores through several techniques
    - Data-mining for HCC pockets of opportunities
    - Focus on providers that have a large volume of HCC eligible patients and target for review"

(bullet points in original.)  As plans developed, the data-mining audits initially "targeted audits for DM [diabetes] with manifestations, Thrombocytopenia, PVD [pulmonary vascular disease], CKD [chronic kidney disease], MDD [major depressive disorder], and Pathological Fractures."

These are all lucrative risk-adjusting diagnosis codes providing increased reimbursement from CMS.

121.    Thereafter, Gabriel instituted new and even more aggressive policies to increase RAF scores.  He required that coders pre-populate patient's medical records before any physician-patient encounter with risk-adjusting diagnosis codes that the coders suspected (but did not know) might be applicable to the patient.  These codes would be swept into the electronic medical record and submitted for reimbursement unless the physician affirmatively deleted the codes from the encounter side of the electronic medical record.  Moreover, Sutter and PAMF's policies precluded coders from deleting any false codes swept into the electronic medical record.  Rather, coders were permitted to delete diagnosis codes only from the "billing" side, which Sutter and PAMF management knew did not prevent the submission of these false codes to MA Organizations, and in turn, to CMS during the "sweeps."  By prohibiting coders from deleting false risk-adjusting diagnosis codes and using them to add codes not reported or verified by physicians in the electronic medical record, Sutter and PAMF knowingly pursued policies designed to yield inflated reimbursements through the over-reporting of diagnosis codes.

122.    Sutter and PAMF management knew of and directed Gabriel's focus on increasing MA Plan reimbursement and on hampering Ormsby's compliance efforts.  For example, at a March 27, 2015 strategy meeting with Cheung of Sutter and Arvin Magusara, a Sutter Senior Analyst, along with Gabriel and Ormsby, Cheung explained that increasing MA Plan patient risk scores "had been a concern for several years" among the RAF Steering Committee, which included Burnich, Cheung, and McGinnis of Sutter and Vahamaki of PAMF.  At the same meeting, Cheung admitted that false coding problems remained and that "CMS is still receiving HCC's that we know are not correct."  Nevertheless, no follow-up discussions took place at the meeting and no efforts were undertaken to correct this problem.

123.    Another example came just a few days later, at a March 31, 2015 "Champions Meeting" that included Drs. Vahamaki, Dresden, Gupta, and Amy Lin, as well as Gabriel and Ormsby.  The meeting notes indicate that Gabriel explained that each PAMF division had previously met the prior week and discussed "[h]ow both the physician and the auditor could

work together to identify areas to increase the RAF scores for each division."  Later during the meeting, Ormsby told management, "I want to go on the record saying that I do not agree with any auditor reviewing/auditing in search of reimbursement.  I don't believe that this is a compliant practice."  Ormsby also complained about management stopping the Encounter and FOCUS Audits used for compliance.  In response, Gabriel "interrupted," and made clear that "we are not doing any encounter audits this year," stating that PAMF's Compliance Department, not coding, would focus on compliance.  At the same time, Gabriel admitted that PAMF was not willing to devote resources to focus on coding accuracy and compliance, acknowledging "[u]nfortunately our compliance department does not have the bandwidth to investigate compliance concerns" related to coding.

124.    Not until the second quarter of 2016—over a year later—did Sutter resume using internal auditing to find and delete erroneous, invalid, unsupported or otherwise false diagnosis codes.  At that time, the Office of Patient Experience initiated an audit attempting to establish an accuracy baseline (*i.e.*, error rate) in 2015 patient encounters resulting in diagnoses of stroke and heart attack, similar to Ormsby's process when she was first hired in 2014.  A sample of MA beneficiaries was randomly selected from each Sutter affiliate, including PAMF, for encounters by primary care physicians and specialists.  After reviewing the medical records for 38 beneficiaries, the accuracy rate at PAMF for diagnosis codes that mapped to the HCC for heart attack was only 39.29%.  Diagnosis codes that mapped to stroke were worse, with an accuracy rate of only 22.22%.  The accuracy rate of PAMF, when combined with Mills Peninsula Division of PAMF and the Mills Peninsula Medical Group (a provider affiliated with PAMF), fell to 10.87% for diagnosis codes that mapped to the HCC for stroke.  The error rates were similarly high system-wide at Sutter, despite a stated goal of a 95% accuracy rate.  For example, a review of 206 MA beneficiaries system-wide at Sutter showed a 53.7% accuracy rate for risk-adjusting diagnoses mapping to heart attack and a 22.8% accuracy rate for risk-adjusting diagnoses mapping to stroke.

//

//

1   **ACCURATE DIAGNOSIS CODING'S CRITICAL IMPORTANCE TO CMS**

2   125.    Sutter and PAMF knew that CMS depends on accurate risk-adjusting diagnosis

3   coding to ensure appropriate reimbursement to MA Organizations and thus, payment to

4   providers, for the healthcare services furnished under the MA Plans.  *See supra* ¶¶ 38-40.

5   Indeed, in determining the health status of each MA Plan patient, CMS's HCC model relies

6   exclusively on risk-adjusting diagnoses that are added into a patient's medical records by

7   physicians during (or coders after) face-to-face encounters between physician and patient.  Thus,

8   accurate diagnosis coding goes to the very essence of Medicare's bargain with and payment to

9   MA Organizations.

10   126.    Given the importance of accurate information, CMS requires certifications signed

11   by MA Organization executives regarding the truth and accuracy of coding and other patient

12   information submitted to CMS.  These signed certifications are a condition of payment by CMS.

13   *See* 42 C.F.R. § 422.504(l)(3) (requiring related entities, contractors and subcontractors of MA

14   Organizations to certify the accuracy, completeness and truthfulness of payment data they

15   generate).  In turn, the MA Organizations require in their contractual delegation agreements with

16   providers, like Sutter and PAMF, similar certifications signed by provider executives.

17   127.    Additionally, CMS audits MA Organizations, and the MA Organizations in turn

18   audit providers, concerning the accuracy of their coding because of its importance to MA Plan

19   reimbursement.  In the event that erroneous risk-adjusting diagnoses codes are "swept" into the

20   reimbursement system, CMS requires the return of any overpayments.  *See* Medicare Managed

21   Care Manual, Chapter 7, § 40 (June 2013); *Swoben,* 848 F.3d at 1176–77 & n.8 (9th Cir.

22   2016).  So do Sutter and PAMF's policies.  *See supra* ¶ 42.

23   128.    PAMF executives, including Dr. Vahamaki, and all of the Physician Champions,

24   also knew that "failing a Medicare audit . . . could trigger a large scale audit" and the need to

25   "protect . . . the organization" against such a result that could lead to the reimbursement of

26   millions of dollars in overpayments.  Highlighting the magnitude of these potential

27   reimbursements, Ormsby provided her supervisor, Crow, with an estimate of $1.936 million in

28   potential reimbursements to CMS if a UHG audit identified the erroneous coding of prostate

cancer for Patient A in 2010.  *See* ¶ 82, *supra*.  Similarly, in December 2014, Ormsby informed Conroy, Cliff and Vahamaki that she was "very concerned" about the "large number" of false diagnosis codes submitted to CMS for reimbursement that potentially could be discovered in HHS-OIG MA audits.  *See supra* ¶¶ 109-110.

129.    More broadly given the need to protect the public fisc, it is black letter law that "[persons] must turn square corners when they deal with the Government."  *See Rock Island, Ark. & La. R.R. Co. v. United States*, 254 U.S. 141, 143 (1920).  Sutter and PAMF executives knew the importance of ensuring compliant practices when billing Medicare.  For example, in August 2013, Alaniz, PAMF's Compliance Analyst, understood the need for such care in addressing coding issues, "especially since are dealing with Medicare."

130.    Finally, Ormsby even went so far as to warn senior PAMF executives that false coding could result in FCA liability.  In mid-September 2014, she informed Dr. Conroy, PAMF's Chief Medical Officer, about the continuing "struggl[es] with coding guidelines" of Dr. Vahamaki and the Physician Champions.  In response, a week later, Conroy asked Ormsby, "what are the range of fines and regulations we are subject to . . . on an issue like inappropriate use of codes such as the obesity code?"  Ormsby provided the answer to Conroy that day, explaining in an email the prospect of FCA penalties and treble damages for false coding and sending him PowerPoint slides that she had received at a Medicare presentation describing the potential FCA liabilities.

## SUTTER AND PAMF'S MISCONDUCT RESULTED IN THE SUBMISSION OF THOUSANDS OF FALSE CLAIMS

131.    During the period from January 2010 through December 31, 2016, Sutter and PAMF, through their unlawful conduct discussed in ¶¶ 1 through 130 above, knowingly caused the submission of thousands of erroneous, invalid, unsupported or otherwise false risk-adjusting diagnosis codes to CMS for tens of thousands of Medicare Advantage beneficiaries at PAMF. The MA beneficiary population at PAMF Mills Peninsula tallied approximately 28,000 over those six years, while PAMF served approximately 74,000 MA beneficiaries during that period. These false claims inflated CMS's reimbursements by tens of millions of dollars.

132.     Sutter and PAMF knew that they were required to submit accurate diagnosis data to the MA Plans and delete erroneous, invalid, unsupported or otherwise false diagnoses. *See supra* ¶¶ 37-38. Sutter and PAMF were also on notice from Ormsby and her audit team, as well as from other audits and chart reviews, of thousands of such coding problems. Yet, Sutter and PAMF knowingly disregarded that information and failed to investigate the prevalence of this miscoding or delete these codes. Instead, they knowingly retained the resulting overpayments.

133.     In addition to Patient A discussed above in ¶¶ 81-82, the following are additional examples of false claims that Sutter and PAMF caused to be submitted to CMS:

a.   Patient B - PAMF and Sutter submitted an ICD-9 diagnosis code for malignant neoplasm of thyroid gland for Patient B for date of service year 2012. This diagnosis code mapped to HCC 10 and increased reimbursement from CMS. However, Patient B's medical records and treatment show the falsity of this coding because (1) Patient B's thyroid cancer was treated by thyroidectomy in July 2007, (2) no recurrence of the cancer occurred, and (3) there was no evidence of treatment, evaluation, or management of thyroid cancer in this patient's 2012 medical records.

b.   Patient C - PAMF and Sutter submitted an ICD-9 diagnosis code for malignant melanoma of skin of scalp and neck for Patient C for date of service year 2012. This diagnosis code mapped to HCC 10 and increased reimbursement from CMS. However, Patient C's medical records and treatment show the falsity of this coding because (1) in 2012, there was no treatment, evaluation or management of skin cancer noted in Patient C's medical records, and (2) Patient C had last been treated for malignant skin cancer in 2006.

c.   Patient D - PAMF and Sutter submitted an ICD-9 diagnosis code that mapped to stroke (specifically, cerebral artery occlusion, unspecified, with cerebral infarction) for Patient D for date of service year 2014. This diagnosis code mapped to HCC 96 and increased the reimbursement from

CMS. However, Patient D's medical records and treatment show the falsity of this coding because (1) Patient D's past medical history reflected a cerebellar infarction, a transient rather than a chronic medical condition and, thus, not mapped to any HCC code, (2) the cerebellar infarction took place in 1990 without further recurrence, and (3) no stroke or cerebrovascular accident event was noted in the patient's medical documentation for service year 2014.

d. <u>Patient E</u> - PAMF and Sutter submitted an ICD-9 diagnosis code that mapped to stroke (specifically, cerebral artery occlusion, unspecified, with cerebral infarction) for Patient E for date of service year 2014. This diagnosis code mapped to HCC 96 and increased reimbursement from CMS. However, Patient E's medical records and treatment show the falsity of this coding because (1) Patient E's 2013 diagnostic test of magnetic resonance angiography reflected normal results without signs of a stroke, and (2) no stroke or cerebrovascular accident event is noted in Patient E's medical documentation for service year 2014. A billing note further highlighted the falsity of this coding, noting a correction of the diagnosis code to a "history of cerebrovascular accident," but that the physician's original code is "associated with an order and cannot be removed."

e. <u>Patient F</u> - PAMF and Sutter submitted and ICD-9 diagnosis code for cerebral artery occlusion, unspecified with cerebral infarction for Patient F for date of service year 2013. This diagnosis code mapped to HCC 96/100 (stroke) and increased reimbursement from CMS. However, Patient F's medical records and treatment show the falsity of this coding because (1) Patient F was admitted in August 2011 for a stroke, (2) no recurrence of the stroke occurred, (3) Patient F had been on Warfarin (an anticoagulant) long-term since her stroke in 2011, and (4) there was no evidence of treatment,

evaluation, or management of a stroke event or cerebrovascular accident in this patient's 2013 medical records.

f. <u>Patient G</u> - PAMF and Sutter submitted an ICD-9 diagnosis code for Cerebral embolism with cerebral infarction; cerebral artery occlusion, unspecified with cerebral infarction for Patient G for date of service year 2013.  This diagnosis code mapped to HCC 96/100 (stroke) and increased reimbursement from CMS.  However, Patient G's medical records show the falsity of this coding because (1) no stroke or cerebrovascular accident event is noted in Patient G's medical documentation for service year 2014, (2) a history of a cerebrovascular accident is noted in the medical record as taking place in August 2004, for which the patient subsequently underwent rehabilitation, (3) there was no evidence of treatment, evaluation, or management of a cerebrovascular accident in this patient's 2012 medical records.

g. <u>Patient H</u> - PAMF and Sutter submitted an ICD-9 diagnosis code for hip/femur fracture, specifically, traumatic fracture of the mid-cervical section and unspecified part of the neck of the femur, closed for Patient H for date of service year 2014.  This diagnosis code mapped to HCC 158 and increased reimbursement from CMS.   However, Patient H's medical records show the falsity of this coding because (1) no management, evaluation or treatment of an acute hip or femur fracture is noted in Patient H's medical records for service year 2014, (2) Patient H was last treated for fracture of the right hip in 2011, and (3) Patient H received a total hip replacement in December 2011.

h. <u>Patient I</u> - PAMF and Sutter submitted an ICD-9 diagnosis code that mapped to hip/femur fracture, specifically, traumatic fracture of the pelvis for Patient I for date of service year 2014.  This diagnosis code mapped to HCC 158 and increased reimbursement from CMS.  However, Patient I's

medical records show the falsity of this coding because (1) no management, evaluation or treatment of an acute hip or femur fracture is noted in Patient I's medical records for service year 2014, (2) Patient I's fracture happened in 2013 per her medical records, and (3) only a history of pelvic fracture is documented in the 2014 medical records.

      i.  Patient J - PAMF and Sutter submitted an ICD-9 diagnosis code for benign neoplasm of the brain for cerebral meninges for Patient J for date of service year 2014. This diagnosis code mapped to HCC 10 and increased reimbursement from CMS. However, Patient J's medical records and treatment show the falsity of this coding because (1) the patient's last brain MRI was in 2012, (2) a 2014 encounter noted a history of a "small meningioma," (3) no recurrence of a brain neoplasm is noted, and (4) there was no evidence of treatment, evaluation, or management of brain cancer in this patient's 2014 medical records.

## FIRST CLAIM FOR RELIEF

### False Claims Act: Reverse False Claims

### 31 U.S.C. § 3729 (a)(1)(G)

134.     The United States repeats and re-alleges the allegations contained in ¶¶ 1 to 133 above as though they are fully set forth herein.

135.     Defendants Sutter and PAMF violated the second part of 31 U.S.C. § 3729(a)(1)(G) as follows: Sutter and PAMF knowingly concealed and knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government by failing to repay Medicare overpayments to which they were not entitled.

136.     Had CMS been aware of Sutter and PAMF's knowing false coding and knowing failure to return overpayments, it would have taken steps to recover them, and CMS has now done so via this suit that it has authorized.

137.     By virtue of the said acts of concealment and/or improper avoidance, the United States has incurred damages and therefore is entitled to treble damages under the FCA, plus a civil penalty for each violation of the Act.

## SECOND CLAIM FOR RELIEF

### False Claims Act: Reverse False Claims

### 31 U.S.C. § 3729 (a)(1)(G)

138.     The United States repeats and re-alleges the allegations contained in ¶¶ 1 to 133 above as though they are fully set forth herein.

139.     Defendants Sutter and PAMF violated the first part of 31 U.S.C. § 3729(a)(1)(G) as follows:  Sutter and PAMF knowingly made, used, and caused to be made or used, false records and statements material to an obligation to pay or transmit money or property to the Government by creating false records and making false statements relating to their failure to repay Medicare overpayments to which they were not entitled.

140.     Had CMS been aware of Sutter and PAMF's knowing false coding and knowing failure to return overpayments, it would have taken steps to recover them, and CMS has now done so via this suit that it has authorized.

141.     By virtue of the said false records, statements, and other acts of concealment and improper avoidance, the United States has incurred damages and therefore is entitled to treble damages under the FCA, plus a civil penalty for each violation of the Act.

## THIRD CLAIM FOR RELIEF

### False Claims Act: Presentation of False or Fraudulent Claims

### 31 U.S.C.  § 3729 (a)(1)(A)

142.     The United States repeats and re-alleges the allegations contained in ¶¶ 1 to 133 above as though they are fully set forth herein.

143.     Defendants Sutter and PAMF violated 31 U.S.C.  § 3729(a)(1)(A) by knowingly presenting and causing  the presentment of false or fraudulent claims for payment or approval resulting in inflated Medicare reimbursements to which they were not entitled.

144.     Had CMS been aware of Sutter and PAMF's knowing false coding, it would have refused to make risk-adjustment payments based on the false coding and/or pursued other legal remedies to avoid the potential disruption of MA Plan benefits to thousands of Medicare beneficiaries to whom Sutter and PAMF provided healthcare services, and CMS has now done so via this suit that it has authorized.

145.     By virtue of the said false or fraudulent claims, the United States has incurred damages and therefore is entitled to treble damages under the FCA, plus a civil penalty for each violation of the Act.

## FOURTH CLAIM FOR RELIEF

### False Claims Act: Making or Using False Records or Statements

### 31 U.S.C.  § 3729 (a)(1)(B)

146.     The United States repeats and re-alleges the allegations contained in ¶¶ 1 to 133 above as though they are fully set forth herein.

147.     Defendants Sutter and PAMF violated 31 U.S.C.  § 3729(a)(1)(B) by knowingly making, using, and causing to be made or used, false records and statements material to false or fraudulent claims resulting in inflated Medicare reimbursements to which they were not entitled.

148.     Had CMS been aware of Sutter and PAMF's knowing false coding, it would have refused to make risk-adjustment payments based on the false coding and/or pursued other legal remedies to avoid the potential disruption of MA Plan benefits to thousands of Medicare beneficiaries to whom Sutter and PAMF provided healthcare services, and CMS has now done so via this suit that it has authorized.

149.     By virtue of the said false records and statements, the United States has incurred damages and therefore is entitled to treble damages under the FCA, plus a civil penalty of each violation of the Act.

## FIFTH CLAIM FOR RELIEF

### Payment by Mistake

150.     The United States repeats and re-alleges the allegations contained in ¶¶ 1 to 133 above as though they are fully set forth herein.

151.     As a consequence of Sutter and PAMF's misconduct and the acts set forth above, Sutter and PAMF received monies from the United States as a result of a mistaken understanding.  Specifically, the United States reimbursed MA Organizations, who in turn reimbursed Sutter and PAMF, under the mistaken understanding of the United States that such claims were based on valid risk-adjustment diagnoses.  Had the United States known the truth, it would not have paid such claims.  Payment was therefore by mistake.

152.     As a result of such mistaken payments, the United States has sustained damages for which Sutter and PAMF are liable in an amount to be determined at trial.

## SIXTH CLAIM FOR RELIEF

### Unjust Enrichment

153.     The United States repeats and re-alleges the allegations contained in ¶¶ 1 to 133 above as though they are fully set forth herein.

154.     As a consequence of Sutter and PAMF's conduct and the acts set forth above, Sutter and PAMF were unjustly enriched at the expense of the United States.  In equity and good conscience such money belongs to the United States.

155.     The United States is entitled to recover such money based on Sutter and PAMF's unjust enrichment in an amount to be determined at trial.

## PRAYER

WHEREFORE, the United States requests that judgment be entered in its favor and against Defendants Sutter and PAMF as follows:

On Claims I, II, III, and IV (False Claims Act), against all Defendants jointly and severally, for: (i) the amount of the United States' damages, trebled as required by law; (ii) the maximum civil penalties allowed by law, (iii) the costs of this action, plus interest as provided by law, and (iv) any other relief that this Court deems appropriate.

As to Claim V (Payment Under Mistake of Fact), for: (i) an amount equal to the money paid by the United States through the Medicare Advantage program as a result of Defendants' false submissions, plus interest; (ii) the costs of this action, plus interest, as provided by law; and (iii) any other relief that this Court deems appropriate.

As to Claim VI (Unjust Enrichment), for: (i) an amount equal to how much Defendants were unjustly enriched, plus interest; (ii) the costs of this action, plus interest, as provided by law; and (iii) any other relief that this Court deems appropriate.

## **DEMAND FOR JURY TRIAL**

The United States of America hereby demands a trial by jury.

Date: March 4, 2019                    Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General, Civil Division

DAVID L. ANDERSON
United States Attorney

MICHAEL D. GRANSTON
PATRICIA L. HANOWER
A.  THOMAS MORRIS
J. JENNIFER KOH
OLGA YEVTUKHOVA
Attorneys, Civil Division
United States Department of Justice

*/s/ Kimberly Friday*
KIMBERLY FRIDAY
Assistant United States Attorney

Attorneys for the United States of America

1

2

## CERTIFICATE OF SERVICE

3

The undersigned hereby certifies that she is an employee of the Office of the United States Attorney for the Northern District of California and is a person of such age and discretion to be competent to serve papers.  The undersigned further certifies that she is causing a copy of:

4

5

### United States' Complaint-In-Intervention

6

to be served on this date upon counsel for Defendants Sutter Health and Palo Alto Medical Foundation as follows:

7

8

Katherine Lauer, Esq.
Latham & Watkins LLP
12670 High Bluff Drive
San Diego, CA 92130
katherine.lauer@lw.com

9

10

11

\_\_\_\_\_  BY FIRST CLASS MAIL, by placing such envelope(s) with postage thereon fully prepaid in the designated area for outgoing U.S. mail in accordance with this offices practice.

12

13

\_\_\_\_\_  BY PERSONAL SERVICE, (MESSENGER)

14

\_\_\_\_\_  FEDERAL EXPRESS

15

\_\_\_\_\_  FACSIMILE, (FAX) Telephone No.:

16

√  BY E-MAIL: I caused each such document to be sent by email to the person or offices of each address above, such person having consented to service of documents by e-mail.

17

18

\_\_\_\_\_  CERTIFIED MAIL, by placing such envelope(s) with postage thereon fully prepaid in the designated area for outgoing U.S. mail in accordance with this offices practice.

19

20

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

21

22

23

Dated:  March 4, 2019          By:      */s/ Kimberly Friday*
                                        KIMBERLY FRIDAY
                                        Assistant United States Attorney

24

25

26

27

28

UNITED STATES' COMPLAINT-IN-INTERVENTION
CV 15-01062-JD                                 54