Jeffrey F. Keller, Esq. (SBN 148005)
jfkeller@kellergrover.com
Kathleen R. Scanlan, Esq. (SBN 197529)
kscanlan@kellergrover.com
**KELLER GROVER LLP**
1965 Market Street
San Francisco, CA  94103
Telephone: (415) 543-1305
Facsimile: (415) 543-7861

Gordon Schnell (*pro hac vice*)
(NY Bar No. 2502136)
gschnell@constantinecannon.com
Sarah P. Alexander (SBN 291080)
spalexander@constantinecannon.com
Hamsa Mahendranathan (*pro hac vice* pending)
hmahendranathan@constantinecannon.com
**CONSTANTINE CANNON LLP**
335 Madison Avenue
New York, NY 10017
Telephone: (212) 350-2700
Facsimile: (212) 350-2701

Mark A. Kleiman, Esq. (SBN 115919)
mkleiman@quitam.org
Pooja Rajaram (SBN 241777)
prajaram@quitam.org
**LAW OFFICES OF MARK
ALLEN KLEIMAN**
2907 Stanford Avenue
Venice, CA  90292
Telephone: (310) 306-8094
Facsimile: (310) 306-8491

Attorneys for Relator
KATHY ORMSBY

Keller Grover LLP
1965 Market Street, San Francisco, CA  94103
Tel. 415.543.1305 | Fax 415.543.7861

# IN THE UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* KATHY ORMSBY | CASE NO. C 15-01062 JD |
| Plaintiff, | **FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT** |
| v. | **JURY TRIAL DEMANDED** |
| SUTTER HEALTH, a California not-for-profit corporation and PALO ALTO MEDICAL FOUNDATION, a not-for-profit healthcare organization. | |
| Defendants. | |

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

On March 6, 2015, Kathy Ormsby filed a sealed *qui tam* complaint as Relator on behalf of the United States of America against Sutter Health ("Sutter") and Palo Alto Medical Foundation ("PAMF"), alleging violations of the False Claims Act ("FCA"), 31 U.S.C. §§ 3729-33.  By her complaint, Relator alleged that Sutter, through its affiliates including PAMF, engaged in a fraud on the Medicare program by its intentional submission of inaccurate and unsupported diagnosis codes that inflated Sutter's reimbursements from Medicare Part C, known as the Medicare Advantage Program.

On December 4, 2018, the Government filed a notice of intervention in Relator's case, and Relator's complaint was subsequently unsealed.  On March 4, 2019, the United States filed its Complaint in Intervention against Sutter and PAMF alleging FCA violations relating to reimbursements from the Medicare Advantage Program for patient care at PAMF (the "PAMF fraud").

The United States did not intervene with regard to Relator's allegations of FCA violations relating to Sutter's reimbursements from the Medicare Advantage Program for patient care at its other affiliates (the "Sutter-wide fraud").  Therefore, through this amended complaint, Relator -- upon knowledge with respect to her own acts and those she personally witnessed, and upon information and belief with respect to all other matters -- maintains her allegations of a Sutter-wide fraud as follows:

**PRELIMINARY STATEMENT**

1.      This False Claims Act case is about Sutter's fraud on Medicare.  As a healthcare provider for tens of thousands of Medicare beneficiaries, Sutter exploited Medicare's Part C program to extract hundreds of millions of dollars in payments to treat medical conditions its patients did not have and provide services its patients did not need and which Sutter ultimately never provided.  Sutter accomplished this scheme through its knowing submission of inaccurate and unsupported medical information which artificially inflated the reimbursement the Centers for Medicare and Medicaid Services ("CMS") made for the care Sutter provided these Medicare patients.

///

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

2.     Under the Medicare Advantage Program, private health insurance companies called Medicare Advantage Organizations ("MAO") are authorized to administer Medicare benefits on behalf of the United States.  They offer Medicare Advantage plans to Medicare-eligible beneficiaries who pay monthly premiums and copayments that are often less than the coinsurance and deductibles under traditional fee-for-service models for Medicare Parts A and B. MAOs may then contract with healthcare providers like Sutter for the care of a plan's participants.  Sutter, through affiliates it owns, controls and/or operates, offers ten Medicare Advantage plans through three MAOs with which Sutter contracts.  Through these ten plans, Sutter is responsible for providing healthcare to approximately 50,000 eligible Medicare Part C beneficiaries for which Sutter is reimbursed hundreds of millions of dollars each year.

3.     A critical difference between traditional Medicare and the Medicare Advantage Program is in how CMS pays the MAOs and providers like Sutter with whom they contract.  The goal of the Part C program is to use a capitated payment system "to improve the quality of care while safeguarding the public fisc."  *United States ex rel. Silingo v. Wellpoint, Inc.*, 904 F.3d 667, 672 (9th Cir. 2018).  Since not all beneficiaries require the same level of care, however, the Medicare Advantage Program requires payments to the private health insurance companies (and healthcare providers like Sutter) be risk-adjusted annually based on the documented health status of each beneficiary.

4.     In 2004, the Government implemented the Hierarchical Condition Category ("HCC") model to calculate risk-adjusted payments for each beneficiary in the Medicare Advantage Program.  The HCC model was intended to compensate healthcare providers like Sutter based on the medical condition and expected needs of the particular enrollee, with higher compensation for less healthy patients (who were predicted to require more care), and lower compensation for more healthy patients (who were predicted to require less care).  Healthcare providers like Sutter submit risk adjustment data, including beneficiary diagnosis data, to the MAOs which, in turn, submit the risk adjustment data to CMS.  CMS uses the HCCs, as well as demographic characteristics, to calculate a risk score for each beneficiary based on these various Risk Adjustment Factors ("RAF").  CMS then uses the risk scores to adjust capitated payments

up or down for the next payment period.  Accurate diagnosis codes reflecting the beneficiary's medical condition are, therefore, squarely at the heart of the Government goal with the Part C program of providing the highest quality of healthcare in the most cost-effective manner.

5.      As of 2017, more than 19 million Americans -- mostly seniors -- were covered through Medicare Advantage plans, at an estimated annual cost of more than $206 billion.  The Government Accountability Office has estimated that tens of billions of dollars in these annual payouts are improper.

6.      Sutter is a significant part of this problem.  With at least 40% of California Medicare beneficiaries already selecting Medicare Advantage, "Sutter is actively trying to get more and more people committed" to the Program.  But Sutter has done much more than seek out "more and more" Medicare Advantage patients.  It has sought out "more and more" Part C revenue through a campaign of intentionally inflating its RAF scores and directly undermining CMS's goal of tying Part C reimbursement to the actual medical condition and healthcare needs of the patient.  Specifically, Sutter failed to take proper steps to ensure the accuracy of the patient information CMS relied on to calculate how much Sutter would be reimbursed to provide care for Medicare Advantage patients.  Indeed, Sutter ignored repeated red flags that made clear the patient information it provided was not accurate and thus resulted in Medicare overpayments it was required to refund.  Sutter's fraud did not occur just at PAMF but throughout its network of affiliates as Relator witnessed first-hand and repeatedly tried to address with Sutter's management.

7.      When Sutter refused to heed Relator's warnings about false claims in Sutter's Medicare Advantage Program and take appropriate action to address its compliance failures and known overpayments, she filed this *qui tam* lawsuit.  Thereafter the Government intervened in the portion of this case related to the PAMF fraud.  Significantly, just two weeks ago, Sutter refunded CMS $30 million in overpayments for the improper coding at Sutter affiliates other than PAMF. This settlement covered medical conditions that -- because of Relator -- Sutter knew were falsely coded and resulted in Medicare overpayment.  As described in more detail below, Sutter was on notice of these overpayments years ago and is only belatedly making partial refunds to CMS after

KELLER GROVER LLP
1965 Market Street, San Francisco, CA  94103
Tel. 415.543.1305 | Fax 415.543.7861

Relator's lawsuit exposed Sutter's fraudulent scheme.  These belated payments do not account for its False Claims Act liability as to those medical conditions or remedy Sutter's obligation to refund the known overpayments for *all the other conditions* it knowingly miscoded for years in a coordinated scheme to inflate its Medicare Part C reimbursement.

## PARTIES

8.     Relator Kathy Ormsby, a citizen of the United States and a resident of the State of Nevada, was employed at PAMF from May 2013 through May 2015 initially as a RAF Project Manager then as PAMF's RAF Coding Manager.  As described below, her title changed soon after her arrival at PAMF to reflect the increased responsibilities she was supposed to have after discovering Sutter had no compliance program to ensure it provided accurate risk-adjustment data under the Medicare Advantage Program.

9.     The United States filed its notice of intervention in this action on December 4, 2018.  On March 4, 2019, the United States filed its Complaint in Intervention against Sutter and PAMF relating to the PAMF fraud.  The United States is suing on behalf of the United States Department of Health and Human Services ("HHS"), which includes its operating division, CMS. At all times relevant to this lawsuit, CMS administered and supervised Medicare Part C and made risk-adjustment payments under the Program.  The United States is a real party in interest in Relator's non-intervened claims with an interest in the outcome of Relator's case.

10.     Defendant Sutter is a California not-for-profit corporation headquartered in Sacramento County.  Sutter owns, controls and/or operates affiliated hospitals and physician foundations throughout California.  Sutter controls these affiliated foundations through overlapping corporate governance boards and executive officers and has done so throughout the relevant period.  Sutter also provides certain centralized support functions to the Sutter system, which include administrative services and system initiatives.

11.     Sutter recently consolidated its former five-region structure into two operating units: a Bay Area operating unit ("Sutter Bay Area") and a Valley operating unit ("Sutter Valley Area").  The Sutter Bay Area includes one medical foundation corporation, Sutter Bay Medical Foundation ("Sutter Bay"), doing business as PAMF, Sutter East Bay Medical Foundation

KELLER GROVER LLP
1965 Market Street, San Francisco, CA  94103
Tel. 415.543.1305 | Fax 415.543.7861

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

("Sutter East Bay"), and Sutter Pacific Medical Foundation ("Sutter Pacific").  The Sutter Valley Area includes one medical foundation corporation, Sutter Valley Medical Foundation ("Sutter Valley"), doing business as Sutter Medical Foundation ("Sutter Medical") and Sutter Gould Medical Foundation ("Sutter Gould").  Sutter is the sole member of Sutter Bay and Sutter Valley. Sutter Bay and Sutter Valley contract with multi-specialty medical groups on an exclusive basis to provide physician services to its patients.  Sutter Valley owns most of the property relating to the activities of these aligned physician practices, including the facilities, medical records and revenue.

12.     Sutter Connect, LLC, doing business as Sutter Physician Services, is a single member limited liability company, of which Sutter is the sole member.  Sutter Physician Services supports Sutter's various medical foundations with services including third party administration, physician billing and managed care management, financial management reporting and provider relations.

13.     The Sutter Medical Network is the network of doctors at Sutter's affiliated hospitals and foundations.  The Sutter Medical Network has approximately 5,500 physicians across the Sutter-affiliated medical foundation corporations, the medical foundation corporations' exclusively contracted medical groups and independent practice associations of physicians. Sutter employs several programs that allow Sutter Medical Network's members to connect into the Sutter medical record database where patients' medical records are maintained.

14.     Defendant PAMF is an affiliate of Sutter and is headquartered in Palo Alto. PAMF is a not-for-profit corporation with approximately 5,600 employees and locations across Alameda, San Mateo, Santa Clara and Santa Cruz counties.  Sutter controls PAMF, including through overlapping corporate governance boards and executive officers.  With regard to the PAMF fraud, Relator does not intend to pursue any claims other than those set forth in the Complaint in Intervention filed by the United States.  *See* Dkt. 41.  Relator nonetheless incorporates by reference the allegations in her original complaint with regard to the PAMF fraud.

///

///

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

**JURISDICTION AND VENUE**

15.     Pursuant to 28 U.S.C. § 1331, this District Court has original jurisdiction over the subject matter of this civil action since it arises under the laws of the United States, in particular, the False Claims Act, 31 U.S.C. § 3729 *et seq.*  In addition, the FCA specifically confers jurisdiction upon the United States District Court.  31 U.S.C. § 3730(b).

16.     This District Court has personal jurisdiction over Sutter pursuant to 31 U.S.C. § 3732(a) because the FCA authorizes nationwide service of process and Sutter has significant operations within this district.

17.     Venue is likewise proper in this district pursuant to 31 U.S.C. § 3732(a) because Sutter transacts substantial business and resides in this judicial district.

**REGULATORY BACKGROUND**

**I.     THE FALSE CLAIMS ACT**

18.     The False Claims Act was enacted in 1863, over a century before Medicare or CMS came into being.  It was passed by President Lincoln to combat widespread fraud by companies selling rancid food, ailing mules and defective weapons to the Union Army during the Civil War.  From the outset, and through several amendments enacted over the past twenty-five years to increase the scope and reach of the statute, both Congress and the Supreme Court have repeatedly highlighted that (1) the False Claims Act is to be applied broadly and flexibly to reach all types of fraud that cause financial loss to the Government, and (2) private parties (relators) should be strongly encouraged to bring actions under the statute to supplement the Government's limited resources to combat fraud.

19.     When evaluating claims under the False Claims Act, the Supreme Court has repeatedly acknowledged and deferred to these twin goals of the statute and "consistently refused to accept a rigid, restrictive reading."  *United States v. Neifert-White Co.*, 390 U.S. 228, 232 (1968).  Instead, it has applied the law recognizing "Congress wrote [it] expansively, meaning to reach all types of fraud, without qualification, that might result in financial loss to the Federal Government."  *Cook Cty. v. United States. ex rel. Chandler*, 538 U.S. 119, 129 (2003) (internal quotation marks omitted).  *See also Rainwater v. United States*, 356 U.S. 590, 592 (1958) ("It

KELLER GROVER LLP
1965 Market Street, San Francisco, CA  94103
Tel. 415.543.1305 | Fax 415.543.7861

seems quite clear that the objective of Congress was broadly to protect the funds and property of the Government. . .”); *Neifert-White*, 390 U.S. at 233 (the False Claims Act “reaches beyond ‘claims’ which might be legally enforced, to all fraudulent attempts to cause the Government to pay out sums of money.”).

20.     Likewise, “[e]ach time Congress has weighed in on the purpose and power of the False Claims Act, it has endorsed a reading of that statute as a robust remedial measure aimed at combatting fraud against the federal government as firmly as possible.” *United States ex rel. Kane v. Healthfirst, Inc.*, 120 F. Supp.3d 370, 391 (S.D.N.Y. 2015).  The False Claims Act together with its amendments “reflect Congress’s more than 150-year commitment to deterring fraud against the federal government and ensuring that Government losses due to fraud are recouped in a timely fashion.” *Id.*

21.     The False Claims Act was amended in 1986 “to loosen restrictive judicial interpretation of the Act’s liability standard and the burden of proof by defining previously undefined terms, by expanding the *qui tam* jurisdictional provisions, and by increasing civil penalties.” *United States ex rel. Stinson, Lyons, Gerlin & Bustmante, P.A. v. Provident Life & Accident Ins. Co.*, 721 F. Supp. 1247, 1252 (S.D. Fla. 1989) (citing 132 Cong. Rec. H6479-82 (daily ed. Sept. 9, 1986)).  After determining that the “growing pervasiveness of fraud necessitate[d] modernization of the Government’s primary litigative tool for combatting fraud,” Congress amended the False Claims Act to “enhance the Government’s ability to recover losses sustained as a result of fraud against the Government.”  S. Rep. No. 99-345, at 1-2 (1986), *as reprinted in* 1986 U.S.C.C.A.N 5266, 5266.  The “reverse false claims” provision of the FCA, 31 U.S.C.A. § 3729(a)(1)(G), was also added as part of these 1986 Amendments.  *Id.* at 18.  It is called a “reverse” false claim “because the financial obligation that is the subject of the fraud flows in the opposite of the usual direction.” *United States ex rel. Huangyan Imp. & Exp. Corp. v. Nature’s Farm Prods., Inc.*, 370 F. Supp. 2d 993, 998 (N.D. Cal. 2005).

22.     The False Claims Act was amended again in 2009 to among other things define an “obligation” to the Government to include the “retention of an overpayment.”  31 U.S.C. § 3729(b)(3).  Congress added this to make explicit that “*money or property that is knowingly*

FIRST AMENDED COMPLAINT FOR
VIOLATIONS OF FALSE CLAIMS ACT

C 15-01062 JD

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

*retained by a person even though they have no right to it*" is subject to False Claims Act liability. S. Rep. No. 110-10, at 13-14 (2009), *as reprinted in* U.S.C.C.A.N. 430, 441 (emphasis added).

23.     A defendant violates the False Claims Act when it "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval"; "knowingly makes, uses or causes to be made or used, a false record or statement material to a false or fraudulent claim"; or "knowingly makes, uses or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government."  31 U.S.C. § 3729(a)(1)(A), (B), (G).

24.     The terms "knowing" and "knowingly" include "actual knowledge of the information," "deliberate ignorance of the truth or falsity of the information," or "reckless disregard of the truth or falsity of the information" and "require no proof of specific intent to defraud."  *Id*. § 3729(b)(1)(A), (B).  With regard to the False Claims Act standard for knowledge, the Ninth Circuit explained:

> In defining knowingly, *Congress attempted "to reach* what has become known as *the 'ostrich' type situation where an individual* has 'buried his head in the sand' and *failed to make simple inquiries* which would alert him that false claims are being submitted." S. Rep. No. 99-345, at 21 (1986), *as reprinted in* 1986 U.S.C.C.A.N. 5266, 5286. Congress adopted "the concept that individuals and contractors receiving public funds have some duty to make a limited inquiry so as to be reasonably certain they are entitled to the money they seek." *Id.* at 20; *see also id.* at 7 (discussing the importance of individual responsibility because the government has limited resources to police fraud). "While the Committee intends that at least some inquiry be made, the inquiry need only be 'reasonable and prudent under the circumstances.'" *Id.* at 21.

*United States v. Bourseau*, 531 F.3d 1159, 1168 (9th Cir. 2008) (emphasis added).

25.     The term "claim" includes "(A) . . . any request or demand, whether under a contract or otherwise, for money . . . that . . . (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government—(I) provides or has provided any portion of the money . . . requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money which is requested or demanded."  *Id*. § 3729(b)(2).

KELLER GROVER LLP
1965 Market Street, San Francisco, CA  94103
Tel. 415.543.1305 | Fax 415.543.7861

26.     The term "material" is defined as "having a natural tendency to influence or be capable of influencing, the payment or receipt of money or property." *Id*. § 3729(b)(4).

27.     The term "obligation" is defined as "an established duty, whether or not fixed, arising from an express or implied contractual … relationship from a fee-based or similar relationship, from statute or regulation, or from the retention of an overpayment." *Id*. § 3729(b)(3).  Even if an overpayment arises out of an innocent billing error or through a mistake of the contractor, the obligation to return the overpayment still attaches.

28.     Consistent with the purpose of the False Claims Act to deter fraud and recoup the Government's losses in a timely fashion, Section 6402(a) of the Patient Protection and Affordable Care Act of 2010 (Enhanced Medicare and Medicaid Program Integrity Provisions), Pub. L. No. 111-148, 124 Stat. 119, 753-56 (2010), amended the Social Security Act to add a new provision that addresses what constitutes an overpayment under the False Claims Act in the context of a federal healthcare program, like the Medicare Advantage Program at issue in this case.  Social Security Act ("SSA") § 1128J(d), 42 U.S.C. § 1320a-7k(d).  Under this provision, an overpayment is defined as "any funds that a person receives or retains under Title XVIII or XIX to which the person, after applicable reconciliation, is not entitled." *See* 42 U.S.C. § 1320a-7k(d)(4)(B).  Congress directed that such overpayments could be enforced under the reverse false claims provisions of the False Claims Act.  *See* SSA § 1128J(d)(3).  Congress also intended that the remedies for knowingly retaining overpayments were to be broadly construed in favor of those enforcement efforts, defining "knowing" and "knowingly" as expansively as under the False Claims Act.  *See* SSA § 1128J(d)(4)(B).  To emphasize the importance of promptly returning such overpayments Congress also provided that an "overpayment must be reported and returned" within "60 days after the date on which the overpayment was identified." *Id*. § 1320a-7k(d)(2).

29.     "[S]ection 1128J(d) of the Act does not require the Secretary to issue regulations for the statute to be effective, and the statute's requirements are in effect in the absence of regulation.  Providers … that identify overpayments received from Medicare or Medicaid should report and return those overpayments to the appropriate payor as required by section 1128J(d) of

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

1   the Act." *Medicare Final Rule Reporting and Returning of Overpayments, Parts A and B*, 81

2   Fed. Reg. 7654, 7655 (Feb. 12, 2016); *see also Medicare Proposed Rule Reporting and Returning*

3   *of Overpayments Part C*, 79 Fed Reg. 1918, 1995 (Jan 2014) (even in the absence of final

4   regulations implementing changes to the Social Security Act, providers are required to adhere to

5   the law and face potential FCA liability for failing to report and return any overpayment).

## II.   THE MEDICARE PROGRAM

7        30.    Medicare is a healthcare benefit program funded by the federal government.  The

8   Medicare program compensates participating doctors, hospitals and other healthcare providers

9   who furnish healthcare services to citizens of the United States (and certain other legal residents)

10  who have reached the age of 65 or who suffer from certain qualifying disabilities.  Medicare was

11  established by Title XVIII of the Social Security Act of 1965 (codified as amended at 42 U.S.C.

12  § 1395 *et. seq.*).

13       31.    The agency of the United States responsible for the Medicare program is the

14  Department of Health and Human Services.  *See, e.g.*, 42 U.S.C. §§ 1395b-1, 1395b-2, 1395b-3,

15  1395b-4, 1395b-7, 1395r and 1395u.  CMS is the agency within HHS administering the program.

### A.   Traditional Medicare

17       32.    CMS administers the hospital insurance benefits program, commonly referred to as

18  "Medicare Part A."  42 U.S.C. §§ 1395c-1395i-5.  Medicare Part A "provides basic protection

19  against the costs of hospital, related post-hospital, home health services, and hospice care."  42

20  U.S.C. § 1395c.

21       33.    CMS also administers Medicare Part B, a 100% federally subsidized health

22  insurance benefit.  Eligible persons aged 65 or older may enroll in Part B to obtain benefits in

23  return for payments of monthly premiums as established by HHS.  The benefits covered by Part B

24  include physician, hospital, outpatient and ancillary services and durable medical equipment.

25       34.    "Traditional Medicare uses a fee-for-service payment model, whereby the more

26  services physicians perform, the more money they earn.  After Medicare was enacted, however,

27  experts came to realize that this payment structure encourages healthcare providers to order more

28  tests and procedures than medically necessary."  *Silingo*, 904 F.3d at 672.  Congress, therefore,

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

authorized a new program that would address these known problems in traditional Medicare.  The result was Medicare Part C beginning in 1997.

**B.  The Medicare Advantage Program – Part C**

35.     Medicare Part C, also known as Medicare Advantage, authorizes qualified individuals to opt out of traditional fee-for-service coverage under Medicare Parts A and B and enroll in privately-run managed care plans that provide coverage for both inpatient and outpatient services.  *See* 42 U.S.C. §§ 1395w-21, 1395w-28.  "Medicare Advantage seeks to improve the quality of care while safeguarding the public fisc by employing a 'capitation' payment system." *Silingo*, 904 F.3d at 672.

36.     Unlike the traditional fee-for-service model where the provider bills for services rendered, in the Medicare Advantage Program CMS pays for the care of enrollees in advance using a monthly "capitation" amount for each beneficiary.  "The capitated amount is a fixed monthly payment regardless of the volume of services an enrollee uses." *United States ex rel. Swoben v. United Healthcare Ins. Co.*, 848 F.3d 1161, 1167 (9th Cir. 2016).

**1.     Sutter's Role as a Medicare Advantage Provider**

37.     Medicare Part C allows private health insurance companies to administer Medicare benefits on behalf of the United States.  These MAOs offer Medicare eligible beneficiaries a variety of Medicare Advantage plans.  Medicare beneficiaries join an MAO plan and pay monthly premiums and copayments that are often less than the coinsurance and deductibles under traditional Medicare.

38.     The MAOs may enter into contracts with providers like Sutter to provide healthcare services for enrollees on behalf of the MAO.  "All contracts or written agreements [between MAOs and providers] must specify that the related entity, contractor, or subcontractor must comply with all applicable Medicare laws, regulations, and CMS instructions."  42 C.F.R. § 422.504(i)(4)(v).

39.     Sutter contracts with three MAOs: Health Net, Inc.; Humana, Inc.; and UnitedHealth Group Inc. ("UnitedHealth"), which offer healthcare through Sutter to Medicare beneficiaries enrolled in the MAOs' Medicare Advantage plans.  Sutter provides healthcare

KELLER GROVER LLP
1965 Market Street, San Francisco, CA  94103
Tel. 415.543.1305 | Fax 415.543.7861

through ten Medicare Advantage plans to approximately 50,000 Medicare beneficiaries for whom CMS pays hundreds of millions of dollars in capitation payments each year.  As of March 2015, Sutter broke down its Medicare Advantage population by affiliate as follows:

| Affiliate | Covered Lives | % of Total MA Population |
|---|---|---|
| Palo Alto Medical Foundation | 8,451 | 16.82% |
| Palo Alto Medical Foundation- Mills Peninsula Division/Mills Peninsula Medical Group | 4,719 | 9.39% |
| Sutter East Bay Medical Foundation | 2,984 | 5.94% |
| Sutter Pacific Medical Foundation | 2,530 | 5.04% |
| Sutter Medical Foundation | 14,975 | 29.81% |
| Sutter Gould Medical Foundation | 7,793 | 15.51% |
| Sutter Independent Physicians | 6,418 | 12.78% |
| Central Valley Medical Group | 2,367 | 4.71% |
| **Sutter Medical Network 2015** | **50,237** | **100%** |

### 2.    The Critical Role of Risk Adjustment

40.    In Medicare Part C, the Government pays to each MAO a fixed, monthly capitated amount for each beneficiary, adjusted by the expected risk of each beneficiary, for the provision of items and services covered for Medicare beneficiaries under Parts A and B.  This per-member, per-month payment does not depend on the amount of healthcare services actually provided. Each year this payment is based on a bidding process with CMS, in which each MAO submits a bid amount, which is then compared to an administratively set benchmark set by CMS based on a statutory formula.  *See* 42 U.S.C. § 1395w-23; *see also* 42 C.F.R. § 422.2, subparts F and G. Since 2000, Congress has required that the capitated payments be adjusted based on (1) each

KELLER GROVER LLP
1965 Market Street, San Francisco, CA  94103
Tel. 415.543.1305 | Fax 415.543.7861

enrollee's demographic factors such as age and gender, among others, and (2) each enrollee's health status.  *See* 42 U.S.C. § 1395w-23 (a)(1)(C).  This is known as risk adjustment, and the RAF-based risk score acts as a multiplier that is applied to the MAO's bid for covering Part A and B services.  *See* 42 U.S.C. § 1395w-23 (a)(1)(G); 42 C.F.R. § 422.308(e).  The purpose of risk adjustment is to "allow[] CMS to pay plans for the risk of the beneficiaries they enroll" and to "make appropriate and accurate payments for enrollees with differences in expected costs." CMS, *Medicare Managed Care Manual*, Ch. 7, § 20 (rev. 118, September 19, 2014).

41.     The Secretary of HHS has the authority to determine the risk adjustment methodology.  *See id*.  Since 2004, CMS has employed an HCC model to calculate a risk score for each beneficiary in a Medicare Advantage plan.  As directed by Congress, the HCC model takes into account demographic factors and health status.  With respect to health status, the HCC model relies on diagnosis codes documented by authorized healthcare providers, *e.g.*, physicians in patient encounters during office visits and hospital outpatient and inpatient stays.  Diagnoses are the sole determinant in the calculation of any risk-adjustment payment based on a beneficiary's health status.

42.     The International Classification of Diseases ("ICD") codes set forth the standards accepted by CMS and the healthcare industry for the identification of patient diagnoses by their physicians.  *See* 45 C.F.R. § 162.1002(a)(1)(i), (b)(1), (c)(2)(i); 42 C.F.R. § 422.310(d)(1); CMS, *Medicare Managed Care Manual*, Ch. 7, Exhibit 30 (rev. 57, August 13, 2004).  ICD codes are alphanumeric codes used by the healthcare providers, insurance companies and public health agencies to represent diagnoses.  Every disease, injury, infection and symptom has its own code. The applicable standards for these ICD diagnosis codes are set forth in the International Classification of Diseases, Ninth Revision, Clinical Modification ("ICD-9") through October 1, 2015, and thereafter the International Classification of Diseases, Tenth Revision, Clinical Modification ("ICD-10").  To ensure accuracy, the patient diagnoses must result from a face-to-face encounter between the physician and patient during the relevant year and must be appropriately documented in the patient's medical record at the time of the encounter.  *See Silingo*, 904 F.3d at 673 ("Every diagnosis code submitted to CMS must be based on a 'face-to-

KELLER GROVER LLP
1965 Market Street, San Francisco, CA  94103
Tel. 415.543.1305 | Fax 415.543.7861

1   face' visit that is documented in the medical record.").  In addition, codes should be based on

2   documented conditions that require or affect patient care, treatment or management.  *See* CMS,

3   *Medicare Managed Care Manual*, Ch. 7, § 111.8 (rev. 47, February 20, 2004); CMS, *2008 Risk*

4   *Adjustment Data Technical Assistance for Medicare Advantage Organizations Participant Guide*,

5   § 7.1.5.

6        43.    HCCs are categories of clinically-related medical diagnoses including major,

7   severe, and/or chronic illnesses.  *See* 42 C.F.R. § 422.2.  Each HCC correlates with the marginal

8   predicted cost of medical expenditures for that set of medical conditions based on CMS's data

9   from administering the traditional Medicare Parts A and B fee-for-service program.  Higher

10  relative values (sometimes referred to as a relative factor, multiplier, or coefficient) are assigned

11  to HCCs that include diagnoses with greater disease severity and treatment costs.  Between 2004

12  and 2013, there were 70 HCCs in the Part C risk adjustment model, and starting in 2014 that

13  number increased to 79, as CMS revised its risk adjustment model.  A single beneficiary may

14  have none, one, or multiple HCCs.  Some examples of HCC codes are HIV/AIDS (HCC 1),

15  metastatic cancer and leukemia (HCC 8), congestive heart failure (HCC 80), and ischemic stroke

16  (HCC 100).  HCC numerical codes changed between the 2004-13 model (known as Version 12)

17  and the 2014 model (known as Version 22).  The numerical examples of HCC codes cited herein

18  are from the Version 22 model.

19        44.    The HCC model is prospective, meaning it relies on risk-adjusting diagnosis codes

20  from dates of service by a provider in one year (the "date of service year") to determine payments

21  in the subsequent year (the "payment year").  Each Medicare Advantage plan beneficiary's risk

22  score is calculated anew for the subsequent year.  The higher a beneficiary's risk score, the higher

23  the Medicare payments to the MAO and the provider.  The MAO distributes a contractually-

24  determined percentage of these payments to providers such as Sutter.  Thus, the risk-adjusting

25  diagnosis codes that map to the HCC codes Sutter submits materially impact the amount of the

26  Medicare payments to the MAO, and therefore, to Sutter.

27        45.    Illustrating this process as pertinent to Sutter, generally after a face-to-face

28  encounter between a physician and an MAO plan patient the provider (generally the physician

FIRST AMENDED COMPLAINT FOR
VIOLATIONS OF FALSE CLAIMS ACT                14                    C 15-01062 JD

and/or coder) (1) documents the encounter in the patient's electronic medical record, (2) assigns the diagnoses reflecting the patient's medical conditions and corresponding ICD codes, and (3) adds those diagnosis codes into Sutter's electronic records system.  The diagnosis codes are transmitted electronically to the MAO through either an electronic data submission after a patient encounter or through a monthly process in the electronic records system known at Sutter as "sweeping" or "sweeps."  Sutter Physician Services Senior Business Analyst, Michael Aguilar, confirmed to Relator that "[f]or all the Sutter Foundations [Sutter Physician Services] is sending diagnostic code records linked to patient encounters out of the [electronic medical record system] . . . every month."  In turn, the MAOs then electronically submit these codes to CMS.  CMS maps each beneficiary's diagnosis codes to HCCs (*i.e.*, the risk-adjusting diagnosis codes), and then calculates each beneficiary's risk score to apply to the payment calculation and determine the reimbursement.  For example, with regard to UnitedHealth Sutter summarizes the encounter data submission pathway as follows: Sutter Affiliate → Sutter Physician Services → Clearinghouse → MAOs → Optum, a UnitedHealth affiliate → CMS.

46.     Regulations and guidance make clear to MAOs and providers such as Sutter that CMS relies on the risk-adjusting diagnosis codes submitted by providers to determine and make accurate capitation payments for each patient enrolled in the Part C program.  "Accurate risk-adjusted payments rely on the diagnosis coding derived from the member's medical record."  *See, e.g.*, 42 C.F.R. § 422.504(l)(3); CMS, *2013 National Technical Assistance Risk Adjustment 101 Participant Guide*, 13.

47.     The Ninth Circuit also confirmed CMS's risk adjustment methodology for Part C relies on diagnosis codes supported by a properly documented medical record, stating:

> [CMS] adjusts the monthly payments to Medicare Advantage organizations to reflect the health status of their enrollees.  This ensures Medicare Advantage organizations are paid appropriately for their plan enrollees (that is, less for healthier enrollees and more for less healthy enrollees). The risk adjustment methodology relies on enrollee diagnoses.  Physicians and other health care providers submit diagnosis codes to the Medicare Advantage organizations, which in turn submit them to CMS. These diagnosis codes contribute to an enrollee's risk score, which is used to adjust a base payment rate.  Each diagnosis code submitted must be supported by a properly documented medical record.

*Swoben*, 848 F.3d at 1167-68 (internal citations omitted).

KELLER GROVER LLP
1965 Market Street, San Francisco, CA  94103
Tel. 415.543.1305 | Fax 415.543.7861

48.     MAOs can delete diagnoses from the encounter data submission pathway including through the Risk-Adjusting Processing System ("RAPS") and Encounter Data System ("EDS") to comply with their obligation to delete known erroneous, invalid, unsupported or otherwise false diagnosis codes previously submitted to CMS.  Similarly, Sutter also has an obligation to delete these false codes in its systems.  Doing so should cause the MAOs to delete those codes in the RAPS system, and thereby cause CMS to adjust the RAF score for the patient downward and the capitated payment downward as well.

### 3.     Medicare Advantage Payments are subject to the False Claims Act

49.     "The Medicare Advantage capitation payment system is subject to the False Claims Act."  *Silingo*, 904 F.3d at 673.

50.     Upon learning of a false diagnosis code resulting in a Medicare Advantage overpayment from CMS, healthcare providers such as Sutter must delete or otherwise withdraw that code.  *See Swoben*, 848 F.3d at 1176-77 & n.8.  They must also refund any overpayment received as a result of the false code.  The failure to delete or withdraw known false codes is the knowing retention of an overpayment in violation of 31 U.S.C. § 3729(a)(1)(G).  Likewise, a failure or refusal to delete or withdraw known false codes is the submission, or causes the submission, of false claims in violation of 31 U.S.C. § 3729(a)(1)(A) and (B).

### THE SUTTER-WIDE FRAUD

## I.     RELATOR'S EXPERIENCE IN RISK ADJUSTMENT

51.     Relator has been a professional medical coder for twenty-five years.  In 2004, she became a Certified Professional Coder with the American Association of Professional Coders ("AAPC").  The AAPC's Certified Professional Coder credential is the gold standard for medical coding in physician office settings.  "[Certified Professional Coders] have proven mastery of all code sets [including ICD-10] . . . and adherence to documentation and coding guidelines.  [Certified Professional Coders] represent excellence in medical coding."  https://www.aapc.com/certification/cpc.aspx  (last visited April 2, 2019).

52.     Because medical coding is a core Health Information Management function, Relator is also a member of the American Health Information Management Association

KELLER GROVER LLP
1965 Market Street, San Francisco, CA  94103
Tel. 415.543.1305 | Fax 415.543.7861

("AHIMA").  According to the AHIMA Standards of Ethical Coding, coding professionals should "[r]efuse to participate in or support coding or documentation practices intended to inappropriately increase payment, qualify for insurance policy coverage, or skew data by means that do not comply with federal and state statutes, regulations and official rules and guidelines." http://ethics.iit.edu/codes/AHIMA%202008.pdf (last visited April 2, 2019).

53.    Together AHIMA and AAPC represent the industry standard for medical coding. Relator regularly cited to these standards in training materials she developed.  Sutter also knew of and cited to AHIMA's Ethics Standards for medical coding in materials it provided to RAF coders.  "AHIMA Standards of Ethical Coding [] direct coders to 'assign and report only the codes and data that are clearly and consistently supported by health record documentation in accordance with applicable code set and abstraction conventions, rules, and guidelines.'"

54.    Prior to joining Sutter, Relator worked as a Data Quality Trainer for risk adjustment for another Medicare Advantage provider.  In that position, Relator gained a deep understanding of how the RAF component of the Medicare Advantage Program is supposed to work and the duties healthcare providers like Sutter have under the program.  Indeed, since Relator started in that position in 2007, the same year CMS fully implemented its risk adjustment model, Relator has been working in this specialized coding area from the beginning.

55.    In 2013, Relator accepted a position at Sutter's PAMF affiliate to support its Medicare Advantage Program.  From that position, Relator observed first-hand the Sutter-wide fraud on which this action is based.

## II.   SUTTER'S UNDERSTANDING OF PART C REIMBURSEMENT AND ITS OBLIGATIONS AS A MEDICARE ADVANTAGE PROVIDER

56.    On May 6, 2013, Relator reported for her first day of work at PAMF's Sunnyvale, California office.  Suzy Cliff, PAMF's Vice President of Revenue Cycle, handled Relator's orientation.  Cliff told Relator that PAMF had "nothing" in place for risk adjustment. Subsequently, Julie Cheung, Sutter's RAF Program Manager, confirmed that even though Medicare Advantage Programs using RAF started at Sutter in 2010, there was no support for the Program Sutter-wide until 2012.  As discussed below, the "support" for RAF Sutter introduced in

KELLER GROVER LLP
1965 Market Street, San Francisco, CA  94103
Tel. 415.543.1305 | Fax 415.543.7861

2012 was Sutter's organized efforts to increase its RAF scores -- not any attempt to develop a compliant RAF program with accurate coding to support reimbursement.

57.     During orientation, Cliff reviewed with Relator the contents of a three-ring binder she had also used in Relator's interview months before.  The first page in Cliff's binder was a November 2012 report showing Sutter's goal was to raise the PAMF RAF score by 28%.  The report also included a snapshot of a "Trend Report by Affiliate" showing the RAF score trend for each of Sutter's five affiliates: PAMF, Sutter East Bay, Sutter Pacific, Sutter Gould and Sutter Medical.

58.     Cliff's binder also included summary reports on the RAF program at each affiliate in a format called "RAF Dashboards," which provided metrics on the RAF score trends in each of the affiliates.  The reports in Cliff's binder also summarized prevalence rates for different diagnoses.  The prevalence rate referred to the number of cases of a specific HCC in the State of California's Medicare Advantage population compared to each affiliate's capture of that HCC in physician encounters at Sutter.  If an affiliate's capture of that HCC was below the state average, Sutter viewed it as an indicator of a lost revenue opportunity.  The HCCs Sutter focused on varied from year to year but typically included the ones with high reimbursement such as chronic obstructive pulmonary disease (HCC 111), diabetes with manifestation (HCC 18), congestive heart failure (HCC 85), major depressive disorder (HCC 58), and peripheral vascular disease (HCC 108).

59.     When Cliff left Relator at the end of her orientation she took the binder with her.  Relator was otherwise left in an empty cubicle.

60.     Though not among the materials in Cliff's binder, Relator eventually found Sutter's Policy for "Overpayment Refund. 13-540."  It provided Sutter's understanding of its obligation under the Social Security Act, as amended by the Patient Protection and Affordable Care Act, to timely report and refund any Medicare overpayments resulting from inaccurate or improper coding and take steps to prevent any overpayments from recurring:

///

///

KELLER GROVER LLP
1965 Market Street, San Francisco, CA  94103
Tel. 415.543.1305 | Fax 415.543.7861

SCOPE
This policy applies to Sutter Health, its Affiliated Entities and Operating Corporations.

POLICY
Sutter Health and its Affiliates will report and refund overpayments from state and federal healthcare programs within 60 days of identification, or the due date for any applicable reconciliation.  As appropriate, Sutter Health and its affiliates will take remedial steps to prevent identified overpayments from recurring.

PURPOSE
The purpose of this policy is to establish the date(s) for identification of overpayments and the process for timely reporting and return of identified overpayments as required by Section 6402 of the Patient Protection and Affordable Care Act ("PPACA").

DEFINITIONS

***

C.  Overpayment – is the amount of money Sutter Health or a Sutter Health affiliate has received in excess of the amount due and payable under any state or federal health care program requirements.  Overpayments include, but are not limited to, finding of incorrect code or modifier assignment resulting in a higher level of reimbursement… or any other finding that reflects an overpayment was received as a result of inaccurate or improper coding or reporting of health care items or services.

61.     Relator and others throughout Sutter including Julie Cheung and Roger Larsen, Sutter Regional Vice President of Finance and PAMF CFO, regularly received updated RAF Dashboards and other RAF trend analyses like the ones in Cliff's binder as part of the Sutter-wide effort to raise RAF scores.  For example, on June 10, 2013, Cliff forwarded Relator an email from Jeffrey Burnich, Sutter Senior Vice President and Executive Officer, with the subject "RAF Quarterly Report," which showed the Sutter-wide progress towards increasing RAF scores across all affiliates.  It also reflected Sutter's understanding that CMS-generated RAF scores are based on the documentation Sutter includes in the patient's medical record.  Dr. Burnich explained that Sutter Medical Network:

is pleased to support you with the latest quality data report to track progress on the Risk Adjustment Factor (RAF) project.  RAF is the Centers for Medicare and Medicaid's (CMS) assignment of a complexity score to a Medicare Advantage patient. This is based on the documentation and coding intensity of the patient's medical condition and patient demographics.

The attached presentation shows the progress towards improving the [Sutter Medical Network's] RAF score.

KELLER GROVER LLP
1965 Market Street, San Francisco, CA  94103
Tel. 415.543.1305 | Fax 415.543.7861

62.    Relator also regularly received Medicare Advantage Performance (MAP) Reports, which like the dashboards provided information on Sutter's progress in increasing RAF scores. For example, a January 2015 MAP Report, subtitled "Progress Toward Improved Acuity Reporting," provided an overview of the Medicare Advantage Program and again Sutter's understanding of its obligation to provide accurate coding information to obtain appropriate reimbursement:

> Under CMS' prospective, risk-adjusted payment model, the health status of the [MA] patient population must be accurately reflected in order to obtain appropriate revenue to cover the costs of care.  The acuity of our Medicare Advantage population is represented as the hierarchical condition category (HCC) score which reflects how well we assess, diagnose, document, code and report select acute and chronic conditions.  The HCC is the clinical component of the total Risk Adjustment Factor (RAF) score.
>
> ***
>
> To support improvement in acuity reporting, Sutter Medical Network, in collaboration with the affiliates, identified a series of target conditions and activities to promote the annual, comprehensive review of health status, thorough documentation, and accurate coding of clinically diagnosed conditions.

63.    Like the RAF Dashboards, the MAP Report provided a "System Overview" including (1) Medicare Advantage population by affiliate; (2) performance metrics for Annual Wellness Visits by affiliate; (3) year over year HCC scores by affiliate as reported by CMS with comparison to statewide averages; and (4) CMS's reported HCC score for each affiliate over time.  The MAP Report also included dashboard summaries for each affiliate separately.  Early MAP reports and quarterly RAF dashboards were maintained on the Sutter Medical Network RAF Program portal ("RAF portal").  Sutter was constantly monitoring and making adjustments to "maximize outcomes for HCC capture and reporting" to achieve its stated goals for increased RAF scores.

64.    Although Relator was primarily supporting PAMF's RAF program, the Sutter-wide effort to increase RAF scores required her to constantly engage with Sutter management and her RAF program counterparts at the other Sutter affiliates.  Not only did Relator routinely interact with Sutter management and her RAF counterparts, but given Relator's substantial RAF experience, she frequently provided them information on the critical role of risk-adjustment and

diagnosis codes in the Medicare Advantage Program.  Julie Cheung, who was responsible for overseeing the RAF program at all five Sutter affiliates, was especially excited to hear any of Relator's ideas regarding risk adjustment given her own lack of experience in the area.  Indeed, even though she had responsibility for the Sutter-wide RAF program, Cheung confided to Relator when they first spoke that she did not know what RAF was when she applied for the job overseeing the Sutter-wide RAF program and had to "google" it.

65.     One example of the type of information Relator provided Cheung is a December 2013 PAMF RAF Implementation plan Relator prepared describing the importance of accurate physician coding:

> Medicare Advantage plans rely entirely on the Hierarchical Condition Category for reimbursement.  Because of this, it is essential for Medicare Advantage plans to ensure providers capture the complete diagnostic profile of every Medicare Advantage patient … Medicare Advantage plans must capture HCC conditions annually.  When documentation does not support the chronic condition(s), and no identification of HCCs has taken place, no reimbursement will be collected from Medicare.

66.     In another instance, Relator's team at PAMF created a clinical documentation training video on the transition from ICD-9 to ICD-10 coding.  They provided the video to Cheung and Relator's RAF counterparts at the other affiliates to facilitate proper training on the new ICD-10 guidelines which would directly impact diagnostic coding that mapped to HCCs in all Sutter's affiliates.

67.     Based on Relator's first-hand experience with the Sutter-wide RAF program, Sutter understood its obligation to provide accurate risk adjustment information and the critical role this information plays in CMS's calculations of appropriate reimbursement under the Medicare Advantage Program.  Sutter understood:

- How CMS calculated risk scores.

- CMS's HCC model incorporated new information, including updates to the ICD standards for coding.

- The role of ICD diagnosis codes to RAF Coding, including the transition to ICD-10.

KELLER GROVER LLP
1965 Market Street, San Francisco, CA  94103
Tel. 415.543.1305 | Fax 415.543.7861

KELLER GROVER LLP
1965 Market Street, San Francisco, CA  94103
Tel. 415.543.1305 | Fax 415.543.7861

- The importance of correctly mapping ICD-9, and then ICD-10, diagnosis codes to CMS's HCC model.

- Capture of HCCs was the clinical component essential to the calculation of the risk adjustment score used to calculate reimbursement.

- There was a direct relationship between higher risk scores and higher payments.

- When documentation does not support a diagnosis of a chronic condition(s), and no identification of HCCs has taken place, no increased reimbursement will be collected from Medicare.

- The health status of the [Medicare Advantage] patient population must be accurately reflected in a properly documented medical record in order to obtain appropriate reimbursement.

- Pursuant to the Affordable Care Act, Sutter had a duty to refund overpayments, including those identified from incorrect, inaccurate or unsupported coding, and failing to do so would result in False Claims Act liability.

### III.   SUTTER'S CAMPAIGN TO INCREASE RAF REVENUE ACROSS ALL AFFILIATES

68.   PAMF's goal in hiring Relator in 2013 was to raise PAMF's RAF score by 28% as part of the Sutter-wide effort to increase RAF scores across all affiliates.  As described in a January 2015 Sutter MAP report, to achieve these increased RAF scores, Sutter instituted in January 2013 a system-wide goal to raise the average HCC more than 30% by July 2014.  Sutter's objective was to bring its RAF scores above the statewide average (with associated increase in revenue) regardless of the actual medical condition of its Medicare Advantage population.  The Sutter-wide measures to accomplish these goals included: (1) increasing the rate of Annual Wellness Visits for Medicare Advantage patients, thereby increasing the opportunity to capture more HCC codes in a required face-to-face encounter with a physician; (2) recapturing HCCs each year to ensure no decrease in reimbursement rates upon CMS's annual rate reset; (3) tracking prevalence rates for those high-value HCCs where Sutter was below the statewide

average; and (4) tracking Year-to-Date HCC Score Average Build-Up which allowed Sutter to

monitor and take action to ensure no downward trend in a patient's HCC score.

69.     Relator soon understood that Sutter viewed RAF as a revenue stream with little to

no consideration for whether the diagnosis codes that led to the RAF reimbursement were

properly supported in the patient's medical record.

70.     Sutter relied on individuals like Relator supporting RAF and "Physician

Champions" at each affiliate to implement management's objectives to increase RAF scores

Sutter-wide.

71.     In Relator's first week at PAMF in May 2013, she was introduced to Dr. Veko

Vahamaki, the lead Physician Champion at PAMF.  Thereafter, Relator and Dr. Vahamaki met

weekly to discuss what each of them was doing as part of the RAF program.  Relator also

regularly interacted with PAMF's other Physician Champions: Dr. Amy Lin, Dr. Graham

Dresden, Dr. Anita Gupta, and Dr. Susan Schaefer.  Dr. Susan Pertsch subsequently joined the

group of PAMF Physician Champions.

72.     Sutter appointed Physician Champions at each affiliate and paid them to train the

primary care physicians largely responsible for the diagnostic coding during patient "encounters"

or visits.  Among other things, the Physician Champions were supposed to be models of accurate

diagnostic coding and were responsible for communicating the importance of diagnostic coding

to other physicians.  With hundreds of primary care physicians in each affiliate, Sutter only paid

the Physician Champions for roughly one day a week, leaving only minutes per physician to do

one-on-one mentoring.  Physician Champions had no experience or training in RAF coding and

were not certified coders.  The Physician Champions at PAMF and the other Sutter affiliates

spent most of their time going to meetings where they would promote Sutter's strategy of

increasing RAF scores and implementing the plan themselves by reviewing patient medical

records for lost opportunities to capture additional HCCs (but not to ensure the diagnostic codes

that mapped to the HCCs reported were adequately supported in the patient records).  The one-

on-one physician meetings they did arrange were largely attempts to overcome the objections of

physicians who resisted being trained on how to increase RAF scores.  After prioritizing these

KELLER GROVER LLP
1965 Market Street, San Francisco, CA  94103
Tel. 415.543.1305 | Fax 415.543.7861

KELLER GROVER LLP
1965 Market Street, San Francisco, CA  94103
Tel. 415.543.1305 | Fax 415.543.7861

revenue-generating activities, there was little, if any, time for actual one-on-one training on accurate RAF coding.

73.     From the beginning, Relator witnessed Sutter's tightly organized corporate campaign to increase RAF scores.  This system-wide effort was run from the top by Sutter RAF Program Director Nancy McGinnis, Sutter RAF Project Manager Julie Cheung, Sutter's RAF/HCC Lead Coder Jessica Driver-Zuniga, who reported to Cheung, and Sutter Senior Vice President and Executive Officer Jeff Burnich.  Cheung, the Program Manager with no RAF experience, or Driver-Zuniga ran meetings and reported back to McGinnis.  Burnich was kept informed of the challenges and successes at the affiliates in implementing Sutter's RAF campaign so that in Burnich's words, his group could support Sutter's "progress towards improving the [Sutter Medical Network]'s RAF score."  Relator also saw that Sutter Vice President of Finance Larsen closely monitored progress through the MAP reports and RAF dashboards.

74.     In his role as a Physician Champion, Dr. Vahamaki attended regular Sutter-wide conference calls and meetings at Sutter's Green Valley, California property.  For example, Sutter-wide Physician Champion meetings were held on at least the following dates: August 22, 2014, November 14, 2015, and February 11, 2015.  The purpose of these meetings was to allow the Physician Champions to exchange information on what each affiliate was doing towards the Sutter-wide goal to raise RAF scores.

75.     Relator participated in Sutter's RAF Coder User Group which was made up of individuals at all Sutter affiliates doing similar jobs ostensibly supporting Sutter's RAF program.  The RAF Coder User Group operated under the direction of Cheung (who was not a certified coder and had no training in medical coding, let alone RAF coding) and Driver-Zuniga.  Many of Sutter's RAF Coder User Group, like the Physician Champions and Cheung, were not certified coders and had no RAF coding experience.

76.     The RAF Coder User Group held monthly calls over WebEx and, like the Physician Champions, met quarterly at Green Valley.  Relator began attending RAF Coder User Group meetings in 2013.  The Group held regular calls or meetings on at least June 6, 2013, July 11, 2013, August 16, 2013, October 28, 2013, December 5, 2013, February 24, 2014, December

4, 2014, March 25, 2015, and April 23, 2015.  The purpose of these regular calls and meetings was to keep the employees across Sutter's affiliates who were supporting the Sutter-wide effort to increase RAF scores up to date on this Sutter-wide effort.  The RAF Coder User Group members at each affiliate would share materials and strategies they were using to further the campaign.

77.     In addition, Sutter created a working group called the "RAF Score Champions" which paired physicians like Dr. Vahamaki with an employee at each affiliate supporting the RAF program.  The purpose of the RAF Score Champions was to encourage the pairs to work together to improve the RAF scores at each affiliate.  Like the Physician Champions and the RAF Coder User Group, the RAF Score Champions met regularly to discuss ways they could increase Sutter's RAF scores.

78.     Since the purposes of all these meetings was to encourage affiliates to exchange strategies that were working to raise RAF scores at their respective locations, Sutter provided them tools to assure their success.  For example, each meeting included time for a "Round Robin" type discussion where the Champions or RAF employees from each affiliate would share what they were doing to increase RAF.  At one RAF Coder User Group meeting, for example, the Round Robin was subtitled "Proactive Coding Strategies."  Following these types of exchanges, Sutter would circulate successful strategies through the RAF portal so anyone supporting the RAF campaign had access to the tools each affiliate was using to raise the RAF scores.

79.     At the same meeting where the coders discussed "Proactive Coding Strategies," Dr. Vahamaki, then lead Champion Sutter-wide, coached coders on ways to overcome objections from physicians to the RAF score raising campaign.  The objections collected in the advance materials included: "I don't see the purpose of doing annual wellness visits.  I know it doesn't extend life" and "I know what RAF means – Revenue for Sutter at My Expense!"  Overcoming physician objections was critical to encouraging action from the primary care physicians who Sutter needed to add multiple diagnoses that would ultimately increase the RAF scores.

80.     Sutter made attendance at these quarterly Green Valley meetings mandatory and the meeting format consistently was driven towards the goal of raising RAF scores.

Keller Grover LLP
1965 Market Street, San Francisco, CA  94103
Tel. 415.543.1305 | Fax 415.543.7861

KELLER GROVER LLP
1965 Market Street, San Francisco, CA  94103
Tel. 415.543.1305 | Fax 415.543.7861

81.     Sutter also provided anyone supporting the RAF campaign with regular reports, including MAP reports and RAF dashboards, comparing the scores for each affiliate benchmarked against the California average.  At their meetings, Sutter directed Physician Champions and members of the RAF Coders User Group to attest to how these reports could be improved to add value for them.

82.     During Relator's weekly meetings with Dr. Vahamaki, they would each report on their respective meetings or communications with other affiliates.  If there were handouts from meetings the other did not have, including MAP reports or RAF dashboards, they would exchange them as part of their pairing as RAF Score Champions.

83.     Relator repeatedly urged Sutter management, the Physician Champions and members of the RAF Coders Users Group to understand that Medicare required compliance, and that Sutter's single-minded focus on raising the RAF scores was not proper.  Each affiliate had to have a compliant process in place for how it was conducting its RAF coding.  Relator would describe what those practices were and how she was implementing them at PAMF.  Sutter initially commended Relator for developing policies and procedures that could be of value Sutter-wide for Medicare compliance and for being a resource for "best practices" for all affiliates to follow.  Nonetheless Sutter refused to undertake the very measures it both applauded and considered "best practices" to address the compliance obligations that came along with receiving more than $400 million each year in Medicare Advantage capitation payments.  Indeed, in contrast to all the effort and mandatory meetings focused on raising RAF scores, neither Sutter nor any of its affiliates held any meetings, let alone mandatory meetings or discussions, or created reports, tools or strategies, to ensure the accuracy of the RAF coding.

84.     Sutter RAF Program Manager Cheung repeatedly confirmed that Relator was the only person at Sutter doing audits to evaluate whether the strategies Sutter was using to increase its RAF scores were generating unsupported diagnosis coding and resulting overpayments.  As discussed below, Sutter ultimately shut down even those efforts so Sutter could single-mindedly concentrate on raising RAF revenue.

KELLER GROVER LLP
1965 Market Street, San Francisco, CA  94103
Tel. 415.543.1305 | Fax 415.543.7861

85.     Sutter's RAF campaign succeeded.  In just the two years from January 2013-January 2015, Sutter increased its average HCC by 21% across all affiliates.  In the one-year period from January 2014-January 2015, Sutter had a system-wide increase of 25% in its RAF score.  When the preliminary numbers reporting an increase in scores from 2014-2015 were circulated, Dr. Vahamaki forwarded them to Relator along with his excitement that the campaign to increase RAF scores was producing results.

86.     Although Sutter's RAF campaign succeeded in increasing RAF scores and Sutter's Part C reimbursement, Sutter continued to intentionally avoid taking any action to ensure the coding supporting its hundreds of millions of dollars in Medicare reimbursement was accurate.  Sutter likewise failed to engage in any effort to identify overpayments it knew existed because of improper coding.  Sutter failed to take these steps even after Relator and other sources provided actual evidence of false coding, known overpayments, and numerous red flags that Sutter's RAF coding across affiliates was inaccurate and resulted in Medicare reimbursement to which Sutter was not entitled.

## IV.     THE MAO AUDITS PROVIDED A RED FLAG TO SUTTER OF SYSTEM-WIDE INACCURATE CODING AND OVERPAYMENTS

87.     From Relator's six years of RAF experience prior to PAMF, she understood and expected that MAOs would periodically conduct audits and medical chart reviews to ensure accurate risk adjustment coding.

88.     In February 2014 Sutter was notified by UnitedHealth, one of the MAOs Sutter contracted with for healthcare to its Medicare Advantage plan participants, that a "Risk Adjustment Data Validation" (RADV) audit was being conducted on a sampling of Sutter patients for 2010 dates of service.  UnitedHealth stated that: "[f]or the first time with this 2011 RADV audit, the CMS will apply the results of the audit to the revenue for all members on the contract, not just the ones in the audit sample.  As a result, any payment adjustment will be applied to the entire member population rather than just those in the audit sample."  As UnitedHealth explained in another communication surrounding the RADV Audit: "The purpose of this request is to

KELLER GROVER LLP
1965 Market Street, San Francisco, CA  94103
Tel. 415.543.1305 | Fax 415.543.7861

validate diagnoses that were sent to CMS for determining health status adjusted payments under risk adjustment."

89.     As requested by UnitedHealth, Relator pulled the medical records for a PAMF patient in the audit, Patient A.  In the process, Relator conducted her own assessment and found no documentation in the patient's medical record to support the HCC for "malignant neo. Prostate" which Sutter had submitted as part of its claim for reimbursement for the care of this patient.  Relator understood that Patient A would thus be a RADV audit failure since there was insufficient documentation to validate the medical condition of malignant prostate cancer with a 2010 date of service.  The audit failure would also require the diagnosis to be deleted and a refund made to CMS for overpayment for the care of Patient A.

90.     Relator spoke several times to Lynn Moura, RAF Project Lead/Health Records Analyst, PAMF, Mills Division and another member of the RAF Coder User Group, about this RADV audit.  Moura had two patients in the RADV audit and she told Relator that at least one of the audited patients failed for lack of supporting documentation for myocardial infarction.  Moura also reported that there were other RADV audit failures at other Sutter affiliates.  Concerned for the potential implication of Patient A's audit failure to PAMF, Relator reviewed the records of another PAMF patient in the RADV audit who had an HCC for active stroke.  This patient failed too as there was no documentation in the medical records supporting a diagnosis of active stroke for 2010 dates of service.

91.     In early March 2014 Relator spoke to Sutter RAF Program Manager Cheung about the RADV audit.  Relator reviewed the PAMF and Mills results with Cheung and impressed upon her that these failures in cancer, stroke and myocardial infarction were a snapshot of Sutter's inaccurate RAF coding Sutter-wide.  Relator stressed the need for Sutter to conduct its own audit or take other remedial steps to assess the full scope of Sutter's false coding and the resulting Medicare overpayments for dates of service starting in 2010, and to ensure accurate coding and appropriate Medicare reimbursement in the future.  This was not a PAMF-only problem.  Cheung admitted to Relator that the invalid and unsupported HCC coding was happening Sutter-wide, telling her PAMF was not "unique."

92.     Relator also explained to Cheung what the potential liability could be if the audit failures were extrapolated across the patient population.  Cheung expressed grave concern at the amount of money (millions of dollars) Sutter could be made to repay.

93.     During this conversation, Relator also let Cheung know that she had forwarded the medical records of the audited patients as UnitedHealth requested.

94.     A few days later, Sutter held a mandatory RAF Coder User Group WebEx call to discuss the RADV audit.  Representatives from all affiliates and Cheung were in attendance.  Relator, Moura and group members from the other affiliates all reported that Sutter failed badly in the RADV audit particularly in the areas of cancer, stroke and myocardial infarction.  Like Relator, others from the group had also forwarded the medical record information UnitedHealth had requested.  Cheung then directed all RAF Coder User Group members to not, under any circumstances, submit medical records, as they had all just done.  If they received such requests in the future, they were to forward the medical records solely to Cheung.

95.     On March 31, 2014, Relator met with Cheung, Driver-Zuniga, Dr. Vahamaki, Sutter RAF Program Senior Analyst Arvin Magusara, and Michelle Tulier from Optum, a UnitedHealth affiliate.  The purpose of the meeting was to strategize on further improving RAF scores.  On April 4, 2014, Tulier sent an email to the meeting's participants with a copy to Nancy McGinnis, Sutter's RAF Director.  With regard to the RADV audit, Tulier referenced training the physicians whose patients were audited to improve their coding and documentation, but there was no discussion about expanding physician training Sutter-wide on accurate RAF coding.  More importantly, there was no discussion of expanding focus auditing to remove known improper codes in their encounter data evidenced by the Sutter-wide failures in the RADV audit.

96.     On July 22, 2014, Relator sent an email to Kris Crow, PAMF Director of Coding and Education, to draw Crow's attention to the scope of potential liability PAMF could be facing if the RADV audit failures were extrapolated, triggering potentially massive refunds.  Relator used the ICD-9 code from Patient A's records and how many times that same ICD-9 mapped to an HCC for PAMF patients.  She found there were 484 such submissions in 2010.  She then conservatively estimated a payment for the HCC ($4,000) and extrapolated out the scope of

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

KELLER GROVER LLP
1965 Market Street, San Francisco, CA  94103
Tel. 415.543.1305 | Fax 415.543.7861

PAMF's potential liability on this HCC for that year by multiplying the total instances of the HCC by the average payment – 484 x 4,000.  This was a total of $1,936,000, which Relator wrote "is probably low."  Since PAMF represented only a fraction of Sutter's Medicare Advantage participants, the $1.9 million represented only a fraction of Sutter's total potential liability from the 2010 RADV audit just for this particular HCC.

97.     On July 29, 2014, Relator sent Crow another email regarding the cancer and stroke failures in the RADV audit, writing "two HCC conditions that came up in the RADV audit were cancer and stroke.  I could not find documentation to support it in the encounters Medicare is requesting.  Based on this, it is my recommendation that we implement a 'focus' audit around these 2 conditions and mandate a mass training to all providers to correct and educate."  Given the Sutter-wide failures in the RADV audit, conducting the audit Relator recommended at all affiliates was the only way Sutter could identify the full scope of its coding failures and Medicare overpayments and prevent them from recurring.  As described below, Relator repeated her recommendations to Cheung, Driver-Zuniga and her counterparts at Sutter's other affiliates.

98.     In July 2014, Cheung invited Relator to participate in the "Peak Audit," a chart review by an outside vendor for dates of service from 2013-July 2014 across all Sutter affiliates that Optum requested Sutter undertake.  Relator responded to the invitation writing "it might be a better investment to hire our own (additional) auditors" to "improve[] documentation and increase 'compliant' capture of HCC in the future."  Cheung responded that "one vocal leader believes that it's worthwhile as long as the $ earned exceeds $ spent," reinforcing the Sutter approach of allocating resources in its RAF program only for the purpose of increasing RAF scores and revenue.  Cheung also expressed frustration that in the face of known Sutter-wide coding failures, Sutter was not taking the necessary steps to prevent these failures from recurring: "We keep spending money to find the same issues, but we're not preventing it from happening again."

99.     Like the RADV audit, the Peak Audit revealed widespread false coding across Sutter's affiliates, requiring Sutter to delete thousands of unsupported diagnosis codes.  In December 2014, Relator exchanged emails with Sutter Physician Services' Michael Aguilar, the person performing the Medicare Advantage submissions Sutter-wide.  According to Aguilar, "[a]s

KELLER GROVER LLP
1965 Market Street, San Francisco, CA  94103
Tel. 415.543.1305 | Fax 415.543.7861

part of the Peak external vendor chart audit project which is now completed [Sutter Physician Services] did send in delete code records that were sent to me by Peak." Aguilar confirmed that, except for the Peak Audit, Sutter had no process in place to submit deletes for unsupported diagnoses in RAF encounter data. But Sutter knew the unsupported diagnoses the Peak Audit uncovered were not a one-off "project" it could consider complete. Unsupported diagnoses that needed to be deleted were an ongoing, system-wide problem dating back to 2010 dates of service, as shown in the RADV audit. Even after deleting thousands of unsupported diagnosis codes found in the Peak Audit, Sutter once again did nothing to identify the full scope of the false coding and "prevent[] it from happening again." Sutter continued its campaign to increase RAF scores across all affiliates without fixing known "issues" and to pay relatively small amounts in refunds as a cost of doing business whenever Sutter got caught by CMS in a chart review or audit.

100.    Relator also was aware of at least two UnitedHealth auditing "projects" at PAMF and Sutter Gould that were ongoing while she was at PAMF. The "Delete Project" found unsupported diagnostic codes for 2012 dates of service. The "Remediation Project," aka the "Wrong Diagnosis Project," found HCCs added at an encounter that was not a valid face-to-face physician visit. This arose when medical assistants were administering injections, but the visits were coded as patients seen by physicians. CMS will not consider an HCC diagnosis code associated with an immunization or therapeutic injection for reimbursement when administered by a medical assistant. Again, since these audits were treated as discrete projects, Sutter never expanded them to root out known false coding issues Sutter-wide or take steps to "prevent[] it from happening again."

101.    Other than these "projects" and the auditing Relator attempted to perform at PAMF, described below, Relator is unaware of other audits at Sutter to address the known problem of unsupported HCCs in the medical records CMS was using as the basis to calculate Sutter's Medicare Advantage reimbursements. If Sutter had performed any such audits, Relator would have known through her regular participation in the RAF Coder User Group and her regular interactions with the Physician Champions and her RAF counterparts at the other Sutter affiliates. Instead, Relator heard at these meetings and in her interactions that no affiliates were

doing audits to remove unsupported HCCs or prevent them from recurring.  They faced resistance from Sutter management to do this kind of auditing, the same resistance Relator found when attempting to conduct these audits at PAMF.

## V.   PAMF'S RAF PROGRAM FAILURES PROVIDED ANOTHER RED FLAG TO SUTTER OF SYSTEM-WIDE INACCURATE CODING AND OVERPAYMENTS

102.    Soon after her arrival at PAMF in 2013 Relator grew concerned that Sutter had been operating its RAF program since 2010 only to capture lucrative HCC codes doing little, if anything, to assure the accuracy of the diagnosis data used to calculate its capitation payments.

103.    As of May 2013, Relator found (1) no Sutter policies or procedures regarding the Medicare Advantage Program to review; (2) no audits or results of any Sutter accuracy testing from prior years or months; (3) no correspondence from any of Sutter's MAOs or expected Standards of Conduct in operating the Medicare Advantage Program; and (4) no sign-in sheets evidencing any RAF training of any healthcare professionals at any time.  There also were no employees at PAMF working on RAF support even though PAMF had more than 8,000 patients enrolled in the Medicare Advantage Program at that time.  Relator was the only (and apparently first) PAMF employee with coding and auditing duties working on issues of risk adjustment in PAMF's Medicare Advantage Program.  The approximately 57 other PAMF employees with coding and auditing duties were all working on revenue cycle/fee-for-service coding supporting PAMF's traditional Medicare and private insurance billing.

104.    PAMF was not unique among the Sutter affiliates.  Relator searched on Sutter's intranet for relevant RAF policies and procedures at Sutter's other affiliates.  Aside from the Overpayment Policy, Relator found no policies or procedures relevant to a RAF program. Relator also asked her peers at the other affiliates and the Physician Champions, but none of them could point her to any relevant materials either.  Thus, as of May 2013, there was no formalized support for the Medicare Advantage Program with approximately 48,000 patients enrolled in plans Sutter-wide.

///

///

KELLER GROVER LLP
1965 Market Street, San Francisco, CA  94103
Tel. 415.543.1305 | Fax 415.543.7861

**A. Relator's Baseline Coding Audits at PAMF Showed High Error Rates**

105.   Since Sutter had not conducted any audits or other testing to establish an accuracy baseline for RAF diagnosis coding at PAMF, Relator began randomly auditing primary care physician encounters[1] to understand PAMF's existing systems.  The results would direct what issues to focus on with physician training, a part of the job responsibilities for which she was initially hired.  Relator's initial primary care physician encounter audits were for dates of service in 2013.  She looked at 42 primary care physician encounters identifying 62 HCCs.  Of the 62 HCCs identified, 53 of them were incorrect because the documentation in the patient's medical records did not support the HCCs according to the ICD coding guidelines in place at the time (ICD-9 in 2013).  These results represented an 85% failure rate.

106.   Relator also audited PAMF's Physician Champions -- the physicians paid to train other physicians how to properly code HCCs.  They failed too.  Relator shared the results of her primary care physician and Champion audits with Dr. Vahamaki, PAMF's lead Champion and the person with supposed responsibility for primary care physician training and one-on-one mentoring for accurate diagnostic coding.  Dr. Vahamaki expressed concern with the results of Relator's audits.  She emphasized to him that the primary care physicians needed more training in accurate RAF coding.

107.   Relator also reported the results of her audits to Cliff and Crow.  Based on Relator's audit results, PAMF agreed to create five full-time employee positions to audit risk adjustment data in PAMF's Medicare Advantage Program (the "RAF Auditors").  Since the cost of five full-time employees, including salaries and benefits, totaled hundreds of thousands of dollars, Relator understood that Sutter Regional Vice President of Finance/PAMF CFO Larsen, at a minimum, knew why PAMF was hiring five new employees and changing Relator's job description after only a few months -- namely, because Relator had exposed widespread coding inaccuracies that needed to be fixed and prevented going forward.  However, Sutter did not authorize additional resources to expand audits Sutter-wide even though other affiliates needed

---

[1] An encounter is a face to face physician visit. 42 C.F.R. § 410.2(6).

KELLER GROVER LLP
1965 Market Street, San Francisco, CA  94103
Tel. 415.543.1305 | Fax 415.543.7861

KELLER GROVER LLP
1965 Market Street, San Francisco, CA  94103
Tel. 415.543.1305 | Fax 415.543.7861

1   help training their physicians on accurate coding too.  In 2015, for example, a coder from Sutter

2   Gould "[a]cknowledged that they need to get out of the office to support the clinicians, but this is

3   a challenge with just two of them to support 100 physicians."

4       108.    Following Crow's direction to justify hiring the five RAF Auditors, Relator

5   created a Corrective Action Plan.  In the Corrective Action Plan, Relator made clear the purpose

6   of her initial audit had been to identify the accuracy rates of the primary care physicians,

7   something which neither PAMF nor Sutter had captured as of June 2013.  When Relator became

8   responsible for implementing these corrective measures and supervising the RAF Auditors, her

9   title was changed to reflect these new responsibilities.  Her new title was PAMF's RAF Coding

10  Manager.

### B.  Relator Created a Formal RAF Training Guide For Sutter-Wide Use and Was Recognized For Promoting Best RAF Practices Throughout Sutter

13      109.    To improve coding accuracy, Relator knew physicians needed to be trained on

14  how to properly document health conditions during the patient encounters.  In Relator's

15  employment before Sutter supporting a Medicare Advantage Program, trainers had detailed

16  guides to help the physicians learn how to do this.  When Relator did not find any training

17  manuals at PAMF, she inquired of her peers in other Sutter affiliates if they had any training

18  materials she could use.  There were none.

19      110.    Similarly, the Physician Champions did not have any materials that could be

20  utilized for primary care physician training.  The Physician Champions (1) did not use formalized

21  training materials on how to code HCCs accurately with the primary care physicians; (2) did not

22  document whatever training they did; and (3) did not have quality control measures, including

23  auditing, to ensure whatever training they were providing was both accurate and effective.

24      111.    Since neither PAMF nor Sutter had any meaningful policies or procedures for the

25  auditing or training of HCC coding, Relator's Corrective Action Plan also outlined her plan to (1)

26  develop policies and procedures that met all applicable requirements and established a consistent,

27  compliant process for auditing, queries, and provider coaching; (2) develop short training

28

KELLER GROVER LLP
1965 Market Street, San Francisco, CA  94103
Tel. 415.543.1305 | Fax 415.543.7861

1   modules and single-page tip sheets explaining Medicare requirements for documentation; and (3)

2   monitor the audit results for consistency and training opportunities.

3       112.    Relator assembled a binder with policies and procedures, audit plans, training

4   plans, training materials, tip sheets, coding guidelines, encounter audit[2] plans, and cancer, fracture

5   and stroke focus audit[3] plans.  These materials were developed in accordance with and cited to the

6   AAPC and AHIMA Standards of Ethical Coding.  Relator used the materials she assembled to

7   train her RAF Auditors.

8       113.    Relator provided the binder to Sutter RAF Program Manager Cheung who gave

9   Relator "kudos" for the practices she developed.  Cheung also recognized in an August 16, 2014

10  email, copied to Sutter Lead Coder Driver-Zuniga and Sutter RAF Director McGinnis, how

11  important Relator's training materials were to ensure accurate coding system-wide at Sutter:

12      PAMF has successfully developed and implemented an audit program that not
        only tracks the coding accuracy of clinicians, but oversees the consistency and
13      accuracy of the coding staff.  *PAMF's effort in this area will be of significant
        value system-wide.*
14
        We would like to recognize Palo Alto Medical Foundation for your progress in
15      acuity capture and reporting. Through the application of lean principles and
        engagement of stakeholders in discussions concerning the quality of clinical
16      documentation, PAMF has implemented strategies that are providing benefit
        beyond immediate RAF efforts.  *In your pursuit of improved medical record
17      management, you have initiated critical conversations that have system-wide
        impact.*  We appreciate your commitment to quality and value your dedication to
18      improving patient care.

19  Relator forwarded Cheung's email, attaching her review of the audit program Relator had

20  created, to Cliff, Larsen, and Robert Cross, Sutter's Director Decision Support, among others,

21  with a copy to Dr. Vahamaki.

22

23  _____

    [2] An encounter audit is a tool to measure whether a primary care physician is complying with the
24  coding guidelines, or not.  It looks solely at what data a primary care physician enters in a specific
    patient encounter.  Encounter audits are commonly used to obtain an accuracy rate for a specific
25  provider.

26
    [3] A focus audit looks at a patient's history for the entire year to try to validate the HCC for that
27  year.  If there is no supporting documentation for the HCC, it must be deleted.  The delete will
    cause the reimbursement for that patient to go down.
28

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

114.     As Relator's peers in Sutter's other affiliates learned what Relator was doing, they asked for materials they could use since they also had no materials to train their physicians. Relator provided the coding guide she assembled among other materials.  For example, when the ICD standard moved from ICD-9 to ICD-10 with direct impact on how diagnoses would map to HCCs, Relator prepared information for her group at PAMF, and also for her peers at the other affiliates and the Physician Champions system-wide.  After one Champions Meeting in 2015 where the need for training materials was discussed, Relator followed up with an email to Cheung offering, "I have lots and lots of training materials if you are interested."  Relator's list included: (1) New Provider; (2) Oncology; (3) Ear Nose and Throat; (4) Infectious Disease; (5) Nephrology; (6) Neurology; (7) Obstetrics/Gynocology Oncology; (8) Opthamology; (9) Psychology; (10) Pulmonology; (11) Cancer; (12) Fracture; (13) Stroke; and (14) Major Depression.  Cheung never responded.  Relator also fielded individual calls and emails from her peers with "Coding Questions" like Sutter Gould's Susan Rutherford who emailed with a coding question regarding thrombocytopenia, a high value HCC on the list of those Sutter wanted to capture.  Relator responded with guidance on steps to follow to assure the patient's medical record would be coded properly.

115.     Relator's 2013 Performance Evaluation praised Relator's efforts to provide best practices Sutter-wide:

> Kathy not only built a fully functioning auditing team from the ground up but also established mutually beneficial relationships with clinical operations within PAMF.  *Kathy hasn't limited her gift of collaboration with PAMF, but has also buil[t] strong relationships with Sutter Medical Network as well as the other Sutter Foundations.  Within Sutter she is known as a resource for RAF, she is sought [out] by others to share best practices . . .*

### C. Relator's Encounter Audits Showed High Error Rates

116.     With initial support from PAMF, Relator began to implement the Corrective Action Plan with a detailed action plan to use the newly hired RAF Auditors to perform encounter audits.  From these encounter audits Relator expected to establish an accuracy rate for the primary care physicians coding HCCs.  This would identify which primary care physicians needed

KELLER GROVER LLP
1965 Market Street, San Francisco, CA  94103
Tel. 415.543.1305 | Fax 415.543.7861

coaching or other training on proper HCC coding.  Relator's RAF Auditors started conducting ten encounter audits per primary care physician per quarter for 2013 dates of service.

117.    These primary care physician encounter audits quickly revealed the primary care physicians had little to no training in proper HCC coding.  On June 3, 2014, Relator reported the preliminary results of the 2013 encounter audits, which showed 1,082 false risk-adjusting codes out of a total of 2,226 patient encounters her group audited.  This represented a 51.4% accuracy rate.

118.    Relator published these results for all PAMF employees, including executive management.  She also apprised Sutter management of the poor results through Sutter Vice President of Finance Larsen, and Sutter Director Decision Support Cross.  Relator also provided the results to Dr. Vahamaki who said the high failure rates should motivate the physicians to be more accurate in their coding.

119.    In July 2014, approximately one year after the random audits of PAMF physicians she first conducted, Relator conducted another random audit of 20 primary care physician encounters to establish their baseline accuracy rate.  The failure rates of this audit were even worse.  Of the 20 encounters audited 18 failed, yielding a 90% failure rate.

120.    As of the time Relator left Sutter in May 2015, no other Sutter affiliates undertook the baseline accuracy testing Relator had initiated at PAMF.  Sutter failed to conduct any baseline auditing outside PAMF despite the strong evidence of coding failures across all affiliates as demonstrated by (1) the high failure rates from Relator's encounter audits; (2) the high failure rates in the PAMF Physician Champions audits; and (3) Cheung's admission that PAMF was not unique in having unsupported and inaccurate diagnosis coding.

121.    Without baseline accuracy rates or any subsequent comparisons or auditing, Sutter had no basis to certify the risk adjustment data it submitted to CMS was accurate, truthful and complete as it was required to do as a condition of receiving Medicare reimbursement.  *See* 42 C.F.R. § 422.504(l).  In fact, any such certification would have been patently false given the numerous red flags informing Sutter the data was not accurate, truthful or complete. Unsurprisingly, as the Government explains in its Complaint in Intervention, when Sutter did

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

1   eventually undertake baseline auditing at its other affiliates some two years later -- after Relator

2   filed this case -- it resulted in the same poor results Relator found at PAMF. Compl. in

3   Intervention, Dkt. 41, ¶ 124.

### D. Relator's Cancer Fracture Stroke Focus Audit Also Showed High Error Rates

#### 1. The Need to Audit Cancer Fracture Stroke Coding

7      122.   Relator's assessment as a certified coder with six years of RAF experience was

8   that Sutter had a pervasive problem of submitting inaccurate and unsupported diagnosis codes

9   resulting in inappropriate Medicare reimbursement. Moreover, as Sutter RAF Program Manager

10   Cheung admitted, Sutter kept "find[ing] the same issues" without "preventing it from happening

11   again." Under these circumstances, best practices (supported by both AHIMA and AAPC

12   standards of ethical coding), Sutter's own Medicare Overpayment Refunds Policy (requiring

13   Sutter and its affiliates to "take remedial steps to prevent identified overpayments from

14   recurring"), and Sutter's obligation to deal honestly with the Government dictated that Sutter

15   conduct focus audits of all HCCs across all affiliates to fix this known problem and determine the

16   amount of Medicare overpayments Sutter knew it needed to refund to CMS. Since Relator was

17   hired to support PAMF's RAF program, that is where she started.

18      123.   Constrained by limited staffing, Relator began with auditing diagnoses for cancer,

19   fracture and stroke, mapping to HCCs 10, 99, 100, 169 and 170 with 2013 dates of service.

20   Relator started with this limited audit plan of five HCCs to account for the work she and her team

21   were also doing with the ongoing primary care physician encounter audits and physician training.

22   Relator expected her RAF Auditors would then expand the focus auditing to include other HCCs

23   and other years of service in the future.

24      124.   To address the Sutter-wide need, Relator urged Cheung, Driver-Zuniga and her

25   peers at the other affiliates to conduct similar focus audits. At a RAF Coder User Group meeting

26   in Green Valley in the fall of 2013, Relator described during the Round Robin exchange that she

27   was conducting encounter audits to establish accuracy baselines for the physicians and would

28   soon start a focus audit for cancer, fracture and stroke.

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

125.     Relator impressed upon the group the particular need to focus on improper coding of cancer, fracture and stroke.  She explained that inaccuracies with these HCCs, especially miscoding these conditions as "active" instead of "history of," were a well-known problem for which they all needed to be auditing.  Lynn Moura added that the same problem existed for myocardial infarction.  Relator also used the example of miscoding a condition as "chronic" or "active" rather than "history of" because it clearly illustrated the connection between inaccurate coding and Medicare overpayments.  CMS increased reimbursement for treatment of patients with active or chronic conditions but not when the patient only had a history of a prior condition.  Therefore, if a diagnosis of "active" cancer, fracture or stroke was left in the patient's medical record when the condition was no longer active, this false coding led directly to providers like Sutter receiving higher Medicare reimbursement for a condition the patient did not have.  In other words, when the patient did not have "active" cancer, fracture or stroke, providers like Sutter would receive reimbursement for services they were not actually providing -- treating active cancer, fracture or stroke.  The reimbursements for these serious conditions could represent thousands of dollars in overpayments per patient per year.  From her more than six years' experience supporting another Medicare Advantage Program, she was aware that providers regularly refunded millions of dollars for improperly coding these very conditions.

126.     Relator stressed to the group that Sutter needed to train its physicians on accurate HCC coding and its direct connection to reimbursement under the Medicare Advantage Program to prevent this and other inaccurate coding from happening *in the future*.  Equally important, Sutter needed to conduct audits to ascertain the extent to which coding *in the past* was improper for the tens of thousands of patients enrolled in Sutter's Medicare Advantage plans and to return overpayments everyone knew existed across Sutter's affiliates.

127.     Cheung, Driver-Zuniga and the RAF Coder User Group members never expressed doubt or reservation that each of the affiliates needed to embrace the RAF best practices of physician training and auditing.  Just the opposite.  They were uniform in the view these audits and training needed to happen Sutter-wide.

///

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

### 2.   PAMF Fails Relator's Cancer Fracture Stroke Focus Audit

128.    The Cancer Fracture Stroke Focus Audit Relator and her RAF Auditors team conducted was more inclusive than the primary care physician encounter audits because it covered every instance where the five HCCs mapping to those medical conditions would have been used during the year.  It was not limited to just the primary care physician encounters.

129.    Further, Relator's team developed tools to delete the unsupported coding and initiate a refund of the Medicare overpayment.  To do so, Relator worked with individuals at PAMF and Sutter Physician Services to understand how Sutter's billing mechanisms worked for the Medicare Advantage Program and to initiate the refunds of overpayments she and her team uncovered in the Cancer Fracture Stroke Focus Audit.  As described above, Sutter had no tools in place to submit deletes because Sutter had not previously initiated deletes other than those related to the Peak Audit.  Relator obtained approval from PAMF management to delete the unsupported codes before she commenced the audit.  This approval was short-lived.

130.    After the audit began, Relator's goal of auditing all the data for the five HCCs for 2013 dates of service soon proved to be unrealistic for her small team of RAF Auditors given their other work on the encounter audits and physician training.  Nevertheless, even without reviewing an entire year's worth of data, the trends evident from the results they had compiled showed pervasive failures with all five HCCs leading to significant Medicare overpayments to PAMF for the care of these Medicare Advantage patients.

131.    Throughout the auditing process, Relator kept Cliff, Crow and Larsen updated on the results, including how many deletes were being submitted to CMS based on inaccurate coding in the encounters.  In the summer of 2014, Cliff relayed to Relator an inquiry from Larsen who questioned why Relator was auditing risk adjustment data for which they had already been paid. Later, Cliff instructed Relator to stop submitting the deletes, citing Larsen's ongoing concern that Relator was auditing old data for which Sutter had already been paid.  Larsen was particularly concerned about auditing the old data because he was trying to increase RAF scores, not make them more accurate, and particularly, not bring them down.

KELLER GROVER LLP
1965 Market Street, San Francisco, CA  94103
Tel. 415.543.1305 | Fax 415.543.7861

132.    Relator refused to participate in any attempt to avoid refunding known overpayments.  She and the RAF Auditors continued the Cancer Fracture Stroke Focus Audit.  In addition, Relator drafted a Revised Corrective Action Plan to ensure that PAMF "implements timely and effective actions when indicators reveal a need for a corrective action" because "PAMF has a responsibility to ensure all documentation supports reimbursement received."

133.    In the fall of 2014, Relator began to see that Sutter and PAMF management did not share her intention to make sure "all documentation supports reimbursement received." Relator learned that Cheung, Larsen, McGinnis and Dr. Vahamaki, among others, were keeping her out of the loop on RAF-related discussions to promote their efforts to increase RAF scores without interference from Relator.  Unsurprisingly, as outlined in its Complaint in Intervention, the Government, during its investigation of Relator's allegations, obtained evidence of numerous communications explicitly excluding Relator relating to Sutter's ongoing efforts to increase RAF scores without assuring the coding was accurate or the reimbursements appropriate, and in fact, knowing they were not.  Compl. in Intervention, Dkt. 41, ¶¶ 104-07, 112.

134.    On September 29, 2014, Relator attended a meeting of PAMF executive management, including Larsen, Cliff, Dr. Vahamaki, PAMF Chief Medical Officer Dr. Conroy, PAMF Medical Director for Quality Dr. Edward Yu, PAMF Medical Director of Information Technology Dr. Criss Morikawa, and PAMF Compliance Committee member Dr. Nilufer Vesuna.  Relator gave a brief presentation on what she and her RAF Auditors were doing, including the Audit Plan.  She specifically identified the five HCCs for cancer, fracture and stroke as significant compliance issues that needed to be remedied.  She explained the pervasive miscoding of these conditions and the substantial Medicare overpayments Sutter was receiving as a result.  Dr. Conroy reviewed the 2014 RAF Auditing Plan specifically identifying a "high priority-potential compliance issue" for cancer, fracture and stroke.  Dr. Conroy told Relator the Auditing Plan "looks good" and "keep doing what you're doing."

135.    At the conclusion of the September 29, 2014 meeting, Relator approached PAMF Compliance Committee member Dr. Vesuna and provided her with a folder containing a copy of the Corrective Action Plan and Revised Corrective Action Plan, together with a list of one-on-one

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

trainings with the physicians' comments. Relator explained that she had been through a Medicare audit before. She told Dr. Vesuna she had prepared a Corrective Action Plan based on that prior experience and her findings at PAMF to date, but that it was not going to mean anything unless someone signed off on it. She urged Dr. Vesuna to review the materials.

136.    Several weeks later, Dr. Vesuna returned the folder to Relator telling her it was well-written and very thorough. Dr. Vesuna told Relator the Corrective Action Plan and Revised Corrective Action Plan were something the Director of Education and Coding needed to review. However, that position was now vacant after Crow transferred out of PAMF on or about August 14, 2014.

137.    On the afternoon of November 26, 2014 (the day before Thanksgiving), Relator was called to a meeting with Marcella Alaniz, PAMF Compliance Analyst; Jessica Lin, PAMF Compliance Analyst; and Mary Campbell, PAMF Project Manager, in Campbell's office. Alaniz told Relator she had never approved Relator's deleting HCCs from patients' medical records. She instructed Relator to stop all auditing immediately. This implemented Sutter Vice President of Finance Larsen's earlier directive that they should not be auditing records for which Sutter had already been paid. Relator instructed her team to stop all auditing, including the Cancer Fracture Stroke Audit and all encounter audits.

138.    In sharp contrast, when it came to adding HCCs and increasing Sutter's revenue, Sutter embraced auditing, fixing the root cause and allocating the staff to make the necessary changes. For example, Sutter's RAF program "launched a data processing investigation to identify causes of lower-than-expected RAF scores" in 2014. From this investigation, Sutter learned that a significant contributing factor to the lower-than-expected RAF scores was CMS rejecting HCCs for technical deficiencies and Sutter not having a process for fixing the defect, resubmitting and thereby allowing for payment. In response, the Sutter Medical Network RAF Team partnered with Sutter Physician Services to support increasing RAF and "develop[ed] a workgroup to evaluate Encounter Rejections, Identify/Fix the Root Cause (future encounters) [and] Fix and resubmit (rejected encounters)." Sutter Physician Services even conducted an audit to establish how many rejected HCCs causing lower-than-expected RAF scores needed to be

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

1   resubmitted.  There were 3,131 of them.  But that audit was only designed to identify HCCs with

2   technical deficiencies that could be resubmitted for payment, not unsupported HCCs that should

3   not have been submitted at all.  The workgroup also included "affiliate liaisons" who worked with

4   Sutter Physician Services to assure the rejected but lucrative HCC codes were resubmitted.

5   Relator was among the affiliate liaisons assigned to work with Sutter Physician Services to get the

6   rejected HCCs resubmitted and Sutter paid.  Sutter Physician Services set up a queue with the

7   rejected HCCs and the affiliate liaisons were tasked to go through the queue and analyze and fix

8   the rejected HCCs in their list.  The results of Sutter Physician Services' investigation, including

9   the audit to identify which HCCs needed to be resubmitted, were presented to the Physician

10  Champions in November 2014 as part of its "accomplishment."  This was the same month that

11  Sutter forced Relator to stop all auditing for inaccurate coding and Medicare overpayments.

12        139.    The directive to Relator to stop all auditing was particularly telling given the

13  known false coding and Medicare overpayments found in the RADV audit, the Peak Audit, the

14  two UnitedHealth audits, and Relator's ongoing Cancer Fracture Stroke Focus Audit.  Sutter

15  clearly knew how to audit and create a remediation plan when it found lost RAF revenue

16  opportunities as it did with its rejections audit.  However, Sutter was unwilling to expand any

17  audit, and indeed stopped auditing, those instances which would result in decreasing revenue and

18  refunding overpayments.

19        140.    Even though Sutter shut down the audits Relator was conducting, in December

20  2014, she reported the results of the Cancer Fracture Stroke Focus Audit her team had compiled

21  for the random sample of HCCs for cancer, stroke, and fracture with dates of services in 2013.

22  She did so to document the pervasive coding failures leading to millions of dollars in Medicare

23  overpayments.  Significantly, less than half the encounters to be audited were completed before

24  management directed that all auditing stop.  In total, the Cancer Fracture Stroke Focus Audit

25  refunded more than $4.2 million after auditing less than half of the relevant encounters for 2013.

26        141.    For HCC-10 (Cancer), the RAF Auditors reviewed 227 encounters out of a total of

27  2,937 encounters reported in 2013 for patients for whom HCC-10 was submitted to CMS from

28  Sutter's PAMF affiliate.  These 227 HCC-10 encounters were found in the medical records of 182

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

patients. Out of the 182 patients where HCC-10 was submitted to CMS, only 18 patients had supporting documentation. For the other 164 patients, the documentation did not support HCC-10 according to ICD-9 guidelines and was therefore submitted to CMS in error. The RAF Auditors submitted refunds for those overpayments. Relator also calculated an HCC-10 accuracy rate of only 9.88% for PAMF in 2013 based on the Cancer Fracture Stroke Focus Audit.

142.   For two HCCs for Stroke (HCC-99/100), the RAF Auditors reviewed 393 encounters out of a total of 778 encounters reported in 2013 for patients for whom HCC-99/100 was submitted to CMS from Sutter's PAMF affiliate. These 393 HCC-99/100 encounters were found in the medical records of 169 patients. Out of the 169 patients where HCC-99/100 was submitted to CMS, only seven patients had supporting documentation. For the other 162 patients, the documentation did not support HCC-99/100 according to ICD-9 guidelines and was therefore submitted to CMS in error. The RAF Auditors submitted refunds for those overpayments. Relator also calculated an HCC-99/100 accuracy rate of only 4.1% for PAMF in 2013 based on the Cancer Fracture Stroke Focus Audit.

143.   For two HCCs for Fracture (HCC 169/170), the RAF Auditors reviewed 243 encounters out of a total of 828 encounters reported in 2013 for patients for whom HCC-169/170 was submitted to CMS from Sutter's PAMF affiliate. These 243 HCC-169/170 encounters were found in the medical records of 86 patients. Out of the 86 patients where HCC-169/170 was submitted to CMS, only 29 patients had supporting documentation. For the other 57 patients, the documentation did not support HCC-169/170 according to ICD-9 guidelines and was therefore submitted to CMS in error. The RAF Auditors submitted refunds for those overpayments. Relator also calculated an HCC-169/170 accuracy rate of only 33.7% for PAMF in 2013 based on the Cancer Fracture Stroke Focus Audit.

**3.   Sutter Took No Action In Response to the Cancer Fracture Stroke Focus Audit Until After Relator Filed this Action**

144.   Sutter management knew the results of the Cancer Fracture Stroke Focus Audit because Relator verbally presented the results to Sutter Vice President of Finance Larsen in September 2014 and provided him the written results in December 2014. Relator also reported

KELLER GROVER LLP
1965 Market Street, San Francisco, CA  94103
Tel. 415.543.1305 | Fax 415.543.7861

the results to Sutter RAF Program Manager Cheung in January 2015.  Relator wanted the inexperienced Cheung to understand the implications of shutting down the audit and failing to return known overpayments.  She gave Cheung a description of the potential False Claims Act liability, including damages and penalties, in the same terms she outlined to PAMF's Chief Medical Officer in September 2014 when she reported the interim results of the Cancer Fracture Stroke Focus Audit to PAMF executives.

145.    In addition, Dr. Vahamaki presented the audit results at the February 2015 Physician Champions meeting in Green Valley.  Two of the RAF Auditors further reported on the audit at the March 2015 RAF Coder User Group meeting.  Sutter Director of Coding and Compliance Greta Fees also attended that meeting purporting to offer resources to ensure that all coding and documentation recommendations have legal review and support.  Notably, it was the first time in Relator's experience where anyone from Sutter Compliance attended one of these meetings, and no one in the group was aware of, or had ever seen, the resources Fees claimed were available on the RAF portal.  The only resources Relator ever saw on the RAF portal before this meeting related to how to increase RAF scores.  Fees, who only weeks before had made a presentation on False Claims Act liability at an industry conference, knew Sutter's failure to make adequate corrective actions when confronted with an issue like unsupported diagnoses and failure to return overpayments could trigger False Claims Act liability.  The title of that presentation was *When the Whistle Blows! Responding to a Potential Relator.*

146.    Sutter Lead Coder Driver-Zuniga was also aware of the results of the Cancer Fracture Stroke Focus Audit and that further efforts to return known overpayments were being blocked by the time the RAF Coder User Group met again in April 2015.  At that meeting, when Relator raised the issue of the known problems of coding cancer, fracture and stroke, Driver-Zuniga proposed that each affiliate audit cancer, fracture, stroke and heart attack for compliance.  Everyone at the meeting, representing all of the Sutter affiliates, agreed the audits should be done.  Sutter never allowed that to happen.

147.    Sutter recently refunded $30 million in overpayments for improper coding for cancer, fracture, stroke and heart attack with dates of service in 2010-2016 at Sutter affiliates

KELLER GROVER LLP
1965 Market Street, San Francisco, CA  94103
Tel. 415.543.1305 | Fax 415.543.7861

other than PAMF.  Sutter only made this refund payment after Relator filed her complaint alleging Sutter's violations of the False Claims Act for improper coding of these exact medical conditions.

**VI.   SUTTER KNOWINGLY SUBMITTED FALSE CLAIMS, RETAINED MEDICARE OVERPAYMENTS, AND EXPANDED ITS SCHEME TO USE AGGRESSIVE FALSE CODING TO INCREASE RAF SCORES SUTTER-WIDE**

148.   When Sutter directed Relator to shut down the Cancer Fracture Stroke Focus Audit in November 2014, it also instructed Relator that, going forward, the physicians would be the only ones permitted to correct a patient encounter in Sutter's electronic medical records system. Relator and the RAF Auditors were instructed to only audit the encounters after they were completed and to note any inaccuracies in the billing side of the electronic medical records only. This procedure brought PAMF in line with Sutter's other affiliates, which were also only making necessary changes on the billing side.

149.   Relator explained to Sutter management that removing unsupported codes on the billing side of the electronic medical records -- as the other affiliates were already doing -- would not stop the incorrect HCCs in the encounter data from being submitted to the MAO and then to CMS for the Medicare Advantage patients.  This is because payments are generated based on the encounter data in a patient's medical record, not the billing side of the electronic medical records. Sutter Physician Services' Michael Aguilar confirmed this to Relator the year before.  "For all the Sutter Foundations [Sutter Physician Services] is sending diagnostic code records *linked to patient encounters* out of the EpicCare E[lectronic]M[edical]R[ecord] system to Optum every month."  In December 2014, Aguilar again confirmed the process.  "We send Optum *encounter data* as part of the EpicCare SMS sweep process."  Relator stressed to Sutter management that removing information from the billing file without deleting the known inaccurate HCCs in the encounter data would continue to overbill CMS.  Sutter's directive did not change.

150.   Pursuant to that directive, Relator instructed the RAF Auditors to stop making any changes in the encounter data and to instruct the physicians to make any necessary corrections in the encounter data.  Despite numerous attempts by Relator and the RAF Auditors to get the

KELLER GROVER LLP
1965 Market Street, San Francisco, CA  94103
Tel. 415.543.1305 | Fax 415.543.7861

physicians to correct the coding inaccuracies in the encounter data, most physicians ignored or refused to make the changes.  The end result was Sutter failing to delete known false codes and failing to refund known overpayments.

151.   On or about February 23, 2015, Sutter RAF Program Manager Cheung further confirmed that the other Sutter affiliates were using the procedure Relator was instructed to use at PAMF starting in November 2014: auditing encounters at the time of service and only making changes on the billing side of the electronic medical record, not in the encounter data.  More importantly, Cheung admitted changing the HCCs only on the billing side did not support accurate submissions of risk adjustment data for the Medicare Advantage Program.  Cheung further admitted that Sutter knew unsupported HCCs caught by the auditors and removed in the billing file were nonetheless being submitted to CMS for payment when the encounter data was swept.  This process caused CMS, in turn, to pay Sutter based on diagnosis codes Sutter knew were false.  Cheung shared Relator's concern that Sutter's practice did not comply with the Medicare Advantage Program requirements.  Cheung admitted this was a Sutter-wide problem telling Relator they needed to "brainstorm" how to fix it because she did not know how.

152.   In a February 24, 2015 "Meeting Preparation Memo" to the RAF Coder User Group, Sutter Lead Coder Driver-Zuniga also confirmed the known system-wide problem causing Sutter to submit false claims and retain known overpayments:

> Due to limitations with the current preformatted electronic claim form in the Sutter E[lectronic]H[ealth]R[ecord], only 12 diagnosis codes[4] can be submitted

---

[4] Encounters (physician office visits) with more than 12 diagnosis codes should have been another red flag to Sutter that encounter data system-wide included false codes.  It is implausible that Sutter's physicians were *routinely* treating patients for 12 or more conditions in a standard office visit (typically less than 30 minutes).  *See Swoben*, 848 F. 3d at 1167-68 ("Each diagnosis code submitted must be supported by a properly documented medical record"); CMS, *2008 Risk Adjustment Data Technical Assistance for Medicare Advantage Organizations Participant Guide*, § 7.1.5 (all diagnosis submitted for payment must be based on a face-to-face health service between the patient and the provider).  Worse, when Sutter implemented its sweep process it was intended to support packing even more diagnosis codes into an encounter -- an even less plausible *routine* course of patient care.  More than a dozen diagnosis codes were only in the encounter data, as Driver-Zuniga admitted, to "capture and report" for RAF and thereby increase reimbursement for the lucrative HCCs to which the various diagnoses mapped.

per encounter.  To overcome this limitation, a monthly "data sweep" was implemented several years back.  While *the [data] sweep supports the capture and reporting of diagnostic information for RAF reporting, [Sutter Medical Network] has learned of an unintended consequence – the inclusion of HCC diagnosis codes removed from claims, but remaining in the Sutter E[lectronic]H[ealth]R[ecord]*.  To improve quality control, [Sutter Medical Network] would like for you to brainstorm with your affiliate, the pros and cons of potential solutions that can be used system-wide.

153.    At a strategy meeting to raise RAF scores a month later, Cheung confirmed that Sutter still did not have a plan to stop the submission of false claims or return known overpayments.  Cheung confirmed that CMS was still receiving HCCs that Sutter knew were false.  Of course, the mechanisms Relator set up at PAMF to correctly delete the HCCs from the encounter data would have removed the false codes Sutter-wide.  But Sutter management shut those mechanisms down to increase RAF scores so would not consider them as a "potential solution."

154.    Every unsupported HCC removed from the billing file by Sutter's own auditors gave Sutter actual notice of false codes and triggered Sutter's obligation to delete the codes from the encounter data on which CMS relies for calculating appropriate payment and to refund overpayments caused by those false codes.  Further, each time Sutter failed to delete or withdraw codes it knew or should have known were false it also submitted, or caused the submission, of false claims.

155.    Sutter's system-wide failure to remove known improper codes was not the only system-wide failure Relator uncovered.  In October 2014, Relator emailed Neil Knutsen, Sutter's Subject Matter Expert for Coding/Billing, to raise a problem with "misleading labels" for stroke in Sutter's electronic medical record.  Because the system-wide label for stroke in the electronic medical record system says "within 8 weeks" providers were inaccurately capturing this HCC.  When she did not receive a response, she emailed Knutsen again in January 2015 to make clear the "labels are causing providers to capture the incorrect ICD-9 codes and we're being reimbursed inappropriately."  In response Knutsen told her "[t]his issue is still pending review by the Compliance Reimbursement Team."  He also indicated that even if Compliance responded, this was an ICD-9 issue so a fix was unlikely before they moved on to ICD 10.  He suggested "[c]ontinued physician education may be the only possible solution at this point."  When Relator

KELLER GROVER LLP
1965 Market Street, San Francisco, CA  94103
Tel. 415.543.1305 | Fax 415.543.7861

elevated the "misleading label" issue to Cheung she just echoed Knutsen's response: "For better or worse, clinician education is the key." Misleading codes for myocardial infarction and morbid obesity in Sutter's medical records system were also causing providers to capture the incorrect codes and Sutter to be reimbursed inappropriately. Sutter ignored the inaccurate ICD-9 coding *already* in its electronic medical records and overpayments made to Sutter as a result. Moreover, since Sutter was not prioritizing this kind of physician training, Knutsen and Cheung's suggestions were empty platitudes and not anything Sutter was actually doing to avoid a problem in the future. It was yet another example of Sutter "find[ing] the same issues, but . . . not preventing it from happening again."

156.     In February 2015, Christian Gabriel became PAMF's Director of Education and Coding, the position vacated by Kris Crow in August 2014. Gabriel had no RAF experience but was responsible for supervising Relator and her team. Gabriel rebuffed Relator's early efforts to re-start audits at PAMF given the known problems exposed in both the encounter and focus audits. Gabriel made clear his job was to increase the RAF revenue, not to be bothered with compliance issues. On March 9, 2015, he wrote to Relator: "Given the lack of progress in improving our RAF/HCC scores, please know that your team, structure and process is my #1 focus so I am hoping you can be the great team player I know you can be." Days later, Gabriel held a marathon meeting with his direct reports to announce new Sutter goals to raise revenue. One of the attendees reported to Relator, who was unable to attend, that Gabriel told them it was time to take off their compliance hats and put on their revenue hats. In another exchange with Relator, Gabriel candidly admitted: "Our compliance department does not have the bandwidth to investigate compliance concerns." During the remainder of Relator's tenure at PAMF, she witnessed Gabriel implement Sutter's goals prioritizing revenue while ignoring its obligations to make sure the encounter data they submitted into the CMS pathway was accurate and to return any overpayments based on false coding.

157.     Since Gabriel had no RAF experience he relied on Sutter's lead Physician Champion, Dr. Vahamaki, and what was happening at other affiliates, for strategies to reach the stated goal of increasing PAMF's RAF scores. One of the key strategies employed across all

KELLER GROVER LLP
1965 Market Street, San Francisco, CA  94103
Tel. 415.543.1305 | Fax 415.543.7861

KELLER GROVER LLP
1965 Market Street, San Francisco, CA  94103
Tel. 415.543.1305 | Fax 415.543.7861

affiliates was using the patient's problem list and a daily alert form to encourage physicians to capture new HCCs and recapture old HCCs that had not yet been documented for the year.  When the problem lists and the daily alerts were not sufficiently successful in capturing HCCs, Sutter modified the process to begin to "Tee-Up" the HCCs in the encounter for the physician.  The Sutter Medical affiliate reported to the RAF Coder User Group in March 2015 that it had been using this process to "pre-load" the HCCs into the encounter for the physician.  When Relator discussed this practice with Gabriel and whether he would implement it at PAMF, he described it as "aggressive" and said "they weren't there yet."  Even Dr. Vahamaki questioned whether pre-populating diagnosis codes in the patient's actual encounter was proper.  Nonetheless after Relator left PAMF in May 2015, PAMF joined the other Sutter affiliates in "teeing up" the encounters -- effectively capturing HCCs regardless of whether the physicians actually diagnosed the patients with the medical conditions.

**CMS RELIES ON ACCURATE CODING TO MAKE APPROPRIATE PAYMENT**

158.    As described above, Sutter knows CMS relies on accurate risk adjustment coding to make appropriate payment through the Medicare Advantage Program.  Sutter also knows, as it summarized in its January 2015 MAP Report, that "the health status of the [Medicare Advantage] patient population must be accurately reflected in order to obtain appropriate revenue" and that HCCs are the "clinical component of the total Risk Adjustment Factor (RAF) score."  Accurate diagnosis codes reflecting the beneficiary's health status are, therefore, squarely at the heart of the Government's goal of providing quality healthcare at the most cost-effective price.

159.    MAOs have a duty to certify the accuracy, completeness and truthfulness of the data in the "clinical component of the total Risk Adjustment Factor (RAF) score" they submit, or cause to be submitted, to CMS because this information is so important to "appropriate" reimbursement for the care of the Medicare Advantage beneficiaries.  42 C.F.R. § 422.504(l) (the duty to certify accuracy is "a condition for receiving a monthly payment").  This duty extends to any provider, like Sutter, that may generate the data submitted or caused to be submitted to CMS.  42 C.F.R. § 422.504(l)(3) ("If such data are generated by a related entity, contractor, or subcontractor … such entity, contractor, or subcontractor must similarly certify (based on best

knowledge, information, and belief) the accuracy, completeness, and truthfulness of the data."). *See also* 42 C.F.R § 422.310 (discussing risk adjustment data).

160.    In order to assure the accuracy of this information critical to "appropriate" reimbursement, CMS and the MAOs conduct audits.  When unsupported risk-adjustment data is submitted into the reimbursement system, which Sutter describes as:

Sutter Affiliate → Sutter Physician Services → Clearinghouse → MAOs → Optum → CMS,

CMS requires the improper data be removed from the system and overpayments be reimbursed. *See* CMS, *Medicare Managed Care Manual*, Ch. 7, § 40 (June 7, 2013); *Swoben*, 848 F. 3d at 1176-77 & n.8.  The importance of all this to the Medicare Advantage Program, and Sutter's recognition of this importance, is further reflected in Sutter's own policy to refund overpayments pursuant to its duties under the Social Security Act as amended by the Patient Protection and Affordable Care Act.  *See supra* ¶ 60 (describing Overpayment Refund Policy).

161.    Sutter knew that failing any audit, including a RADV audit, the Peak Audit, or an internal focus audit like the one Relator was conducting until Sutter shut her down, would obligate Sutter to refund overpayments potentially amounting to millions of dollars.  Relator explained this at multiple times to multiple Sutter decision-makers responsible for Sutter's RAF program, including, among others, Sutter's Vice President of Finance Roger Larsen, Sutter's RAF Program Manager Julie Cheung, Sutter's RAF Program Director Nancy McGinnis, Sutter's RAF/HCC Lead Coder Jessica Driver-Zuniga, and Sutter's Lead Physician Champion Dr. Vahamaki.

162.    Sutter also knew Congress's specific intent in creating the Medicare Advantage Program was to reduce the cost of care associated with the traditional Medicare fee-for-service program.  *See Silingo*, 904 F.3d at 672 (goal of the Part C program was to use a 'capitation' payment system "to improve the quality of care while safeguarding the public fisc").  Further, as a provider of healthcare under the traditional fee-for-service model for decades, Sutter knew that in order to protect the taxpayer dollars funding all Medicare programs Sutter through its affiliates "must turn square corners when they deal with the Government."  *See Rock Island, Ark. & La. R.R. Co.*, 254 U.S. 141, 143 (1920).  At all times relevant to this Complaint, Sutter knew it

KELLER GROVER LLP
1965 Market Street, San Francisco, CA  94103
Tel. 415.543.1305 | Fax 415.543.7861

KELLER GROVER LLP
1965 Market Street, San Francisco, CA  94103
Tel. 415.543.1305 | Fax 415.543.7861

needed to ensure its Medicare Advantage Program complied with Congress's goals for Part C of improving quality of care and reducing costs.  Indeed, Sutter's Regional Physician Champion of Diagnostic Coding and Sutter Clinical Lead wrote: "We are just trying to code and document correctly for Medicare (and all of our patients)."

163.    Finally, Sutter knew its failure to remedy the pervasive false coding issues could lead to FCA liability.  Relator discussed this specifically in the context of shutting down the Cancer Fracture Stroke Focus Audit in January 2015.  In addition, Sutter's Greta Fees, who was brought in to meet with the RAF Coders User Group in the months immediately after Sutter terminated the Cancer Fracture Stroke Focus Audit, knew that failing to repay known overpayments to the Government would result in False Claims Act liability.

**HARM TO THE GOVERNMENT**

164.    By submitting false, improper and unsupported coding, Sutter has overbilled and received improper payments from CMS amounting to hundreds of millions of dollars per year.

165.    In 2015, for example, average monthly Medicare Advantage premiums in the counties served by Sutter ranged from $765 per month to $867 per month (depending on the County and the CMS-calculated "bonus rate") -- *before* Risk Adjustment Factors are even considered.  Taking $800 per month as a conservative average, this means CMS's reimbursement for the 50,237 Medicare Advantage patients in Sutter plans would be over $482 million without any Risk Adjustment payments at all.  Even deducting a percentage of that amount for the MAO acting as the intermediary, Sutter's payments likely exceeded $400 million for just one year.

166.    On April 9, 2019, Sutter, including all its affiliates with Medicare Advantage plans except PAMF, signed a settlement agreeing to refund $30 million to CMS to resolve allegations by the Department of Justice and CMS of submitting improper payment data that inflated the payments Sutter received.  The settlement covered improper billing for medical conditions including cancer, hip and vertebral fractures, strokes and myocardial infarction, involving six HCCs for 2010-12, and seven HCCs for 2013-16.

167.    In 2015, the settling affiliates accounted for 28,282, or 56.3% of Sutter's Medicare Advantage patients, and the patients with the improperly billed HCCs covered by the settlement

account for a relatively small portion of the Sutter patient populations, even for the settling affiliates.

168.   Inflating a patient's risk adjustment score has a 1:1 effect on what Medicare pays for a final monthly payment.  That is, if Medicare paid Sutter $9,600 per year for a patient with a risk adjustment score of 1.0, it would pay roughly three times as much for a patient with a risk adjustment score of 3.0, or $28,800 per year.

169.   Thus, Sutter's campaign to raise its risk adjustment score by 20% would convert to roughly $100 million dollars in extra Medicare payments every year for Sutter.

170.   The effects of Sutter's fraudulent scheme distorted Sutter's priorities away from compliance, which potentially *costs* Sutter money, and caused it to ensure that auditors focused on increasing RAF scores to improperly increase the money Sutter gets from Medicare.  As an example, in 2015 Sutter's PAMF affiliate instituted a data mining plan which it executed at the very same time Gabriel, the Sutter employee implementing the plan, insisted to Relator that Sutter lacked the bandwidth for compliance.  Sutter's data mining plan selected four of the high-yield HCCs.  Indeed, Sutter emphasized that each of the four was a "high potential missed opportunity" summarized as follows:

| Diagnosis | HCC | RAF Increase |
|---|---|---|
| Peripheral Vascular Disease | 107/108 | 0.410/0.299 |
| Congestive Heart Failure | 85 | 0.368 |
| Chronic Obstructive Pulmonary Disease | 111 | 0.346 |
| Major Depression | 58 | 0.330 |

A 33% increase in a patient's risk factor would mean thousands of dollars in increased payments for each such patient.

171.   Sutter's campaign was conducted despite Relator's repeated warnings to Sutter's corporate headquarters.  In addition to the examples described above, on March 25, 2015, Relator wrote Cheung, warning her of "Poor documentation around CVA, CA, FX.  I have reported my findings to our local compliance department and they have requested that we stop auditing." (CVA, CA, FX refers to medical shorthand for stroke [cardiovascular accident], cancer, and fracture.)

KELLER GROVER LLP
1965 Market Street, San Francisco, CA  94103
Tel. 415.543.1305 | Fax 415.543.7861

172.    Accordingly, Relator expects that Sutter has submitted or caused the submission of tens of thousands of false claims to CMS during the relevant period.  Further, because Sutter has known of these overpayments by CMS, the retention of each overpayment creates a new and separate false claim for each overpayment not refunded after sixty (60) days.  While the exact amount will be proven at trial, the United States has paid hundreds of millions of dollars in improper, inflated capitation payments under the Medicare Advantage Program as a result of Sutter's scheme.

### PUBLIC DISCLOSURE/ORIGINAL SOURCE

173.    The facts alleged in this First Amended Complaint have not been previously disclosed to the public and to the extent they have been disclosed to the Government, Relator was the original source of these facts.  31 U.S.C. § 3730(e)(4).

174.    Even if substantially the same allegations or transactions as alleged in this complaint were publicly disclosed, the Relator is an "original source" as defined in 31 U.S.C. § 3730(e)(4)(B).  Relator has knowledge that is independent of and materially adds to any publicly disclosed allegations or transactions, and voluntarily provided the information to the Government before filing this action.

### COUNT I

### Retention of Overpayments

### Violation of the False Claims Act – 31 U.S.C. § 3729(a)(1)(G)

175.    Relator realleges and incorporates by reference the allegations made in Paragraphs 1 through 174 of this Complaint.

176.    As described above, Sutter violated 31 U.S.C. § 3729(a)(1)(G) when it knowingly concealed and knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government by failing to repay Medicare overpayments to which it was not entitled.

177.    Had CMS been aware of the knowing failure to return overpayments, it would have taken steps to recover them.

KELLER GROVER LLP
1965 Market Street, San Francisco, CA  94103
Tel. 415.543.1305 | Fax 415.543.7861

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

178.     By virtue of the alleged acts of concealment and/or improper avoidance, the United States has incurred damages and therefore is entitled to treble damages under the FCA, plus a civil penalty for each violation of the Act.

## COUNT II

### Retention of Overpayments

### Violation of the False Claims Act – 31 U.S.C. § 3729(a)(1)(G)

179.     Relator realleges and incorporates by reference the allegations made in Paragraphs 1 through 174 of this Complaint.

180.     As described above, Sutter violated 31 U.S.C. § 3729(a)(1)(G) when it knowingly made, used, and caused to be made or used, false records and statements material to an obligation to pay or transmit money or property to the Government by creating false records and making false statements relating to their failure to repay Medicare overpayments to which it was not entitled.

181.     Had CMS been aware of the knowing failure to return overpayments, it would have taken steps to recover them.

182.     By virtue of the false records, statements, and other acts of concealment and improper avoidance alleged, the United States has incurred damages and therefore is entitled to treble damages under the FCA, plus a civil penalty for each violation of the Act.

## COUNT III

### Presentation of False or Fraudulent Claims In

### Violation of the False Claims Act – 31 U.S.C. § 3729(a)(1)(A)

183.     Relator realleges and incorporates by reference the allegations made in Paragraphs 1 through 174 of this Complaint.

184.     Sutter violated 31 U.S.C. § 3729(a)(1)(A) by knowingly presenting and causing the presentment of false or fraudulent claims for payment or approval resulting in inflated Medicare reimbursements to which it was not entitled.

185.     Had CMS been aware of Sutter's knowing false coding, it would have refused to make risk-adjustment payments based on the false coding and/or pursued other legal remedies to

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

1  avoid the potential disruption of Medicare Advantage plan benefits to thousands of Medicare

2  beneficiaries to whom Sutter provided healthcare services.

3      186.    By virtue of the false or fraudulent claims alleged, the United States has incurred

4  damages and therefore is entitled to treble damages under the FCA, plus a civil penalty for each

5  violation of the Act.

6  ## COUNT IV

7  ## False or Fraudulent Records and Statements

8  ## Material to False or Fraudulent Claims

9  ## Violation of the False Claims Act – 31 U.S.C. § 3729(a)(1)(B)

10      187.    Relator realleges and incorporates by reference the allegations made in Paragraphs

11  1 through 174 of this Complaint.

12      188.    Sutter violated 31 U.S.C. § 3729(a)(1)(B) by knowingly making, using, and

13  causing to be made or used, false records and statements material to false or fraudulent claims

14  resulting in inflated Medicare reimbursements to which it was not entitled.

15      189.    Had CMS been aware of Sutter's knowing false coding, it would have refused to

16  make risk-adjustment payments based on the false coding and/or pursued other legal remedies to

17  avoid the potential disruption of Medicare Advantage plan benefits to thousands of Medicare

18  beneficiaries to whom Sutter provided healthcare services.

19      190.    By virtue of the false records and statements alleged, the United States has

20  incurred damages and therefore is entitled to treble damages under the FCA, plus a civil penalty

21  for each violation of the Act.

22  ## RELIEF REQUESTED

23      WHEREFORE, Relator requests judgment be entered against Sutter, ordering that:

24      1.      As to all counts for the violations of the Federal False Claims Act:

25          a.   Sutter cease and desist from violating the False Claims Act, 31

26              U.S.C. § 3729 *et. seq.*;

27          b.   Sutter pay an amount equal to three times the amount of

28              damages the United States has sustained because of Sutter's

<div style="text-align: left; writing-mode: vertical;">

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

</div>

1    actions, plus the maximum civil penalties against Sutter for

2    each violation of 31 U.S.C. § 3729;

3       c.   Relator be awarded the maximum amount allowed pursuant to

4    31 U.S.C. § 3730(d);

5       d.   Relator be awarded all costs of this action, including attorneys'

6    fees, expenses, and costs pursuant to 31 U.S.C. § 3730(d);

7      2.   Relator, on behalf of the United States, also requests that Relator be granted all

8    such other relief as the Court deems just and proper.

9    **DEMAND FOR JURY**

10   Pursuant to Fed. R. Civ. P. 38, the Relator hereby demands a trial by jury.

11

12   Dated:  April 23, 2019           Respectfully submitted,

13

14                                           **KELLER GROVER, LLP**

15

16   By: */s/ Kathleen R. Scanlan*
                       KATHLEEN R. SCANLAN

17                          JEFFREY F. KELLER

18                    **CONSTANTINE CANNON LLP**
                       GORDON SCHNELL

19                          SARAH P. ALEXANDER
                       HAMSA MAHENDRANATHAN

20

21                    **LAW OFFICES OF MARK ALLEN KLEIMAN**

22                          MARK A. KLEIMAN
                       POOJA RAJARAM

23

24                    Attorneys for Relator

25

26

27

28

---

FIRST AMENDED COMPLAINT FOR
VIOLATIONS OF FALSE CLAIMS ACT

C 15-01062 JD

**KELLER GROVER LLP**
**1965 Market Street, San Francisco, CA 94103**
**Tel. 415.543.1305 | Fax 415.543.7861**

1

## CERTIFICATE OF SERVICE

2

The undersigned hereby certifies that she is an employee of Constantine Cannon and is a person

3

of such age and discretion to be competent to serve papers.  The undersigned further certifies that

4

she is causing a copy of:

5

6

**Relator's First Amended Complaint; Waiver of Service of Summons**

7

8

to be served on this date upon counsel for Defendants Sutter Health and Palo Alto Medical

9

Foundation as follows:

10

Katherine Lauer, Esq.
Latham & Watkins LLP
12670 High Bluff Drive
San Diego, CA 92130
katherine.lauer@lw.com

11

12

13

\_\_\_\_\_ BY FIRST CLASS MAIL, by placing such envelope(s) with postage thereon fully prepaid
in the designated area for outgoing U.S. mail in accordance with this offices practice.

14

15

\_\_\_\_\_ BY PERSONAL SERVICE, (MESSENGER)

16

\_\_X\_\_ FEDERAL EXPRESS

17

\_\_\_\_\_ FACSIMILE, (FAX) Telephone No.:

18

19

\_\_\_\_\_ BY E-MAIL: I caused each such document to be sent by email to the person or offices of
each address above, such person having consented to service of documents by e-mail.

20

\_\_\_\_\_ CERTIFIED MAIL, by placing such envelope(s) with postage thereon fully prepaid in the
designated area for outgoing U.S. mail in accordance with this offices practice.

21

22

23

I declare under penalty of perjury under the laws of the United States that the foregoing is true

24

and correct.

25

Dated:   April 23, 2019          By:      */s/ Christine Zengel*
                                         CHRISTINE ZENGEL

26

27

28

FIRST AMENDED COMPLAINT FOR
VIOLATIONS OF FALSE CLAIMS ACT                58                              C 15-01062 JD