1  Jeffrey F. Keller (SBN 148005)
      jfkeller@kellergrover.com
2  Kathleen R. Scanlan (SBN 197529)
      kscanlan@kellergrover.com
3  **KELLER GROVER LLP**
   1965 Market Street
4  San Francisco, CA 94103
   Telephone: (415) 543-1305
5  Facsimile: (415) 543-7861

6  Gordon Schnell (*pro hac vice*)                    Mark A. Kleiman (SBN 115919)
      gschnell@constantinecannon.com                     mkleiman@quitam.org
7  Sarah P. Alexander (SBN 291080)                    Pooja Rajaram (SBN 241777)
      spalexander@constantinecannon.com                  prajaram@quitam.org
8  Hamsa Mahendranathan (*pro hac vice*)              **LAW OFFICES OF MARK**
      hmahendranathan@constantinecannon.com           **ALLEN KLEIMAN**
9  **CONSTANTINE CANNON LLP**                          2907 Stanford Avenue
   335 Madison Avenue                                  Venice, CA 90292
10 New York, NY 10017                                  Telephone: (310) 306-8094
   Telephone: (212) 350-2700                           Facsimile: (310) 306-8491
11 Facsimile: (212) 350-2701

12

13            **IN THE UNITED STATES DISTRICT COURT**
              **NORTHERN DISTRICT OF CALIFORNIA**
14

15  UNITED STATES OF AMERICA,                    Case No. C 15-01062 LB
    *ex rel.* KATHY ORMSBY
16                                               **RELATOR'S OPPOSITION TO**
                  Plaintiff,                     **DEFENDANTS' MOTION TO**
17                                               **DISMISS RELATOR'S FIRST**
                                                 **AMENDED COMPLAINT**
18          v.

19  SUTTER HEALTH, a California not-for-profit   Date: October 24, 2019
    corporation and PALO ALTO MEDICAL           Time: 9:30 a.m.
20  FOUNDATION, a not-for-profit healthcare     Courtroom: Courtroom C, 15th Floor
    organization.                                Judge: Hon. Laurel Beeler
21
                  Defendants.
22

23

24

25

26

27

28
                                                        Case No. 15-01062 LB
─────────────────────────────────────────────────────────

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................................ 1

STATEMENT OF FACTS ............................................................................................. 2

I.  SUTTER'S PARTICIPATION IN THE MEDICARE ADVANTAGE PROGRAM .......... 2

II. SUTTER'S CAMPAIGN TO SUBMIT INACCURATE AND UNSUPPORTED
    CODING TO INCREASE RISK SCORES AND OBTAIN IMPROPER
    OVERPAYMENTS ........................................................................................... 4

III. SUTTER'S $30 MILLION SETTLEMENT FOR IMPROPERLY RETAINED
     OVERPAYMENTS ........................................................................................... 7

ARGUMENT ................................................................................................................ 8

I.  THE GOVERNMENT'S PARTIAL INTERVENTION DOES NOT BAR
    RELATOR'S AMENDED COMPLAINT ............................................................... 8

    A.  The Government's Intervention Was Partial, Not Full ............................. 9

    B.  Pursuing Non-Intervened Claims is Permissible and Routine Under the FCA ........ 11

        1.  Relator has the right to pursue the non-intervened claims of
            Sutter-wide fraud ...................................................................... 11

        2.  Sutter's sole reliance on *Brooks* is misplaced. ........................... 14

II. RELATOR'S AMENDED COMPLAINT EASILY SATISFIES RULE 9(B) .................... 17

CONCLUSION ........................................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**                                                                                    **Page(s)**

*Anderson News, L.L.C. v. Am. Media, Inc.,*
   680 F.3d 162 (2d Cir. 2012) ...............................................................................23

*Ebeid ex rel. United States v. Lungwitz,*
   616 F.3d 993 (9th Cir. 2010) ..............................................................................21

*Fed. Recovery Servs. Inc. v. United States,*
   72 F.3d 447 (5th Cir. 1995) ................................................................................13

*Griffith v. Conn,*
   No. 11-157, 2018 WL 1402374 (E.D. Ky. Mar. 20, 2018) .........................................13

*Klaczak v. Consol. Medical Transp. Inc.,*
   No. 96-6502, 2005 WL 1564981 (N.D. Ill. May 26, 2005).........................................13

*United States of America v. Tetra Tech EC, Inc.,*
   No. 13-30835 (N.D. Cal.) ...................................................................................15

*United States ex rel. Allen v. Guidant Corp.,*
   No. 11-22, 2012 WL 878023 (D. Minn. Mar. 14, 2012) .....................................12, 13

*United States ex rel. Baker v. Cmty. Health Sys., Inc.,*
   No. 05-279, 2014 WL 10212574 (D.N.M. May 16, 2014).........................................13

*United States ex rel. Becker v. Tools & Metals, Inc.,*
   No. 05-0627, 2009 WL 855651 (N.D. Tex. Mar. 31, 2009)........................................12

*United States ex rel. Bennett v. Biotronik, Inc.,*
   876 F.3d 1011 (9th Cir. 2017) .............................................................................17

*United States ex rel. Bilotta v. Novartis Pharms. Corp.,*
   50 F. Supp. 3d 497 (S.D.N.Y. 2014) ......................................................................13

*United States ex rel. Brooks v. Stevens-Henager Coll., Inc.,*
   359 F. Supp. 3d 1088 (D. Utah 2019)............................................................... *passim*

*United States ex rel. Cafasso v. General Dynamics C4 Systems, Inc.,*
   637 F.3d 1047 (2011)..........................................................................................19

*United States ex rel. Dresser v. Qualium Corp.,*
   No. 12-01745 (N.D. Cal. May 11, 2015)...................................................10, 12, 13

*United States ex rel. Fallon v. Accudyne Corp.,*
   97 F.3d 937 (7th Cir. 1996) .................................................................................13

*United States ex rel. Feldman v. City of New York,*
   808 F. Supp. 2d 641 (S.D.N.Y. 2011) ....................................................10, 11, 12

ii

*United States ex. rel. Ketroser v. Mayo Found.*,
  729 F.3d 825 (8th Cir. 2013) ...........................................................................13

*United States ex rel. Kuney v. Cablexpres Corp.*,
  No. 18-1239 (N.D.N.Y. Apr. 13, 2016) ...........................................................13

*United States ex rel. Lee v. Corinthian Colleges*,
  655 F.3d 984 (9th Cir. 2011) ...........................................................................19

*United States ex rel. Lutz v. Berkeley Heartlab, Inc.*,
  225 F. Supp. 3d 487 (D.S.C. 2016) ..................................................................13

*United States ex rel. Magee v. Lockheed Martin Corp.*,
  No. 09-324, 2010 WL 972214 (S.D. Miss. Mar. 12, 2010) ..............................13

*United States ex rel. Merena v. SmithKline Beecham Corp.*,
  205 F.3d 97 (3d Cir. 2000) ...............................................................................16

*United States ex rel. Nichols v. Omni H.C., Inc.*,
  No. 02-66, 2008 WL 906426 (M.D. Ga. Mar. 31, 2008).................................12

*United States ex rel. O'Keefe v. McDonnell Douglas Corp.*,
  918 F. Supp. 1338 (E.D. Mo. 1996) .................................................................14

*United States ex rel. Sansbury v. LB & B Assocs., Inc.*,
  58 F. Supp. 3d 37 (D.D.C. 2014) ......................................................................12

*United States ex rel. Shemesh v. CA, Inc.*,
  89 F. Supp. 3d 36 (D.D.C. 2015) .................................................................12, 13

*United States ex rel. Silingo v. Wellpoint, Inc.*,
  904 F.3d 667 (9th Cir. 2018) ............................................................................20

*United States ex rel. Stone v. Rockwell Int'l Corp.*,
  282 F.3d 787 (10th Cir. 2002) .........................................................................13

*United States ex rel. Swoben v. United Healthcare Insurance Co.*,
  848 F.3d 1161 (9th Cir. 2016) ......................................................17, 19, 20, 23

*United States ex rel. Voss v. Monaco Enters., Inc.*,
  No. 12-0046, 2016 WL 3647872 (E.D. Wash. July 1, 2016) ..........................13

*United States v. Public Warehousing Co. K.S.C.*,
  242 F. Supp. 3d 1351 (N.D. Ga. 2017) ............................................................12

*Universal Health Servs., Inc. v. United States*,
  136 S. Ct. 1989 (2016) ......................................................................................10

**Statutes**

31 U.S.C. §§ 3729-3733 ............................................................................ *passim*

iii

**<u>Other Authorities</u>**

S. Rep. No. 99-345 (1986), *as reprinted in* 1986 U.S.C.C.A.N. 5266 ............................................11

Relator's Opposition to Motion to Dismiss

436031.4

Relator Kathy Ormsby respectfully opposes the Motion to Dismiss Relator's First Amended Complaint filed by Palo Alto Medical Foundation ("PAMF") and Sutter Health (collectively, "Sutter").  ECF No. 68 ("Mot.").

## PRELIMINARY STATEMENT

This case has always been about Sutter's system-wide scheme to exploit the Medicare Advantage program through Sutter's knowing submission of inaccurate and unsupported diagnosis codes.  Sutter's scheme involved an active campaign across all affiliates to inflate the risk adjustment scores submitted to the Center for Medicare Services ("CMS").  It involved Sutter's complete disregard of the numerous red flags identifying these widespread coding failures and the resulting overpayments that followed.  And it involved Sutter's refusal to engage in, and its decision to shut down, any attempts to correct these failures and return these overpayments.  It was this scheme, as alleged in Relator's original Complaint, that led to the Government's partial intervention and its $30 million settlement with Sutter for improperly retained overpayments.

Despite this settlement, including its carve-out allowing Relator to pursue False Claims Act liability for these overpayments, Sutter now tries to dismiss Relator's Amended Complaint by claiming she has no right to pursue the non-intervened claims.  But Sutter's argument misconstrues the Government's partial intervention as a complete intervention because it failed to include the magic word "Partial" in the title of the Notice of Intervention.  This formalistic requirement lacks any legal basis and is undermined by the Government's Complaint-in-Intervention, which does not encompass the Sutter-wide fraud Relator challenges.  Sutter also relies on a single out-of-circuit case to claim that despite the long history of courts allowing relators to pursue non-intervened claims in partially intervened cases, Relator here is automatically barred from doing so.  That case has no application here, especially in light of the strong Congressional purpose and textual and judicial authority supporting Relator's right to pursue the non-intervened claims.

Sutter also argues that Relator failed to satisfy Rule 9(b)'s pleading requirements.  This argument both misapplies the law and ignores the detailed allegations in the Amended Complaint. First, Sutter incorrectly asserts Relator must include differentiated allegations regarding each of

Sutter's affiliates, ignoring Ninth Circuit precedent to the contrary.  Second, Sutter holds Relator

to an invented Rule 9(b) standard using an arbitrary list of facts it claims are missing from the

Amended Complaint.  Not only is Sutter wrong about the standard, it is also wrong that these facts

are missing.  Just as Sutter ignored Relator's warnings of fraud and potentially catastrophic

liability, Sutter now turns a blind eye to the highly detailed allegations fully setting forth "the who,

what, when, where, and how of [Sutter's] misconduct."  Relator's allegations easily satisfy Rule

9(b).

For these reasons, and as more fully set forth below, Relator respectfully requests this

Court deny Sutter's motion to dismiss her Amended Complaint.[1]

## STATEMENT OF FACTS

## I.   SUTTER'S PARTICIPATION IN THE MEDICARE ADVANTAGE PROGRAM

Sutter Health is a California health care network with affiliated hospitals and physician

groups (organized into "foundations") throughout Northern California.  Am. Compl. ¶ 10.  Sutter

controls and directs its network through overlapping corporate governance boards and executive

officers and maintains all patient records in a system-wide medical record database.  *Id.* ¶¶ 10–11.

Its limited-liability company, Sutter Physician Services, likewise controls physician billing

throughout the Sutter network.  *Id.* ¶¶ 12, 45.  In addition to PAMF, Sutter's other affiliates

include Sutter East Bay Medical Foundation ("Sutter East Bay"), Sutter Pacific Medical

Foundation ("Sutter Pacific"), Sutter Medical Foundation ("Sutter Medical") and Sutter Gould

Medical Foundation ("Sutter Gould").  *Id.* ¶ 11. The physicians at these affiliates collectively

make up "Sutter Medical Network."  *Id.* ¶ 13.

Sutter provides healthcare to roughly 50,000 patients in the Medicare Advantage ("MA")

program.  Am. Compl. ¶¶ 2, 39.  Through MA, private health insurance companies called

Medicare Advantage Organizations ("MAOs") are authorized to administer Medicare benefits on

---

[1] With respect to the arguments Sutter makes in its motion to dismiss the Government's
Complaint-in-Intervention, ECF No. 66, and which Sutter incorporates by reference, Mot. at 9,
Relator refers the Court to the Government's arguments in its opposition to Sutter's motion, filed
today, which Relator incorporates herein.

2

behalf of the United States.  *Id.*  Under this program, CMS makes capitated, per-patient payments totaling hundreds of millions of dollars each year to reimburse Sutter for the care of MA beneficiaries.  *Id.* ¶¶ 3, 165, 172.  These payments are based on the patient's expected medical needs regardless of whether the patient actually seeks treatment during the relevant period.  The payments are calculated using risk scores, which in turn depend on various Risk Adjustment Factors ("RAF") including, most importantly, information about the patient's health conditions. *Id.* ¶¶ 3–4.  Physicians document this information in a patient's electronic medical record ("EMR") using International Classification of Diseases ("ICD") codes that identify each patient's diseases, injuries, infections, and symptoms.  *Id.* ¶¶ 45, 68.

Sutter Physician Services submits these ICD codes to the MAO associated with the patient's MA plan, which in turn sends the information to CMS.  *Id.* ¶ 45. CMS converts the ICD codes, along with patient demographic information, into Hierarchical Condition Categories ("HCC") that CMS uses to calculate a patient's risk score.  *Id.*  CMS depends on the accuracy of the risk adjustment coding data it receives and uses this data to make appropriate payments through the MA program.  *Id.* ¶ 158.  Sutter, like all MA providers, must certify the accuracy, completeness, and truthfulness of the data it causes the MAOs to submit to CMS.  *Id.* ¶ 159.  It is legally required to delete or otherwise withdraw inaccurate or unsupported diagnosis codes and refund any MA overpayments.  *Id.* ¶ 50.

Relator worked at Sutter's PAMF affiliate from May 2013 to May 2015.  *Id.* ¶ 8.  She was hired to support its RAF program and was promoted to RAF Coding Manager.  *Id.* ¶¶ 55, 108. Through this work, Relator routinely engaged with Sutter's corporate management and her RAF counterparts elsewhere in the Sutter network.  *Id.* ¶¶ 55, 64; *see also id.* ¶ 115 (Relator's 2013 performance evaluation highlights that Relator "has also buil[t] strong relationships with Sutter Medical Network [and] the other Sutter Foundations").  She has first-hand knowledge of the risk adjustment practices employed throughout Sutter.  *See, e.g., id.* ¶¶ 64, 67, 73, 83.  After Relator realized that Sutter was doing almost nothing to ensure the accuracy of the diagnosis data it was submitting for reimbursement in its MA program, she began encounter audits (of specific visits

made by specific physicians) and later focus audits (targeting specific HCCs). *Id.* ¶¶ 105–08, 116–43. Sutter's managers knew she had launched audits. *Id.* ¶¶ 107, 118, 131, 134. She urged that both types of audits be expanded throughout the Sutter system. *Id.* ¶¶ 124–26. But when her audits uncovered widespread coding errors that should have triggered Sutter's return of the corresponding overpayments, Sutter shut down her audits. *Id.* ¶¶ 117, 119–20, 137–43. The abrupt shut-down was part of Sutter's broader scheme to increase its reimbursement under the MA program despite corporate management's acknowledgement of the widespread coding errors throughout the Sutter system. *Id.* ¶¶ 91, 120. After stopping Relator's audits, Sutter also took steps to ensure no similar audits were conducted throughout the Sutter system. *Id.* ¶¶ 120, 148–53.

## II. SUTTER'S CAMPAIGN TO SUBMIT INACCURATE AND UNSUPPORTED CODING TO INCREASE RISK SCORES AND OBTAIN IMPROPER OVERPAYMENTS

Starting in January 2013, Sutter instituted a system-wide scheme to inflate its average HCC risk score by more than 30% over the previous year and a half. *Id.* ¶ 68. This campaign came straight from the top, led by a team that included Sutter Senior Vice President and Executive Officer Jeffrey Burnich, Sutter RAF Program Director Nancy McGinnis, Sutter RAF Program Manager Julie Cheung, and Sutter RAF/HCC Lead Coder Jessica Driver-Zuniga. *Id.* ¶ 73. These corporate leaders, along with Sutter Regional Vice President of Finance Roger Larsen, closely monitored various RAF score metrics and reports to ensure Sutter's "progress towards improving [Sutter Medical Network]'s RAF score."[2] *Id.* ¶ 61. Relator, along with her counterparts

---

[2] These reports included: (i) *Trend Reports by Affiliate*, which contained RAF score trends; (ii) *RAF Dashboards*, which contained metrics on RAF score trends at each affiliate; (iii) *Prevalence Rate Reports*, which summarized prevalence rates for high-value reimbursement codes like chronic obstructive pulmonary disease (HCC 11), diabetes with manifestation (HCC 18), congestive heart failure (HCC 85), major depressive disorder (HCC 58), and peripheral vascular disease (HCC 108); (iv) *RAF Quarterly Reports*, which showed Sutter-wide progress towards increasing RAF scores; and (v) *Medicare Advantage Performance ("MAP") Reports*, which provided information on Sutter's progress in increasing RAF scores and contained a system-wide overview of Sutter's MA patient population by affiliate, performance metrics by affiliate, yearly HCC scores reported by CMS for the patients of each affiliate compared to statewide averages,

4

1  elsewhere in the Sutter network, regularly received these reports as part of Sutter's system-wide

2  effort to inflate RAF scores.  *Id.* ¶¶ 57–62.

3       In addition to directing Relator and her counterparts to implement this inflated RAF

4  scheme, Sutter also relied on "Physician Champions" to carry out the plan.  *Id.* ¶¶ 70, 71.  The

5  Physician Champions were supposed to train other Sutter physicians on proper diagnosis coding.[3]

6  *Id.* ¶ 72.  Instead they promoted Sutter's strategy of inflating RAF scores by, among other things,

7  capturing additional diagnoses without regard to whether they were accurate or there was evidence

8  in the medical record to justify them.  *Id.*

9       The Physician Champions and other Sutter employees carrying out the RAF inflation

10  scheme held regular conference calls and meetings focused on improperly boosting Sutter's RAF

11  scores.  These included Physician Champion conference calls and meetings held regularly at

12  Sutter's Green Valley location, RAF Coder User Group monthly WebEx calls and quarterly

13  meetings also held at Green Valley, and RAF Score Champions working group meetings.  These

14  mandatory meetings helped achieve the corporate goal of ramping up RAF scores throughout the

15  Sutter network.[4]

16       Sutter's inflation campaign successfully elevated Sutter's average HCC and RAF scores

17  across all its affiliates.  *Id.* ¶ 85 (Sutter-wide increase of 21% in average HCC from January 2013

18  to January 2015); *see also id.* (Sutter-wide increase of 25% in RAF scores from January 2014 to

19  January 2015).  These increases were achieved by deliberately disregarding the pervasive, Sutter-

20  wide issue of inaccurate and unsupported diagnosis codes that plagued the entire Sutter system.

21  The improper coding resulted in roughly $100 million in annual MA overpayments.  *See id.* ¶ 169.

22

23

---

24  HCC scores for each affiliate over time, and "Dashboard" summaries for each affiliate.  *Id.* ¶¶ 57–
25  58, 61–63, 73.
   [3] Most of the champions Sutter selected had no certification, experience, or training in RAF
26  coding.  *Id.* ¶ 72.  In fact, one of Relator's audits revealed that these so-called experts on diagnosis
   coding failed to appropriately code their own patient encounters.  *Id.* ¶ 106.
27  [4] The Amended Complaint specifies the dates of these meetings and the Sutter corporate managers
28  who attended them.  *Id.* ¶¶ 73–75.

In securing these overpayments, Sutter ignored a virtual forest of red flags warning of system-wide coding failures and improperly retained overpayments:

- The February 2014 Risk Adjustment Data Validation ("RADV") audit identifying numerous patients with unsupported diagnosis codes at multiple Sutter affiliates, *id.* ¶¶ 88–90;

- The "Delete Project" audit identifying unsupported diagnosis codes in a sample of PAMF and Sutter Gould patients from 2012, *id.* ¶ 100;

- The "Remediation Project" audit identifying improperly documented diagnosis codes in a sample of PAMF and Sutter Gould patients, *id.* ¶ 100;

- The July 2014 Peak Audit identifying widespread inaccurate coding across all Sutter affiliates from January 2013 to July 2014, *id.* ¶¶ 98–99;

- Relator's audits identifying failure rates of 90% in one sample and 48.6% in another when auditing PAMF primary care physician encounters from 2013, *id.* ¶¶ 116–19; and

- Relator's cancer, fracture, and stroke focus audits identifying accuracy rates of 9.88%, 4.1%, and 33.7%, respectively, along with $4.2 million in overpayments, in just half of Relator's random sample of PAMF patient records from 2013, *id.* ¶¶ 140–43.

Relator repeatedly warned Sutter of its affiliate-wide coding failures and the significant risk of FCA liability they posed.[5]  In response, Sutter management began excluding Relator from its efforts to increase RAF scores at the expense of accuracy.  *Id.* ¶ 133.  Sutter continued to pursue its inflated RAF scheme even though the patients' medical records were riddled with coding

---

[5] *See, e.g.*, Am. Compl. ¶¶ 97, 124 (Relator recommended Sutter-wide focus audits to PAMF Director Crow, RAF Program Manager Cheung, Lead Coder Driver-Zuniga, and Relator's counterparts at other affiliates because of the widespread failures at PAMF); *id.* ¶¶ 91–92 (Relator warned Cheung in March 2014 that RADV audit failures represented a significant overpayment liability when extrapolated); *id.* ¶ 96 (Relator emailed Crow about the same); *id.* ¶ 144 (Relator described False Claims Act liability to Cheung in January 2015); *see also id.* ¶ 118 (Relator presented the results of her encounter audit and focus audits to Sutter VP of Finance Roger Larsen, Sutter Director of Decision Support Robert Cross, Cheung, Dr. Vahamaki, and others); *id.* ¶ 146 (Sutter management and the RAF Coder User Group uniformly agreed that the PAMF audits and trainings should be implemented Sutter-wide); *id.* ¶ 98 (Cheung recognized Sutter kept "find[ing] the same issues," *i.e.*, inaccurate RAF coding).

inaccuracies[6] and it fully understood its obligations to ensure coding accuracy and return

overpayments resulting from inaccurate and unsupported coding.[7] Sutter never performed even

simple encounter audits to establish baseline accuracy for its doctors' coding (not to mention focus

audits which would expose how much it was being overpaid for the "errors"). Relator urged that

these audits be launched Sutter-wide, *id.* ¶¶ 91, 120, 144–46, based on widespread failures in her

audits at PAMF and the common understanding (as admitted by Sutter's corporate RAF Program

Manager Cheung) that PAMF was not unique in having unsupported and inaccurate diagnosis

coding. *Id.* ¶¶ 91, 120. Nor did Sutter take corrective action after the RADV and Peak audits

exposed affiliate-wide failures to fix the known coding inaccuracies. *Id.* ¶¶ 99, 101. Sutter's

scheme prioritized adding diagnosis codes to the "encounter side" of patient EMRs but did not

incorporate auditing after the encounter to ensure that diagnosis coding was accurate.[8] In 2015,

after years of Sutter's active promotion of inaccurate and unsupported risk data along with its

active suppression of Relator's efforts to remedy these Sutter-wide failures, Relator filed this *qui*

*tam* action.

## III.   SUTTER'S $30 MILLION SETTLEMENT FOR IMPROPERLY RETAINED OVERPAYMENTS

On December 4, 2018, three and a half years after Relator filed her original Complaint, the

Government intervened to pursue the Government's claims for liability under the False Claims

---

[6] *See id.* ¶¶ 48, 50, 60–67.

[7] *See, e.g.*, Am. Compl. ¶¶ 60, 122 (Sutter's overpayment policy required Sutter and its affiliates to "take remedial steps to prevent overpayments from recurring"); *id.* ¶ 62 (Sutter's January 2015 MAP Report stated "the health status of the [MA] patient population must be accurately reflected in order to obtain appropriate revenue to cover the costs of care"); *id.* ¶ 145 (Sutter Director of Coding and Compliance Greta Fees attended a presentation about FCA liability and knew Sutter's failure to take corrective action could trigger such liability).

[8] The EMR has an "encounter side," used by physicians to document patient information, and a "billing side," used for accounting. *Id.* ¶ 149. Sutter Physician Services submits codes documented on the "encounter side" through MAOs to CMS. *Id.* ¶¶ 45, 149. Sutter staff could note corrections to diagnosis coding on the billing side, but this did not stop the incorrect codes in the encounter data from being submitted to CMS. *Id.* ¶¶ 148–49. Sutter only permitted physicians to make changes to the encounter data. *Id.* ¶ 150. In Relator's experience, most physicians ignored or refused to make the corrections. *Id.* ¶ 150.

7

Act.  ECF No. 26 ("Notice of Intervention") ("The United States intends to file its own complaint against Defendants Sutter Health and Palo Alto Medical Foundation . . . and potentially other affiliated entities"); Am. Compl. at 1, ¶¶ 7, 9.  Three months later it filed its Complaint-in-Intervention alleging FCA violations for MA fraud relating to PAMF.  Shortly thereafter, Sutter and the Government entered into a settlement agreement arising out of $30 million in Medicare Advantage overpayments relating to other Sutter affiliates.  *See* Am. Compl. ¶¶ 7, 166; Mot. Seeking Judicial Notice, filed herewith, Ex. B (April 11, 2019 Settlement Agreement ("Settlement")); *see also id.* Ex. A (DOJ, "Medicare Advantage Provider To Pay $30 Million to Settle Alleged Overpayment Of Medical Advantage Funds" (Apr. 12, 2019) ("DOJ Press Release")).  The Settlement provided for the return of overpayments due to Sutter's inaccurate coding of six medical conditions, including the cancer, fracture, and stroke codes specifically identified in Relator's Complaint filed in 2015.  Am. Compl. ¶ 7.  The Settlement preserved the right of the Government or Relator to pursue FCA claims (and associated treble damages) related to these overpayments.  Mot. Seeking Judicial Notice, Ex. B (Settlement) at 5 ("[T]he following claims of the United States are specifically reserved and are not released: . . . Any liability arising under 31 U.S.C. §§ 3729–3733 (the False Claims Act).").  That same month, Relator filed her First Amended Complaint to maintain the claims against Sutter not pursued in the Government's Complaint-in-Intervention.  ECF No. 52.

## ARGUMENT

## I.   THE GOVERNMENT'S PARTIAL INTERVENTION DOES NOT BAR RELATOR'S AMENDED COMPLAINT

Sutter makes two basic arguments in claiming the Government's intervention precludes Relator from pursuing allegations of Sutter-wide fraud.  First, Sutter argues the Government fully intervened in the suit leaving nothing for Relator to pursue.  Mot. at 3.  Second, relying on a solitary, out-of-circuit district court case, Sutter argues that even a partial intervention precludes Relator from pursuing Sutter-wide claims.  Sutter asserts this despite decades of judicial authority

1    to the contrary, several of which Sutter recognizes in its brief.  *Id*. at 4.  Neither argument is

2    persuasive.

3         **A.      The Government's Intervention Was Partial, Not Full**

4          Sutter's claim of full intervention here is premised on the faulty assertion that Relator did

5    not allege Sutter-wide fraud in her original Complaint but did so for the first time in her Amended

6    Complaint only after the Government intervened.[9]  To the contrary, Relator's original Complaint

7    alleged a risk-adjustment fraud scheme across all Sutter affiliates:

8              The compliance failures Relator uncovered should have been an eye-opener to Sutter-
               wide inflated capitation payments because what Relator identified was not a problem
9              with just a sub-section of payments at PAMF for 2013.  Relator exposed a system-
               wide failure at Sutter . . . .  Sutter has taken steps to throttle Relator's efforts to refund
10             all the inaccurate payments made to PAMF and taken no effort at all to correct the
               inaccurate payments it knows exist at Sutter's other affiliates . . . .

11

12   Compl. ¶¶ 8–9.[10]  *See also* Am. Compl. at 1 (with original Complaint, "Relator alleged that Sutter,

13   through its affiliates including PAMF, engaged in a fraud on the Medicare program").  Indeed, the

14   Government acknowledged as much in its Notice of Intervention, which contemplated

15   "potentially" intervening in Relator's case against "other affiliated entities," not just PAMF.

16   Notice of Intervention ¶ 2.  Furthermore, it was only after these allegations and the Government's

17   investigation, including of fraud at these other affiliates, that the non-FCA Settlement was

18   reached.  The Settlement, which the Government and Sutter finalized *after* the Government filed

19   its Complaint-in-Intervention, specifically reserved the right to pursue FCA claims related to

20

21   _____

22   [9] *See e.g.*, Mot. at 3 ("After the government filed its Complaint-in-Intervention, Relator filed a
     new, amended complaint purporting to pursue allegations of Sutter-wide fraud." (internal quotes
23   and cite omitted)); *id.* at 4 (characterizing Amended Complaint as attempting "to expand the scope
     of the relator's allegations to additional defendants and additional claims"); *id.* at 6 ("The
24   government's Complaint-in-Intervention asserts the same claims for relief under the False Claims
     Act as Relator's original complaint.").

25   [10] *See also* Compl. ¶ 90 ("Julie Cheung (Sutter's RAF Program Manager) confirmed that the other
     three Sutter affiliates were only making changes to the billing records, not the patient's medical
26   records."); ¶ 114 ("Over more than a year and a half, Relator and her RAF Auditors confirmed and
     documented: No training program for HCC coding existed for physicians at PAMF or any other
27   Sutter affiliate"); ¶ 119 ("Sutter knows that the same uncorrected inaccuracies in HCC coding
     Relator identified at PAMF exist in each of Sutter's three other affiliates.").

28

1   Sutter's risk-adjustment fraud.  *See* Mot. Seeking Judicial Notice, Ex. B (Settlement) at 5.  This

2   provision would be nonsensical or extraneous if the Complaint-in-Intervention encompassed

3   Relator's allegations of Sutter-wide fraud.  Sutter's contention that the Amended Complaint raises

4   new claims of Sutter-wide fraud for the first time is thus flatly contradicted by the original

5   Complaint and the Settlement that followed it.

6        Sutter ignores all this and instead places ultimate weight on the absence of the word

7   "Partial" from the Government's Notice of Intervention.  But this attempt to read a magic words

8   requirement into the FCA—in this case, "partial intervention"—is exactly the kind of formalistic

9   argument the Supreme Court rejected in *Universal Health Servs., Inc. v. United States*, 136 S. Ct.

10   1989 (2016).  *Id*. at 2001 (rejecting defendant's argument that something has to be labeled

11   "condition of payment" to be material to the government's payment decision).  No court has ever

12   refused to treat a case as partially intervened merely because the Government did not include that

13   specific verbiage in the title.  Nor has any court refused to allow a relator to pursue non-intervened

14   claims merely because the government's intervention notice did not specifically indicate it was a

15   partial intervention.  In fact, many courts, including this one, have allowed relators to pursue non-

16   intervened claims under these precise circumstances.  *See, e.g.*, *United States ex. rel. Dresser v.

17   Qualium Corp.*, No. 12-01745 (N.D. Cal. May 11, 2015), ECF No. 15 (partially intervened case

18   where the intervention notice was titled "Notice of Election to Intervene"—the same as here).

19        Even more basically, Sutter ignores that the Government's Complaint-in-Intervention is

20   silent about the Sutter-wide fraud and the misconduct Relator alleges occurred at Sutter's other

21   affiliates.  The absence of these allegations in and of itself demonstrates that the Government

22   intervened in just one part of the case.  It also shows how far removed this case is from the

23   *Feldman* case on which Sutter relies.  *See* Mot. at 5 (citing *United States ex rel. Feldman v. City of

24   New York*, 808 F. Supp. 2d 641 (S.D.N.Y. 2011)).  There, the court found that the relator's

25   complaint was "superseded in its entirety" because "no material aspect of the Relator's Amended

26   Complaint [was] not covered by the Government's Amended Complaint."  808 F. Supp. 2d at

27   648–49.  Notably, the court recognized that "if the Government only partially intervenes in an

28

1  action," as the Government has done here, "a relator may retain standing to prosecute those

2  aspects of his or her complaint as to which the Government has not intervened." *Id.* at 648.

3  Sutter's own authority, along with the numerous cases decided similarly, directly undermines

4  Sutter's attempt to use the Government's intervention decision to block Relator from pursuing

5  claims of Sutter's system-wide fraud.

6        **B.**    **Pursuing Non-Intervened Claims Is Permissible and Routine Under the FCA**

7        Given the Government's partial intervention here, Relator has the absolute right to pursue

8  her allegations of Sutter-wide fraud.  This right stems from the language and congressional

9  purpose behind the *qui tam* provisions of the modern-day FCA and from the multitude of cases

10  where courts have permitted relators to pursue non-intervened claims.  Defendants' sole support to

11  the contrary comes from *United States ex rel. Brooks v. Stevens-Henager Coll., Inc.*, 359 F. Supp.

12  3d 1088 (D. Utah 2019), which directly conflicts with the FCA's plain language and legislative

13  purpose, as well as the long history of partial intervention cases, and which has never been

14  followed by any court.  *See* Mot. at 3–4.

15        **1.**    **Relator has the right to pursue the non-intervened claims of**

16                **Sutter-wide fraud**

17        Congress specifically designed the *qui tam* provisions of the FCA to supplement the

18  government's resources with those of private parties like Relator.  In passing the 1986

19  amendments to the statute, Congress stressed an overarching intent to encourage "more private

20  enforcement" and a "coordinated effort of both the Government and the citizenry."  S. Rep. No.

21  99-345, at 2, 23–24 (1986), *as reprinted in* 1986 U.S.C.C.A.N. 5266, 5266–67, 5288–89.

22  Amending the FCA was a priority because with the "lack of resources on the part of Federal

23  enforcement agencies . . . , assistance from the private citizenry can make a significant impact on

24  bolstering the Government's fraud enforcement effort."  S. Rep. No. 99-345 (1986), at 7–8, *as*

25  *reprinted in* 1986 U.S.C.C.A.N. 5266, 5272–73.  Sutter's attempt to impose limitations on the

26  ability of relators to pursue non-intervened claims thus frustrates the purpose of the FCA's central

27  design, which is "to encourage a working partnership between both the Government and the *qui*

28

*tam* plaintiff."  132 Cong. Rec. H9382-03 (remarks of Rep. Berman, co-author of the 1986 amendments).

In recognition of this broad congressional purpose, no court—other than *Brooks*, as discussed below—has doubted the right of a relator to pursue non-intervened claims.  Just the opposite.  A long history of decisions uniformly recognizes that relators may proceed with claims not asserted by the government under the plain language and purpose of the FCA.  *See, e.g.*, *Dresser*, No. 12-1745, 2016 WL 3880763, at *10 (N.D. Cal. July 18, 2016) (finding "Defendants' view of the FCA is contrary to the text of the statute, which gives relators the right to continue as a party to an FCA action even when the United States chooses to intervene"); *United States ex rel. Shemesh v. CA, Inc.*, 89 F. Supp. 3d 36, 55–56 (D.D.C. 2015) (rejecting defendant's attempt to dismiss relator's complaint in partially intervened case because "dismissal is not automatically triggered by the government's intervention"); *United States ex rel. Sansbury v. LB & B Assocs., Inc.*, 58 F. Supp. 3d 37, 47 (D.D.C. 2014) ("[A] relator's initial complaint continues to be the operative complaint for all non-intervened claims."); *United States v. Public Warehousing Co. K.S.C.*, 242 F. Supp. 3d 1351, 1357 (N.D. Ga. 2017) (quoting same); *Feldman*, 808 F. Supp. 2d at 648 (discussing relator's standing to pursue non-intervened claims); *United States ex rel. Allen v. Guidant Corp.*, No. 11-22, 2012 WL 878023, at *6–7 (D. Minn. Mar. 14, 2012) (citing *Feldman* to find "government's complaint does not supersede Relator's complaint" when government only partially intervened); *United States ex rel. Becker v. Tools & Metals, Inc.*, No. 05-0627, 2009 WL 855651, at *9 (N.D. Tex. Mar. 31, 2009) ("[T]his court joins other courts that have held that relators are entitled to proceed on their claims when the government only partially intervenes."); *United States ex rel. Nichols v. Omni H.C., Inc.*, No. 02-66, 2008 WL 906426, at *4 (M.D. Ga. Mar. 31, 2008) ("Nothing in the language of the statute or offered by Defendants suggests that [the relator] should be barred from pursuing those claims as to which the Government has declined to intervene.").[11]

---

[11] *See also United States ex. rel. Ketroser v. Mayo Found.*, 729 F.3d 825 (8th Cir. 2013) (government intervention not treated as bar to relator pursuing non-intervened claims); *United*

12

1

2

3

4

5

6

Even Sutter recognizes, as it must, "that there are many cases in which courts have allowed relators to litigate individual claims for relief under the False Claims Act after the government intervenes." Mot. at 4. But Sutter claims these cases are limited to where "the government affirmatively declined to intervene in individual claims for relief originally asserted by the relator, while intervening in others, or affirmatively declined to intervene against certain defendants, while prosecuting the action against others." *Id.*

7

8

9

10

11

12

13

14

15

16

17

18

19

This is just another attempt to impose a "magic words" requirement for pursuing non-intervened claims. No case imposes this kind of stricture. And Sutter's conjured limitation directly conflicts with the many cases that allow relators to pursue a broader scheme than that alleged by the government in partially intervened cases. *See, e.g.*, *Dresser*, No. 12-1745, 2016 WL 3880763 (allowing relator to pursue broader theory of liability for why Defendants' durable medical equipment operations were fraudulent than that alleged by government); *Shemesh*, 89 F. Supp. 3d at 56 (finding "relator's allegations are not substantially similar to those set forth by the government" as relator and government's complaints concern different periods of time); *Allen*, No. 11-22, 2012 WL 878023, at *6–7 ("Relator's complaint pertains to defective Prizm 1861 devices manufactured after April 16, 2002. The government's allegations with respect to the Prizm 1861 relate only to devices manufactured before April 16, 2002. Thus, the government has only partially intervened in this action as it relates to the Prizm 1861." (citations omitted)). In all these cases, the courts allowed the relator to pursue misconduct broader in location, time, or scope

20

21

22

23

24

25

26

27

28

*States ex rel. Stone v. Rockwell Int'l Corp.*, 282 F.3d 787 (10th Cir. 2002) (same); *Fed. Recovery Servs. Inc. v. United States*, 72 F.3d 447 (5th Cir. 1995) (same); *United States ex rel. Fallon v. Accudyne Corp.*, 97 F.3d 937 (7th Cir. 1996) (same); *Griffith v. Conn*, No. 11-157, 2018 WL 1402374 (E.D. Ky. Mar. 20, 2018) (same); *United States ex rel. Voss v. Monaco Enters., Inc.*, No. 12-0046, 2016 WL 3647872 (E.D. Wash. July 1, 2016) (same); *United States ex rel. Lutz v. Berkeley Heartlab, Inc.*, 225 F. Supp. 3d 487 (D.S.C. 2016) (same); *United States ex rel. Kuney v. Cablexpress Corp.*, No. 08-1239 (N.D.N.Y. Apr. 13, 2016), ECF No. 100 (same); *United States ex rel. Bilotta v. Novartis Pharms. Corp.*, 50 F. Supp. 3d 497 (S.D.N.Y. 2014) (same); *United States ex rel. Baker v. Cmty. Health Sys., Inc.*, No. 05-279, 2014 WL 10212574 (D.N.M. May 16, 2014) (same); *United States ex rel. Magee v. Lockheed Martin Corp.*, No. 09-324, 2010 WL 972214 (S.D. Miss. Mar. 12, 2010) (same); *Klaczak v. Consol. Medical Transp. Inc.*, No. 96-6502, 2005 WL 1564981 (N.D. Ill. May 26, 2005) (same).

13

1   than what the government pursue with its intervention—exactly what Relator is doing here with

2   her allegations of Sutter-wide fraud.[12]

3   ## 2.   Sutter's sole reliance on *Brooks* is misplaced

4   Sutter looks to the Utah district court decision in *Brooks* as the only support for its attempt

5   to invoke an automatic dismissal of Relator's non-intervened claims.  Mot. at 3–4.  *Brooks*

6   concerned a relator who added new claims and new defendants *after* the government had already

7   intervened.  359 F. Supp. 3d at 1095–96.  The court found that the relator lacked "the right to add

8   defendants and claims to the action."  *Id.* at 1125.  *Brooks* is thus inapposite to this case, since

9   Relator has not added any new claims or defendants beyond those in her original Complaint.

10   Expanding *Brooks* beyond the particular facts at issue, as Sutter attempts to do here, would

11   be contrary to the text and history of the FCA and in direct conflict with the numerous cases

12   recognizing the right of relators to pursue non-intervened claims.  No other court has followed the

13   decision, let alone expanded it to a case like this one where the relator alleged fraud from multiple

14   locations or sources and the government has intervened as to only some of them.  In fact, this

15   Court recently noted its own "concerns" about *Brooks*, especially when applied to cases like this

16   one.[13]

17   _____

18   [12] Sutter's own *O'Keefe* case further undermines Sutter's attempt to block Relator's pursuit of
Sutter-wide fraud claims.  *See* Mot. at 5 (citing *United States ex rel. O'Keefe v. McDonnell*

19   *Douglas Corp.*, 918 F. Supp. 1338, 1346–47 (E.D. Mo. 1996)).  There, the government partially
intervened in a complaint alleging a defense contractor improperly billed the government for

20   inflated and otherwise mischarged labor costs.  The government did not intervene in the portion of
the complaint alleging the use of "'unverified' materials" in the same contracts at issue in the

21   intervened claims.  *See* 918 F. Supp. at 1346.  The court rejected the defendants' challenge to the
relator's pursuit of these non-intervened claims, finding "[t]he only limitations on the relator's

22   participation in the case are contained in § 3730(c)(2)" and "[t]here is nothing in the FCA which

23   prevents the relator from pursuing these claims."  *Id.* at 1347.  The court thus had no doubts about
permitting the relator to pursue claims relating to a broader scheme involving the same contracts

24   the government was challenging with its intervention.

25   [13] During a recent oral argument in *United States of America v. Tetra Tech EC, Inc.*, No. 13-03835
(N.D. Cal.), Judge Donato stated: "I have concerns about [*Brooks*].  I'm not sure I read the statute

26   the same way."  Tr. of Oral Argument at 8:16–17 (June 13, 2019), ECF No. 80.  In particular,
Judge Donato noted some factual differences between the facts presented in *Brooks* and those

27   before him in *Tetra Tech*: "Here there is disparate sites.  There is no question, Alameda and
Treasure Island are not Hunters Point.  And there is no question also that the word 'action' cannot

28

14

1        Based on the facts presented, the *Brooks* court held that the FCA did not allow for partial

2 intervention because, under its reading of 31 U.S.C. § 3730(b)(4), the government may elect to

3 proceed with a *qui tam* action or decline to intervene but "[t]here is no in between."[14]  359 F.

4 Supp. 3d at 1124.  *Brooks*'s all or nothing approach to intervention would put section 3730(b)(4)

5 in tension with the rest of the FCA.  Indeed, it would directly conflict with the language dictating

6 the process the government is supposed to follow after intervention:  either filing its own

7 complaint or amending the relator's complaint "to clarify or add detail to *the claims in which the*

8 *Government is intervening*."  31 U.S.C. § 3731(c) (emphasis added).  This provision can only be

9 read as allowing the government to choose some, but not all, claims in which to intervene.

10        Adopting the *Brooks* "no in between" standard would also run afoul of the FCA's

11 requirement that the government consent to any dismissal of a relator's claims: "The action may

12 be dismissed only if the court and the Attorney General give written consent to the dismissal and

13 their reasons for consenting."  31 U.S.C. § 3730(b)(1).  It likewise would clash with the relator's

14 right to object to and challenge any dismissal.  31 U.S.C. § 3730(c)(2)(A).  The automatic

15 dismissal of non-intervened claims—without any vehicle or opportunity for the government or

16 relator to weigh in or object—would effectively nullify these sections of the FCA.[15]  There is no

17 way to reconcile these competing provisions with *Brooks*'s absolutist approach.

18        Moreover, *Brooks* (and *Sutter*) rely on a misreading of the "take over the action" language

19 of section 3730(b)(4)(B) that is inconsistent with the multi-claim nature of FCA actions.  Even

20

21 be read so broadly that anything touching Hunters Point necessarily precludes sites in
geographically different locations." *Id.* at 8:21–9:1.  In this case, of course, there is a parallel

22 situation.  Relator is pursuing claims of fraud at multiple locations which are not included in the
Government's Complaint-in-Intervention.

23 [14] 31 U.S.C. § 3730(b)(4) provides: "Before the expiration of the 60-day [seal] period or any
extensions obtained under paragraph (3), the Government shall—(A) proceed with the action, in

24 which case the action shall be conducted by the Government; or (B) notify the court that it
declines to take over the action, in which case the person bringing the action shall have the right to

25 conduct the action."

26 [15] The non-FCA Settlement Agreement in this case illustrates this point.  *See* Mot. Seeking
Judicial Notice, Ex. B.  By explicitly carving out the FCA, the Attorney General specifically did

27 not give written authorization under 31 U.S.C. § 3730(b)(1) to dismiss Relator's FCA claims
against the other Sutter affiliates—quite the opposite.

though numerous statutory provisions in the FCA refer to an "action," as the Third Circuit has

explained, the context makes clear that "action" is not intended to refer to the entire lawsuit.  In

*United States ex rel. Merena v. SmithKline Beecham Corp.*, 205 F.3d 97, 101 (3d Cir. 2000), as

amended (Apr. 21, 2000), then-Judge Alito reviewed the many times "action" is used in the statute

to mean cause of action or claim, not the entire civil suit:

> The statute authorizes a qui tam plaintiff to bring a "civil action for a *violation* of
> section 3729," 31 U.S.C. § 3730(b)(1) (emphasis added), but surely such a plaintiff
> may bring an action containing multiple claims, each of which alleges a separate
> violation of section 3729. When a qui tam action is filed, the government may
> "proceed with *the action*," §§ 3730(b)(2) and (4) (emphasis added) or "decline to take
> over *the action*," § 3730(b)(4)(B) (emphasis added), but the government often decides
> to take over only certain claims in a multi-claim action, and we are aware of no
> decision holding that this is improper.  The statute authorizes the government to
> "dismiss *the action*" and "settle *the action*," 31 U.S.C. § 3730(c)(2)(A) and (B), but
> again, we are aware of no decision holding that the government may not settle or
> dismiss only some of the claims in a multi-claim complaint, and we can think of no
> reason why the government should not be permitted to do so.

*Id.* at 102.  Other statutory sections similarly use "action" to mean a cause of action, not the entire

civil suit.  *See, e.g.*, 31 U.S.C. § 3730(h)(1) (retaliation protection for acts done "in furtherance of

an action under this section," with action referring to one or more claims in the lawsuit); *id.*

§ 3731(e) (defendants may not "deny[] the essential elements of the offense in any action" after

pleading guilty to the same in a separate proceeding, with "any action" meaning one or more

claims under the FCA); *id.* § 3732(b) (federal jurisdiction for state or local claims "if the action

arises from the same transaction or occurrence as an action brought under" FCA, with action

meaning one or more claims in the lawsuit).  *Brooks* simply ignores these other statutory

provisions in positing that section 3730(b)(4) requires a single intervention decision as to the

entire case.[16]

---

[16] Sutter also cites to *United States ex rel. Bennett v. Biotronik, Inc.*, 876 F.3d 1011 (9th Cir. 2017)
to bolster their crabbed statutory construction that "action" in section 3730(b)(4) is a unitary term.
Mot. at 3.  But *Bennett* had nothing to do with this provision or whether a relator could pursue
non-intervened claims.  Instead, it concerned the government action bar in 31 U.S.C. § 3730(e)(3),
which prevents relators from bringing actions "which are the subject of a civil suit . . . in which
the Government is already a party."  The *Bennett* Court simply found that for purposes of 31
U.S.C. § 3730(e)(3), the government's "party" status to a suit does not end after the case settles
and extends to claims it did not settle.  876 F.3d at 1019–20.  Sutter's reliance on *Bennett* for the

16

1    For all these reasons, Sutter's request that this court expand the *Brooks* holding to these

2 facts is misplaced and cannot be squared with the text of the FCA, the dozens of cases affirming a

3 relator's right to pursue non-intervened claims, and the strong Congressional purpose of

4 promoting relators as a critical supplement to government enforcement efforts.  Sutter presents no

5 reason for this Court to deviate from this statutory language, the cases interpreting it, and the

6 legislative intent and long history of a relator-government partnership in enforcing the statute.

7 **II.    RELATOR'S AMENDED COMPLAINT EASILY SATISFIES RULE 9(B)**

8    The Amended Complaint is replete with particularized facts supporting Relator's

9 allegations of a Sutter-wide fraud on the Medicare Advantage program.  These facts are more than

10 sufficient to meet the requirements of Rule 9(b), which is intended to ensure a complaint is

11 "specific enough to give defendants notice of the particular [alleged] misconduct . . . so that they

12 can defend against the charge."  *United States ex rel. Swoben v. United Healthcare Insurance Co.*,

13 848 F.3d 1161, 1180 (9th Cir. 2016).  In the Ninth Circuit, relators must allege "the who, what,

14 when, where, and how of the misconduct charged, including what is false or misleading about a

15 statement, and why it is false" in order to plead FCA claims with the particularity required by Rule

16 9(b).  *Id.* (citations omitted).  The Amended Complaint does all this in significant detail:

17 • **What Are the False Claims and Why They Are False.**  Sutter knowingly submitted to

18     the government inaccurate and unsupported diagnosis codes that artificially inflated

19     Sutter's MA reimbursements by hundreds of millions of dollars, despite numerous red

20     flags and warnings from Relator regarding the false claims.  Am. Compl. at 1; ¶¶ 6, 46,

21     48, 50, 68–69, 86, 91, 98, 120–21, 124–25, 170–72.  Sutter knowingly retained these

22     hundreds of millions of dollars in improper overpayments.  *Id.* ¶¶ 86, 96, 99, 121, 172.

23

24

25

26 _____

27 assertion that "intervention is an all-or-nothing proposition," Mot. at 3, is further undermined by
the fact that *Bennett* itself concerns the aftermath of a partially intervened case, the propriety of
28 which the Court never questioned or even discussed.

- **Why Did Sutter Engage in this Fraud.** Sutter wanted to increase RAF scores throughout its network—without any regard to whether they were accurate or supported—to increase its MA reimbursements. *Id*. ¶¶ 68, 145, 153, 156, 170.

- **How Did Sutter Engage in this Fraud.** Sutter knowingly submitted (or, at the very least, submitted with reckless disregard) inaccurate and unsupported patient diagnostic information from all its affiliates despite numerous red flags and warnings of widespread inaccuracies, and CMS relied upon that patient information to calculate reimbursement. Specifically, Sutter failed to take any steps to ensure the accuracy of the diagnosis codes in the EMR. Sutter engaged in a campaign to increase affiliate-wide RAF scores at the expense of diagnosis coding accuracy. And Sutter knowingly failed to refund overpayments it learned of through multiple audits and Relator's repeated admonitions of potential False Claims Act liability. *Id*. ¶¶ 68–86.

- **Who Was Involved in the Fraud.** Numerous Sutter executives and other Sutter employees were involved in Sutter's system-wide fraud, including: Sutter RAF Program Manager Julie Cheung, Sutter Regional Vice President Roger Larsen, Director Christian Gabriel, Sutter SVP and Executive Officer Jeffrey Burnich, Sutter RAF Program Director Nancy McGinnis, Sutter RAF/HCC Lead Coder Jessica Driver-Zuniga, Sutter Physician Champions including Lead Champion Dr. Veko Vahamaki, members of the RAF Coder User Group, and members of the RAF Score Champion working group. *Id*. ¶¶ 61, 73, 118, 131, 133, 137, 144–45, 156.

- **When and Where Did Sutter Engage in the Fraud**. Sutter held regular meetings, often at Sutter's Green Valley location, and calls to implement and enforce its campaign to increase RAF scores, including on the following dates: June 6, 2013, July 11, 2013, August 16, 2013, October 28, 2013, December 5, 2013, February 24, 2014, August 22, 2014, November 14, 2014, December 4, 2014, February 11, 2015, March 25, 2015, and April 23, 2015. Sutter's scheme dated as far back as 2010 and continued at least through the time Relator left Sutter in May 2015. *Id*. ¶¶ 74–80, 88–97.

Sutter offers a two-prong attack on the sufficiency of Relator's allegations, which completely ignores the coordinated scheme alleged in the Amended Complaint and all the supporting details that describe it.

Sutter's *first* argument is that Relator "fails to differentiate among Sutter's various non-PAMF affiliates."  Mot. at 6–7 (citing *Swoben* and *United States ex rel. Lee v. Corinthian Colleges*, 655 F.3d 984 (9th Cir. 2011), for the proposition that the Ninth Circuit does not allow a complaint to "lump multiple defendants together").  But Relator did not name these affiliate foundations as defendants in her Amended Complaint.  Mot. at 6.  Relator brings this action against Sutter itself for submitting and causing its affiliates to submit false claims.  Relator's allegations regarding how the fraud was carried out in the various affiliates are just further evidence of Sutter's system-wide fraud.  Rule 9(b) does not require Relator to differentiate her allegations among Sutter's affiliates, especially since it was Sutter—as the parent company—that conceived, directed, and implemented this scheme across its network.  This case is thus far-removed from the two cases Sutter cites, both of which related to claims against independent defendants (separately controlled from the defendants who remained in the case) where the relator advanced few or no allegations independently linking them to the scheme.[17]

Sutter's reliance on *Swoben* also ignores the part of that opinion most applicable here: "There is no flaw in a pleading [] where collective allegations are used to describe the actions of multiple defendants who are alleged to have engaged in precisely the same conduct."  848 F.3d at 1184.  Putting aside that the Court was talking about defendants, not affiliates controlled by a single defendant who perpetrated the alleged fraud, the Court's language describes exactly the case here.  All the Sutter affiliates are subject to Sutter's inflated RAF scheme in the same way because they are under the complete control and direction of Sutter.

---

[17] Mot. at 7.  *See Swoben*, 848 F.3d at 1182 (relating to claims against certain MAOs where relator provided no details linking them to the scheme); *Lee*, 655 F.3d at 998 (relating to claims against school board members where the complaint "simply attribute[d] wholesale" allegations against the college to the individual board members).  Sutter also cites *United States ex rel. Cafasso v. General Dynamics C4 Systems, Inc.*, 637 F.3d 1047 (2011), but that case does not even address differentiating among entities.

Relator's Opposition to Motion to Dismiss

436031.4

1      In this way, this case is more like *United States ex rel. Silingo v. Wellpoint, Inc.*, where the

2  Ninth Circuit found common allegations against multiple defendants sufficient under Rule 9(b)

3  because "a complaint need not distinguish between defendants that had the exact same role in a

4  fraud." 904 F.3d 667, 677 (9th Cir. 2018). As *Silingo* explains, if a fraudulent conspiracy

5  resembles a wheel (where a single member acts as the "hub" and conspires with two or more

6  member "spokes"), "then any parallel actions of the 'spokes' can be addressed by collective

7  allegations." *Id*. at 678. Here, Relator's collective allegations regarding the parallel actions of the

8  "spokes" (all Sutter affiliates) are more than sufficiently particular to withstand Rule 9(b) scrutiny,

9  particularly since her FCA claims are against Sutter—the hub and parent that controls and directs

10  the affiliates, maintains all affiliate patient records, and submits (through Sutter Physician

11  Services) all MA claims for these patients. Am. Compl. ¶¶ 10–12.

12      Sutter's *second* argument is that Relator has failed to allege the particular details of

13  Sutter's fraudulent scheme. Mot. at 7. But in making this argument, Sutter merely highlights a

14  series of arbitrarily selected allegations it claims are missing from the Amended Complaint.

15  Sutter misconstrues the purpose behind Rule 9(b), which is about providing adequate notice of the

16  alleged fraud. Consequently, as *Swoben* made clear, "statements of the time, place and nature of

17  the alleged fraudulent activities are sufficient" for Rule 9(b). 848 F.3d at 1180. The standard

18  "does not require absolute particularity or a recital of the evidence," and "a complaint need not

19  allege a precise time frame, describe in detail a single specific transaction or identify the precise

20  method used to carry out the fraud." *Id*. (internal quotations omitted). Nor does an FCA

21  complaint need to identify representative false claims, so long as it alleges "particular details of a

22  scheme to submit false claims paired with reliable indicia that lead to a strong inference that

23  claims were actually submitted." *Id.* (quoting *Ebeid ex rel. United States v. Lungwitz*, 616 F.3d

24  993, 998 (9th Cir. 2010)).

25      Thus, Sutter's focus on "a single patient," "a single allegedly unsupported diagnosis code,"

26  "a single alleged overpayment," etc., *see* Mot. at 7, skirts the Amended Complaint's detailed

27  allegations of Sutter's system-wide fraud. This includes the dozens of pages of particularized

28

1  facts identifying (i) Sutter's scheme to raise RAF scores, *see* Am. Compl. ¶¶ 68–86; (ii) the

2  coordination throughout Sutter's network including Sutter-wide meetings and conference calls, *id.*

3  ¶¶ 74–80; (iii) participation by and direction of Sutter's senior management, *id.* ¶¶ 61, 73, 118,

4  133, 137, 144–45, 156; (iv) participation by Sutter's Physician Champions, *id.* ¶¶ 74, 78, 79, 81,

5  82; (v) Sutter's knowing failure to ensure accurate diagnosis codes supported in the patient

6  records, *id.* ¶¶ 98, 120, 121, 131, 156; (vi) Sutter's widespread risk adjustment data inaccuracies,

7  *id.* ¶¶ 89–91, 98–100, 120, 122, 125; (vii) the numerous red flags, including multiple audits

8  results, that put Sutter on notice of the scope and impact of the problem Sutter-wide, *id.* ¶¶ 87–

9  107, 116–43, 154; (viii) Sutter's termination of Relator's efforts to address and remedy the

10 problem, *id.* ¶¶ 84, 137, 139–40, 148; (ix) Sutter's recognition of the problem and the need to

11 address it, *id.* ¶¶ 107, 146, 161; (x) Sutter's knowing or reckless submission of inaccurate and

12 unsupported diagnosis codes to CMS, *id.* ¶¶ 121, 131, 148–51; and (xi) Sutter's knowing retention

13 of MA overpayments, *id.* ¶¶ 96, 139, 146, 161.  These detailed allegations more than meet the

14 requirements of Rule 9(b).

15     In any event, Sutter does not simply ignore these detailed allegations of Sutter's system-

16 wide fraud.  Sutter also ignores the very allegations it claims are missing:

17 • Sutter claims "Relator does not identify a single allegedly unsupported diagnosis code

18   submitted by a non-PAMF affiliate."  Mot. at 7, 9.  *But see* Am. Compl. ¶ 166

19   (referencing the $30 million Settlement for overpayments arising out of unsupported

20   diagnosis codes for cancer, hip and vertebral fractures, strokes and myocardial

21   infarction); *id.* ¶¶ 90, 99–100 (alleging unsupported diagnosis codes identified in the

22   RADV, Peak, and "Delete Project" audits); *id.* ¶¶ 151–54 (alleging "Sutter knew

23   unsupported HCCs caught by the auditors and removed in the billing file were

24   nonetheless being submitted to CMS for payment when the encounter data was

25   swept . . . caus[ing] CMS [] to pay Sutter based on diagnoses codes Sutter knew were

26   false.").

27

28

1

- Sutter claims Relator "does not identify a single patient at a non-PAMF affiliate whose
2    diagnosis codes were allegedly unsupported." Mot. at 7. *But see* Am. Compl. ¶ 90
3    (alleging audit failures from patients throughout Sutter with unsupported risk adjustment
4    data during the 2014 RADV audit); *id.* ¶ 99 (identifying from the Peak audit widespread
5    inaccurate coding in patient records across all Sutter's affiliates); *id.* ¶ 100 (alleging the
6    "Delete Project" found unsupported diagnosis codes for patients at PAMF and Sutter
7    Gould); *id.* ¶ 152 (alleging Sutter submitted to CMS "HCC diagnosis codes removed
8    from [the billing side of] claims" because they remained in Sutter's encounter-side
9    EMR).

10

- Sutter claims Relator "does not allege a single alleged overpayment identified at a non-
11   PAMF affiliate that was not properly returned." Mot. at 7. *But see* Am. Compl. ¶ 166
12   (referencing the $30 million in MA overpayments that Sutter wrongfully retained for at
13   least three years, refunding them only after Relator disclosed the Sutter-wide fraud to
14   the government); *id.* ¶¶ 148–50, 152–53 (alleging Sutter implemented no mechanism to
15   halt its submission of knowingly false claims, or return known overpayments, arising
16   out of "HCC diagnosis codes removed from claims [in audits], but remaining in the
17   Sutter E[lectronic ]H[ealth ]R[ecord].");  ¶ 98 (Cheung recognized Sutter kept "find[ing]
18   the same issues," i.e., inaccurate RAF coding).

19

- Sutter claims Relator does not offer "any particularized facts about the 'RAF score'
20   trend for non-PAMF affiliates," or "any allegations about whether and to what extent
21   risk scores at non-PAMF affiliates actually increased." Mot. at 7, 9. *But see* Am.
22   Compl. ¶¶ 57–58 (alleging Sutter tracked RAF score trends by affiliate using several
23   reports including the Trend Reports by Affiliate and the RAF dashboard); *id.* ¶ 85
24   (alleging that RAF scores increased by 21% on average across all affiliates).

25

- Sutter characterizes Relator's claims of no Sutter-wide best practices or training
26   materials as "broad allegations" without "particularized supporting detail." Mot. at 8.
27   *But see* Am. Compl. ¶¶ 103–04 (alleging as of May 2013 Relator found no policies with

28

22

1    best practices for RAF coding, no correspondence of accepted standards of conduct

2    from MAOs, and no sign-in sheets evidencing RAF training); *id.* ¶ 104 (the Sutter-wide

3    intranet contained no relevant RAF policies or procedures); *id.* (alleging Relator asked

4    Physician Champions and her colleagues elsewhere in Sutter's network for training

5    materials and they had none to provide); *id.* ¶ 114 (Relator's peers elsewhere in Sutter's

6    network asked for the training materials she created).

7         Sutter also claims Relator fails to "offer any particularized allegations to show that efforts

8    to increase risk scores at other Sutter affiliates were pursued through illegitimate means rather

9    than indisputably permissible means, such as training doctors to do a better job of accurately

10   capturing diagnosis codes." Mot. at 7. A motion to dismiss is not the place to weigh potentially

11   competing inferences on the legitimacy or illegitimacy of Sutter's actions.[18] Moreover, in even

12   making this argument, Sutter ignores the core allegations in the Amended Complaint—starting

13   with the very first paragraph—that Sutter carried out its scheme for the singular purpose of

14   "intentional[ly] submi[tting] inaccurate and unsupported diagnosis codes that inflated Sutter's

15   reimbursements from Medicare Part C." The numerous allegations that follow only reinforce and

16   expand in painstaking detail upon this central theme of the Amended Complaint. There is no

17   equivocation on this issue or any inference of legitimacy that can be drawn from these allegations,

18   as Sutter suggests, especially when they are viewed (as they must be) in a light most favorable to

19   Relator.

20        Indeed, on the so-called question Sutter raises of whether it was merely trying to train its

21   doctors to do a better job of more accurate coding, the Amended Complaint directly refutes any

22   such inference. *See, e.g.*, Am. Compl. ¶ 98 (Cheung expressed concern that Sutter was not taking

23   steps to prevent coding inaccuracies in light of the known failures); *id.* ¶ 83 (none of the Sutter

---

[18] *See, e.g.*, *Swoben*, 848 F.3d at 1176 ("Whether the defendants had a good-faith reason to design the reviews as they did is not a matter to decide at this stage of the proceedings, particularly where the defendants factual assertions are less than obvious."); *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 184 (2d Cir. 2012) ("The choice between or among plausible inferences or scenarios is one for the factfinder.").

23

affiliates held meetings to ensure RAF coding accuracy); *id.* ¶ 84 (Cheung repeatedly confirmed Relator was the only person at Sutter using audits to evaluate whether Sutter's inflated RAF scheme was generating unsupported diagnosis codes and overpayments).  The Amended Complaint likewise defeats any notion of legitimacy in Sutter's scheme to raise RAF scores.  *See, e.g.*, *id.* ¶ 69 (Relator understood that Sutter viewed RAF as a revenue stream with little to no consideration for whether the codes were supported in the patient's record); *id.* ¶¶ 98, 156 (Cheung relayed a "vocal [Sutter] leader" thought that audits were only "worthwhile as long as the $ earned exceeds $ spent."); *id.* ¶ 131 (Sutter Regional Vice President Roger Larsen stated "why . . . audit[] risk adjustment data for which [Sutter] had already been paid").[19]

Finally, in pointing to its settlement with the Government as a demonstration "that Sutter did exactly what Relator alleges it was supposed to do," *see* Mot. at 8, Sutter mischaracterizes the circumstances surrounding Sutter's $30 million payment.  Contrary to what Sutter contends, it did *not* "in fact, return potential overpayments after they had been identified at its non-PAMF affiliates."  *Id.*  Rather, after witnessing Sutter's active efforts to increase risk scores it knew to be inaccurate, unsupported, and resulting in Medicare overpayments for years, Relator brought this action and exposed the fraud to the Government.  At the conclusion of its investigation of Relator's complaint, the Government gave notice it intended to file its own complaint which would potentially include "other affiliated entities."  Notice of Intervention at 2.  *Only then* did Sutter refund *some* of the overpayments it obtained as a part of its fraudulent scheme.  That payment does not present some kind of extra pleading hurdle or threshold as Sutter asserts.  Mot. at 8.  It is just further proof that the catalyst for Sutter's refund of improper overpayments was Relator's filing of her original Complaint exposing Sutter's system-wide scheme to defraud the

---

[19] *See also id.* ¶¶ 72, 106 ("Physician Champions . . . review[ed] patient medical records for lost opportunities to capture additional HCCs (but not to ensure the diagnostic codes that mapped to the HCCs reported were adequately supported in the patient records)"); *id.* ¶ 79 (alleging one physician objection that stated "I know what RAF means—Revenue for Sutter at My Expense!"); *id.* ¶ 83 (Relator warned Sutter management that its single-minded focus on raising RAF scores was improper).

1  Medicare Advantage program.[20]

2                          **<u>CONCLUSION</u>**

3          For the reasons set forth herein, Relator respectfully requests that the Court deny

4  Defendants' Motion to Dismiss Relator's First Amended Complaint.[21]

5

6

7  Dated:  August 27, 2019                    Respectfully submitted,

8                                             **KELLER GROVER, LLP**

9
                                             By:  _/s/ Kathleen R. Scanlan_____
10                                                  JEFFREY K. KELLER
                                                   KATHLEEN R. SCANLAN
11

12                                           **CONSTANTINE CANNON LLP**
                                                   GORDON SCHNELL
13                                                 SARAH P. ALEXANDER
                                                   HAMSA MAHENDRANATHAN
14

15                                           **LAW OFFICES OF MARK ALLEN KLEIMAN**
                                                   MARK A. KLEIMAN
16                                                 POOJA RAJARAM

17

18                                           *Attorneys for Relator*

19

20

21

22

23

24

25  _____
    [20] Sutter's attempt to use the settlement to impose on Relator a "particularly high" pleading
26  burden, *see* Mot. at 8, also ignores Section 3 of that agreement "specifically reserving" claims for
    any "liability arising under 31 U.S.C. §§ 3729–3733 (the False Claims Act)." *See* Mot. Seeking
27  Judicial Notice, Ex. B (Settlement) at 5.
    [21] If the Court grants Defendants' motion, Relator respectfully requests leave to amend.
28                                           25