DAVID L. ANDERSON (CABN 149604)
United States Attorney
SARA WINSLOW (DCBN 457643)
Chief, Civil Division
BENJAMIN J. WOLINSKY (CABN 305410)
Assistant United States Attorney

      450 Golden Gate Avenue, Box 36055
      San Francisco, California 94102-3495
      Telephone: (415) 436-6996
      Facsimile: (415) 436-6748
      benjamin.wolinsky@usdoj.gov

ANDY J. MAO
PATRICIA L. HANOWER
A. THOMAS MORRIS
J. JENNIFER KOH
OLGA YEVTUKHOVA
Attorneys, Civil Division
United States Department of Justice

      P.O. Box 261, Ben Franklin Station
      Washington, D.C. 20044
      Telephone: (202) 307-1026

Attorneys for the United States of America

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

| | |
|---|---|
| THE UNITED STATES OF AMERICA *ex rel.* KATHY ORMSBY, <br><br>      Plaintiff, <br><br>   v. <br><br> SUTTER HEALTH and PALO ALTO MEDICAL FOUNDATION, <br><br>      Defendants. | Case No. 3:15-cv-01062-LB <br><br> **UNITED STATES' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE COMPLAINT-IN-INTERVENTION** <br><br> Date:       October 24, 2019 <br> Time:      9:30 AM <br> Courtroom:  C, 15th Floor |

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

FACTS ........................................................................................................................... 2

LEGAL STANDARD ...................................................................................................... 5

ARGUMENT .................................................................................................................. 6

    I.     The United States alleges facts sufficient to show direct and reverse FCA
          violations. ......................................................................................................... 6

          A.     The United States alleges that Defendants caused the submission of
                   false claims by engineering a campaign to pad risk scores. ................................. 6

          B.     The United States alleges the requisite knowledge, including that
                   Defendants ignored red flags and physician warnings. .......................... 9

          C.     The United States pleads materiality.  Specifically, that CMS would
                   have acted on these claims had it known the facts. ............................... 11

          D.     The United States alleges reverse false claims, too. .................................. 14

    II.    The United States satisfies Rule 9(b) because it identifies the scheme's "who,
          what, where, when and how." ......................................................................... 16

    III.   The actuarial equivalence argument is meritless. ............................................. 18

          A.     Defendants misconstrue *Azar* and *Poehling*. ....................................... 18

          B.     In any event, the comparative error argument is no defense to fraud. ................. 20

          C.     Defendants premise their motion on disputed facts. ........................................ 22

    IV.   Defendants argue that the common law claims require the United States to
          prove overpayments.  That is incorrect. ......................................................... 24

    V.    Any dismissal should be without prejudice and with leave to amend. ............................. 25

CONCLUSION............................................................................................................... 25

## TABLE OF AUTHORITIES

### CASES

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ................................................................................................................ 17

*Bryson v. United States*,
396 U.S 64 (1969) .................................................................................................................. 21

*Cedars-Sinai Med. Ctr. v. Shalala*,
125 F.3d 765 (9th Cir. 1997) ................................................................................................ 21

*Dennis v. United States*,
384 U.S. 855 (1966) ............................................................................................................... 21

*Ebeid ex rel. United States v. Lungwitz*,
616 F.3d 993 (9th Cir. 2010) ............................................................................................ 5, 17

*Eminence Capital, LLC v. Aspeon, Inc.*,
316 F.3d 1048 (9th Cir. 2003) .............................................................................................. 25

*Halo Elecs., Inc. v. Pulse Elecs., Inc.*,
136 S. Ct. 1923 (2016) .......................................................................................................... 11

*Heckler v. Cmty. Health Servs.*,
467 U.S. 51 (1984) ................................................................................................................ 10

*In re Packaged Seafood Prods. Antitrust Litig.*,
242 F. Supp. 3d 1033 (S.D. Cal. 2017) ................................................................................ 24

*Odom v. Microsoft Corp.*,
486 F.3d 541 (9th Cir. 2007) ................................................................................................ 17

*Turner v. City and Cnty. of San Francisco*,
788 F.3d 1206 (9th Cir. 2015) ....................................................................................5, 11, 17

*United Healthcare Ins. Co. v. Azar*,
330 F. Supp. 3d 173 (D.D.C. 2018) .............................................................................. *passim*

*United HealthCare Ins. Co. v. Price*,
255 F. Supp. 3d 208 (D.D.C. 2017) ...................................................................................... 18

*United States ex rel. Cafasso v. Gen. Dynamics C4 Sys., Inc.*,
637 F.3d 1047 (9th Cir. 2011) ........................................................................................... 5, 17

*United States ex rel. Harper v. Muskingum Watershed Conservancy Dist.*,
842 F.3d 430 (6th Cir. 2016) ................................................................................................ 15

*United States ex rel. Landis v. Hospice Care, LLC*,
2010 WL 5067614 (D. Kan. Dec. 7, 2010) ............................................................................ 9

*United States ex rel. Landis v. Tailwind*,
234 F.Supp.3d 180 (D.D.C. 2017) ........................................................................................ 24

*United States ex rel. Lee v. Corinthian Colls.*,
   655 F.3d 984 (9th Cir. 2011) ............................................................................ 5, 17

*United States ex rel. Longhi v. Lithium Power Techs., Inc.*,
   513 F. Supp. 2d 866 (S.D. Tex. 2007) .................................................................. 9

*United States ex rel. Oliver v. Parsons Co.*,
   195 F.3d 457 (9th Cir. 1999) ............................................................................. 11

*United States ex rel. Poehling v. UnitedHealth Grp., Inc.*,
   2018 WL 1363487 (C.D. Cal. Feb. 12, 2018) ................................................ 13, 15

*United States ex rel. Poehling v. UnitedHealth Grp., Inc.*,
   2019 WL 2353125 (C.D. Cal. Mar. 28, 2019) ..................................................... 20

*United States ex rel. Silingo v. Well Point, Inc.*,
   904 F.3d 667 (9th Cir. 2018) ...................................................................... 2, 6, 20

*United States ex rel. Swoben v. United Healthcare Ins. Co.*,
   848 F.3d 1161 (9th Cir. 2016) ................................................................... *passim*

*United States v. Bellecci*,
   2008 WL 802367 (E.D. Cal. Mar. 25, 2008) ...................................................... 24

*United States v. Bourseau*,
   2006 U.S. Dist. LEXIS 100313 (S.D. Cal. Sept. 29, 2006) ................................. 25

*United States v. Bourseau*,
   531 F.3d 1159 (9th Cir. 2008) .................................................................14, 15, 16

*United States v. Chen*,
   2006 WL 1554547 (D. Nev. May 30, 2006) ......................................................... 9

*United States v. Mackby*,
   261 F.3d 821 (9th Cir. 2001) ....................................................................... 10, 15

*United States v. Mead*,
   426 F.2d 118 (9th Cir. 1970) ............................................................................. 24

*United States v. Stevens*,
   605 F. Supp. 2d 863 (W.D. Ky. 2008) ................................................................. 9

*United States v. Weiss*,
   914 F.2d 1514 (2d Cir. 1990) ............................................................................. 21

*Universal Health Servs. v. United States ex rel. Escobar*,
   136 S. Ct. 1989 (2016) ..............................................................................12, 13, 16

**STATUTES**

31 U.S.C. § 3729(a)(1)(G) ........................................................................................ 14

31 U.S.C. § 3729(b) ................................................................................................... 9

42 U.S.C. § 1395u .................................................................................................. 22

Subchapter XVIII of the Social Security Act, 42 U.S.C. §§ 1395w-21 to 1395w-28 ..................... 2, 7, 18

**RULES**

Federal Rule of Civil Procedure 12(b)(6) ........................................................... 5, 16

Federal Rule of Civil Procedure 15(a)(2) ................................................................. 25

Federal Rule of Civil Procedure 9(b) ................................................................... *passim*

**REGULATIONS**

42 C.F.R. § 412 ....................................................................................................... 22

42 C.F.R. § 422 .................................................................................................. *passim*

42 C.F.R. § 424 ....................................................................................................... 23

45 C.F.R. § 162 ......................................................................................................... 8

**SECONDARY SOURCES**

26 Samuel Williston & Richard A. Lord,
   A Treatise on the Law of Contracts (4th ed. 2003) .......................................... 12

**OTHER AUTHORITIES**

2004 Medicare Managed Care Manual,
   § 111.1, Ex. 30 & 111.4 (Rev. 57, Aug. 13, 2004)
   https://www.cms.gov/Regulations-and-
   Guidance/Guidance/Transmittals/Downloads/R57MCM.pdf ........................................ 8

2013 Medicare Managed Care Manual, § 40 (June 2013) )
   https://www.cms.gov/Regulations-and-
   Guidance/Guidance/Transmittals/Downloads/R114MCM.pdf ...................................... 8

Clinical Modification International Classification of Diseases
   (ICD-9-CM and ICD-10-CM) for Coding and Reporting ......................................... 8

CMS, 2013 National Technical Assistance
   Risk Adjustment 101 Participant Guide 13 (2013)
   https://www.csscoperations.com/Internet/Cssc3.Nsf/files/2013_RA101Participant
   Guide_5CR_081513.pdf/$File/2013_RA101ParticipantGuide_5CR_081513.pdf ......................... 8

CMS, Medicare Managed Care Manual Chapter 7,
   § 111.8 (Rev. 57, Aug. 13, 2004)
   https://www.cms.gov/Regulations-and-
   Guidance/Guidance/Transmittals/Downloads/R57MCM.pdf ........................................ 8

Form HCFA-1450/UB-92, FL 67
   https://www.usrds.org/forms/07_UB92_CMS_1450_Uniform_Bill.pdf ............................ 22

# INTRODUCTION

The United States alleges that Sutter Health ("Sutter") and Palo Alto Medical Foundation ("PAMF") (collectively, "Defendants") designed a campaign to inflate the number and severity of patient diagnoses under the Medicare Advantage Program ("MA Program") to obtain payments to which they were not entitled because they feared leaving "millions of dollars on the table."  To do so, executives deputized "physician champions" who pressured colleagues to submit diagnosis codes for more lucrative conditions.  Defendants also manipulated patient medical records to add suspected diagnoses and, when red flags arose, ignored their auditors.  Now, Defendants move to dismiss the United States' complaint-in-intervention ("Complaint") based mainly on an order from an Administrative Procedure Act ("APA") case in another circuit.  *See United Healthcare Ins. Co. v. Azar*, 330 F. Supp. 3d 173 (D.D.C. 2018).  Putting aside that *Azar* is subject to a pending motion for reconsideration, Defendants' argument collapses under its own weight:

First, the United States sets forth well-pleaded facts sufficient to show violations of the False Claims Act ("FCA").  As alleged in the Complaint, Defendants engineered a campaign to pad risk scores.  They ignored audit results, physician warnings, and other red flags.  These detailed allegations, which the Court must accept as true, satisfy the falsity and scienter elements of direct and reverse FCA violations.  Nor is there a materiality issue here.  The United States alleges that, had the Centers for Medicare and Medicaid Services ("CMS") known the facts, it would have taken action up to refusal of payment.  The Ninth Circuit considered similar allegations in *United States ex rel. Swoben v. United Healthcare Ins. Co., et al.*, 848 F.3d 1161 (9th Cir. 2016), and found a cognizable legal theory.

Second, the United States satisfies Federal Rule of Civil Procedure ("Rule") 9(b) because it identifies the scheme's "who, what, where, when, and how."  Over the course of its 53-page Complaint, the United States names the relevant executives and physician champions; includes direct quotations from their emails; and specifies the time and context of those remarks to detail the corporate campaign to add improper diagnoses that boost reimbursement from the MA Program.  Nothing more is required at the pleading stage.

Third, the actuarial equivalence argument is meritless.  Defendants rely on *Azar*, which is non-binding.  That case also concerns an administrative rule that applies different standards, most notably a

different knowledge standard, than the FCA.  What's more, the *Azar* court made clear that its holding was unlikely to affect FCA litigation.  In any event, second-guessing the rules of a federal program is no defense to claims of fraud, and Defendants' argument depends on disputed facts, which is inappropriate for a motion to dismiss.

Fourth, Defendants argue that the common law claims require the United States to prove overpayments.  That is incorrect.

For these reasons, as explained in greater detail below, the Court should deny Defendants' motion.

## FACTS

This case stems from thousands of false claims for reimbursement submitted to Medicare Part C, also known as the MA Program.  Under the MA Program, a beneficiary opts out of traditional Medicare coverage and enrolls in a plan ("MA Plan") managed by a private insurance company known as a Medicare Advantage Organization ("MAO").  *See* Subchapter XVIII of the Social Security Act, 42 U.S.C. §§ 1395w-21 to 1395w-28. Sutter, through its provider affiliates, including PAMF, furnishes healthcare services to thousands of Part C beneficiaries under at least ten MA Plans managed by three MAOs.

CMS reimburses MAOs differently than traditional Medicare.  Rather than pay a healthcare provider directly for each procedure or service, CMS pays a capitated (fixed) amount to an MAO to provide healthcare coverage for a beneficiary.  Recognizing that the cost of care for a beneficiary will vary, CMS adjusts the fixed amount based on a methodology that reflects various factors, including the beneficiary's health status, as reflected by diagnoses reported for each MA patient.  42 U.S.C. § 1395w-23(a)(1)(A).  This "risk adjustment" using CMS' Hierarchical Condition Categories ("HCC") model yields higher rates for older, sicker patients and lower rates for younger, healthier patients.  *Id.* § 1395w-23(a)(1)(C)(i).

Providers like Sutter and PAMF submit diagnosis codes to MAOs, which in turn submit them to CMS.  Every diagnosis code submitted to CMS must be based on a "face-to-face visit" that is documented in the medical record.  *See United States ex rel. Silingo v. Well Point, Inc.*, 904 F.3d 667, 623-624 (9th Cir. 2018).  MAOs pay Sutter a percentage of the risk adjusted payments that the MAOs

receive from CMS.  Compl. ¶ 6.  If Sutter submits invalid diagnoses, then CMS will make inflated

payments to the MAO and the MAO will make inflated payments to Sutter.  Thus, Sutter was

incentivized to maximize the number and severity of diagnoses it submitted to MAOs for MAOs to then

submit to CMS.

By 2010, Defendants became concerned about revenue.  Management and physicians began to

discuss the "urgency that the upper echelon of Sutter [felt] for the need to enhance our HCC RAF

scores."  Compl. ¶ 44.  They believed that doing so would be "worth tens of millions of dollars to the

enterprise," which had been thus far "left on the table."  *Id.*; *see also id.* ¶ 46.  To capture that money,

Defendants embarked on a campaign to increase the number and severity of risk-adjusting diagnoses for

their MA patients. This effort became known as the RAF ("Risk-Adjustment Factor") Campaign.  *Id.* ¶

48.  Its goal was to hike reimbursements from CMS.  *Id.* ¶ 46.

To do that, Defendants deputized a group of doctors as "physician champions."  Compl. ¶ 45.

Each physician champion would "act as a liaison between the coding team and the [other] physicians"

on the theory that physicians would be more likely to accept coding guidance from a colleague.  *Id.*

Physician champions received extra pay for that work; in turn, they encouraged aggressive coding with

management approval.  *Id.*  The Complaint identifies specific physician champions for PAMF, including

Dr. Veko Vahamaki (PAMF's Lead RAF physician champion).  *Id.*

The stated goal of the RAF Campaign was "to reach a 28% improvement" in risk-adjusting

diagnoses for its MA Plan patients.  *Id.* ¶ 48.  And in November 2012, Dr. Jeffrey Brown (PAMF's

Associate Medical Director for Managed Care) went a step further: he authorized coders to insert

diagnoses into patient medical records—even though they were never identified by a physician during

the patient encounters.  *Id.* ¶ 47.  Dr. Vahamaki called this a "pit crew plan" and believed it "would

significantly help with the RAF efforts."  *Id.* ¶ 49.  At the time, a Sutter Vice President and Chief

Informatics Officer warned Dr. Vahamaki that the tactic seemed like "a dangerous step."  *Id.* ¶ 49.

The campaign got results.  Data from early 2014 showed $4.4 million in revenue gains from the

RAF Campaign from 2012 to 2013.  Compl. ¶ 58.  In March 2015, Sutter reported "a 20% overall

system wide increase" in the RAF risk scores of MA Plan patients.  *Id.*  That included increases at all

four of PAMF's divisions between 15% and 23%, which was expected to achieve $4.173 million in additional Medicare reimbursements.  *Id.*

But soon the Defendants saw red flags.  An MAO audited PAMF and raised concerns about false risk adjusting diagnosis codes for services in 2010, 2011, and 2012.  Compl. ¶ 59.  In October 2012, auditors identified acute myocardial infarction, or heart attack, as an outlier and determined that 27 out of 30 of the patient records containing diagnoses mapping to this category were unsupported or otherwise false (a 90% failure rate).  *Id.* ¶ 60.  A separate audit found that six out of seven patient records contained underlying diagnosis codes that were similarly false (an 86% failure rate).  *Id.*

Later audits found similar problems.  For example, MAO auditors focused on the heart attack risk adjusting diagnosis code at another PAMF location and found invalid 28 out of 30 diagnosis codes submitted for dates of service in years 2013, 2014, and 2015 (a 93% failure rate).  Three out of four similar diagnosis codes were found to be false at yet another location (a 75% failure rate).  Compl. ¶ 62. Defendants knew they were required to delete these diagnoses.  But while they did delete those specific diagnosis codes identified by the MAO auditors, Defendants ignored the fact that these high failure rates signaled a larger problem.  *Id.*  Defendants also refused to expand auditing to any other problematic, risk adjusting diagnosis codes.  *Id.*

Defendants' management continued to ignore other red flags, including those raised by Kathy Ormsby ("Relator").  For example, Relator personally conducted a random audit of 42 physician-patient encounters at PAMF in the first two quarters of 2013.  Compl. ¶ 71.  In so doing, she followed the ICD-9 coding guidelines used by Medicare.  *Id.*  Relator completed this audit in early June 2013.  *Id.*  She discovered an 85% coding failure rate in the diagnoses that PAMF submitted for reimbursement, with 53 of the 62 risk adjusting diagnosis codes being false.  *Id.* ¶ 72.  Relator continued to raise many red flags over the following years.  *See id.* ¶¶ 74-90.  Still, Defendants refused to correct the problem.

Defendants also ignored warnings from their own physicians.  For example, after the RAF campaign began, one doctor told Dr. Vahamaki about a coder changing a patient diagnosis code, stressing that "it is so obviously unethical."  Compl. ¶ 96.  Another doctor told a PAMF auditor that "pre-populating diagnoses into [a] visit encounter is possibly fraud" and asked "does CMS know about

1  what you all are doing?" *Id.*  But, yet again, Defendants refused to take appropriate action or end the
2  campaign.

3       Instead, Defendants' conduct led to the submission of thousands of false claims to CMS.  The
4  United States alleges that, from January 2010 through December 2016, Defendants caused the
5  submission of thousands of erroneous, invalid, unsupported, or otherwise false codes to CMS for tens of
6  thousands of MA beneficiaries at PAMF.  *Id.* ¶ 131.  The MA beneficiary population at one of PAMF's
7  locations tallied about 28,000 over those six years, while another served approximately 74,000 MA
8  beneficiaries during that period.  *Id.*  These false claims inflated CMS' reimbursements by an estimated
9  tens of millions of dollars.  In addition, Defendants' decision to conceal previously submitted false
10  diagnoses led to them avoiding repaying inflated payments they received for those diagnoses.

11  **LEGAL STANDARD**

12       When faced with a motion under Rule 12(b)(6), a district court takes the facts alleged in the
13  complaint as true.  *See United States ex rel. Lee v. Corinthian Colls.*, 655 F.3d 984, 991 (9th Cir. 2011).
14  The court must draw all reasonable inferences in favor of the plaintiff.  *See Turner v. City and Cnty. of*
15  *San Francisco*, 788 F.3d 1206, 1210 (9th Cir. 2015).  In the FCA context, those allegations need only
16  include enough detail to make a plausible inference that the defendant submitted false claims to the
17  United States.  *Ebeid ex rel. United States v. Lungwitz*, 616 F.3d 993, 998 (9th Cir. 2010) (to withstand a
18  motion to dismiss, "it is sufficient to allege particular details of a scheme to submit false claims paired
19  with reliable indicia that lead to a strong inference that claims were actually submitted") (citations
20  omitted).

21       Under Rule 9(b), the FCA complaint must simply identify the "who, what, when, where, and
22  how" of the misconduct charged.  *United States ex rel. Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637
23  F.3d 1047, 1055 (9th Cir. 2011).  But while Rule 9(b) requires particularity for the "circumstances
24  constituting fraud or mistake," all "other facts may be plead generally, or in accordance with Rule 8."
25  *See Corinthian Colls.*, 655 F.3d at 991, 996.  That includes scienter.  *Id.*

26
27
28

**ARGUMENT**

I.   **The United States alleges facts sufficient to show direct and reverse FCA violations.**

    A.   **The United States alleges that Defendants caused the submission of false claims by engineering a campaign to pad risk scores.**

Defendants argue that the complaint suffers a "fatal flaw" because "under Medicare Advantage's comparative standard, it does not allege false claims or unlawfully retained overpayments."  Defendants also claim that the Complaint's "central legal premise" is that "unsupported diagnosis codes always and necessarily result in overpayments . . . ."  Mot. 12.  That argument is wrong for three reasons.

To start, the FCA applies no such standard.  When a plaintiff alleges that the defendant took affirmative steps in a scheme to avoid learning a diagnosis' falsity, there is a cognizable legal theory under the FCA.  *See Swoben*, 848 F.3d at 1175 ("[W]e hold that when, as alleged here, Medicare Advantage organizations design retrospective reviews of enrollees' medical records deliberately to avoid identifying erroneously submitted diagnosis codes that might otherwise have been identified with reasonable diligence, they can no longer certify, based on best knowledge, information and belief, the accuracy, completeness and truthfulness of the data submitted to CMS.");  *Silingo*, 904 F.3d 667, 673 ("The Medicare Advantage capitation system is subject to the False Claims Act.").  Neither *Swoben* nor *Silingo* required a comparative error analysis to establish false claims.  And willful blindness and other reckless disregard in the MA Program is no excuse for purposes of FCA liability.  *Swoben*, 848 F.3d at 1175 ("This is especially true, when, as alleged here, they were on notice that their data included a significant number of erroneously reported diagnosis codes.").

Similarly, in this case, Defendants embarked on a campaign to inflate the diagnoses reported for their MA patients, without regard to whether they were valid or supported by relevant medical records.  *See* Compl. ¶¶ 8-9, 63.  As a result, Defendants caused the submission of thousands of false diagnoses to Medicare for payment.[1]  *Id.* ¶¶ 8, 44.  The scheme involved an array of tactics, including pre-populating patient records with new diagnoses before a medical visit even took place, *see id.* ¶¶ 52, 54-57, using "physician champions" to pressure clinicians to increase the number and severity of the diagnosis codes

---

[1] As discussed below, the false claims were material because diagnosis codes submitted by MAOs directly affect the amount CMS pays the MAOs.  *See Swoben*, 848 F.3d at 1167-68.

they submitted, *see id.* ¶¶ 45-6, and deploying a "pit crew plan" to add diagnoses to the medical record

through cheat sheets, coding parties, problem lists, visual alerts, and electronic reminders in the medical

record, *id.* ¶¶ 40-51.  Defendants had no meaningful safeguards or compliance training.  Compl. ¶¶ 80,

142-49.  That misconduct falls within *Swoben* and FCA case law, and sufficiently pleads falsity.

Defendants assumed a duty to submit accurate records when they chose to participate in the MA

Program, governed by MA Program regulations.  In particular, the provider agreements that Defendants

signed with MAOs required participants to establish proper procedures, including a training and

compliance program, and to ensure accurate medical coding and recordkeeping.  Compl. ¶ 5.  Since the

early 2000s, Medicare regulations and rules have memorialized the requirement that to be accurate and

truthful, a diagnosis must be supported by medical record documentation.  Compl. ¶¶ 31, 36; *see also*

42 C.F.R. §§ 422.504(l)(3), 422.310(d); *Swoben*, 848 F.3d at 1176 ("CMS requires medical diagnosis

codes to be supported by a medical record," when they are submitted for payment under Medicare

Advantage).  The Complaint notes that Sutter's own written policies and procedures recognized that

payments received for unsupported diagnoses were required to be paid back, including any "incorrect

code or modifier assignment resulting in a higher level of reimbursement, insufficient or lack of

documentation to support billed services . . . lack of medical necessity . . . or any other finding that

reflects an overpayment was received as a result of inaccurate or improper coding or reporting of

healthcare items or services."  Compl. ¶ 42 (emphasis in original).  Defendants did not follow their own

policy.  Instead, Sutter submitted false diagnoses to MAOs and pressured clinicians to increase the

number and severity of diagnoses.  All the while, the RAF Campaign lacked any meaningful coding

compliance or training programs, and misused auditors to inflate patient diagnosis codes rather than

guard against such abuses, Compl. ¶¶ 7-11, causing MAOs to submit false claims to CMS.

CMS relies on MAOs to submit the patient diagnosis codes necessary to determine payment,

including the information necessary to adjust for health status.  42 U.S.C. § 1395w-23(a)(3)(B).  Those

patient diagnosis codes originate with providers such as Sutter, which agree to comply with Medicare

laws, regulations, and instructions, Compl. ¶ 29, and are bound to undertake due diligence and make

good faith efforts to submit accurate and truthful diagnoses.  42 C.F.R. § 422.504(l)(3); *Swoben*, 848

F.3d at 1168-69.  MAOs are bound by regulation to require providers like Sutter and PAMF to perform

their functions consistent with the MAOs' obligations to the MA Program.  42 C.F.R. § 422.504(i)(3)

and (i)(4).  As MA providers, Defendants agreed to certify to the accuracy and truthfulness of the data

generated for payments under the MA program, 42 C.F.R. § 422.504(l)(3); to "comply with all

applicable Medicare laws, regulations, and CMS instructions," *id*. at § 422.504(i)(4)(v); and to receive

effective compliance training and education related to preventing fraud, waste, and abuse, *id*. at §

422.503(b)(4)(vi)(C)(1).  Compl. ¶ 29.  Those regulations are not optional.  Nor are they somehow

contingent upon a separate overpayment rule.

Medicare Advantage further requires that all diagnosis codes submitted to CMS meet specific

standards.  They include the following:  (i) the diagnosis code must result from a face-to-face encounter

with a clinician and a patient; (ii) this encounter must be during the relevant year; (iii) the diagnosis code

must be appropriately documented in the patient's medical record at the encounter; and, (iv) the

diagnosis code must be based on documented conditions that require or affect patient care treatment or

management.  *See*, *e.g.*, 42 C.F.R. § 422.504(l)(3); CMS, Medicare Managed Care Manual Chapter 7, §

111.8 (Rev. 57, Aug. 13, 2004) ("codes should be based on documented conditions that require or affect

patient care treatment or management"); CMS, 2013 National Technical Assistance Risk Adjustment

101 Participant Guide 13 (2013) (accurate risk adjusted payments rely on the diagnosis coding derived

from the member's medical record).  HHS has adopted the Clinical Modification International

Classification of Diseases (ICD-9-CM and ICD-10-CM) for Coding and Reporting as primary national

standards for diagnostic coding.  45 C.F.R. § 162.1002.  Diagnosis codes must conform to those

standards to be accurate and truthful under section 422.504(l), and the ICD Guidelines have long

specified that the medical record must support the diagnosis coding.  *See*, *e.g.*, 42 C.F.R. §§

422.310(d)(1), 422.504(l)(1); 2013 Medicare Managed Care Manual, § 40 (June 2013); 2004 Medicare

Managed Care Manual, § 111.1, Ex. 30 & 111.4 (Rev. 57, Aug. 13, 2004).  Providers have a duty to

delete known, previously-submitted unsupported codes.  *See*, *e.g.,* 42 C.F.R. § 422.504(l)(3).

Defendants cannot disavow these duties.

1

2

**B.**   **The United States alleges the requisite knowledge, including that Defendants ignored red flags and physician warnings.**

3   Defendants argue next that the Complaint does not allege scienter.  Mot. 19.  But that argument

4   misstates both the law and the United States' allegations.

5   First, Defendants misconstrue the "knowledge" requirement under the FCA.  The statute defines

6   "knowledge" broadly to include any of three standards: actual knowledge, deliberate ignorance, or

7   reckless disregard.  *See* 31 U.S.C. § 3729(b).  Reckless disregard, of particular relevance here, is "the

8   refusal to learn of information which an individual, in the exercise of prudent judgment, should have

9   discovered," *United States v. Chen*, 2006 WL 1554547, at *8 (D. Nev. May 30, 2006), or the failure to

10   "take reasonable steps" to ensure that "claims for governmental reimbursement are accurate."  *United*

11   *States v. Stevens*, 605 F. Supp. 2d 863, 868 (W.D. Ky. 2008).  Deliberate ignorance "contemplates

12   'constructive knowledge' or what has become known as the ostrich type situation where an individual

13   has 'buried his head in the sand' and failed to make simple inquiries which would alert him that false

14   claims are being submitted." *United States ex rel. Longhi v. Lithium Power Techs., Inc.*, 513 F. Supp. 2d

15   866, 876 (S.D. Tex. 2007).  In *Swoben*, the Ninth Circuit found it sufficient that the complaint alleged

16   the defendants "were on notice that their data included a significant number of erroneously reported

17   diagnosis codes" to the MA Program but "turned a blind eye to the over-reporting errors." *Swoben*, 848

18   F.3d at 1175.  Other courts have reached substantially the same conclusion.  *See, e.g., United States ex*

19   *rel. Landis v. Hospice Care, LLC*, 2010 WL 5067614, at *5 (D. Kan. Dec. 7, 2010) (finding allegation

20   of reckless business practices sufficient to plead knowledge in a Medicare scheme).

21   The Complaint meets and exceeds this bar.  Sutter's own written policy stated that it and its

22   affiliates could only submit supported codes, and would "take remedial steps to prevent . . . incorrect

23   code or modifier assignment causing a higher level of reimbursement, insufficient or lack of

24   documentation to support billed services."  Compl. ¶ 96.  And yet, as detailed in the Complaint,

25   Defendants ignored many red flags showing that their RAF Campaign would lead, and had led, to false

26   diagnoses.

27   The complaint lists specific examples, too.  One doctor complained about a coder who changed a

28   patient diagnosis from acute bronchitis to pneumonia, stressing that "it is so obviously unethical."  *Id.*

1    Another doctor warned that pre-populating diagnoses was "possibly fraud" and asked if "CMS know[s]

2    about what you all are doing?"   *Id.*   Defendants largely ignored the results of audits which identified

3    thousands of unsupported diagnoses.   Compl. ¶¶ 59-62, 71-90.   In fact, recognizing the negative effect

4    these audits would have on its bottom line, Sutter intervened to prevent identification and deletion of

5    unsupported diagnoses.   Compl. ¶¶ 90-91, 97, 106-109, 131.   In other words, the United States alleges

6    that through this scheme Defendants knowingly caused MAOs to submit false or fraudulent claims for

7    payment to CMS, and knowingly made false records material to false or fraudulent claims.   Compl. ¶¶

8    131-147.   These allegations satisfy the "knowledge" requirement.

9         Second, Defendants had regulatory and contractual obligations that alerted them to the

10   importance of truthful and accurate diagnoses.   Compl. ¶¶ 42-43, 59, 126.   Because Defendants are

11   "participant[s] in the Medicare program," they have "a duty to familiarize [themselves] with the legal

12   requirements for cost reimbursement."   *See Heckler v. Cmty. Health Servs.*, 467 U.S. 51, 64 (1984); *see*

13   *also United States v. Mackby*, 261 F.3d 821, 828 (9th Cir. 2001).   Medicare requires that "a certification

14   of the 'accuracy' and 'truthfulness' of risk adjustment data [requires] that any reported diagnosis to be

15   substantiated by underlying records."   *Azar,* 330 F. Supp. at 189 (citing 42 C.F.R. § 422.310(d), (e) and

16   42 C.F.R. § 422.504(l)(2)).   Downstream entities, such as Defendants, certify to the "accuracy,

17   completeness, and truthfulness" of their risk adjustment data based on their "best knowledge,

18   information, and belief."   42 C.F.R. § 422.504(l)(3).   The content of the certification is not a suggestion;

19   instead, it outlines the required standards under Medicare.

20        The certification reflects that providers and MAOs are responsible for undertaking due diligence

21   and making "good faith efforts" to submit accurate, complete, and truthful information.   That is because

22   certifications serve as the "bulwark[s] against fraud."   *Swoben*, 848 F.3d at 1168-69 ("Certification

23   under § 422.504(l) has always required due diligence and good faith.").   The Ninth Circuit has

24   determined that an MA contractor who was "on notice that their data included a significant number of

25   erroneously reported diagnosis codes," cannot "in good faith certify that it believes the resulting risk

26   adjustment data . . . are accurate complete and truthful."   *Id*. at 1175.   Here, Defendants signed the

27   certifications vouching for the accuracy, completeness, and truthfulness of the payment data they

28

1  generated, including the coding and patient information.  Compl. ¶ 126.  They cannot claim ignorance

2  now.

3         Third, Sutter's "error rate" argument is equally unpersuasive.  Contrary to Defendants'

4  assertions, the United States need not allege that Defendants knew that their error rate exceeded some

5  presumed error rate to establish scienter.  Mot. 16.  As a preliminary matter, Defendants' argument that

6  they reasonably interpreted an ambiguous regulation is inappropriate for a motion to dismiss because it

7  presents a disputed question of fact about knowledge.  *Turner*, 788 F.3d at 1210.  Scienter is a subjective

8  inquiry which may be shown even if the defendant had an objectively reasonable interpretation of a

9  regulatory requirement.  *United States ex rel. Oliver v. Parsons Co.*, 195 F.3d 457, 460 (9th Cir. 1999)

10  (holding that a defendant's reasonable interpretation does not bar the finding of scienter).  To meet their

11  burden on this defense, Defendants must show that (i) the contractual or regulatory requirement is

12  susceptible to more than one reasonable explanation, (ii)  they contemporaneously adopted its supposed

13  reasonable interpretation because post-hoc, litigation-adopted views do nothing to excuse their liability,

14  and (iii) the United States did not warn them away from the interpretation.  *Halo Elecs., Inc. v. Pulse*

15  *Elecs., Inc.*, 136 S. Ct. 1923, 1933 (2016) ("[C]ulpability is generally measured against the knowledge

16  of the actor at the time of the challenged conduct.").  This is a fact-specific inquiry, requiring showings

17  that Defendants simply cannot make on a motion to dismiss.

18         In sum, the United States alleges that—at minimum—Defendants turned a blind eye to the fact

19  that the diagnoses they submitted were unsupported by the medical record.  Nothing more is required at

20  this stage.

21
                    **C.      The United States pleads materiality.  Specifically, that CMS would have**
22                  **acted on these claims had it known the facts.**

23         Defendants tell the Court that "the government does not and cannot allege with the requisite

24  particularity that any falsity in Defendants' certifications would have been material to the government's

25  decision to pay."  Mot. 15.  But, again, Defendants ignore the pleadings and the law.  To start, the

26  diagnoses submitted to CMS because of Defendants' fraud are the material false claims, not the

27  certifications.

28

Materiality turns on a holistic analysis of multiple factors; no single consideration is determinative. *See Univ. Health Servs. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 2002 (2016) ("The term 'material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property.") (citations omitted).  Instead, the Supreme Court has explained that "materiality looks to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation."  *Id*.  Several factors bear on that inquiry: whether the violation goes to the "essence of the bargain," *id*. at 2003, n. 5; whether the violation is "minor or insubstantial," *id*. at 2003; and whether the United States acted in this or other cases when it knew about similar violations, *id*. at 2003-04.  These considerations may be analyzed from either of two perspectives: that of a "reasonable" person, or that of the particular defendant.  *Id*. at 2002-03.  But so long as a matter could be or is a "substantial factor" in determining the United States' response, it is material.  *See* 26 Samuel Williston & Richard A. Lord, A Treatise on the Law of Contracts § 69:12 (4th ed. 2003).  The test is not about pleading magic words.

The United States alleges facts that satisfy *Escobar*.  CMS' requirement—truthfulness and clinical support for the diagnosis in the medical record—goes directly to the "essence of the bargain."  It is neither "minor nor insubstantial."  Diagnoses directly affect payment and are the very essence of CMS' payment system; their accuracy is material to CMS' decision to make risk adjusted payments to MAOs.  As discussed above, CMS makes payments to MAOs based on reported diagnoses and MAOs share those payments with Defendants.  *See Swoben*, 848 F.3d at 1167 (explaining that "[t]he risk adjustment methodology relies on enrollee diagnoses").  Here, the United States alleges that MAOs compensated Sutter with a share of the payments that the MAOs received from Medicare for the beneficiaries under Sutter's care.  Compl. ¶¶ 6, 7, 10, 126-30.

The United States alleges further that the invalid diagnoses affected payment to the Defendants in a direct and immediate way.  Sutter and PAMF's management was aware of this impact, and encouraged them to inflate profits by padding risk scores through the RAF Campaign.  Compl. ¶¶ 128, 130.  Defendants engaged in a systemic violation of the requirement that accurate diagnosis data be submitted to MAOs for many patients over a period of almost ten years, and these violations were not isolated to one particular clinician or inattentive coder.  Compl. ¶¶ 77-79, 81-84, 89-90, 96, 98-108.

Thus, a reasonable person would attach importance to the requirement that the diagnosis codes are truthful and supported by the medical record.

Had CMS known the facts, it would have acted to recover payments made for unsupported diagnoses. Compl. ¶¶ 136, 140, 144, 148. Faced with similar circumstances, a court found that diagnostic data was material, because "not only do various contractual and regulatory materials require Defendants to submit accurate diagnostic data, but that data is central to the calculation of the amount of money CMS pays to Defendants." *United States ex rel. Poehling v. UnitedHealth Grp., Inc.*, 2018 WL 1363487, at *9 (C.D. Cal. Feb. 12, 2018). As Defendants admit in their list of administrative remedies, CMS has taken money back when it discovered unsupported diagnoses, for example, through Risk Adjustment Data Validation Audits. Compl. ¶ 127. Defendants were on notice that unsupported diagnoses found during a CMS audit would cause a financial impact to their bottom line. Compl. ¶ 128. Finally, the fact that the United States chose to bring a case under the FCA further shows that the record requirement mattered to CMS.

Defendants understood that the record requirement mattered. Compl. ¶¶ 136, 139, 144, 148. As participants in the Medicare program, they had a duty to familiarize themselves with the relevant Medicare regulations, including those applicable here. Based on their internal and external audits, red flags raised by Relator, and other chart reviews, Defendants knew that submitting unsupported diagnoses would lead to claims being denied. Compl. ¶¶ 97, 107, 128-32. Indeed, Sutter's own policies and procedures required Sutter to submit only supported diagnosis codes and prevent "incorrect code[s] or modifier assignment[s] resulting in a higher level of reimbursement, insufficient or lack of documentation to support billed services . . . lack of medical necessity . . . or other finding that reflects an overpayment was received as a result of inaccurate or improper coding." Compl. ¶¶ 42, 96. Sutter knew it was required to delete those diagnosis codes. Compl. ¶ 62. All of these allegations support materiality. And the Complaint pleads explicitly that, had CMS been aware of Sutter's conduct, it would have sought to recover the resulting overpayments. Compl. ¶¶ 135, 140, 144, 148. *Escobar* requires nothing more.

The unsupported diagnosis codes are the false claims that Defendants caused to be submitted to Medicare. As described above, the United States has pleaded their materiality.

### D.      The United States alleges reverse false claims, too.

Defendants feign ignorance and argue there cannot be a reverse false claim here because they had no "reason to believe that their overall rate of unsupported codes exceeded the rate of unsupported codes in the fee-for-service program . . . ." According to Defendants, "[w]ithout that knowledge, [they] had no way of definitively determining whether they had been overpaid."  Mot. 16.  Again, that is not the law.

The United States pleads sufficient facts to maintain its claim based on reverse FCA violations. As set forth in the Complaint, Defendants knowingly made, used, and caused to be made or used, false statements material to an obligation to pay CMS, because Defendants knowingly and improperly avoided or decreased an obligation to reimburse CMS.  31 U.S.C. § 3729(a)(1)(G); Compl.  ¶¶ 131-47. Defendants knew, or acted in reckless disregard or deliberate ignorance of the truth, that the diagnosis codes they submitted to MAOs were unsupported.  Indeed, their contracts with the MAOs, and the relevant Medicare statute and regulations, obligated them to correct reimbursements unsupported by patient medical records. Their failure to do so caused false statements to be used that were material to the obligation to repay CMS, and knowingly and improperly avoided the obligation to repay CMS. Compl. ¶¶ 29, 36, 59, 126-29.

The Ninth Circuit confronted a similar question and rebuffed the Defendants' position.  *See United States v. Bourseau*, 531 F.3d 1159, 1169 (9th Cir. 2008) (obligation to pay arose when defendants submitted cost reports, even though the reconciliation process was not completed, because both CMS and defendants had a continuing obligation under the reconciliation process).  In *Bourseau*, the defendants received interim payments periodically throughout the year with a final reconciliation payment based on their submission of cost reports at year end.  But those defendants submitted false costs on their reports to conceal and avoid repaying CMS for improperly inflated interim payments.  *Id.* The Ninth Circuit found those false reports violated the reverse false claims provision because they "concealed and decreased amounts that [the defendants] were obligated to repay to Medicare," even though the specific amount owed was unknown when the cost reports were submitted.  *Id.* at 1171-72. The false cost reports impeded CMS' ability to determine whether defendants were overpaid, and avoided or decreased the obligation to pay the United States.  *Id.* at 1172.  Again, so too in this case.

This FCA theory dovetails with Defendants' existing regulatory obligations.  CMS makes advance interim payments throughout the year to MAOs, who in turn pay providers like Sutter.  Those payments are adjusted after year end through a reconciliation process.  CMS increases or decreases payments to MAOs, who in turn may increase or decrease payments to providers like Sutter and PAMF.  *See* 42 C.F.R. § 422.304(a).  Even before the specific amount owed is determined through the reconciliation process, MAOs, and in turn providers, have a "continuing, specific obligation to repay each other." *Bourseau,* 531 F.3d at 1170.  When providers elect to hide known unsupported diagnosis codes, they, as in *Bourseau,* impede CMS' ability to determine whether the interim payments should be decreased.  The United States thus need not allege Defendants were overpaid, or knew they were overpaid, in a specific amount when they elected not to delete known unsupported diagnosis codes in order to establish a reverse FCA violation.  And contrary to Defendants' contention, Mot. 16, the United States need not allege that Defendants identified an overpayment and failed to repay within 60 days. No case has ever so held.

Nor is there any real question about scienter.  Other courts confronted with that issue have interpreted the requisite scienter to encompass both a defendant's awareness of an obligation to the United States and the violation of this obligation.  *See United States v. Mackby*, 261 F.3d 821, 828 (9th Cir. 2001) (citations omitted); *United States ex rel. Harper v. Muskingum Watershed Conservancy Dist.*, 842 F.3d 430, 436-37 (6th Cir. 2016).  Sutter understood its obligation to submit accurate diagnoses, knew that the diagnoses they submitted to MAOs were unsupported, and elected not to delete them.  In that sense, these allegations track *Bourseau*, which established "defendants' obligation to provide a [truthful] cost report each year so the government agency could make appropriate reconciliation payments based on those reports."  *See United States ex rel. Poehling v. UnitedHealth Group, Inc.*, 2018 WL 1363487, at *11 (C.D. Cal. Feb. 12, 2018) (citing *Bourseau*, 531 F.3d at 1162).

The United States alleges that Defendants ignored red flags, which satisfies the knowledge requirement.  Defendants took no steps to investigate or identify the false submissions or inflated payments.  Compl. ¶¶ 59-62, 71-79, 83-88, 90, 124.  To the contrary: management stopped the audits into false diagnosis coding; narrowed the scope of other audits to a search for lucrative-but-missed diagnoses; and precluded coders from deleting false diagnoses from electronic medical records.  Compl.

¶¶ 106-08, 119-24.  For her part, Relator implored management to address false diagnoses, allow fuller audits, and provide adequate compliance training—but they refused her.  Compl. ¶¶ 69, 73, 74, 79, 82, 86-89;  *see also Bourseau*, 531 F.3d at 1168 (noting that FCA definition of "knowingly" encompasses "the 'ostrich' type situation where an individual has 'buried his head in the sand' and failed to make simple inquiries which would alert him that false claims are being submitted") (citations omitted).

Defendants argue that this authority to delete false diagnosis codes properly fell to physicians instead of Relator and her auditors.  But this purported reason for shifting the responsibility to overburdened physicians is an after-the-fact justification and thinly veiled attempt to flip Rule 12(b)(6) on its head.  Mot. 17.  Inferences at this stage are drawn in favor of the United States, not the other way around.  Here, the United States pleads that "physician champions" pressured doctors to engage in aggressive coding in search of additional reimbursement, not accuracy.  Compl. ¶¶ 47, 50, 57, 76, 96, 107, 123.  Sutter then limited auditors' ability to ensure that diagnosis coding was truthful, accurate, and in compliance with the law.  Compl. ¶ 106.  Based on the substantial error rates revealed by the audits, Sutter knew or recklessly disregarded that unsupported diagnosis codes had been submitted and that they received corresponding inflated interim payments as a result.  Compl. ¶¶ 91-2, 97, 99, 102.

These failures are material.  In *Bourseau*, the Ninth Circuit concluded that the false reports were material because they had "the potential effect, or natural tendency, to decrease the amount" owed to Medicare, even though the cost reports were never audited.  531 F.3d at 1171.  *Escobar* instructs that materiality turns on the capacity of the violation to affect the governmental decision maker.  *Escobar*, 136 S. Ct. 1989 at 2001-03.  The Complaint more than adequately alleges that Defendants' failure to delete known unsupported diagnosis codes had the potential to avoid amounts owed to Medicare, satisfying *Bourseau* and *Escobar*.

## II.    The United States satisfies Rule 9(b) because it identifies the scheme's "who, what, where, when and how."

Defendants claim that "[b]y basing its complaint on the improper premise that every unsupported code results in an overpayment, the government also ignores a second problem with its theory:  It cannot allege [facts] with the particularity that Rule 9(b) requires..."  Mot. 15.  Defendants go on to claim that

the Complaint must allege that Defendants affirmatively knew they were submitting false claims. Again, that is not the test under Rule 9(b).

To be clear, Rule 9(b) "requires only that the circumstances of fraud be stated with particularity; other facts may be plead generally, or in accordance with Rule 8." *Corinthian Colls.*, 655 F.3d at 992 (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 687 (2009)). A complaint need not list every detail of the alleged fraud. *Ebeid*, 616 F.3d at 998-99. Instead, a plaintiff need only give the time, place, and specific content of the false representation. *See Odom v. Microsoft Corp.*, 486 F.3d 541, 553 (9th Cir. 2007).

Here, the Complaint satisfies Rule 9(b) because it alleges the "who, what, when, where and how" of Defendants' scheme. *See Cafasso*, 637 F.3d at 1055. It names the "who": PAMF, Sutter, and their management, including Christian Gabriel, among others, who participated in the fraudulent conduct. Compl. ¶¶ 91, 93, 104-11, 119, 120-23. The Complaint describes the fraudulent nature of Defendants' conduct, including specific business practices like pre-populating diagnoses into the medical record. It describes "when" that fraud occurred: January 2010 through December 2016. In fact, it adds dates for many examples of internal business practices, and identifies nine representative patients whose diagnosis codes were unsupported by the medical records, plus references thousands of other false claims caused to be submitted by Defendants. Compl. ¶¶ 117-24, 133. The Complaint alleges "where," too: at PAMF and at the corporate levels of Sutter. *See*, *e.g.*, Compl. ¶¶ 44-58. In doing so, the United States points to specific emails by executives like Dr. Jeffrey Burnich.

The Complaint also alleges a "how." Specifically, Defendants set out to design a campaign to improperly extract MA reimbursement by circumventing MA safeguards. That includes the requirements that submission of diagnoses for payment be supported by relevant medical records, and that submissions conform to all relevant national standards—like the ICD-9-CM and ICD-10-CM. *See*, *e.g.,* 42 C.F.R. §§ 422.310(d)(1), 422.504(l)(1). By knowingly causing the submission of false claims, hiding known unsupported diagnoses, and halting practices that would allow them to learn of unsupported diagnoses to avoid paying back for inflated interim payments, Defendants received and kept payments to which they were not entitled. Because all reasonable inferences must be drawn in the United States' favor, *see Turner*, 788 F.3d at 1210, there is no basis for dismissal here.

### III.     The actuarial equivalence argument is meritless.

At bottom, Defendants bet their motion on a single premise: the Complaint "fails to allege that, under [an MAO contract-wide audit] paradigm, Defendants were overpaid or the diagnosis codes they submitted were an improper basis for payment." Mot. 12.  To make that argument, Defendants focus on a single term, "actuarial equivalence."  In short, that term refers to how CMS ensures an actuarial connection between the payments it would make for a given beneficiary under traditional Medicare and the payments it makes to an MAO for covering a similar individual under Medicare Part C.  *See* 42 U.S.C. § 1395w-23(a)(1)(C)(i).  To be clear, Defendants are questioning the structure of the payment system in the MA Program.

Defendants insist that MAOs would be systematically underpaid in violation of the Medicare statute if providers like Sutter had to submit only valid diagnoses codes.  Mot. 7-8, 11-12.  They say that a claim cannot be false, nor would money be owed back in the MA context, unless the number of false diagnoses reported exceeds a threshold determined by the mistakes made in submissions to traditional Medicare.  Mot. 11-12.  But that argument fails because it misconstrues *Azar* and *Poehling*, it is an invalid defense to fraud, and it depends on what are—at best—disputed facts inappropriate for a motion to dismiss.

### A.     Defendants misconstrue *Azar* and *Poehling*.

Defendants ask this Court to adopt certain aspects of the holding in *Azar*, an APA challenge to a CMS rule.  Mot. 1.  The United States is not seeking to enforce that administrative rule here, and *Azar* is neither controlling nor persuasive.

First, unlike in *Azar*, the United States here seeks to recover damages resulting from an alleged fraud.  The *Azar* court itself disavowed the suggestion "that [MA participants] should be permitted knowingly and recklessly to bill CMS for erroneous diagnosis codes," as Sutter contends.  *Azar,* 330 F. Supp. 3d at 189.  As the *Azar* court explained in a separate opinion, "[w]hether a government contractor knowingly engaged in fraud, and whether a government agency appropriately promulgated a rule" are very different legal questions.  *United HealthCare Ins. Co. v. Price*, 255 F. Supp. 3d 208, 211 (D.D.C. 2017) (recognizing that "any decision in this matter will not answer the most relevant questions in the FCA Cases [which include] whether a government contractor knowingly engaged in fraud.")  As a

result, even if *Azar* were correctly decided, which the United States disputes,[2] it does not govern an FCA case that alleges knowing fraud.   The *Azar* litigation itself made that clear.

Second, the reasoning from *Azar* does not fit.  That order rests on two predicates—both absent here.  To start, the *Azar* court found that the Overpayment Rule would cause CMS to underpay MAOs "because essentially *no errors* would be reimbursed."  *Azar,* 330 F. Supp. at 187 (emphasis added). Here, the United States does not seek to recover all payments based on all errors in any MAO's submissions, but only damages resulting from Defendants' fraud.  The object of this suit is not perfection in diagnosis coding, but rather truthfulness.  Contrary to Defendants' assertions, the Complaint does not allege innocent mistakes or "discrepancies."  Mot. 6.  Next, the Overpayment Rule provided that "an overpayment is 'identified' whenever an [MAO] determined or 'should have determined through the exercise of reasonable diligence,' that it had received an overpayment."  *Azar,* 330 F. Supp. 3d at 182.  In other words, the *Azar* court found this to be a simple negligence standard, while the FCA applies a different knowledge standard.  *Id.* at 190-191.  Here, the United States alleges that Defendants acted with actual knowledge, reckless disregard, or deliberate ignorance of the truth. Defendants will not be held to a simple negligence analysis here.

Lastly, Defendants omit key words in their quotations from *Azar*—which render those citations misleading.  In their brief, Defendants say *Azar* held that "an overpayment exists 'when, and only when, the error rate for an MA contract is greater than the CMS error rate' in traditional Medicare."  Mot. 11-12. But Defendants excluded that sentence's first five words:  "[u]nder an RADV audit, therefore..." *Azar,* 330 F. Supp. 3d at 186.  That distinction matters.  This case is not based on a Risk Adjustment Data Validation ("RADV") audit, in which erroneous diagnosis codes are identified or estimated without any requirement of knowing fraud.  Here, the United States seeks damages for false diagnoses knowingly or recklessly submitted by Defendants.  There is no authority for the proposition that such knowing falsehoods are permissible so long as their rate falls below the CMS error rate in traditional Medicare.  As the *Azar* court noted, in "the context of an RADV audit, a contract-wide 'error rate' is extrapolated from a sample and extended to an entire contract . . . ."  *Id.*  Here, however, the United

---

[2] The United States filed a motion for partial reconsideration in *Azar*, which is pending. *See United Healthcare Ins. Co., et al. v. Azar*, 1:16-cv-00157-RMC, at *2 (May 23, 2019) (Dkt. No. 86).

1    States seeks damages for known false diagnoses recklessly submitted by defendant providers, not an

2    administrative remedy based on a RADV audit.

3           Defendants also misstate the district court's holding in *Poehling*.  They claim that by denying an

4    early motion for summary judgment, the court somehow endorsed Defendants' argument that they were

5    entitled to a free pass to submit a certain number of invalid diagnoses.  But in that case, the district court

6    only found ambiguity: at that early stage of the litigation, it could not determine that an MAO clearly

7    must delete known unsupported diagnosis codes.  *See United States ex rel. Poehling v. UnitedHealth*

8    *Grp., Inc.*, 2019 WL 2353125, at *7-9 (C.D. Cal. Mar. 28, 2019).  The district court never found that the

9    MAO was free to maintain unsupported diagnoses, as Defendants argue here.  *Poehling* does not help

10   Defendants; it cuts against them.

11          Instead, this case falls under existing Ninth Circuit precedent.  *See Swoben*, 848 F.3d at 1179

12   (holding that relator pleaded a cognizable legal theory where "defendants took affirmative steps to

13   generate and report skewed data" under an MA program); *Silingo*, 904 F.3d 667, 673 ("if enrollee

14   diagnoses are overstated, then the capitation payments . . . will be improperly inflated.").  In this circuit,

15   "diagnosis codes submitted" for payment through Medicare Advantage "must be supported by a

16   properly documented medical record."  *Swoben*, 848 F.3d at 1168.  That rule allows no room for Sutter's

17   argument that a certain number of knowingly false diagnosis submissions are permitted.  The Ninth

18   Circuit has also held that, once affirmative diagnosis verification procedures are undertaken (as they

19   were when Relator performed her audits here), they must be conducted in good faith.  *Id.* at 1179.

20   Instead, Sutter eliminated the portion of the RAF program that led to deletion of invalid diagnoses, and

21   leaned on physicians and coders to try to pad their risk scores.  Compl. ¶¶ 46, 57-58, 70.  Again, Ninth

22   Circuit precedent controls here.

23                    **B.    In any event, the comparative error argument is no defense to fraud.**

24          Defendants argue that *Azar* ushered in a new "comparative" standard for the FCA and accuracy

25   of diagnoses in the MA Program.  Defendants are lobbying for an MA payment system that does not

26   exist.

27          No "comparative error rate" analysis exists within the current payment system.  Nothing in the

28   MA risk adjustment payment process requires or provides for a comparison of error rates before an

1   MAO submits diagnosis codes for payment, or deletes known invalid diagnoses.  *See Swoben*, 848 F.3d

2   at 1168 ("Each diagnosis code submitted must be supported by a properly documented medical

3   record.").  Regardless of *Azar,* providers such as Sutter continue to be bound by both contractual and

4   regulatory provisions to report accurate data.  *See, e.g.*, 42 C.F.R. § 422.504(l)(3).  No court has

5   dismissed an FCA case based on a "comparative error rate" requirement.

6        Defendants essentially argue that the MA payment system that is in place—where diagnoses

7   must be documented in a medical record to sustain payment—is unlawful.  But challenging the legality

8   of a rule is no defense to fraud.  *See Cedars-Sinai Med. Ctr. v. Shalala,* 125 F.3d 765, 767 (9th Cir.

9   1997).  In *Cedars-Sinai*, the defendant hospitals in an FCA case sought a declaratory judgment that a

10  Medicare coverage rule violated the APA.  *Id.*  The Ninth Circuit explained, however, that such a

11  judgment would be no defense.  "If the Hospitals did indeed knowingly submit false claims in order to

12  receive payment for devices not covered under the [Medicare coverage] rule, the invalidity of the rule

13  will be no defense [to claims under the False Claims Act.]"  *Id.*[3]  Defendants cannot commit fraud,

14  knowingly violate the terms of the MA payment system, and then defend by challenging its legality.

15  Defendants agreed to follow Medicare's rules and regulations by signing a contract as an MA provider,

16  and those rules required medical record support for all reported diagnoses. Dissatisfaction with the MA

17  payment methodology does not entitle Defendants to self-help.

18       Defendants never explain how they would know any given MAO's error rate, or CMS's error

19  rate, to compare them before determining whether to submit a diagnosis known to be unsupported, or

20  determining not to delete a previously submitted diagnosis later found to be unsupported.[4]  Indeed,

21  Defendants never explain how they could have known even their own error rate, given that they ignored

22  red flags and structured their business practices to avoid identifying invalid diagnoses.  Applying *Azar*

23  as Defendants would have the Court do here leads to an absurd result.  By manufacturing the concept

24

25  [3] The Ninth Circuit adopted the reasoning of *Bryson v. United States*, 396 U.S 64, 68 (1969); *Dennis v. United States*, 384 U.S. 855 (1966); and *United States v. Weiss*, 914 F.2d 1514, 1522-23 (2d Cir. 1990).

26

27  [4] Their theory is also self-contradictory. Defendants contend both that it was impossible to determine whether an overpayment exists without comparing error rates, Mot. 15, while, at the same time, they admit to deleting unsupported diagnoses without comparing error rates, Mot. 16.  That

28  Defendants deleted unsupported diagnoses without comparing error rates undermines their stated premise that it was impossible to determine whether an overpayment exists without comparing errors.

1    that claims are payable, and no obligation to delete known unsupported diagnoses exists, until an

2    MAO's error rate exceeds CMS' error rate—and there is no process by which error rates are

3    compared—they guarantee themselves endless bounds to submit false diagnoses and keep the payment

4    in perpetuity with no redress.

5              **C.   Defendants premise their motion on disputed facts.**

6           Viewed in the most generous light, Sutter argues that the traditional Medicare data used to

7    calibrate the payment rates to MAOs contains errors that corrupt the payment model and lead to

8    systematic underpayment of MAOs.  According to Sutter, this would violate the "actuarial equivalence"

9    provision of the Medicare statute.  And so they conclude that MAOs must have a right to submit and

10   keep payments for false diagnoses submitted to CMS to compensate for the underpayment.  Even if this

11   argument had legal validity (which it does not), it heavily depends on facts that are not alleged in the

12   United States' Complaint.  The assumptions underlying Defendants' argument are at best premised on

13   disputed fact issues about whether MA providers such as Sutter and MAOs are systematically underpaid

14   under the existing payment model and whether Defendants could reasonably believe that they had a

15   right to submit and keep payments from unsupported diagnosis codes to compensate for that

16   underpayment.  A motion to dismiss is not appropriate to resolve such issues.

17          In their brief, Defendants rely on a hypothetical example involving 1,000 beneficiaries in

18   traditional Medicare (Parts A and B) and 1,000 identical beneficiaries in the MA Program (Part C) to

19   suggest that MAOs would be underpaid if they complied with their obligation to delete known invalid

20   diagnosis codes.  Mot. 7-8.  Sutter's hypothetical depends on a flawed assumption, however, that only

21   Part C providers have an obligation to submit accurate data to CMS.  That is not true.  CMS likewise

22   requires traditional Medicare providers to submit accurate claims data and often relies on diagnoses

23   submitted by those providers to make coverage and payment determinations.  For example, Part A

24   payments are based on "Diagnosis Related Groups" or DRGs.  *See* 42 C.F.R. § 412.60(c); Form HCFA-

25   1450/UB-92, FL 67 (instructing Part A providers that entering an incorrect diagnosis "may result in

26   incorrect assignment of a DRG and cause you to be incorrectly paid").  Similarly, under Part B,

27   Medicare typically only covers goods and services that are medically necessary, as supported by the

28   diagnosis code recorded in the patient's chart.  *See* 42 U.S.C. § 1395u(p)(1) ("Each request for payment

1    . . . for an item or service furnished by a physician or practitioner . . . shall include the appropriate

2    diagnosis code (or codes) as established by the Secretary for such item or service."); 42 C.F.R. §

3    424.32(a)(2) ("A claim for physician services . . . must include appropriate diagnostic coding for those

4    services . . . .").

5         In its hypothetical, Sutter assumes that traditional Medicare claims were never audited or

6    corrected either before or after they were used to calibrate the Part C (HCC) payment model.  But that

7    assumption is invalid, too.  The claim dataset used to calibrate the HCC model reflects a snapshot in

8    time.  Certain claims and diagnoses could have been corrected by the Part A and B providers that

9    submitted them or rejected by CMS before or after the claims dataset was generated to calibrate the

10   HCC model.  For example, in Sutter's hypothetical, the traditional Medicare provider might have

11   initially submitted claims reflecting 2,000 invalid diagnosis codes, but 500 of those diagnoses were

12   corrected before the dataset containing the remaining 1,500 claims was compiled to calibrate the HCC

13   model.  Likewise, Part A and B providers could later return money to CMS based on a retrospective

14   audit or an FCA enforcement action causing a lower payment to the Part A and B provider (less than the

15   $1 million in Sutter's hypothetical).  Indeed, this flaw in Sutter's hypothetical becomes clear if one

16   assumes that both the Part A and B provider and MA provider conducted retrospective audits.  The Part

17   A and B provider's audit reveals that claims totaling $100,000 were invalid, and the Part C provider's

18   audit reveals that 400 diagnoses were unsupported.  If the Part A and B provider returns $100,000 to

19   CMS and the Part C provider does not delete the 400 diagnoses, then CMS has paid $900,000 on the

20   traditional Medicare side and the MA provider retains $1 million – a windfall of $100,000.  If both the

21   traditional Medicare provider and the MA provider comply with their obligation to correct their data,

22   they continue to receive comparable payments.

23        The law demands that Sutter – like Part A and B providers – submit accurate data, correct

24   inaccuracies, and return payments received when it knows that diagnoses are invalid.  Even if this Court

25   were to find that Sutter's arguments about actuarial equivalence are somehow relevant to resolving this

26   FCA case, they are based on at best disputed issues of fact that are inappropriate to be resolved on a

27   motion to dismiss.

28

1    **IV.    Defendants argue that the common law claims require the United States to prove**
2              **overpayments.  That is incorrect.**

3         Sutter claims "the Complaint-in-Intervention's failure to allege any government overpayments
4    also requires dismissal of the government's common law claims, all of which depend on a showing that
5    the government overpaid Defendants."  Mot. 12, n.4.  Besides seeking recovery under the FCA, the
6    United States alternately seeks recovery under the common law remedies of unjust enrichment and
7    payment by mistake.  Neither of these common law theories requires the demonstration of scienter under
8    the FCA, nor is an action for unjust enrichment subject to the particularity standards of Rule 9(b).  *See*
9    *United States v. Mead*, 426 F.2d 118, 124 (9th Cir. 1970) (holding that the United States could recover
10   under the "common law doctrine of payment by mistake" despite failing to prove that the defendant
11   acted "knowingly" under FCA).  These remedies are supported by many of the same factual allegations
12   against Defendants as the FCA claims.  Compl. ¶¶ 150-55.

13        Defendants make just one argument to dismiss the common law claims in one sentence of a
14   footnote.  Mot. 12, n.4.  They contend the United States must allege that Sutter was overpaid to
15   overcome a motion to dismiss.  That is incorrect.  A claim for payment by mistake simply requires that
16   the United States plead that it made payments under an erroneous belief material to the decision to pay,
17   and that those payments flowed to Defendants.  *Mead*, 426 F.2d at 124.  The Complaint adequately
18   alleges that CMS made payments to MAOs, which in turn paid Defendants, under the mistaken belief
19   that the submitted diagnoses were supported by relevant medical records.  Nothing more is required.

20        Similarly, a claim of unjust enrichment requires that the United States plead and prove that
21   Defendants received a benefit, and retained and appreciated the benefit, and that further retention of the
22   benefit would be unjust.  *United States v. Bellecci*, 2008 WL 802367, at *6 (E.D. Cal. Mar. 25, 2008)
23   (collecting cases).  Unjust enrichment applies to benefits transmitted from a plaintiff to a defendant
24   through third parties.  *See, e.g., In re Packaged Seafood Prods. Antitrust Litig.*, 242 F. Supp. 3d 1033,
25   1089 (S.D. Cal. 2017)*; United States ex rel. Landis v. Tailwind*, 234 F. Supp. 3d 180, 206 (D.D.C.
26   2017).  Here, the Complaint alleges that Defendants received payments from CMS transmitted through
27   MAOs, to which they were not entitled.  Courts have long recognized claims for unjust enrichment
28   where health care providers receive taxpayer funds they should not have received.  *See, e.g., United*

1  *States v. Bourseau*, 2006 U.S. Dist. LEXIS 100313, at *38 (S.D. Cal. Sept. 29, 2006).  These allegations

2  sufficiently plead that the Defendants were unjustly enriched.

3  **V.    Any dismissal should be without prejudice and with leave to amend.**

4      Lastly, should the Court grant Defendants' Motion to Dismiss, in whole or in part, the United

5  States requests that any such dismissal be without prejudice and that the United States be granted leave

6  to amend.  *See* Fed. R. Civ. P. 15(a)(2); *see, e.g., Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048,

7  1052 (9th Cir. 2003) (holding that dismissal without leave to amend is improper unless the complaint

8  could not be saved by any amendment).

9                                              **CONCLUSION**

10      This Court should deny the motion.  In the alternative, any dismissal should be without prejudice

11  and with leave to amend.

12

13

14  Dated: August 27, 2019                 Respectfully submitted,

15                                       JOSEPH H. HUNT

16                                       Assistant Attorney General, Civil Division

17                                      */s/ Olga Yevtukhova*

18                                       ANDY J. MAO
                                     PATRICIA L. HANOWER

19                                       J. JENNIFER KOH
                                     A.  THOMAS MORRIS
                                     OLGA YEVTUKHOVA

20

21                                       Attorneys, Civil Division
                                     United States Department of Justice

22                                       DAVID L. ANDERSON

23                                       United States Attorney

24                                       BENJAMIN J. WOLINSKY
                                     Assistant United States Attorney

25                                       *Attorneys for the United States of America*

26

27

28