LATHAM & WATKINS LLP
Katherine A. Lauer (Bar No. 138010)
   *katherine.lauer@lw.com*
Jason M. Ohta (Bar No. 211107)
   *jason.ohta@lw.com*
Amy E. Hargreaves (Bar No. 266255)
   *amy.hargreaves@lw.com*
12670 High Bluff Drive
San Diego, CA 92130
Telephone: (858) 523-5400
Facsimile: (858) 523-5450

Steven M. Bauer (Bar No. 135067)
   *steven.bauer@lw.com*
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
Telephone: (415) 391-0600
Facsimile: (415) 395-8095

*Attorneys for Defendants Sutter Health and Palo Alto Medical Foundation*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* KATHY ORMSBY,<br><br>    Plaintiff,<br><br>v.<br><br>SUTTER HEALTH and PALO ALTO MEDICAL FOUNDATION,<br><br>    Defendants. | Case No. 3:15-cv-01062-LB<br><br>**DECLARATION OF FLORENCE L. DI BENEDETTO IN SUPPORT OF DEFENDANTS' UNOPPOSED MOTION TO STAY PROCEEDINGS**<br><br>Date: May 7, 2020<br>Time: 9:30 a.m.<br>Courtroom: Courtroom B, 15th Floor<br><br>Assigned Judge: Hon. Laurel Beeler<br>Complaint Filed: March 6, 2015<br>Trial Date: None Set |

I, Florence L. Di Benedetto, state and declare as follows:

1. I am the Senior Vice President and General Counsel of Sutter Health. In this role, I oversee all of the legal, risk, privacy, and information security affairs of Sutter Health and its affiliated entities ("Sutter"). I also am a member of Sutter Health's Executive Leadership Team ("ELT"), which is comprised of Sutter Health's President and CEO, Sarah Krevans ("CEO"), and her Senior Vice President direct reports. Sutter Health's ELT is responsible for leading and managing Sutter in a variety of critical areas, including patient care delivery, operations, and strategy. It also is responsible for providing coordinated direction to Sutter and its affiliates in the event of a disaster.

2. Sutter's disaster planning resources include a sophisticated emergency response system known as the Sutter Health Emergency Management System ("SHEMS"). SHEMS coordinates and directs Sutter's response to health care emergencies such as COVID-19, natural disasters, network outages, and other crises that uniquely challenge Sutter's operations and ability to provide patient care. SHEMS is a part of Sutter Health's Risk Services, function, which I oversee. As a result, I am the Sutter Health executive primarily accountable for SHEMS.

3. On January 23, 2020, Sutter activated SHEMS due to the COVID-19 pandemic and resulting healthcare emergency. Since its activation, SHEMS has operated 24 hours a day, seven days a week – virtually until March 9, 2020, and thereafter in-person from the SHEMS Incident Command Center located in Sutter's headquarters in Sacramento. I anticipate that SHEMS will continuously operate in this manner for the foreseeable future until the COVID-19 healthcare emergency is resolved.

4. At all times, SHEMS has an Incident Commander responsible for directing all SHEMS activities. I and three other Sutter Health Senior Vice Presidents take turns serving as the SHEMS Incident Commander on a rotational basis over recurring 16-day periods. During each recurring 16-day period, each Senior Vice President serves as the SHEMS Incident Commander for four days; leads SHEMS during its night shift for four days; and otherwise attends to COVID-19 issues in the SHEMS Incident Command Center or as part of ELT.

5. In addition to serving as a SHEMS rotational Incident Commander since SHEMS' activation on January 23, 2020, I work closely with Sutter Health's CEO, Sutter's ELT, and other senior Sutter leaders to coordinate Sutter's broader response to the COVID-19 emergency. In this regard, I meet with Sutter's CEO and the ELT seven days a week, and with other senior leaders as needed, to address numerous COVID-19 response issues. All ELT members, including me, have been redeployed to focus exclusively on addressing the numerous challenges presented by the COVID-19 pandemic. Virtually no other work is being done by Sutter's ELT.

6. As the Sutter executive accountable for SHEMS and a rotational Incident Commander, and having worked closely with Sutter Health's ELT on Sutter's broader COVID-19 response, I have personal knowledge of the significant anticipated impact of the COVID-19 emergency on California's healthcare system. Put simply, the anticipated demand of patients needing medical attention due to COVID-19 is expected to greatly exceed the capacity of California's healthcare system. During a March 23, 2020 press conference, California's Governor, Gavin Newsom, stated that computer modeling predicts California will need an additional 50,000 hospital beds to accommodate the anticipated surge in patients requiring medical care. California also is expected to need a drastic expansion of its critical care bed capacity, as well as a massive infusion of ventilators, testing kits, personal protective equipment ("PPE"), and other related supplies to properly care for its patients. California will need additional patient care providers and other staff to properly meet this demand.

7. I have been heavily involved in the planning and coordination of Sutter's efforts to help California confront this unprecedented crisis. Sutter's exclusive focus in this regard is to ensure that it is optimally prepared to meet the anticipated surge in patients and thereby save lives in the more than 100 communities it serves in Northern California. This is a massive, company-wide effort requiring the support of all Sutter employees.

8. Sutter's effort is largely focused on resources. Sutter's ELT members and their respective teams are working diligently to, among other things: (1) maximize Sutter's capacity to treat new COVID-19 patients while caring for other patients with non-COVID-19 illnesses, including by working to triple its critical care bed capacity, suspending all elective procedures,

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

DECLARATION OF FLORENCE L. DI BENEDETTO
ISO UNOPPOSED MOTION TO STAY
CASE NO. 3:15-cv-01062-LB

canceling all routine appointments, and otherwise focusing resources on the most critical of patient care needs; (2) ensure that Sutter's facilities and human resources – and most importantly, its nurses, doctors and other patient care providers – are optimally redeployed to treat the anticipated surge of patients, including by ensuring a process to grant emergency privileges for physicians; (3) secure additional PPE, testing equipment, ventilators, and other supplies essential to treating the anticipated surge of patients; (4) drastically expand Sutter's telehealth capabilities; and (5) secure and coordinate emergency funding for Sutter's hospitals. All of these activities require the immediate and sustained engagement of Sutter's administrative and clinical leadership, as well as the attorneys in Sutter's Office of the General Counsel ("OGC").

9. Surge planning is a critical part of this effort, particularly given recent extreme COVID-19 outbreaks in areas like Italy and New York. SHEMS is, therefore, coordinating and directing a round-the-clock coordinated surge planning effort in which teams of operators, clinicians, senior leaders and other employees utilize public health data and other resources to (1) anticipate worst-case scenarios in terms of patient surge, supply requirements, facilities capacity, and staffing needs; (2) assess the Sutter Health system's capability to handle a worst-case-scenario surge in every respect, from the space in its facilities (both hospital and ambulatory) to its human resources to its core support services such as supply chain; and (3) based on identified gaps, reconfigure and/or redeploy existing resources, as well as leverage additional resources as much as possible. This work, which is ongoing, will ultimately result in each Sutter affiliate preparing a surge plan for submission – through SHEMS – to Sutter's ELT for approval. This requires an immense amount of planning and coordination at all levels, and it further requires SHEMS and each affiliate to organize and direct teams of employees, often in ways that require them to spend substantial time away from their ordinary work activities.

10. Though Sutter's surge planning is still ongoing, it is clear that Sutter needs to mobilize substantial additional resources to confront the COVID-19 surge. For example, Sutter currently projects a need for as many as 900 intensive care unit ("ICU") beds, which exceeds its current capacity. Meeting this need will require the reconfiguration of many of Sutter's hospitals

and other facilities, such as ambulatory surgery centers, to accommodate the additional ICU beds and/or to make room for non-critical care patients. Sutter also will require additional ventilators, anesthesia machines, critical care monitors, IV pumps, PPE, and other supplies to accommodate the projected patient care surge. Sutter's Supply Chain function is working non-stop to try to secure these and other materials, both from vendors and donation sources.

11. Sutter also has partnered with the State of California to address this crisis. California's Secretary of Health and Human Services has asked Sutter to make the Pacific Campus of Sutter's old California Pacific Medical Center ("CPMC") available as a healthcare facility for providing patient care. Discussions with the State are underway, and teams of Sutter operators and attorneys are extremely busy working to facilitate a potential State lease of the Pacific Campus. Sutter teams also are working with the State to assist them in determining how the State will equip, staff and operate the facility. To facilitate this effort, James Conforti, Sutter's Chief Operating Officer, and Jeff Gerard, Sutter's Chief Strategy Officer, have begun working with State officials in the Office of Emergency Services to assist them in their effort to operationalize this facility. Mr. Gerard is working full-time in this capacity, and Mr. Conforti further supports this effort by chairing the California Hospital Association's Rapid Response Team. We also anticipate that Sutter attorneys will provide ongoing legal advice and counsel to prepare the facility for use by the State. And to support the operations of the facility, we expect Sutter will provide support services such as engineering resources. This is a massive effort requiring the rapid mobilization of significant resources within Sutter and substantial coordination with the State.

12. The above-described activities are just a part of Sutter's intense, collective effort to confront the COVID-19 emergency. It is in the public interest and a matter of life and death, and Sutter therefore must focus all of its resources on this critical mission. No part of Sutter Health is untouched by this emergency. Every support function is impacted.

13. This includes Sutter's legal function. With very limited exceptions, I work exclusively on Sutter's COVID-19 response and will do so for the foreseeable future, both as a rotational Incident Commander of SHEMS, and as a member of Sutter's ELT. Almost all of this

work is non-legal and focused on ensuring that Sutter can meet the patient care demands of the COVID-19 emergency. To the extent that I am required to oversee legal issues during this time, almost all of them are unique issues related to the COVID-19 emergency that require extra attention. My day-to-day legal work has largely been suspended during this emergency.

14. The other attorneys in Sutter's Office of the General Counsel have similarly redirected their attention to ensuring that Sutter can meet the anticipated demand of the COVID-19 emergency, and their participation in this effort is as essential as mine. This includes the members of the OGC who routinely manage litigation and require strategic litigation direction from members of Sutter's ELT, including me and Sutter's CEO. These attorneys have been redirected to address the myriad unique legal issues triggered by the COVID-19 emergency, including, but not limited to: (1) significant legal issues relating to patient care, such as scope of practice and physician privilege issues; (2) labor and employment law issues involving Sutter and its workforce of approximately 55,000 employees, including but not limited to wage-and-hour issues, union issues, and employee benefit and leave issues; (3) reimbursement issues; (4) real estate issues, particularly those triggered by Sutter's potential lease of the old CPMC Pacific Campus to the State of California; (5) technological issues such as telehealth and ensuring a stable platform for work to continue remotely, where necessary and appropriate; (6) a multitude of contractual issues triggered by these emergent circumstances; (7) hospital and ambulatory licensure issues; and (8) regulatory questions around fraud and abuse issues, billing issues, and privacy issues stemming from Sutter's rapid implementation of new service modalities and alternative care sites. These are just a small sample of the wide range of legal issues confronting Sutter's OGC right now. Sutter anticipates that this disruption will only become more acute in the coming months.

15. Due to my redeployment and that of my team of OGC attorneys to focus on supporting Sutter's COVID-19 response efforts, Sutter's ability to strategically manage its litigation is severely compromised and will be for the foreseeable future. Not only are OGC attorneys largely unavailable to assist with litigation-related activities due to their redeployment, but much of the OGC's support staff and their related functions are also unavailable or severely

compromised. Moreover, Sutter employees other than clinical staff and limited administrative personnel are working remotely, and are thus subject to a number of inefficiencies, including but not limited to technological difficulties caused by a sudden surge of remote system users. This has caused Sutter's e-Discovery team to operate at greatly reduced capacity because of email search function delays, limitations on the volume of data that can be uploaded remotely, and other similar disruptions. In addition, hard copy documents may be unavailable due to the closure of many of Sutter's administrative offices. And Sutter's IT function (which supports Sutter's e-Discovery team) has been focused not just on the above-referenced telehealth issues, but also an increased volume of cyberattacks and other privacy and information security issues resulting from the deployment of new technologies designed to assist with the COVID-19 emergency.

16. Witnesses also are largely unavailable. OGC attorneys, members of Sutter's e-Discovery team, and Sutter's outside counsel routinely rely on witnesses from all areas of the Sutter system to verify facts, provide declarations, give deposition and/or trial testimony, assist with litigation-related investigations, supply documents, assist expert witnesses, and otherwise support Sutter's litigation activities. Most, if not all witnesses in the Sutter system are unavailable or severely compromised at this time because their efforts, like those of my OGC attorneys, have been redirected to supporting Sutter's COVID-19 response.

17. In short, as to every critical litigation management activity – including executive level strategic decision-making, the review of briefs and pleadings, the gathering of information and documents, and the utilization of witness support – Sutter is severely compromised due to its unprecedented system-wide mobilization of resources to confront COVID-19. As a result, Sutter would be strategically harmed if this litigation were to proceed on the current schedule because it is unable to divert resources away from its response to the COVID-19 public health emergency.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on 3/30/2020, at Sacramento, California.

*[signature]*

Florence L. Di Benedetto